An appropriate order follows.

In re **DOCTORS HOSPITAL OF HYDE PARK, INC.,** Debtor.

**Gus A. Paloian, Chapter 11 Trustee of Doctors Hospital of Hyde Park, Inc.,** Plaintiff,

v.

**LaSalle Bank National Association, f/k/a LaSalle National Bank, as Trustee for Certificate Holders of Asset Securitization Corporation Commercial Pass–Through Certificates, Series 1997, D5, by and through its servicer, Orix Capital Markets, LLC,** Defendant.

Bankruptcy No. 00 B 11520.
Adversary No. 02 A 00363.

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Oct. 4, 2013.

John Costello, Esq., Scott A. Semenek, Jeffrey L. Gansberg, Esq., Yeny Estrada, Edwards Wildman Palmer LLP, Chicago, IL, for Debtor/Plaintiff/Trustee.

Kathryn M. Gleason, Esq., Office of the U.S. Trustee, Chicago, IL.

Lewis T. Stevens, Esq., Michael Warner, Esq., Simon Warner & Doby LLP, Fort Worth, TX, Howard A. Adelman, Esq., Adam P. Silverman, Esq., Adelman, Gettleman, Merens, Berish & Carter, Ltd., Chicago, IL, for LaSalle Bank.

N. Neville Reid, Fox, Hefter, Swibel, Levin & Carroll LLP, Chicago, IL, for Unsecured Creditors Committee.

James M. Witz, Esq., Frances Gecker, Esq., Freeborn & Peters, Chicago, IL, for Stephen Weinstein.

David T.B. Audley, Esq., Michael T. Benz, Esq., Richard Wohlleber, Chapman and Cutler LLP, Chicago, IL, for LaSalle Bank N.A. as Trustee for Certificates–Holders of Asset Securitization Corp. Commercial Mortgage Pass–Through Certificates, Series 1997 D5, and through its servicer, ORIX Capital Markets, LLC.

Nancy A. Peterman, Esq., Jane B. McCullough, Esq., Kimberly M. DeShano, Esq., Greenburg Traurig, PC, Chicago, IL, for Asset Securitization Corp. and Nomura Asset Capital Corp.

Stacy J. Flanigan, Winston & Strawn LLP, Chicago, IL, for Dan K. Webb.

*COUNTS VIII, IX AND X AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW (MODIFYING PARTS I AND II)*

JACK B. SCHMETTERER,
Bankruptcy Judge.

This proceeding was tried on remand after appeals to the Seventh Circuit by both parties from a judgment entered following the first trial. The parties rested after further trial on issues remanded, and final arguments were filed in writing. Findings of Fact and Conclusions of Law are hereby made and entered in the following parts:

 I. Introduction and Summary of Findings and Conclusions ........................ 569

 II. Authority to Enter Final Judgment ......................................... 585

 III. Findings of Fact as to Solvency Issues ..................................... 592

 IV. Conclusions of Law as to Solvency Issues................................... 625

 V. Findings of Fact as to Bankruptcy Remote Entity Issues ...................... 664

 VI. Conclusions of Law as to Bankruptcy Remote Entity Issues ................... 694

Conclusions: Entry of Judgment on Each Count for Defendant........................ 722

## I.

## INTRODUCTION AND SUMMARY OF FINDINGS AND CONCLUSIONS

Plaintiff seeks to recover allegedly fraudulent transfers made to Defendant during the period from October 1, 1997 through the date of the bankruptcy filing by the Debtor on April 17, 2000, Doctors Hospital of Hyde Park, Inc. The fraudulent transfers were said to have consisted of payments of rent, to the extent that they exceeded fair market value, during a period of time when Doctors Hospital was insolvent. It is claimed that the rent came from the Debtor, while the defense asserts that it mostly came from a separate entity (referred to below as the "bankruptcy remote entity")

After a first trial, it was held that Plaintiff had proved insolvency during the entire period from August 1997 to April 2000, but judgment was entered only as to fraudulent transfers of rent that Doctors Hospital made directly to Defendant before July 1998. As to the transfers after that date, it was determined that the transfers were not made with assets of the Hospital, but were paid with assets of an

entity named MMA Funding, LLC. MMA Funding, LLC was created in 1997 to act as a special purpose borrower on a loan from Daiwa–Healthco–2 LLC secured by Doctors Hospital's accounts receivable, an entity whose assets were asserted to be "bankruptcy remote," *i.e.*, intended not to be administered in a possible Doctors Hospital bankruptcy.

Doctors Hospital of Hyde Park, Inc. (the "Hospital") filed its related chapter 11 Bankruptcy case on April 17, 2000. On March 28, 2001, LaSalle filed its proof of claim in the bankruptcy case in the amount of $60,139,317.04 based on asserted obligations of Doctors Hospital arising from its guarantee of a loan. Doctors Hospital filed this above titled adversary complaint pleading twenty-eight counts against a number of individuals and entities, Dr. James Desnick, and many others.[1] However, Counts VIII, IX, and X of the adversary complaint asserted claims only against LaSalle Bank National Association, f/k/a LaSalle National Bank as trustee for certain asset certificate-holders of Asset Securitization Corporation Commercial Mortgage Pass–Through Certificates, Series 1997, D5 ("LaSalle"). Those counts serve as a counterclaim to the LaSalle claim. On April 22, 2004, Gus A. Paloian (the "Trustee") was appointed as chapter 11 Trustee for Doctors Hospital, and he pursued those counts.

Counts VIII, IX, and X of this adversary complaint against LaSalle seek (1) to void as fraudulent transfers a guaranty and related security agreement that Doctors Hospital made in connection with a loan from LaSalle's predecessor, Nomura Asset Capital Corporation, to Doctors Hospital's landlord (Count VIII) and (2) to void a lease held by Defendant as Nomura's assignee or to recover as fraudulent transfers payments of rent that Doctors Hospital had made to LaSalle in excess of the property's fair market rental value (Counts IX and X). Count X was brought pursuant to 11 U.S.C. § 548(a)(1)(B). Counts VIII and IX were brought pursuant to the Illinois Uniform Fraudulent Transfer Act ("IUFTA") and 11 U.S.C. § 544(b)(1), which is asserted to permit the trustee to avoid a transfer of the debtor's property under applicable non-bankruptcy law. Those three counts were consolidated for trial.

The first trial ("First Trial") on the consolidated counts originally took place in 2006. Findings of Fact and Conclusions of Law were made and entered and a Final Judgment Order entered. *Doctors Hosp. of Hyde Park Inc. v. Desnick, et al. (In re*

---

1. On or about April 1, 2004, Doctors Hospital filed with this Court a Settlement Agreement between Doctors Hospital, Desnick, and all the other defendants except LaSalle, Stephen Weinstein, and Robert Krasnow. The Hospital's claims against Weinstein and Krasnow were severed from Counts against LaSalle for purposes of trial. *Doctors Hosp. of Hyde Park, Inc. v. Desnick, et al. (In re Doctors Hosp. of Hyde Park, Inc.)*, 360 B.R. 787, 798 ¶ 30 (Bankr.N.D.Ill.2007). Krasnow was dismissed as a party to the case and all counts against him dismissed, both with prejudice on May 21, 2007. (02 A 00363, Dkt. No. 653) Counts against Weinstein were dismissed, and he from the case, with prejudice on October 22, 2007 (Dkt. No. 702). Additionally, La-

Salle filed a counterclaim in the adversary proceeding, seeking approximately $60 million based on the guaranty and security agreement related to the loan. (Dkt. No. 183). All Counts of that Counterclaim were dismissed on February 26, 2004 except for LaSalle's breach of guaranty claim (Count II) against Doctors Hospital. (Dkt. No. 309). The grant of Summary Judgment entered against LaSalle on Count II of its counterclaim was affirmed by the District Court Judge on appeal and was undisturbed on appeal to the Seventh Circuit. *LaSalle N.A. Bank v. Paloian*, 406 B.R. 299, 310 (N.D.Ill.2009); *Paloian v. LaSalle Bank N.A.*, 619 F.3d 688, 692 (7th Cir.2010).

*Doctors Hosp. of Hyde Park, Inc.),* 360 B.R. 787 (Bankr.N.D.Ill.2007) ("Initial Opinion"). It was held therein that rental payments made after July 7, 1998 were not fraudulent transfers because they were not made with assets of Doctors Hospital. *Id.* at 853. LaSalle's request to void the lease pursuant to which rental payments were made was denied in the Judgment and that ruling was not appealed. For rental payments made prior to July 7, 1998, the Trustee was awarded damages to the extent that rental payments were found to have exceeded fair market value plus interest, resulting in judgment in favor of the Trustee allowing his counterclaim in the amount of $4,342,238.43. Both parties filed motions to alter or amend the judgment, which were denied in Additional Findings of Fact and Conclusions of Law dated July 25, 2007. *In re Doctors Hosp. of Hyde Park, Inc.,* 373 B.R. 53 (Bankr. N.D.Ill.2007). Separate appeals were filed and were consolidated by a District Court Judge. That Judge affirmed all Findings and Conclusions. *LaSalle N.A. Bank v. Paloian,* 406 B.R. 299, 366 (N.D.Ill.2009). Appeal to the Seventh Circuit Court of Appeals followed.

### Remanded Issues and Further Second Trial

The proceeding is now before this court on remand from the Court of Appeals for the Seventh Circuit. *Paloian v. LaSalle Bank, N.A.,* 619 F.3d 688 (7th Cir.2010) (the "Remand Opinion"). Many adjudications in this Court's Initial Opinion made after the First Trial were accepted by the Remand Opinion and are deemed to continue and apply herein. As stated by the

Remand Opinion, issues "pretermitted" by that Opinion have been decided, are law of the case, and are not within the scope of remand. *Id.* at 692.[2] At issue following remand is the holding following the First Trial that post-July 1998 rental payments were not fraudulent transfers. The remand order sought further consideration of two issues: *First,* whether Doctors Hospital was insolvent at any time before filing for bankruptcy. Solvency is a significant issue because if the Hospital was not insolvent when the payments in issue took place, then Trustee Paloian may not recover as fraudulent transfers under 11 U.S.C. §§ 544(b)(1) and 548(a)(1)(B) the payments that were made to LaSalle even if those payments were found to have been made from property of the Debtor. *Second,* whether there was a true sale to MMA Funding, LLC of accounts receivable from the Hospital, and that issue further involves the question whether MMA Funding, LLC was in fact an actual business entity and not a part, department, or function of the Debtor. *Paloian,* 619 F.3d at 696. The status of MMA Funding, LLC is therefore relevant to Counts IX and X of the adversary complaint, because if it was not a true business entity dealing with its own funds, then payments made by it to LaSalle were from the Hospital's assets and might be recoverable by the Trustee.

All evidence introduced at the original trial was re-offered at the remand trial and admitted without objection. Additional evidence and stipulations were approved and admitted. Pursuant thereto, the following Findings of Fact and Conclusions of Law are made and entered.

---

**2.** Issues decided in the *Initial Opinion* and not impacted by the Remand Opinion include findings that: (1) All Lease payments made by the Hospital exceeded reasonably equivalent value; (2) the "Cash Collateral Account" was not a true escrow account; and (3) the parties post-Agreement course of performance did

not modify the Daiwa Loan Agreement such that the Hospital should be treated as the actual borrower. *Doctors Hosp. of Hyde Park, Inc. v. Desnick, et al. (In re Doctors Hosp. of Hyde Park, Inc.),* 360 B.R. 787, 838 (Bankr. N.D.Ill.2007).

## Undisputed Background Facts

### A. *Parties and Related Entities*

**Doctors Hospital of Hyde Park, Inc.** was an Illinois Subchapter–S corporation that had its principal place of business at 5800 South Stony Island Avenue, Chicago, Illinois. From approximately August 24, 1992 until April 17, 2000, it was owned and controlled by Dr. James Desnick. (Jt. Ex. 202 ¶ 1)[3]

**James Desnick** was, at all relevant times, the sole shareholder and director of Doctors Hospital. (Jt. Ex. 202 ¶ 2)

**Daiwa Healthco–2 LLC** ("Daiwa") is a Delaware limited liability company with its place of business in New York City, New York. (Jt. Ex. 202 ¶ 3)

**HPCH LLC** ("HPCH") was a Delaware limited liability company that acquired in 1997 the Doctors Hospital property. HPCH was owned 99% by HPCH Partners, L.P. and 1% by its managing member, HP Membership. Desnick was HPCH's managing partner, owned 100% of HP Membership and approximately 99% of HPCH Partners, L.P. (Jt. Ex. 202 ¶ 4)

**LaSalle Bank National Association, f/k/a LaSalle National Bank as Trustee for Certificate Holders of Asset Securitization Corporation Commercial Mortgage Pass–Through Certificates, Series 1997, D5,** by and through its Servicer, Orix Capital Markets, LLC ("LaSalle"), is a trust whose Trustee, LaSalle Bank National Association is a national banking association with its principal place of business in Illinois. (Jt. Ex. 202 ¶ 2)

**Medical Management of America, Inc.** was a Delaware corporation and purported manager of Doctors Hospital substantially owned and controlled by James Desnick. (*see* Jt. Ex. 202 ¶ 12)

**MMA Funding, LLC** was an Illinois limited liability corporation owned 99% by Doctors Hospital and 1% by MMA Funding, Inc. (also owned and controlled entirely by Desnick), the special purpose manager of MMA Funding, LLC. (Jt. Ex. 202 ¶ 11)

**Nomura Asset Capital Corporation** ("Nomura") is a Delaware corporation with its principal place of business in New York City, New York. (Jt. Ex. 202 ¶ 14)

### B. *History of Doctors Hospital*

Doctors Hospital was built in 1916 by the Illinois Central Railroad as a component of its employee health insurance plan. The railroad sold the facility in 1960 and it became a not-for-profit community hospital. Dr. James Desnick purchased Doctors Hospital of Hyde Park in 1992 for approximately $2.4 million through an entity he controlled, HPCH Partners, L.P. The real estate and certain fixtures were located at 5800 South Stoney Island Avenue in Chicago and titled to HPCH, LLC.[4]

---

**3.** These Findings of Fact and Conclusions of Law include references to evidence from the first trial (as defined below) as well as new evidence adduced during the trial on remand. All exhibits admitted at the first trial were readmitted pursuant to the Amended Final Pretrial Order on Remanded Hearing dated March 24, 2011 (Dkt. No. 771, the "Pretrial Order"). Citation to the record will be as follows: trial transcript from the first trial in 2006 including the volume number and page number thereof (06 Tr. Vol. ——: ——); trial transcript from the remand trial, including the volume number and page number thereof (12 Tr. Vol. ——: ——); joint exhibits from the first trial (Jt. Ex. ——); Plaintiff's exhibits from the first trial (PL Ex. ——); Defendant's exhibits from the first trial (Def. Ex. ——); joint exhibits from the remand trial (New Jt. Ex. ——); Plaintiff's exhibits from the remand trial (New Pl. Ex. ——); Defendant's exhibits from the remand trial (New Def. Ex. ——).

**4.** 99% of HPCH was owned by HPCH Partners, L.P. The remaining 1% was owned by its managing member, HP Membership. Dr.

Doctors Hospital ("Debtor" or "Hospital") managed the hospital's business operations. The Hospital leased the hospital property from HPCH.

Doctors Hospital's revenue was largely derived from reimbursements from the government in the form of Medicare and Medicaid reimbursements, as well as payments from private insurance companies such as Blue Cross and Blue Shield.

### C. The Daiwa Loan

Trustee Paloian appealed from the original judgment holding that certain transfers to LaSalle's account were not property of Doctors Hospital and therefore could not be recovered by the Hospital (as debtor) as fraudulent transfers. The transfers at issue arise from a March 31, 1997 loan from Daiwa to MMA Funding, LLC, a wholly-owned subsidiary of Doctors Hospital. Loans were made during a period from October 1997 until Doctors Hospital's bankruptcy petition was filed in April 2000. The Daiwa loan was a revolving loan designed as a healthcare securitization program. Under this type of program, Daiwa loaned funds to the wholly-owned subsidiary of participating entities and in exchange, participating entities contributed receivables to their wholly-owned subsidiaries as security for a loan. The Daiwa Loan was memorialized in several documents: (i) The Loan and Security Agreement between MMA Funding, LLC and Daiwa ("Daiwa Loan Agreement"); (ii) The Healthcare Receivables Contribution Agreement between MMA Funding and Doctors Hospital ("Contribution Agreement"); (iii) The Depository Agreement between Doctors Hospital, MMA Funding, LLC, Daiwa and Grand National Bank; and (iv) Assignment of Healthcare Receivables Contribution Agreement as Collateral Security by MMA Funding, LLC in

favor of Daiwa ("MMA Funding Assignment"). (Jt. Ex. 202 ¶ 40)

Parties to the Daiwa loan, MMA Funding, LLC and Daiwa, indicated through certain documents that they intended MMA Funding, LLC to be a special purpose vehicle that would protect Daiwa from the possibility of a bankruptcy case to be filed by Doctors Hospital. *See e.g.,* Credit Approval Memorandum Daiwa Securities America Medical Management of America, Inc. (Jt. Ex. ¶ 117); Shefsky and Froelich Legal Opinion (Def. Ex. 16) For this reason, transaction documents identified the subsidiary (MMA Funding, LLC) as the borrower but not the participating entity (Doctors Hospital), and Daiwa as the lender. According to the terms of the transaction documents in this case, Doctors Hospital was to contribute its accounts receivable to MMA Funding, LLC. In return for loan disbursals from March 1997 to March 2000, Doctors Hospital allegedly contributed all of its healthcare receivables to MMA Funding, LLC pursuant to the Contribution Agreement. MMA Funding, LLC then assigned the receivables as collateral security in favor of Daiwa under an agreement titled "Assignment of Healthcare Receivables Contribution as Collateral Security by MMA Funding, LLC in Favor of Daiwa." Daiwa then agreed to loan funds in the amount of $25 million to MMA Funding, LLC in exchange for a security interest in those receivables. Pursuant to this exchange, Daiwa forwarded loan advances to a bank account in the name of MMA Funding, LLC. Daiwa and MMA Funding, LLC were at all times the only signatories to the loan transaction documents. The loan documents stated that only MMA Funding, LLC could borrow and repay the loan. The agreement also required MMA Fund-

Desnick owned 100% of HP Membership and a controlling interest in HPCH Partners, L.P.

ing, LLC to submit borrowing base certificates to Daiwa in connection with each advance under the loan.

The loan documents also provided that MMA Funding, LLC was to designate the account into which Daiwa would transfer loan disbursals. From April 1997 to July 1998, Daiwa transferred borrowings into an account titled in the name of MMA Funding, LLC at Grand National Bank. After July 1998, MMA Funding, LLC directed that new borrowings be deposited into an account controlled by LaSalle Bank pursuant to the terms of the Nomura loan, discussed below.

### D. The Nomura Loan and HPCH Lease

In August 1997 Nomura Asset Capital Corporation loaned $50 million to Doctors Hospital through HPHC LLC, the entity from whom Doctors Hospital leased the Hospital property. The obligations of HPHC under the loan were secured by the Hospital property and a lease between HPHC and Doctors Hospital, among other things. The Hospital promised to pay HPHC additional rent. HPHC gave Nomura a security interest in the rent owed by the Hospital. The Nomura loan was securitized and thereafter sold to a third party that bundled several billion dollars of commercial credit for sale to investors. The loan assets were transferred to a trust, of which LaSalle National Bank is the trustee and Orix Capital Markets is the servicer.

If MMA Funding, LLC actually was a lawful "bankruptcy-remote entity" then the Trustee will not be able to recover payments from the entity made to LaSalle as fraudulent transfers after July 1998. Again, in July or August of 1997, HPCH acquired legal title to the Doctors Hospital property from HPCH Partners LP. On August 28, 1997, Doctors Hospital entered

into an agreement with HPCH to lease the Hospital property for approximately $470,000 per month. On that same date, Nomura made a loan to HPCH in the amount of $50 million. Under its lease with HPCH, Doctors Hospital paid rent on a net basis equal to the debt service payment owed by HPCH on the Nomura loan. HPCH assigned to Nomura all of its rights in the HPCH Lease and rent due under it. The Nomura Loan was secured by the HPCH lease, the Hospital real estate, hospital equipment, accounts receivable, and other intangibles relating to Doctors Hospital. Doctors Hospital also executed and delivered a Guaranty to Nomura for the entire amount of the loan. The Hospital also executed an "Equity Pledge Agreement" that granted Nomura a security interest and lien on all of Doctors Hospital's 99% interest in MMA Funding.

It was established at the First Trial that although HPCH and Nomura were parties to the loan agreement and Doctors Hospital the loan guarantor, the Nomura Loan was intended primarily to benefit Desnick, and initially all proceeds of the Loan were deposited into an account held in the name of Desnick and his spouse. *Doctors Hosp. of Hyde Park, Inc. v. Desnick, et al. (In re Doctors Hosp. of Hyde Park, Inc.),* 360 B.R. 787, 804 (Bankr.N.D.Ill.2007). Doctors Hospital received none of the proceeds of the Nomura Loan. HPCH was alone responsible for debt service payments. Absent default of some kind, Doctors Hospital had no obligation to make debt payments.

On October 24, 1997, two months after entering into the loan agreement, Nomura transferred all its rights, title, and obligations under the loan to the Asset Securitization Corporation ("ASC"). ASC then immediately transferred all its rights, title, and obligations under the loan to LaSalle as ASC's Trustee. The Nomura Loan

thus became part of a pool of loans owned by LaSalle and serviced by Orix.

### E. Fraud Allegations Against the Hospital

In an agreement with the United States and the State of Illinois dated May 1999, the Hospital agreed to pay $4.5 million in settlement of allegations by the government that the Hospital had engaged in practices of so-called "up-coding" for services and therefore overcharged for Medicaid and Medicare services. The Hospital was also under federal investigation for allegedly fraudulent "kickback" schemes involving over $20.1 million of alleged medically unnecessary services billed to Medicaid and Medicare dating from 1993 through 1998.

### *Jurisdiction*

Under 28 U.S.C. § 1334(a) the district courts have exclusive jurisdiction over bankruptcy cases. Pursuant to 28 U.S.C. § 157(a) and its own Internal Operating Procedure 15(a), the District Court for the Northern District of Illinois had referred its bankruptcy cases to the bankruptcy judges of this District. Subject to the discussion below, when presiding over a referred case, a bankruptcy judge has jurisdiction under 28 U.S.C. § 157(b)(1) to enter orders and judgments in core proceedings. This adversary proceeding is core pursuant to 28 U.S.C. § 157(b)(2)(H) as a "proceeding[ ] to determine, avoid, or recover fraudulent conveyances." Venue is proper under 28 U.S.C. §§ 1408 and 1409.

### Authority to Enter Final Judgment

For reasons described more fully in Part II of the Conclusions of Law below, it is held that there is authority for a bankruptcy judge to enter final judgment on this action to recover fraudulent transfers under 11 U.S.C. §§ 544 and 548 notwithstanding *Stern v. Marshall,* —— U.S. ——,

131 S.Ct. 2594, 180 L.Ed.2d 475 (2011). This adversary proceeding seeks to recover judgment for alleged transfers under those provisions. Some courts have expressed concern that the reasoning of *Stern* calls into question the authority to enter judgment on that issue. (*See* Paloian's Brief Concerning Entry of Judgment, 02 A 00363, Dkt. No. 836, at 2–3) Following an order for briefing on the question, the Trustee indicated by his filing on October 10, 2011 that he does not consent to entry of final judgment on its claims by a bankruptcy judge. (*See* Paloian's Brief Concerning Entry of Judgment, 02 A 00363, Dkt. No. 836, at 3)

Although there are opinions going both ways on the issue, the Seventh Circuit has unequivocally found authority for a bankruptcy court to enter final judgment in an action for fraudulent transfer against a creditor who has filed a proof of claim. *Peterson v. Somers Dublin Ltd.,* 729 F.3d 741, 747 (7th Cir.2013) ("The current dispute comes within a bankruptcy judge's authority, notwithstanding *Stern,* because all of the defendants submitted proofs of claim as the Funds' creditors and thus subjected themselves to preference-recovery and fraudulent-conveyance claims by the Trustee.")

If final judgment is appropriately entered, the district court's standard of review will be under the clearly erroneous standard. Fed. R. Bank. P. 8013. If a bankruptcy judge does not have constitutional authority to enter final judgment on fraudulent conveyance claims then under Seventh Circuit law, the forthcoming Findings of Fact and Conclusions of Law may not be treated as proposed under this court's authority over controversies deemed related under 28 U.S.C. § 157(c). *Wellness Int'l Network, Ltd. v. Sharif,* 727 F.3d 751, 776 (7th Cir.2013) ("No statutory provision authorizes a bankruptcy court to

propose findings of fact and conclusions of law in a core proceeding; such a report and recommendation from the bankruptcy court is statutorily authorized only in non-core proceedings ...."); *But see Feuerbacher v. Moser*, No. 4:11–CV–272, 2012 WL 1070138, *9 (E.D.Tex. Mar. 29, 2012) (noting that "the vast majority of courts to confront the issue have concluded that bankruptcy courts nonetheless have unquestioned authority to submit proposed findings of fact and conclusions of law.") (citing cases).

### Summary of Key Findings:

For reasons set forth at length in Parts III, IV, V, and VI these Findings and Conclusions it will be held and found that:

1) Doctors Hospital was insolvent at all times from September 30, 1999 through April 17, 2000, not earlier, and therefore the sale in issue was effected prior to insolvency on March 31, 1997.

2) MMA Funding, LLC was a valid bankruptcy remote entity at all times from July 1998 onward.

3) MMM Funding, LLC purchased the Hospital's receivables in a true sale.

## SUMMARY OF FINDINGS AND CONCLUSIONS ON SOLVENCY ISSUES

### Scope of Remand Opinion

The parties disagree in many respects on the meaning and impact of the Remand Opinion on remand. As to solvency, LaSalle argues that Opinion conclusively decided several issues, and in so doing precluded those issues from consideration herein. The Trustee argues that only two discrete issues were remanded on the subject of solvency. For reasons described more fully in Part IV below, on remand, the entire solvency analysis has been reviewed based on all evidence received to determine if and when the Hospital became insolvent before filing for bankruptcy in April 2000. The detailed Findings of Fact and Conclusions of Law pertaining to solvency issues are found in Parts III and IV below. A summary of those Findings and Conclusions are set forth here.

### Count VIII was Removed from Consideration on Remand

For reasons described more fully in Part IV hereinbelow, it is held that Count VIII was removed from consideration on remand. LaSalle asserted that Count VIII of the Trustee's Adversary Complaint "is no longer in play on remand." (Solvency Brief 16 n.5) In Count VIII, the Trustee alleged that the Guaranty and the liens and security interests granted to secure it were avoidable as constructively fraudulent under the Illinois UFTA, 740 ILCS 160/1 et seq. The Trustee argued that a part of Count VIII remains alive on remand. Specifically, the Trustee argues that its request to recover aggregate payments made on the Nomura Loan to the extent those payments exceeded fair market rental value can be resolved on remand. (Trustee's Proposed Findings and Conclusions, Dkt. No. 895, at 36) (Adversary Complaint, 02 A 363, Dkt. No. 1, at 40) However, that request for relief was explicitly waived by the Trustee and was therefore was not preserved for decision on remand. (02 A 363, Dkt. No. 568, at 2)

### Summary of LaSalle's Arguments on Insolvency

LaSalle argues that the evidence on remand does not establish that the Hospital was insolvent at any time prior to its bankruptcy filing on April 17, 2000. It argues, to the contrary, that the evidence establishes that the Hospital was solvent at all times prior to its bankruptcy filing. Therefore, LaSalle argues that the Trustee has failed to establish the transfers in

question were fraudulent as defined by 11 U.S.C. § 548 and 740 ILCS 160/2.

### THE TRUSTEE FAILED TO ESTABLISH THAT THE HOSPITAL WAS INSOLVENT BEFORE SEPTEMBER 30, 1999

On remand, both parties offered extensive evidence consisting primarily of expert reports. The Trustee offered Plaintiff's Expert Report on Remand of Scott Peltz and Michael Lane. LaSalle offered Defendant's Expert Report prepared by Edward McDonough. Peltz and Lane concluded that the Hospital was insolvent by over $17.5 million as of September 30, 1997 and by over $17.2 million as of October 31, 1997 despite a holding in the Remand Opinion based on its review of the First Trial record that the Hospital was "comfortably solvent" as of August 28, 1997. Peltz and Lane reached these conclusions despite their inability to point to any change in the Hospital's financial condition during the period between August 1997 and October 1997.

Edward M. McDonough ("McDonough"), LaSalle's solvency expert on remand, challenged what he viewed as the Peltz and Lane's attempts to circumvent the Remand Opinion. McDonough provided his own calculations of the Hospital's Fair Value of Equity and concluded that the Hospital was solvent for all measurement periods through September 30, 1999. His report also criticized Plaintiff's Expert Report on Remand in several respects as described below.

In Plaintiff's Expert Report on Remand, Peltz and Lane relied on the "Capitalized Cash Flow Method" ("CCF Method") as their primary method for performing a balance sheet test of solvency. In the Initial Opinion, it was found that Peltz and Lane appropriately applied the CCF Method on a going concern basis to compute the balance sheet test. *Doctors Hospital of Hyde Park, Inc. v. Desnick, et al.*

*(In re Doctors Hosp. of Hyde Park, Inc.)*, 360 B.R. 787, 854 (Bankr.N.D.Ill.2007). The first phase of that method of computation normalizes the company's cash flow. The process of normalization incorporates the value of assets needed to produce cash flow but excludes non-operating assets and liabilities. (12 Tr. Vol. IV: 481–82) Once the cash flow is normalized to reach "Debt–Free Cash Flow," a growth rate and a capitalization multiple are applied to reach an "Indicated Enterprise Value, Before Adjustments." Next, non-operating assets are added to the value to obtain the "Indicated Enterprise Value." Subtracted from that amount are "Claims on Enterprise Value" to reach the final "Indicated Fair Value of Equity" (the ultimate solvency conclusion).

### A. Period From August to October 1997

On remand, Peltz and Lane concluded that the Hospital was insolvent by over $17.5 million as of September 30, 1997 and by over $17.2 million as of October 31, 1997. LaSalle questions how this could be so because the Remand Opinion found the Hospital to be "comfortably solvent" on August 28, 1997. LaSalle argues this conclusion cannot be correct as neither Peltz nor Lane could identify any change in financial condition of the Hospital between August 28 and October 31, 1997.

The Trustee responded that the Hospital's apparent quick descent into insolvency "is simply the result of the Seventh Circuit's unsupported finding" in the Remand Opinion. (PL's Executive Summary of Final Argument, at 6) While agreeing that the Seventh Circuit's fact determination is binding on remand, LaSalle contends that two anomalies in the Opinion create a misleading perception that the Hospital experienced a sudden financial deterioration.

According to the Trustee, the Remand Opinion first incorrectly found that this Court had found the Hospital insolvent only as of August 28, 1997. In fact, insolvency was found by the Opinion following the First Trial from that date to the date of the Hospital's bankruptcy petition in April 2000. Peltz and Lane felt free to examine the Hospital's financial status at any date after August 28, 1997 for that reason. The Trustee now argues that his experts could not ignore evidence of insolvency because the Remand Opinion made a finding limited to one date. The Remand Opinion stated that "[t]he discounted-cash-flow analysis showed that the Hospital was solvent in August 1997—indeed, comfortably solvent." *Paloian v. LaSalle Bank N.A.*, 619 F.3d 688, 693 (7th Cir. 2010).

Secondly, the Trustee disputes the Remand Opinion's requirement that Peltz/ Lane should add an $18.5 million asset to the Hospital's August 1997 balance sheet in order to offset a liability that Peltz and Lane argue they did not treat as a liability. The Trustee contends that Peltz/Lane had actually made a normalizing adjustment to the Hospital's income for fraudulent earnings, something he argues is quite different from a liability.

For reasons stated more fully in Part IV of the Conclusions of Law hereinbelow, and accepting the Remand Opinion's view of the evidence before it, Peltz and Lane are found to have been unable to explain satisfactorily the Hospital's apparent quick descent into insolvency from August to October 1997. Furthermore, as explained below, Peltz's arguments against consideration of Desnick's wealth were rejected by the Remand Opinion. His attempts to

reargue the issue are unavailing in light of that prior ruling that is law of the case.

### B. LaSalle's Challenges to Peltz's Trailing–Twelve–Month as Adjusted Methodology

At the trial on remand, LaSalle objected to the admissibility of Plaintiff's Expert Report on Remand on the grounds that it does not satisfy the test established by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). That objection was overruled and Plaintiff's Expert Report on Remand was admitted into evidence. Defendant argues that, even though the Report was admitted at trial, the sufficiency and weight of that Report and supporting testimony should be considered. (Solvency Brief 27) *Wechsler v. Hunt Health Sys., Ltd.*, 381 F.Supp.2d 135, 141 (S.D.N.Y.2003).

McDonough first critiqued Peltz's use of the Trailing–Twelve–Month as Adjusted Methodology ("TTM Methodology") because he concluded it was based on unreliable data and suspect adjustments.[5] Peltz testified that he used a trailing-twelve-month methodology, based on the Hospital's internal monthly financial statements, only to provide a check on their solvency analysis. Though Peltz admitted that the internal statements were unreliable, he used them because, he contended, they were the only records available to determine whether anything had occurred between the year-ends that would change the solvency analysis. In addition, Peltz adjusted the monthly data to match the then current available audited financial statements. Peltz contend that this is an accepted practice for mid-year valuation. For reasons stated more fully in Part IV

---

**5.** Lane did not assist Peltz in preparing the TTM as Adjusted Methodology. (12 Tr. Vol. VI: 898–99).

of the Conclusions of Law hereinbelow, the analysis presented in Plaintiff's Expert Report on Remand using the audited financials is sufficient to reach a conclusion on the date of the Hospital's date of insolvency without addressing the propriety of Peltz's use of the internal financials.

Plaintiff's Expert Report on Remand presents a solvency conclusion based solely on the Hospital's audited financials and solvency valuation dates of September 30, 1997, September 30, 1998, September 30, 1999 and March 31, 2000, with the use of "retrojection" to assess the Hospital's solvency at all points between those measuring dates. This approach is the same as that undertaken by Peltz and Lane in their first expert report used at the First Trial. Plaintiff's Expert Report on Remand treats the TTM Methodology as a test to the main solvency analysis.

### C. Challenges to Peltz/Lane's Capitalization of Normalized Cash Flow Analysis

#### (1) Challenges to Peltz/Lane's Calculation of Normalization of Income

*(a) $4.638 Million Adjustment for Fraud*

In attempting to normalize the Hospital's cash flow, Peltz/Lane adjusted its income for 1997 by $4.6 million and 1998 by $2.3 million. This adjustment was based on earnings argued to be derived from Medicare/Medicaid fraud. The numbers, based on a contemporaneous calculation made by Coopers & Lybrand, were not treated by Peltz and Lane as liabilities that might be offset by assets such as Desnick's wealth. Instead, Peltz and Lane made the adjustment at what they describe as the "preliminary stage" of their insolvency analysis to reach a normalized income that would appear realistic to a hypothetical buyer. Peltz cited several reasons not to apply Desnick's wealth to

offset the deduction, including that he believed that a hypothetical buyer would not assume future payments from Desnick would be forthcoming. Peltz also contended that including income derived from fraud increased and therefore distorted the Hospital's value.

LaSalle argues that in Plaintiff's Expert Report on Remand, Peltz and Lane "zeroed out" the deductions they took from the Hospital's income in 1997 and 1998 for contingent upcoding and kickback liability as required by the Remand Opinion. Peltz and Lane did this by offsetting those deductions against the $18.5 million in settlements paid by Desnick in 1999 and 2000. However, according to LaSalle, Peltz and Lane imposed a similar, but different, deduction in the Hospital's income in 1997 and 1998. In Plaintiff's Expert Report on Remand, Peltz and Lane relied on a $4.638 million "reserve" for contingent future upcoding liability identified in the Coopers & Lybrand Report. That Report was available to Peltz and Lane at the First Trial, and was analyzed and admitted at the First Trial without any deduction from the Hospital's 1997 and 1998 income based on the "reserve." Without this reduction, and keeping all of Peltz and Lane's other calculations constant, the Hospital had a positive Fair Value of Equity as of September 30, 1997 and 1998.

For reasons stated in Part IV of the Conclusions of Law, the reduction in the Hospital's income based on the Coopers and Lybrand reserve for upcoding was improper absent valuing the contingent asset of Desnick's wealth. Because Peltz/Lane valued did not assign any value to Desnick's wealth in their calculation, the reduction in the Hospital's income for upcoding must be erased.

#### (b) $1.2 Million Add–Back in Litigation Costs

McDonough included an add-back of $1.2 million in extraordinary litigation ex-

penses in 1999 paid by Desnick. LaSalle argues the amount was extraordinary because it appears only once in the entire history of the Hospital's audited financial records. In preparing his calculation, McDonough assumed that Desnick paid for these litigation costs, further supporting in his view the add-back of the expenses.

Peltz and Lane did not add back the $1.2 million for reimbursement of legal costs in 1999 in Plaintiff's Expert Report on Remand for the following reasons: (1) assuming such a payment from Desnick constitutes impermissible hindsight; (2) McDonough admitted at trial that he does not know whether Desnick ever actually paid this amount; (3) Peltz and Lane, in their calculation of normalized net income, had already made a positive adjustment of $12.997 million in 1999 that renders add back of the litigation expenses duplicative; and (4) the financials audited by KPMG state that the Hospital incurred expense in legal proceedings, claims and litigation expenses in the ordinary course of business, rendering the $1.2 million not extraordinary.

For reasons more fully stated in Part IV of the Conclusions of Law, this expense did not appear in any prior year audited financials and Peltz was wrong to value the potential recovery from Desnick at zero. Peltz/Lane could not adequately explain why this line-item should not be included in adjusting the Hospital's net income for 1999.

## (2) Reduction of Capitalization Multiplier: Calculation of Weighted Average Cost of Capital

LaSalle argues that Peltz/Lane improperly reduced the capitalization multiplier from the first expert report, this reducing the Hospital's value in his solvency analysis.

The multiplier reduction was from 6.90 to 5.38 (1997); from 6.67 to 5.56 (1998); from 6.54 to 5.38 (1999); and from 6.13 to 5.18 (2000). Peltz/Lane achieved this by making two changes to the capitalization rate calculation. First, Peltz/Lane applied a different tax rate, as required by the Remand Opinion. LaSalle and McDonough do not take issue with this change.

In Plaintiff's Expert Report on Remand, Peltz/Lane also altered the size premium used in calculating the "Weighted Average Cost of Capital" ("WACC"). In a solvency analysis, WACC estimates the cost of equity and cost of debt. In their first report, Peltz/Lane calculated the cost of equity by using the "Adjusted Capital Asset Pricing Model" ("ACAPM") and incorporating a specific company risk premium. ACAPM estimates the required rate of return of an equity investor given a level of risk. This model is the most widely used technique to estimate the cost of equity. In the calculation of WACC in Plaintiff's Expert Report on Remand, Peltz/Lane used the same "Specific Company Risk Premium" as in their first expert report. LaSalle now, as at the First Trial, takes issue with the premium used.

### (a) Increase in Size Premium

In calculating WACC, Peltz/Lane applied an equity size premium. In Plaintiff's Expert Report on Remand, they used a "tenth decile premium" rather than the "micro cap" premium they used in their first report. Peltz testified that the reason for this change was the change in the Hospital's tax treatment required by the Remand Opinion. Peltz also testified that he made the change to the size premium because the Hospital's internal financial records reflected great variations from the audited financial records. This, in his view, made it appropriate in his judgment to place the Hospital in a riskier category. LaSalle questions how this change makes sense because Peltz had the same internal

financial records to review when he prepared Plaintiff's First Expert Report. (12 Tr. Vol. III: 424–28)

For reasons more fully explained in Part IV of the Conclusions of Law, it is held that Peltz/Lane's change in size premium was unwarranted and must be rejected.

### (b) Ten Percent Company Specific Risk Premium

Peltz and Lane applied a ten percent company specific risk premium in Plaintiff's Expert Report on Remand. The Trustee argues that this should be accepted on remand because that risk premium was accepted at the First Trial and is therefore law of the case. Peltz and Lane stand by their use of this figure because, they contend, it is supported by evidence concerning the financial, obsolescence, and numerous other risk factors facing the Hospital compared to guideline companies. The Trustee further argues that LaSalle's solvency expert initially used a ten percent company specific risk premium in making his initial solvency report. The Trustee argues that McDonough only became critical of the premium used by Peltz/Lane after he discovered a mistake in his report that rendered the Hospital insolvent for fiscal year 1999.

For reasons more fully described in Part IV of the Conclusions of Law, LaSalle has not provided any persuasive reason to discard the finding from the Initial Opinion. Choice of risk premium is indeed subjective and no facts have changed to alter the previous ruling on this issue.

### (3) Challenges to Peltz/Lane's Calculation of Claims on Enterprise Value

### (a) Net Working Capital Excess/Shortfall

McDonough's criticized Peltz and Lane's calculation of Net Working Capital ("NWC"), which is included in "Claims On Enterprise Value" to reach the Hospital's

Fair Value of Equity. NWC is calculated by deducting current liabilities from current assets and then comparing that result to the Industry Level of Working Capital. LaSalle argues that Peltz improperly included a NWC for the Hospital that resulted in a reduction in enterprise value and resulting Fair Value of Equity. McDonough proposed the following modifications to Peltz/Lane's calculation: (1) inclusion of amounts due from Desnick as a working capital asset; (2) inclusion of *qui tam* settlement obligations that were ultimately paid by Desnick; (3) inclusion of $1.2 million in litigation expenses (also paid by Desnick) from working capital. McDonough also questioned Peltz's use of "industry level of working capital" for purposes of calculating NWC. The "industry level of working capital" indicates that the figures represent the medial level of working capital for the industry according to the Risk Management Association.

In turn, Peltz and Lane criticized McDonough's calculation of NWC. The Trustee contends that McDonough improperly assumed that Desnick would pay the Hospital's liability for settlement of the government's *qui tam* fraud claims. Peltz/Lane contend that Desnick had no obligation to pay those claims and no hypothetical buyer would assume that Desnick would pay it after a sale. They also contend that Desnick did not sign the settlement agreement in his personal capacity and that he did not pay the entire amount.

For reasons stated more fully in Part IV of the Conclusions of Law, neither the Trustee's experts nor LaSalle's experts' calculation of NWC excess/shortfall is satisfactory. The Trustee's experts were wrong to exclude amounts due from Desnick. However, in his own Report, McDonough double-counted the $1.2 million in litigation expenses ultimately paid by Desnick. However, Peltz's use of the industry

level of working capital was explained at trial and is therefore adopted.

### (b) Treatment of Over–Market Lease Payments

The Initial Opinion concluded that the Hospital did not receive "reasonably equivalent value" for its monthly lease payments to Nomura because the payments far exceeded the fair market rental value of the Hospital property. *Doctors Hosp. of Hyde Park, Inc. v. Desnick, et al.,* 360 B.R. 787, 840–41 (Bankr.N.D.Ill.2007). In calculating insolvency, Peltz/Lane adjusted the Hospital's net income by excluding from expenses the excess market-value lease payments. They also capitalized the excess lease payments and deducted that amount from the "Indicated Enterprise Value" of the Hospital. Peltz and Lane treated the lease payments in this way because they did not believe that a hypothetical buyer would assume the payment of over-market rent in assessing the value of the Hospital. Peltz and Lane made the same adjustments in their first expert report. That reasoning and the adjustments were originally accepted here.

As at the First Trial, LaSalle proffers several arguments against the treatment Peltz/Lane give to the lease payments. First, LaSalle argues that Peltz/Lane's treatment is not in accordance with GAAP treatment for operating leases and it is not how the Hospital's auditor treated the payments. It next argues that bifurcation of the lease payments is not supported by any valuation methodology and that Peltz himself has not used this approach before. Finally, LaSalle argues that any hypothetical buyer would be bound by the terms of the lease and would require that the full lease payments be deducted as a current expense. Peltz/Lane made adjustments for the Hospital's lease payments, because those payments were found in the First Trial to be substantially over market value.

Peltz/Lane justified their adjustments by stating that a hypothetical buyer would not agree to pay a price for the Hospital that is based on a valuation using over market lease payments. Although a buyer might be bound to make the payments under the lease, Peltz/Lane contend that a buyer would only pay a price for the Hospital business that compensated by a price reduction for paying the over-market rent.

For reasons stated more fully in the Conclusions of Law, Peltz/Lane's treatment of the over-market lease payments is once again accepted and adopted in the solvency calculation.

### The Trustee Cannot Rely on Previous Findings as to Alternative Tests of Insolvency

#### 1. Paying Debts as they Came Due

Following the First Trial, it was determined that the Hospital had debts beyond its ability to pay as they matured at all times from August 28, 1997 to April 17, 2000. *Doctors Hosp. of Hyde Park, Inc. v. Desnick,* 360 B.R. at 868. That conclusion was based on several exhibits admitted in to evidence at the First Trial and re-admitted at the Remand Trial. LaSalle instead relies on its contention that the Remand Opinion and the Rehearing Denial Order indicate a determination by the Seventh Circuit that the Hospital was paying its debts as they became due up to the filing of its bankruptcy petition. (Solvency Brief 24) (citing *Paloian,* 619 F.3d at 692–93; Def. Ex. 81) On remand, the Trustee argues that he has presented evidence on this alternative test of insolvency. (Reply 14) (citing Pl. Br. 40–42; Jt. Ex. 72, at 20; New PL Ex. 1, at 10–15, 22) He argues that instead of dealing with this evidence head on, LaSalle relies on a mischaracterization of the Remand Opinion. Indeed, LaSalle states, without citation to any particular piece of evidence, that it does rely

on evidence presented at both the First and Remand Trials.

However, for reasons more fully described in Part IV of the Conclusions of Law, the Trustee has not met his burden of proof on remand on this test of insolvency. The weight of evidence as viewed in the Remand Opinion contradicted any possible finding that the Hospital was not paying its debts as they came due.

### 2. Unreasonably Small Capital Test

After the First Trial, it was determined that the Trustee proved that the Hospital was engaged in business for which its remaining property constituted unreasonably small capital from August 1997 to April 2000. *Doctors Hosp. of Hyde Park, Inc. v. Desnick, et al.*, 360 B.R. 787, 870 (Bankr. N.D.Ill.2007). However, as more fully described in the Conclusions of Law, that conclusion was secondary to the balance sheet analysis. Accordingly, analysis was sparse such that discussion of this test occupied half a page of an eighty-five page opinion. On remand, the parties barely addressed the issue and the Trustee's experts simply reiterated their findings from the First Trial. (New Pl. Ex. 1 ¶ 43) As a result, any conclusion as to solvency based solely on this test would be inadequate in light of the Remand Opinion's mandate that the question of insolvency be reviewed on remand.

### THE TRUSTEE ESTABLISHED INSOLVENCY AFTER SEPTEMBER 30, 1999

McDonough offered no opinion that the Hospital was solvent after September 30, 1999 because, he stated, there were no audited financial records for that period. However, even accepting each of his modifications to Defendant's Supplemental Expert Report on Remand, the Hospital is found to have been insolvent beginning September 30, 1999 up until the date it filed for bankruptcy in April 2000. Peltz/Lane concluded that the Hospital re-

mained insolvent during that seven-month period.

### SUMMARY OF FINDINGS AND CONCLUSIONS ON BANKRUPTCY REMOTE ENTITY ISSUES

This dispute centers on two loan transactions involving the Hospital and two of its affiliates. The first transaction involved MMA Funding, LLC, a "special purpose entity" ("SPE") created as part of a receivables-financing transaction. The Hospital obtained a revolving line of credit from Daiwa Healthco–2, LLC (the "Daiwa Loan"), pursuant to which (i) the Hospital contributed its healthcare receivables on an ongoing basis to MMA Funding, LLC, (ii) MMA Funding, LLC granted a security interest in those healthcare receivables to Daiwa, (iii) Daiwa loaned funds to MMA Funding, LLC, and (iv) MMA Funding, LLC disbursed those funds to the Hospital and to the Hospital's creditors as the purchase price of the receivables.

The second transaction involved a $50 million loan from Nomura Asset Capital Corp. to HPCH, LLC ("HPCH"), another affiliate of the Hospital. The Hospital operated in facilities that it leased from HPCH. Nomura Asset Capital Corporation ("Nomura") loaned $50 million to HPCH (the "Nomura Loan"). In exchange, HPCH granted Nomura security interests in the facilities it leased to the Hospital and the rent payments it received from the Hospital. The Hospital guaranteed HPCH's obligations to Nomura and secured that guaranty by granting Nomura security interests in certain of its personal property. The flow of funds used to pay HPCH's obligations under the Nomura Loan was complex and changed over time. *See Doctors Hosp. of Hyde Park, Inc. v. Desnick, et al. (In re Doctors Hosp. of Hyde Park, Inc.)*, 360 B.R. 787, 811–12 (Bankr.N.D.Ill.2007). Initially, the Hospi-

tal paid HPCH's obligations under the Nomura Loan from cash that the Hospital received various third parties. Later, MMA Funding, LLC paid HPCH's obligations from proceeds of the Daiwa Loan. Nomura sold the Nomura Loan (together with the related security and credit enhancements) to Asset Securitization Corporation, which in turn sold it as part of a mortgage securitization pool to LaSalle as trustee. The parties have stipulated that the payments made to LaSalle beginning in July 1998 were made from loan advances by Daiwa under the Daiwa Loan Agreement. (New Def. Ex. 82 ¶¶ 194, 198) Daiwa advanced funds that were paid into the Cash Collateral Account and from that account to LaSalle. (*Id.*)

As noted earlier, in the Opinion issued after the First Trial, it was held that the debtor did not receive a reasonable equivalent value for the rental payments made under the lease and the lease was not an arm's length transaction. Therefore, all rent transfers made before July 1998 were voidable to the extent that they exceeded reasonable fair rental value because it was held that the Hospital was insolvent at the time of those transfers. It was also held that the post–1998 rent payments were not made with the debtor's funds and could not be recovered as fraudulent transfers.

The principal non-solvency issue on remand is whether MMA Funding, LLC or the Hospital owned the funds transferred to LaSalle on a monthly basis beginning in July 1998. The parties have stipulated

that the transfers of funds beginning in July 1998 were advances by Daiwa under the MMA Funding, LLC Loan Agreement.[6] The parties dispute the existence of MMA Funding, LLC as an entity separate and distinct from the Hospital. If MMA Funding, LLC existed as a separate entity, then as borrower on the MMA Funding, LLC Loan, the funds were its funds and not the Hospital's. Those funds would then not be recoverable by the Trustee through this adversary proceeding. As the Remand Opinion stated, "the parties agree that, if MMA Funding became a legitimate bankruptcy remote vehicle as part of the Daiwa loan, this prevents recovery of payments made on the Nomura loan from July 1998 forward." *Paloian v. LaSalle Bank, N.A.,* 619 F.3d 688, 695 (7th Cir.2010). The Remand Opinion stated that based on what it could "tell from this record" there was "scarcely any evidence in this record that LLA Funding even *existed.*" *Id.* at 696 (emphasis in original). The Opinion left for remand the questions of whether "there was a bona fide sale of accounts receivable from the Hospital to MMA Funding" and whether "MMA Funding was more than a name without a business entity to go with it." *Id.*

On remand, the Trustee principally argued that the Remand Opinion articulated the following test to determine whether an entity is legitimately a "bankruptcy remote entity" ("BRE"):

**6.** In summary, between August 28, 1997 and July 7, 1998, the Hospital made transfers directly to a "Cash Collateral Account," controlled by LaSalle, and LaSalle accepted these transfers and used them to make payments on the Nomura Loan. Under the Initial Findings and Conclusions, it is these transfers that were void to the extent they excluded fair market value of the rent on the Doctors Hospital property. From July 7, 1998 through April 2000, however, the Trust took payments

owed under the Nomura Loan from deposits made by Daiwa into the "Cash Collateral Account" at the direction of MMA Funding. It then forwarded to the certificate-holders funds representing debt service payments. It was held that rent payments during this time period were not made with Doctors Hospital's assets but with MMA Funding LLC's and therefore not voidable as fraudulent transfers. See generally Findings of Fact Nos. 295–303.

1. The BRE must be independent of the entity that generates the receivables and of the owner of that entity;

2. The BRE must remain separate from the generator of the receivables after the closing of the transaction;

3. The BRE must observe corporate formalities;

4. The BRE must exhibit indicia of separateness such as its own office, phone number, checking account, and stationary;

5. The BRE must prepare financial statements and tax returns;

6. The accounts receivable or loan obligation should not be carried on the records of the entity generating the receivables;

7. The BRE "must buy assets (here accounts receivable)" and "must manage [those assets] in its own interest rather than the debtor's."

These factors focused the analysis on whether MMA Funding, LLC was "operationally distinct" from the Hospital.

### Part I Conclusions

LaSalle argued and offered evidence to show that MMA Funding, LLC functioned exactly as it was intended. The sole purpose of the entity was to buy and hold receivables from the Hospital that served as collateral for the Daiwa Loan. LaSalle offered testimony of Daiwa officials familiar with transaction involving bankruptcy remote entities showing that MMA Funding, LLC actually had the characteristics typical of those entities. Furthermore, LaSalle offered evidence that MMA Funding, LLC purchased the receivables from the Hospital.

LaSalle is found and held in Parts V and VI below to have proven that MMA Funding, LLC was a real entity that engaged in a true sale. For reasons stated more fully in the Findings of Fact (Part V) and the Conclusions of Law as to Non–Solvency

Issues (Part VI), it is found and held that the Trustee has not met his burden to establish that MMA Funding, LLC was not separate from the Hospital or that no "true sale" of the Hospital's Receivables occurred.

In Parts III and IV it is found and held that the sale took place before Doctors Hospital became insolvent. Therefore, judgment will separately be entered in favor of LaSalle on Counts IX and X of this adversary proceeding, and Count VIII that was abandoned by the Trustee Plaintiff will be dismissed with prejudice.

In Part II, authority is cited for the undersigned to enter Final Judgment.

## II.

### AUTHORITY TO ENTER FINAL JUDGMENT

As Counts VIII, IX, and X comprise counterclaims to the LaSalle claim against the Bankruptcy Estate and to recover fraudulent conveyances, statutory "core" authority lies under 28 U.S.C. § 157(b)(2)(C) and (H) to adjudicate those Counts. Some questions might have been raised until recently as to whether a bankruptcy judge still has authority to enter final judgment in this adversary proceeding in light of the Supreme Court holding in *Stern v. Marshall*, —— U.S. ——, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011). A recent decision has settled that question in this Circuit. *Peterson v. Somers Dublin Ltd.*, 729 F.3d 741 (7th Cir.2013)

After Findings of Fact and Conclusions of Law were initially entered herein on July 17, 2013 (Docket No. 953), but before final judgment issued, two Seventh Circuit panels decided cases impacting the authority of bankruptcy judges to enter final judgment in light of *Stern*. *See Wellness Int'l Network, Ltd. v. Sharif*, 727 F.3d 751 (7th Cir.2013) and *Peterson v. Somers*

*Dublin Ltd.*, 729 F.3d 741 (7th Cir.2013). The parties here were therefore invited to submit oral argument on the effect of those decisions. That argument was heard and considered.

■ Under 28 U.S.C. § 157(b)(2)(H), fraudulent conveyance actions are core proceedings, which by statute permit a bankruptcy judge to enter final judgment on the action. 28 U.S.C. § 157(b)(1). Some have considered whether that authority was called into question by the Supreme Court decision in *Stern v. Marshall.* That decision held that the Constitution requires the "removal of [certain trustee] counterclaims ... from core bankruptcy jurisdiction" and placed within the purview of an Article III judge for entry of final judgment. 131 S.Ct. at 2620. The *Stern* holding was directed at non-bankruptcy law counterclaims that are not necessarily resolved in the process of ruling on a creditor's proof of claim. *Id.* at 2619–20. For discussion of possible consequences of that decision, see University of Illinois law professor Ralph Brubaker's argument prior to *Peterson* that § 157(b)(2)(H) is likewise unconstitutional to the extent it would allow a bankruptcy judge to enter final judgment. Ralph Brubaker, *Article III's Bleak House (Part II): The Constitutional Limits of Bankruptcy Judge's Core Jurisdiction,* Bankr.L. Letter, Sept. 2011, at 1–2.

■ In *Stern*, the Supreme Court held that a bankruptcy judge, lacking life tenure and guaranteed compensation, does not have constitutional authority to enter final judgment on a state law counterclaim advanced by a debtor in response to a creditor's claim unless the counterclaim will necessarily be resolved in ruling on the creditor's claim. 131 S.Ct. at 2618. In so holding, the *Stern* Opinion described its holding as "narrow" and limited to the constitutionality of 28 U.S.C. § 157(b)(2)(C), which authorizes bankruptcy judges to enter final judgments on "counterclaims by the estate against persons filing claims against the estate." *Stern*, 131 S.Ct. at 2620. Congress was held to have violated Article III separation of powers principles by authorizing a bankruptcy judge to exercise authority over a common law tort claim. *Id.* at 2600–01.

■ Following *Stern*, a bankruptcy judge may not simply rely on whether a matter is "core" under § 157 but must also examine the matter to determine whether there is also constitutional authority to enter final judgment. *E.g., Steinle v. Trico Real Estate, L.P. (In re CCI Funding I, LLC)*, Adv. No. 10–1418, 2012 WL 3421173, at *6 (Bankr.D.Colo. Aug. 15, 2012); *Somerset Props. SPE, LLC v. LNR Partners, Inc. (In re Somerset Props. SPE, LLC)*, Adv. No. 11–00053, 2012 WL 3877791, at *4 (Bankr.E.D.N.C. Sept. 6, 2012). To determine whether there is constitutional authority to enter final judgment on a matter, the bankruptcy judge must consider whether "the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process." *Stern v. Marshall*, 131 S.Ct. at 2618.

Although, by its terms, *Stern* only ruled on the constitutionality of 28 U.S.C. § 157(b)(2)(C), some opinions and commentators have argued that *Stern's* reasoning calls for greater application and that its separation of powers analysis applies to other subsections of § 157. *E.g., FTI Consulting, Inc. v. Merit Mgmt. Grp., LP*, 476 B.R. 535, 538 (N.D.Ill.2012); *Murphy v. Felice (In re Felice)*, 480 B.R. 401, 417 (Bankr.D.Mass.2012); J. Richard Leonard, *Introduction*, 86 Am. Bankr.L.J. 1, 1–2 (2012); Tyson A. Crist, *Stern v. Marshall: Application of the Supreme Court's Landmark Decision in the Lower Courts*, 86 Am. Bankr.L.J. 627, 635 (2012).

Court opinions have been divided on whether bankruptcy judges still have constitutional authority to enter final judgment on fraudulent transfer actions; there are opinions going both ways on the issue. *See, e.g., Kelley v. JPMorgan Chase & Co.,* 464 B.R. 854, 863 (D.Minn.2011) (holding that *Stern* did not warrant withdrawal of reference in adversary proceeding in which trustee asserted fraudulent transfer claims); *Official Comm. Of Unsecured Creditors of Appalachian Fuels, LLC v. Energy Coal Res., Inc. (In re Appalachian Fuels, LLC),* 472 B.R. 731, 741 (E.D.Ky. 2012) ("Plaintiff's fraudulent transfer and preference claims are statutorily defined core claims to which the holding of *Stern* does not apply, and therefore the Bankruptcy Court has authority to enter final orders and judgments on such claims pursuant to 28 U.S.C. § 157(b)(1)"); *Fox v. Picard (In re Madoff),* 848 F.Supp.2d 469 (S.D.N.Y.2012) (in *dicta*); *Walker, Truesdell, Roth & Assoc. v. Blackstone Grp., L.P. (In re Extended Stay, Inc.),* 466 B.R. 188 (S.D.N.Y.2011) ("*Stern* does not affect the ability of the bankruptcy court to rule on state law fraudulent conveyance claims...."); *Burtch v. Seaport Capital, LLC (In re Direct Response Media, Inc.),* 466 B.R. 626 (Bankr.D.Del.2012); *but see Heller Ehrman, LLP v. Arnold & Porter, LLP, et al. (In re Heller Ehrman),* 464 B.R. 348 (N.D.Cal.2011) (holding that withdrawal of reference was unwarranted despite finding that bankruptcy court lacked constitutional authority to enter final judgment on a debtor's fraudulent transfer claims).

■ Opinions ruling under *Stern* that bankruptcy judges cannot enter final judgments in proceedings to recover fraudulent transfers under 11 U.S.C. §§ 544 and 548 have reached that conclusion because *Stern* noted that its holding was consistent with *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989). In *Granfinanciera* the Supreme Court held that a non-claimant defendant to a fraudulent conveyance action under the Bankruptcy Code has a right to a jury trial. *Id.* at 36, 109 S.Ct. 2782. *Stern* equated the state law counterclaim at issue in *Stern* to the fraudulent transfer claim at issue in *Granfinanciera,* stating that both claims involved "private rights" and therefore do not fall within the "public rights" exception to Article III. *Stern,* 131 S.Ct. at 2614. In a footnote, the *Stern* Opinion discussed the Supreme Court's conclusion in *Granfinanciera* "that fraudulent conveyance actions were 'more accurately characterized as a private than public right' as we have used those terms in our Article III decisions." That footnote read in full:

> We noted that we did not mean to "suggest that the restructuring of debtor-creditor relations is in fact a public right." Our conclusion was that, "even if one accepts this thesis," Congress could not constitutionally assign resolution of the fraudulent conveyance action to a non-Article III court. Because neither party asks us to reconsider the public rights framework for bankruptcy, we follow the same approach here.

*Stern,* 131 S.Ct. 2594, 2614 n. 7 (2011).

That footnote and other language in *Stern* analogizing the claim at issue in *Granfinanciera* to the claim at issue in a fraudulent conveyance action has been cited in support of the conclusion that bankruptcy judges do not have constitutional authority to enter final judgment on fraudulent transfer claims, at least when the creditor has not filed a proof of claim against the estate. Those opinions holding that fraudulent conveyance claims are beyond the adjudicatory powers of a bankruptcy judge reason that "[t]o now conclude that the very claim presented in

*Granfinanciera*—a fraudulent conveyance claim—is a 'public rights' claim would be totally at odds with the Stern Court's analogy to *Granfinanciera.*" *Kirschner v. Agoglia,* 476 B.R. 75, 80 n. 3 (S.D.N.Y. 2012).

The distinction between public rights and private rights originates in another Supreme Court opinion, *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). In *Marathon,* a plurality of the Court agreed that assignment of the debtor's pre-petition breach of contract and warranty claims for resolution by a bankruptcy judge violated Art. III of the Constitution. *Marathon,* 458 U.S. at 87, 102 S.Ct. 2858. The *Marathon* plurality Opinion recognized three limited exceptions the Art. III requirement: territorial courts, military tribunals, and cases involving "public" as opposed to "private" rights. *Id.* at 64–67, 102 S.Ct. 2858. The *Marathon* Opinion explained, "[o]ur precedents clearly establish that only controversies in the former category may be removed from Art. III courts and delegated to legislative courts or administrative agencies for their determination. Private-rights disputes, on the other hand, lie at the core of the historically recognized judicial power." *Id.* at 70, 102 S.Ct. 2858 (citations and footnote omitted).

Although the *Marathon* plurality could not agree on the precise scope of the public rights exception those Justices agreed that the state-law breach of contract and warranty claims did not fit within the exception. *See id.* at 69, 102 S.Ct. 2858. Nevertheless, the *Marathon* Opinion suggested that some bankruptcy proceedings might fit within the public rights exception, stating: "the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must be distinguished from the adjudication of state-created private rights, such as the right to recover contract damages that is at issue in this case. The former may well be a 'public right,' but the latter obviously is not." *Id.* at 71, 102 S.Ct. 2858. Following *Marathon,* the Supreme Court issued several opinions seeking to further define the exception but no defined rule was ever established. *See Executive Benefits Ins. Agency v. Arkison (In re Bellingham Ins. Agency, Inc.),* 702 F.3d 553, 560 (9th Cir. 2012) (citing and describing cases), *cert granted Exec. Benefits Ins. Agency v. Arkison (In re Bellingham Ins. Agency, Inc.),* —— U.S. ——, 133 S.Ct. 2880, 186 L.Ed.2d 908 (2013).

After *Stern,* a panel of the Ninth Circuit Court of Appeals concluded that *Stern* and *Granfinanciera* "together point ineluctably to the conclusion that fraudulent conveyance claims, because they do not fall within the public rights exception, cannot be adjudicated by non-Article III judges." *Bellingham,* 702 F.3d at 561.

■■ As described previously, this adversary proceeding comprises a counterclaim that sought recovery that might offset and reduce LaSalle's proof of claim. A Seventh Circuit panel has recently held that a bankruptcy court has broad authority to enter final judgment in a fraudulent conveyance claim by a creditor who has filed a proof of claim. *Peterson,* at 744–745. The opinion relied on *Katchen v. Landy,* 382 U.S. 323, 329–36, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966), and *Langenkamp v. Culp,* 498 U.S. 42, 44–45, 111 S.Ct. 330, 112 L.Ed.2d 343, (1990) for the proposition "that Article III authorizes bankruptcy judges to handle avoidance actions against claimants." *Id.* The Opinion further cited to *Granfinanciera* to support its reasoning that the key distinction is whether a proof of claim has been filed by the defendant claimant. *Peterson* reasoned that neither *Stern* nor *Wellness* held to the contrary.

*Peterson* at 744–45. Indeed, both *Stern* and *Wellness* involved claims that went beyond the issue that would be passed on when ruling on the creditor's proof of claim. In *Stern*, the counter-plaintiff's tortious interference claim raised several additional issues including whether tortious interference with an *inter vivos* gift was recognized under Texas state law. *Stern*, 131 S.Ct. at 2617. In *Wellness*, in addition to the issues to be decided under counts that would have been constitutionally permissible, there were several additional issues, including whether Illinois state law recognizes an alter-ego theory in trust law. *Wellness*, at 760–61. Thus, the counterclaim in both *Stern* and *Wellness* involved distinct, articulable state law issues that were not necessary to resolving the creditor's proof of claim.

As earlier noted, the Supreme Court ruled in *Stern* that for a bankruptcy court to have constitutional authority to enter final judgment in an action under *Katchen* and *Langenkamp*, "the question is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process." *Stern* at 2618. The *Stern* court did not give further guidance regarding what "stems from the bankruptcy itself," or regarding necessity, except that holding the tortious interference claim was deficient. While the *Peterson* Opinion did not refer to "necessity," it does point to 11 U.S.C. § 502(d), which provides,

> Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is

liable under section 522(f), 542, 543, 550, or 553 of this title.

11 U.S.C. § 502. The mandatory language "shall" makes it necessary to resolve the issues referred to in the statute unless the party filing a proof of claim either turns over the property or pays for it. Section 544(b)(1) gives the trustee authority to avoid a transfer of the debtor's property under applicable non-bankruptcy law, while § 548 is the Bankruptcy Code's fraudulent conveyance statute. Here, LaSalle filed a proof of claim for $60,139,317.04 on March 10, 2004. Claim 529–1. Counts VIII and IX were brought pursuant to § 544(b)(1), and Count X was brought pursuant to § 548. Therefore, under both *Stern* and *Peterson*, final judgment may be entered here because the issues are necessarily involved in the claims allowance process.

The Sixth Circuit has similarly held it to be "crystal clear" that bankruptcy judges have constitutional authority to enter final judgments on state law fraudulent transfer claims when the defendant has filed a proof of claim sufficiently related to the fraudulent transfer. *Onkyo Eur. Elecs. GMBH v. Global Technovations, Inc. (In re Global Technovations)*, 694 F.3d 705, 722 (6th Cir.2012). *Global Technovations* expressly relied upon the fact that the defendant filed a proof of claim against the bankruptcy estate such that the case was "fundamentally unlike *Granfinanciera*, where the bankruptcy estate reached out to file a fraudulent-transfer claim against a party who had filed no claim against the estate." *Id.* The Opinion reasoned that the defendant "brought itself voluntarily into the bankruptcy court." *Id.* Furthermore, the fraudulent transfer claim was a defense to the defendant's proof of claim. *Id.* Therefore, the Opinion reasoned, " 'it was not possible … to rule on [the defendant's] proof of claim without first resolv-

ing' the fraudulent transfer issue.'" *Id.* (*citing Stern,* 131 S.Ct. at 2616).

The Ninth Circuit's decision in *In re Bellingham* does not compel a contrary result. In *Bellingham,* it was held that bankruptcy judges do not have constitutional authority to enter final judgments on fraudulent conveyance actions asserted against non-creditors to the bankruptcy estate. *Bellingham,* 702 F.3d at 565. However, *Bellingham* involved facts that were similar to facts in *Granfinanciera,* whereas here, LaSalle has filed a proof of claim against the Hospital's bankruptcy estate and the present case is a counterclaim to the LaSalle claim.

**If Permitted by Future Rulings, Waiver Would Apply to Bar the Parties from Asserting Lack of Bankruptcy Court Authority**

In *Wellness Int'l,* it was held that objections to a bankruptcy judge's authority to enter final judgment under Article III are not waivable by the parties. The Opinion began with the proposition that Article III serves two distinct interests, "litigants' right to have their cases decided by independent and impartial judges, and it also operates as an inseparable element of separation of powers by protecting the judicial branch from encroachment by the political branches." *Wellness Int'l* at 759 (citing *Stern*). In answering whether the right to an Article III adjudication is more personal or structural, the Opinion looked to *Commodity Futures Trading Comm'n v. Schor,* 478 U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986), a case involving an executive agency's adjudication of a state law counterclaim. *Schor* held whether a statute violates Article III depends on "an examination of the relative allocation of powers." *Schor,* 478 U.S. at 851, 106 S.Ct. 3245. Relevant factors to be considered are said to include whether the forum "dealt only with a particularized area of

law," how far its powers departed from the traditional agency model, the authority to enforce orders, and the standard of review by an Article III court. *Wellness Int'l* at 769 (citing *Schor* ). The Wellness Opinion then addressed a split of authority between two circuit courts on whether Article III protections are waivable, *Waldman v. Stone,* 698 F.3d 910 (6th Cir.2012), and *In re Bellingham Ins. Agency Inc.,* 702 F.3d 553 (9th Cir.2012).

*Wellness* agreed with *Waldman* that the right to adjudication by an Article III judge cannot be waived. *Wellness Int'l* at 759–60. The *Wellness* Opinion emphasized that "the issue here is not so much the aggrandizement of the Legislative or Executive Branches, as it is the diminution of the Judicial one." *Waldman,* at 918. However, that conclusion conflicts with that of the Ninth Circuit panel, which ruled in *Bellingham* that the defendant consented to adjudication of the fraudulent conveyance action by failing to object until the case reached the circuit level. 702 F.3d 553, 567 (9th Cir.2012). *Bellingham* held that Article III bars a bankruptcy judge from entering final judgments in such actions absent the parties' consent as described above, but held that the defendant to the fraudulent conveyance action in that case waived its right to final adjudication by an Article III judge. *Id.* at 565.

In reaching that conclusion, *Bellingham* reasoned that

> [t]he waivable nature of the allocation of adjudicative authority between bankruptcy courts and Article III courts is well established.... Following the genesis of the modern bankruptcy system, the Supreme Court clarified that "Article III, § 1's guarantee of an independent and impartial adjudication by the federal judiciary of matters within the judicial power of the United States ... serves to protect primarily personal,

rather than structural, interests." *Schor*, 478 U.S. at 848, 106 S.Ct. 3245. *Stern* further made clear that § 157 "does not implicate questions of subject matter jurisdiction." 131 S.Ct. at 2607. Accordingly, "as a personal right, Article Ill's guarantee of an impartial and independent federal adjudication is subject to waiver." *Schor*, 478 U.S. at 848, 106 S.Ct. 3245; *see also Daniels–Head & Assocs. v. William M. Mercer, Inc. (In re Daniels–Head & Assocs.)*, 819 F.2d 914, 918 (9th Cir.1987). And in fact, § 157(c)(2) expressly provides that bankruptcy courts may enter final judgments in non-core proceedings "with the consent of all the parties to the proceeding." 28 U.S.C. § 157(c)(2).

■ *Wellness Int'l* and *Waldman*, reasoned that the Supreme Court has already ruled that § 157(b) violates structural protections of Article III. *Wellness Int'l* at 760 (citing *Stern* ). Therefore, the current law of this Circuit is that waiver by the parties is not effective to give a bankruptcy court Article III constitutional authority over § 157(b) core matters. *Id.*

The law regarding consent and waiver is in a state of flux. The issue of whether consent or waiver may give bankruptcy courts authority to enter final judgment is before the Supreme Court in *Executive Benefits Insurance Agency v. Arkison*, —— U.S. ——, 133 S.Ct. 2880, 186 L.Ed.2d 908 (2013) (granting certiorari). Further, a party in *Wellness* is seeking a rehearing or rehearing en banc of the panel opinion.

This adversary proceeding was originally tried and decided pre-*Stern*, and remanded to the undersigned Bankruptcy Judge also pre-*Stern* on designated issues. Plaintiff originally demanded trial by jury. (02 A 00363, Complaint, Dkt. 1, at 1) That right was definitively waived in open court at the beginning of the Remand Trial. (12 Tr. Vol. I:9–10)

After remand, the bankruptcy judge invited comment of the parties on possible application *of Stern* to this case. While Plaintiff expressed concern as to potential application of the decision, his counsel it did not express any claim that the remanded proceeding be heard by an Article III judge, nor has either party asserted such right or sought withdrawal of the reference. There was no motion asserting such a right or requesting removal for trial by a District Judge. Trial on remanded issues went forward here long after *Granfinanciera* was decided and was completed long after *Stern* was decided. Should it ultimately be decided that waiver by the parties is a viable answer to the issue of bankruptcy authority, this case would qualify.

## These Findings and Conclusions May not be Treated as Proposed on Appeal

■ The Seventh Circuit also ruled in *Wellness Int'l* that "[n]o statutory provision authorizes a bankruptcy court to propose findings of fact and conclusions of law in a core proceeding; such a report and recommendation from the bankruptcy court is statutorily authorized only in non-core proceedings." *Wellness* at 761 (Petition for Rehearing en banc pending). *But see Feuerbacher v. Moser*, No. 4:11–CV–272, 2012 WL 1070138, *9 (E.D.Tex. Mar. 29, 2012) (noting that "the vast majority of courts to confront the issue have concluded that bankruptcy courts nonetheless have unquestioned authority to submit proposed findings of fact and conclusions of law.") (citing cases). As stated above, this proceeding is undoubtedly core under § 157(b)(2)(H) as a proceeding to avoid fraudulent conveyances and final judgment may be entered. If it were not so, this court would certainly recommend these Findings and Conclusions to the reviewing District Judge. However, there is cur-

rently no authority in this Circuit to recommend proposed findings of fact and conclusions of law if the case is under core but unconstitutional authority. If there were is no constitutional authority under *Stern* to enter final judgment on a fraudulent conveyance against a creditor who has filed a proof of claim, these Findings of Fact and Conclusions of Law could not be used for any purpose and the parties would be obliged to start the litigation over after many years of work.

The issue of whether a bankruptcy courts may submit proposed findings of fact and conclusions of law in a core but unconstitutional case is before the Supreme Court in *Executive Benefits Insurance Agency v. Arkison*, —— U.S. ——, 133 S.Ct. 2880, 186 L.Ed.2d 908 (2013) (granting certiorari).

## *CONCLUSION AS TO AUTHORITY TO ENTER FINAL JUDGMENT*

In light of the foregoing, authority in this Circuit allowing a bankruptcy judge to enter final judgment in this proceeding to recover fraudulent transfers will be followed., and final judgment will be entered.

## III.

## FINDINGS OF FACT ON SOLVENCY ISSUES

1. These Findings include citations to evidence from the First Trial as well as new evidence admitted at. the Remand Trial.

PARTIES AND RELATED PERSONS AND ENTITIES

2. Doctors Hospital of Hyde Park, Inc. was an Illinois Subchapter S corporation that had its principal place of business at 5800 South Stoney Island Avenue, Chicago, Illinois. At all relevant times, it operated hospital facilities at that address. (New Def. Ex. 82 ¶ 1)

3. Defendant LaSalle Bank National Association, f/k/a LaSalle National Bank as Trustee for Certificate Holders of Asset Securitization Corporation Commercial Mortgage Pass–Through Certificates, Series 1997, D5, by and through its Servicer, Orix Capital Markets, LLC, is a trust that has elected to be treated as a Real Estate Mortgage Investment Conduit under the Internal Revenue Code of 1986, whose Trustee, LaSalle Bank National Association is a national banking association with its principal place of business in Illinois. (Def. Ex. 82 ¶ 2) In *Paloian v. LaSalle*, 619 F.3d 688, 691–692 (7th Cir.2010), the Court of Appeals determined that Defendant was the initial transferee under Section 550(a) of the Bankruptcy Code of the challenged transfers in this case.

4. Daiwa Healthco–2 LLC (*"Daiwa"*) was a Delaware limited liability company with a place of business located in New York, New York (New Def. Ex. 82, ¶ 3), and was the lender on the MMA Funding, LLC Loan (as defined below). In March 1998, the MMA Funding, LLC Loan was transferred to Daiwa Healthco–3, which became the successor lender on the MMA Funding, LLC Loan.

5. HPCH, LLC was a Delaware limited liability company. In approximately July or August 1997, HPCH acquired the record title of the Hospital Property (as defined below) from HPCH Partners, L.P. (New Def. Ex. 82 ¶ 4)

6. At all relevant times, Dr. James H. Desnick (*"Desnick"*) an individual, was the sole shareholder and a director of Doctors Hospital of Hyde Park. (New Def. Ex. 82 ¶ 5). Desnick never participated in the accounting department or accounting functions of the hospital (New Def. Ex. 143, at 133, 167)

7. Desnick Descendants Irrevocable Trust is a trust created by Dr. Desnick and the owner of 1,305 shares of stock in

Medical Management of. America, Inc. (New Def. Ex. 82 ¶ 6)

8. Desnick Family Irrevocable Trust is a trust created by Desnick and the owner of 137 shares of stock in Medical Management of America, Inc. (New Def. Ex. 82 ¶ 7)

9. HPCH Partners, L.P. was an Illinois limited partnership. (New Def. Ex. 82 ¶ 8)

10. HP Membership Inc. was a special purpose Delaware Corporation. This corporation may have been dissolved for failure to file annual franchise reports. (New Def. Ex. 82 ¶ 9)

11. Medical Management of America, Inc. was a Delaware corporation and was a purported manager of Doctors Hospital and HPCH. Desnick, Desnick Trust 1, and Desnick Trust 2 owned 100% of MMA. (New Def. Ex. 82 ¶ 10) Medical Management oversaw the different entities owned by Desnick. (New Def. Ex. 8)

12. MMA Funding, Inc. was a special purpose Delaware corporation and the special purpose manager of MMA Funding, L.L.C. Desnick was 100% owner of MMA Funding, Inc. (New Def. Ex.–82 ¶ 11)

13. MMA Funding, LLC was an Illinois limited liability corporation. MMA Funding, LLC was owned 99% by Doctors Hospital and 1% by Medical Management. (New Def. Ex. 82 ¶ 12)

14. HPCH was owned 99% by HPCH Partners, L.P. and 1% by its managing member, HP Membership. Desnick owned 100% of HP Membership and a controlling interest in HPCH Partners, L.P. (New Def. Ex. 82 ¶ 13)

15. Nomura Asset Capital Corporation ("Nomura") is a Delaware corporation with its principal place of business located in New York, New York. (New Def. Ex. 82 ¶ 14)

16. ORIX Capital Markets LLC ("ORIX") is special servicer of a pool of loans owned by the Trust, including the Nomura Loan (defined below). As special servicer, ORIX attempts to maximize the collection of principal and interest and other amounts due under the loan documents. (New Def. Ex. 82 ¶ 15)

17. Philip Robinson ("Robinson") was CFO of Medical Management beginning in April 1997. Desnick viewed Robinson as his troubleshooter and "right hand man" with respect to accounting, but not legal, matters. (New Def. Ex. 143, 154, 209) Robinson described himself as Desnick's "right hand man" regarding Desnick's financial interests. (New Def. Ex. 144, at 47–48) Robinson was responsible for helping Desnick with the financial and accounting side of all businesses under Desnick's control. (New Def. Ex. 144, at 10–11) Robinson reported to Desnick. (New Def. Ex. 143, at 152–153)

18. Nelson Vasquez ("Vasquez") is an individual who is or was residing in Chicago, Illinois and was a financial officer of Doctors Hospital from approximately 1998 to the closing of the hospital. (New Def. Ex. 82 ¶ 16)

19. Michael Nelson ("Nelson") is a former chief financial officer of Doctors Hospital. (New Def. Ex. 82 ¶ 17)

20. Richard Felbinger ("Felbinger") is a former chief financial officer of Doctors Hospital. (PL Ex. 26, at 10)

21. Stephen Weinstein ("Weinstein") was the Chief Executive Officer of Doctors Hospital from September 1994 to September 1998. Weinstein left the employ of Doctors Hospital in September 1998. (New Def. Ex. 82 ¶ 18)

22. Seth Gillman ("Gillman") served as staff attorney for Medical Management from 1996–1998 and General Counsel from 1998–2001. (New Def. Ex. 88; 12 Tr. Vol.

VIII, 1050–51, 1054) Gillman also served as the registered agent of MMA Funding, LLC for a period of time. (12 Tr. Vol. VIII, 1072)

23. At all relevant times Desnick owned and/or controlled Doctors Hospital, HPCH, MMA Funding, Inc., MMA Funding, LLC, HP Membership, and HPCH Partners, L.P. (New Def. Ex. 82 ¶ 19)

SOLVENCY WITNESSES AT THE REMAND TRIAL

24. In addition to all of the witnesses who testified at the First Trial on behalf of Plaintiff, at the Remand Trial Plaintiff introduced the expert reports and testimony of Scott Peltz ("Peltz") and Michael Lane ("Lane"). Peltz and Lane's opinions are contained in their first expert report ("First Expert Report"), dated February 4, 2005 (Jt. Ex. 72), their testimony at the First Trial, and their November 15, 2011 supplemental expert report (New PL Ex. 1) ("Plaintiff's Expert Report on Remand"), and their testimony at the Remand Trial.

25. In addition to all of the witnesses who testified at the First Trial on behalf of the Defendant, at the Remand Trial Defendant introduced the expert reports and testimony of Edward McDonough ("McDonough"), a Managing Director at Alvarez & Marsal's Dispute Analysis & Forensic Services, LLC. McDonough submitted an initial report and thereafter a brief supplemental report on remand on behalf of the Defendant, which provide both a criticism of the expert report prepared for Plaintiff by Plaintiff's experts, Scott Peltz and Michael Lane (New PL Ex. 1) the same experts who testified on behalf of the Plaintiff at the First Trial, as well as McDonough's own conclusions of solvency as to Doctors Hospital during the relevant time period. (New Def. Ex. 66 and 130).

26. At the Remand Trial, Defendant introduced the deposition testimony of Robinson. (New Def. Ex. 144) Robinson's deposition was taken in this case on November 29, 2011. Robinson also testified at the First Trial.

27. At the Remand Trial, Defendant introduced the deposition testimony of Desnick. (New Def. Ex. 143) Desnick's deposition was taken in this case on November 17, 2011.

PROCEDURAL BACKGROUND

28. Doctors Hospital filed a petition under Title 11 of the United States Code on April 17, 2000 (the "Petition Date"). (New Def. Ex. 82 ¶ 20)

29. On April 29, 2004, Gus A. Paloian was appointed Trustee of the Debtor. (New Def. Ex. 82 ¶ 22) By Order dated March 6, 2006 (Dkt. No. 504), Gus A. Paloian as Chapter 11 Trustee of the Debtor was substituted as party plaintiff in this case.

30. On April 15, 2002, Doctors Hospital filed an adversary complaint, No. 02 A 00363, against Defendant. (New Def. Ex. 82 ¶ 21)

31. Trial was first conducted in this proceeding from March 20, 2006 to March 31, 2006. On March 23, 2007, an Amended Final Judgment Order (Dkt. No. 599, the "Judgment") was entered on Counts VIII, IX and X of the Complaint. The Judgment was premised on the Findings of Fact and Conclusions of Law dated March 2, 2007, reported at 360 B.R. 787 (Bankr. N.D.Ill.2007). Additional Findings of Fact and Conclusions of Law dated July 25, 2007, reported at 373 B.R. 53 (Bankr. N.D.Ill.2007) were also entered.

32. On appeal, the District Court affirmed. *LaSalle N.A. Bank v. Paloian*, 406 B.R. 299 (N.D.Ill.2009).

33. On August 27, 2010, the Court of Appeals for the Seventh Circuit handed down its decision in *Paloian v. LaSalle Bank, N.A.*, 619 F.3d 688 (7th Cir.2010).

The decision vacated the judgment of the District Court and remanded the case to the District Court with instructions to remand the case to this Court for further proceedings consistent with the decision. *Id.* at 696.

34. On September 10, 2010, the Plaintiff filed his Petition for Rehearing with the Court of Appeals.

35. By Order dated October 15, 2010, the Court of Appeals denied the Rehearing Petition (New Def. Ex. 81, the "Rehearing Denial Order") In the Rehearing Denial Order, the Court of Appeals stated:

[Plaintiff] contends that the panel overlooked two alternative grounds for the bankruptcy judge's finding of insolvency: that the Hospital failed to pay its debts as they came due and had unreasonably little capital. Yet the bankruptcy judge found that the Hospital *did* pay its debts in timely fashion until its bankruptcy filing; these "alternative grounds" turn out to be restatements of the bankruptcy court's principal finding and are inadequate for the reasons given in the panel's opinion. The petition for rehearing is denied.

36. The District Court remanded the case to this Court on October 26, 2010 (*see* 02 A 00363, Dkt. No. 728)

37. On April 7, 2011 this Court entered an order (Dkt. No. 780, New Def. Ex. 86, the "Motion in Limine Order") determining, for purposes of remand, that (a) Doctors Hospital was solvent as of August 28, 1997 on all insolvency theories, (b) Plaintiff was barred from introducing evidence on remand seeking to demonstrate that Doctors Hospital was insolvent on any theory as of August 28, 1997, and (c) Plaintiff was barred on remand from seeking to avoid the Guaranty, the Assignment, the Pledge and Security Agreement and/or the Equity Pledge Agreement (all as defined in Judgment) as fraudulent transfers.

38. This Court conducted the remand trial from January 9, 2012 to February 2, 2012 (the "*Remand Trial*").

### BACKGROUND OF THE HOSPITAL

39. Doctors Hospital was built in 1916 by the Illinois Central Railroad as a component of its employee health insurance plan. In 1960 the railroad sold the facility, and it became a not-for-profit community hospital named Hyde Park Community Hospital. After the not-for profit community hospital ceased operations, HPCH Partners, L.P., an entity controlled by Desnick, purchased the real estate and facilities for approximately $2,400,000.00 in 1992. (New Def. Ex. 82 ¶ 32).

40. Doctors Hospital's revenue was largely derived from reimbursements from the government in the form of Medicare and Medicaid reimbursements, as well as payments from private insurance companies such as Blue Cross and Blue Shield (the "*Receivables*"). (New Def. Ex. 82 ¶ 33).

41. On August 24, 1992, HPCH Partners, L.P. leased the real estate located at 5800 South Stoney Island Avenue, Chicago, Illinois (the "*Hospital Property*") to Doctors Hospital. Doctors Hospital leased and utilized the Hospital Property as a hospital. (New Def. Ex. 82 ¶ 34).

42. In early 1997, Doctors Hospital was obligated on loans made by First National Bank of Northbrook. (New Def. Ex. 57) The loans were secured by the Receivables and by a mortgage on the Hospital Property. (New Def. Ex. 61–63).

### The Daiwa Securitization

43. On March 31, 1997, Daiwa, pursuant to a healthcare receivables securitization program (the "Daiwa Securitization"), agreed to lend up to $25,000,000 to MMA Funding, LLC (the "Daiwa Loan"). Under the language of the loan transaction

documents, Doctors Hospital contributed its receivables to MMA Funding, LLC, and Daiwa, in turn, loaned funds to MMA Funding, LLC according to specified formulae. (New Def. Ex. 82 ¶ 41; Jt. Ex. 202 ¶ 40; PL Ex. 33, at 11–12, 21–25; Jt. Exs. 1, 5, 117, 118).

44. In approximately July or August 1997, HPCH acquired the record title of the Hospital Property from HPCH Partners, L.P. (New Def. Ex. 82 ¶ 4)

45. HPCH leased the Hospital Property to Doctors Hospital pursuant to a Lease Agreement dated August 28, 1997 (the "Lease"). (New Def. Ex. 82 ¶ 122)

### The Nomura Loan

46. On August 28, 1997, Nomura loaned the principal amount of $50,000,000 (the "Nomura Loan") to HPCH. The obligations of HPCH under the Nomura Loan were secured, *inter alia*, by the Hospital Property and an assignment of rents under the Lease. (New Def. Ex. 82 ¶ 102)

47. Desnick received almost all of the proceeds of the $50 million Nomura Loan when it closed. (New Def. Ex. 82 ¶ 103; Jt. Ex. 202 ¶ 85)

48. On October 24, 1997, Nomura and Asset Securitization Corporation ("ASC") entered a Mortgage Loan Purchase and Sale Agreement ("MLPSA"). Under Section 1 of the MLPSA, Nomura sold and transferred all of its right, title and interests in and to the Nomura Loan, along with numerous other mortgage loans, to ASC. (New Def. Ex. 82 ¶ 142)

49. Contemporaneously with the execution of the MLPSA, on October 24, 1997 ASC, LaSalle National Bank and others entered into a Pooling and Servicing Agreement (the "PSA"). (New Def. Ex. 82 ¶ 154)

50. In Section 2.01 of the PSA, ASC as "Depositor" sold to the Trust all of ASC's "right, title and interest … in and to [the

Nomura Loan]" along with all of the various other mortgage loans. (New Def. Ex. 82 ¶ 155)

51. Section 1.01 of the PSA originally named AMRESCO Services, L.P. ("AMRESCO") as the Special Servicer. (New Def. Ex. 82, ¶ 157)

52. ORIX Capital Markets, LLC is the successor-in-interest to AMRESCO Management, Inc. in its role as Special Servicer under the PSA. (New Def. Ex. 82 ¶ 158)

53. The Nomura Loan was evidenced by, *inter alia*, a Promissory Note in the principal sum of $50,000,000 in favor of Nomura (the "Promissory Note"). (New Def. Ex. 82 ¶ 109)

54. Exhibit B to the Nomura Loan Agreement established $471,630.19 as the base monthly payment of principal and interest under the Nomura Loan. (New Def. Ex. 82 ¶ 106)

55. The monthly lease payments under the Lease were approximately the same amount as Doctors Hospital had been paying since 1992. (New Def. Ex. 82 ¶¶ 35–40)

56. The Lease provided for "an initial term beginning August 29, 1997 and ending on August 29, 2012." (New Def. Ex. 82, ¶ 129)

57. The Nomura Loan matured on September 11, 2017. (Jt. Ex. 11, at 20) (defining "Maturity Date") However, there was an "Optional Prepayment Date" of September 12, 2012 on the Nomura Loan. (Jt. Ex. 11, at 23) (defining "Optional Prepayment Date")

### Proceeds of MMA Funding, LLC Loan

58. Approximately $7.9 million was funded upon closing of the Daiwa Securitization in March, 1997. (Jt. Ex. 202 ¶ 61) Approximately $1.4 million of the $7.9 mil-

lion initial funding was made available to the Hospital. (*Id.*; Jt. Ex. 37)

### Upcoding and Kickback Allegations and Settlements

 59. "Upcoding" occurs when a healthcare provider receives reimbursement from Medicare and Medicaid based on a more acute (and therefore more costly) diagnosis than the patient's condition warranted. (New Def. Ex. 82 ¶ 394; 06 Tr. IV: 30; Jt. Ex. 147, at 9 n.15)

60. In March 1999 the federal and state governments reached a settlement with Doctors Hospital concerning overcharges due to "upcoding" on patient billings submitted to Medicare and Medicaid. Doctors Hospital agreed to pay a fine of $4.5 million. (New Def. Ex. 82 ¶ 396; Jt. Ex. 161; New Pl. Ex. 1 ¶ 22.2) The overbilling related to this settlement occurred from January 1993 to June 1997.

61. A separate investigation focused on (1) kickbacks paid to Doctors Hospital's physicians in exchange for medically unnecessary patient admissions, and (2) the hospital's inability to establish medical necessity and Medicare eligibility requirements for certain physicians' services. (New Def. Ex. 82 ¶ 397) All of these activities occurred during the period 1993–1998. (New Def. Ex. 82 ¶ 397; Jt. Ex. 72, Tab B4)

62. In December 2000 the federal government reached a settlement with Desnick regarding the kickback and other fraud allegations. (New Def. Ex. 82 ¶ 398; New Pl. Ex. 1 ¶ 22.3) He agreed to pay $14.5 million. (Jt. Ex. 162)

63. The notes to Doctors Hospital's audited financial statements for fiscal year 1999 contain the following statement:

> The hospital is involved in a *qui tam* legal action that was filed against a number of hospitals across the country concerning certain billing practices. In

1999, the Hospital executed an agreement (Settlement Agreement) with the United States Attorney's Office for the Northern District of Illinois, Civil Division; the United States Department of Health and Human Services, Office of Inspector General; the State of Illinois; and the Realtor, Health Outcome Technologies. The Settlement Agreement requires the Hospital to pay $4,500,000 over a twenty-four month period. At September 30, 1999 and 1998, the amount of this settlement obligation outstanding was $3,100,000 and $4,500,000, respectively, and is included with estimated third-party payor settlements in the accompanying balance sheets.

(New Def. Ex. 82 ¶ 401)

### Financial Performance of Doctors Hospital as Disclosed by Audited Financials

64. From its incorporation in 1992 through 1999, the Debtor prepared annual financial statements that were audited by KPMG. (Jt. Ex. 28) These audited financial statements contain yearly comparative balance sheets, income statements, and cash flow data in dollars, percentages, and ratios. (*Id.*)

65. The Debtor reported increases in revenues from $29.4 million in 1993 to $68.1 million in 1996. (Ex. 31, at 3; *see generally* Jt. Ex. 28)

66. The Debtor had positive net income from 1993 to 1998. (Jt. Ex. 28; Ex. 31 at 3) In 1997, the reported net income reflected a $7.4 million management fee that was actually a distribution to the owner. (Jt. Ex. 28 (KPMG Audit Report for Sept. 30, 1998), at 10; Jt. Ex 31, at 3)

67. In its startup year of fiscal 1993, the Debtor had an operating cash flow deficit of $.6 million. (Jt. Ex. 31, at 3) However, from 1994 through 1998, the

Debtor had positive operating cash flows (after reclassifying the management fee of $7.4 million in 1997 as a distribution to owner). (Jt. Ex. 28 (KPMG Audit Report for Apr. 27, 1999), at 10; Jt. Ex. 31, at 3)

68. Total liabilities of the Debtor increased with the size of the business from $6.9 million in 1993 to $12.6 million in 1996. (Jt. Ex. 28). In 1997, liabilities as listed on the audited Financials increased to a total of $25 million. (Jt. Ex. 28; Jt. Ex. 31 at 3) Total liabilities increased in 1998 to $25.5 million. (Jt. Ex. 28)

69. KPMG's audited financials of Doctors Hospital for the years ending September 30, 1997 and 1998 did not contain any going concern qualifications. (Jt. Ex. 37)

### Financial Performance of Doctors Hospital after Daiwa and Nomura Transactions

70. After the MMA Funding, LLC and Nomura loans were consummated on March 31, 1997 and August 28, 1997, respectively, Doctors Hospital continued in operation before filing for bankruptcy on April 17, 2000, and was able to make all of its rental payments and meet all of its other obligations through March 2000. (New Def. Ex. 82 ¶ 232; Jt. Ex. 202 ¶¶ 20, 70–84)

71. The payments called for under the HPCH Lease were at a level equal to what Doctors Hospital was paying for use of its facility since 1992 under prior leases. (*See* Jt. Exs. 18, 154, 155; New Def. Ex. 82 ¶¶ 35, 36, 37, 38, 39, 40)

72. There were no defaults on any payments under the MMA Funding, LLC Loan or HPCH Lease; some initial capital contributions due under the Nomura transaction were inadvertently not paid, but were made up in May 1998. (New Def. Ex. 82 ¶ 233; 06 Tr. Vol. II: 70–71; 06 Tr. Vol. IV: 206; 12 Tr. Vol. III: 324–325; 12 Tr. Vol. VI: 921)

73. There was a renewal of the Daiwa Securitization between MMA Funding, LLC and Daiwa in February, 1999 for two more years. (Jt. Exs. 4, 28, and 31, at 3; New Def. Ex. 82 ¶ 234)

### PLAINTIFF'S SOLVENCY MEASUREMENT DATES AND SOLVENCY CONCLUSIONS

### Plaintiff's Expert Witnesses on Remand

74. Michael Lane, one of Plaintiff's insolvency experts, is an expert in the healthcare industry, healthcare financing (including receivables financing), Medicare/Medicaid (including Medicare/Medicaid Reimbursement), and the Chicago metropolitan area healthcare market. (New Def. Ex. 82 ¶ 221; 06 Tr. Vol. III: 49–50, 61–62) Lane, who now leads the healthcare corporate restructuring practice at Navigant Capital Advisors, has over twenty-five years of experience in banking and accounting aspects of healthcare. (New Def. Ex. 82 ¶ 221; 06 Tr. Vol. III: 22–49) He became familiar with the Hospital during the course of his work with its creditors committee and counsel beginning in August 2000. (New Def. Ex. 82 ¶ 221; 06 Tr. Vol. III: 64–67)

75. Peltz and Lane also provided in Plaintiffs' Expert Report on Remand calculations of Doctors Hospital's Indicated Fair Value of Equity as of the audited year ends for September 30, 1997, 1998 and 1999, based on the same audited Financials Peltz and Lane used to reach their solvency conclusions in Plaintiff's First Expert Report, and further as of March 31, 2000. (New Pl. Ex. 1 and Tab 11 thereto; 12 Tr. Vol. I: 52)

76. Tab 11 to Plaintiff's Export Report on Remand summarizes the methodology used and concludes that Doctors Hospital had a negative Indicated Fair Value of Equity as of September 30, 1997, 1998, 1999, and as of March 31, 2000, as follows:

| *September 30, 1997* | *September 30, 1998* | *September 30, 1999* | *March 31, 2000* |
|---|---|---|---|
| $(17,502) | $(5,817) | $(19,507) | $(24,293) |

(New Pl. Ex. 1, Tab 11)

77. Neither Peltz nor Lane could identify any material changes in Doctors Hospital's financial condition from August 28, 1997 to October 31, 1997, which would have rendered Doctors Hospital insolvent, or any other test for insolvency, as of September 30, 1997, and over $17.2 million as of October 31, 1997. (12 Tr. Vol. VI: 896–97, 12 Tr. Vol. IX: 1188–91)

78. Neither Peltz nor Lane had reviewed or were even aware of this Court's Motion in Limine Order before preparing Plaintiff's Expert Report on Remand, and it is not referenced in that report. (New PL Ex. 1; 12 Tr. Vol. II: 290–91)

79. Peltz testified that the internal financials for Doctors Hospital reflect that for the period August 1997 through October 1997, Doctors Hospital's financial performance actually improved. (Jt. Ex. 195; 12 Tr. Vol. III: 328–29)

80. Peltz testified that the execution of the HPCH Lease did not render Doctor's Hospital insolvent between August 28, 1997 and September 30, 1997 (12 Tr. Vol. II: 292–93), and while Peltz could not recall what rent Doctors Hospital was paying prior to August 28, 1997, the parties stipulated that Doctors Hospital was paying approximately the same amount of rent for the years prior to and after the HPCH Lease was entered into. (New Def. Ex. 82 ¶¶ 35, 36, 37, 38, 39, 40; 12 Tr. Vol. III: 323)

81. Both methodologies used by Peltz and Lane in Plaintiff's Expert Report on Remand, as described above, reflect the Remand Opinion by: (i) adding back to the audited financial statements the amounts deducted from normalized income via imposition of a 40% tax rate on Doctors Hospital's income (the "tax effecting" which the Court of Appeals ruled was improper); and (ii) adding back the amounts which Peltz and Lane had deducted from Doctors Hospital's income for 1997 and 1998 based on a proration of the upcoding and kickback settlements for those years, which the Court of Appeals ruled was improper by failing to also take into account the contingent asset of Desnick's ability to pay any such contingent liabilities. (New PL Ex. 1, Ex. 1 n.6 and n.11; New Pl. Ex. 1, Ex. 11 n.2 and n.5)

### 1. *Same Division of Responsibility by Peltz and Lane in Plaintiff's Expert Report on Remand as with Plaintiff's First Expert Report*

82. Peltz and Lane authored Plaintiff's Expert Report on Remand dated November 15, 2011. (New Pl. Ex. 1) As with Plaintiff's First Expert Report, Peltz was responsible for all aspects of the solvency section of Plaintiff's Expert Report on Remand, with Lane providing input on the healthcare industry, particularly as it related to the company specific risk premium applied to Doctors Hospital. (12 Tr. Vol. II: 275–76; 12 Tr. Vol. VI: 850–52)

83. Peltz/Lane's starting point for their analysis was their calculation of insolvency presented at the First Trial. (New PL Ex. 1, Tab 10) That calculation was based on the fiscal year-end audited financial statements as of September 30, 1997, 1998, and 1999, and the monthly statements for the partial year 2000. The revised calculation, with footnotes showing the adjustments, appears in Exhibit 11 of Plaintiff's Expert Report on Remand.

84. As with Plaintiff's Expert Report on Remand, Plaintiff's First Expert Re-

port reflects a fair market value balance sheet methodology, as well as cash flow and capital adequacy methods to assess Doctors Hospital's solvency for the period October 1, 1997 through March 30, 2000. (Jt. Ex. 159; New Pl. Ex. 1: 16–22)

85. Plaintiff's experts measured solvency from the period starting October 31, 1997 and through March, 2000 (New Pl. Ex. 1), and testified at trial that Doctors Hospital was insolvent at all times during this period. (New Pl. Ex. 1, at 4; 12 Tr. Vol. II: 276–77, 286–87)

## 2. No New Information Reviewed in Preparing Plaintiff's Expert Report on Remand

86. Peltz testified that although he made changes in Plaintiffs Expert Report on Remand by now using the reserve in the Coopers & Lybrand Report, and further utilizing a new size risk adjustment, he had no new information or documents at his disposal when Plaintiff's First Expert Report was prepared. (12 Tr. Vol. I: 54–55; 12 Tr. Vol. II: 284–85)

87. Lane testified that he did not have anything new at his disposal when preparing Plaintiff's Expert Report on Remand that he did not have when preparing Plaintiff's First Expert Report, nor did Lane interview anyone as part of his involvement in Plaintiff's Expert Report on Remand, or review the recent depositions of Robinson and Desnick before preparing Plaintiff's Expert Report on Remand. (12 Tr. Vol. VI: 903–04)

## 3. Same Solvency Tests Presented

88. As with Plaintiff's Expert Report on Remand, Plaintiff's First Expert Report reflects a fair market value balance sheet methodology, as well as cash flow and capital adequacy methods to assess Doctors Hospital's solvency for the period

October 1, 1997 through March 30, 2000. (Jt. Ex. 159; New PL Ex. 1, at 16–22)

## 4. Plaintiff's Conclusions in the Expert Report on Remand as to Cash Flow and Adequate Capital

89. Based on the same financial data used for the balance sheet approach (as now adjusted by Peltz), Peltz concluded in Plaintiff's Expert Report on Remand that, as was his conclusion in Plaintiff's First Expert Report, Doctors Hospital was also insolvent under the cash flow and capitalization tests between September 30, 1997 and March 31, 2000. (New Pl. Ex. 1, Section VI ¶¶ 43, 44)

## 5. "Trailing Twelve Month" Methodology in Plaintiff's Expert Report on Remand

90. On remand, Peltz and Lane also applied a trailing twelve months methodology to determine the annualized income utilized in the computation of the fair value of Doctors Hospital's equity ("TTM Methodology"). (New Pl. Ex. 1, at 16–17, ¶¶ 33–34; 12 Tr. Vol. I: 115–17)

91. This trailing-twelve-month methodology utilizes as its primary basis for normalizing income the internal financial statements prepared by Doctors Hospital for the period October 1997 through March 2000, but then adjusted by using the audited financials of Doctors Hospital effective September 30, 1997, 1998 and 1999, but only first applied to these internal financials as of the actual release dates of the audited financials months later, not as of their effective date months prior. (New Pl. Ex. 1, at 16–17, ¶¶ 33–34; 12 Tr. Vol. I: 115–17)

92. Lane had no input into deciding to use these internal financials, or to have monthly measurement dates as part of Plaintiff's Expert Report on Remand; he was simply informed by Peltz's team that

they were going to use the internal financials this time around and explained the methodology. (12 Tr. Vol. VI: 898–99)

93. Lane, a CPA who has participated in audits of hospitals when employed by an outside auditing firm, Deloitte and Touche, acknowledged he is not aware of any generally accepted auditing standards that allow the use of audited financials to adjust unreliable monthly financials to try and make them reliable. (12 Tr. Vol. VI: 930)

94. Peltz and Lane testified they did not have all of the interim financials to review when preparing the TTM Methodology as part of Plaintiff's Expert Report on Remand. (12 Tr. Vol. II: 187; Vol. VI: 929)

95. Peltz and Lane previously testified under oath in both their depositions in 2006 and at the first trial that these internal financial statements of Doctors Hospital were very suspect and unreliable, such that they did not rely on these internal financial statements in Plaintiffs' First Expert Report, but rather relied on the audited financial statements prepared by KPMG in preparing their own report. (06 Tr. Vol. IV: 11, 15, 97; 12 Tr. Vol. I: 119; 12 Tr. Vol. III: 335; 12 Tr. Vol. VI: 925–26)

96. Peltz utilized the audited financial statements for Doctors Hospital dated as of September 30, 1997, 1998 and 1999 as a "starting point," and thereafter made monthly adjustments to the internal financials, by taking the percentage difference between the audited versus internal financials for revenues and expenses for a particular year, and applying that percentage difference to each trailing twelve month measurement date. (New Pl. Ex. 1, Ex. 3 thereto; 12 Tr. Vol. I: 116–17)

97. Peltz testified that he used the audited financials only as of the date they were issued, which were months after the September 30 fiscal year had ended for Doctors Hospital, and not their effective date, such that, for example, if Peltz were making adjustments to the August 1998 internal financials, Peltz would utilize the 1997 audited financials, even though the 1997 audited financials involved review of 1997 financial results, not 1998 financial results. (12 Tr. Vol. III: 342–43; 12 Tr. Vol. IX: 1219)

98. Peltz testified he used the TTM Methodology given his professional opinion and upon the advice of counsel, in light of the Court of Appeal's general criticism of the use of "hindsight" in valuation methodology and not because the Remand Opinion required it. (12 Tr. Vol. I: 131; Vol. III: 331–32, 356–57)

99. Peltz did not recall ever using this TTM Methodology in any prior solvency analysis, and he does not recall ever seeing another valuation expert using such a methodology. (12 Tr. Vol. III: 347)

100. Peltz further acknowledged that there are no learned treatises he could point to that describes the approach he took in his TTM Methodology. (12 Tr. Vol. III: 350, 352)

101. Peltz also admitted he did not discuss with RSM McGladry's audit group if such an approach was acceptable for any purpose. (12 Tr. Vol. III: 358)

102. Lane had no input into deciding to use these internal financials, or to have monthly measurement dates as part of Plaintiff's Expert Report on Remand. (12 Tr. Vol. VI: 898–99)

103. Lane, a CPA who has participated in audits of hospitals when employed by an outside auditing firm, Deloitte and Touche, acknowledged he is not aware of any generally accepted auditing standards that allow the use of audited financials to adjust unreliable monthly financials to try and make them reliable. (12 Tr. Vol. VI: 930)

104. Peltz and Lane testified they did not have all of the interim financials to review when preparing the TTM Methodology as part of Plaintiff's Expert Report on Remand. (12 Tr. Vol. II: 187, Vol. VI: 929)

105. Peltz further admitted he did not start counting an account receivable due Doctors Hospital from Desnick as an asset in his TTM Methodology until July, 1999, since that was the first time it appeared on the interim monthly financials. (12 Tr. Vol. II: 158–61)

106. Using the TTM Methodology, Plaintiffs' Expert Report on Remand concludes that Doctors Hospital had a negative Indicated Fair Value of Equity of $17.286 million starting as of October 31, 1997 and, notwithstanding a trend toward a more positive Indicated Fair Value of Equity through March, 1998, then continued to decline (according to Peltz), reaching a low of a negative $51.399 million Indicated Fair Value of Equity in March 2000, all as reflected on Tab 1 to Plaintiff's Expert Report on Remand. (New Pl Ex. 1 and Tab 1 thereto)

**Paying Debts as They Come Due**

107. Richard Felbinger, CFO for Doctors Hospital from April to September, 1998, testified that one request for an advance from IDPA was made by Doctors Hospital in May, 1998. That was the only request he could recall. (New Def. Ex. 82 ¶ 251; Pl. Ex. 26, at 39–40)

108. Felbinger also testified that overdrafts were not continuous during his time at Doctors Hospital; they were able to manage cash, obtain funds from Desnick, and a bridge loan from a local bank. (New Def. Ex. 82 ¶ 252; Pl. Ex. 26, at 38)

109. Robinson testified, as he had previously testified by affidavit in the Daiwa litigation, that it was not unusual for hospitals like Doctors Hospital, who are dependent on third party payors, to have intermittent cash flow problems as the hospital awaits payments from these third party payors. (New Def. Ex. 95; New Def. Ex. 144, at 86–87)

110. Robinson confirmed that while he was not satisfied at certain points with the procedures for getting things billed and collected at Doctors Hospital, when Nelson Vasquez and others came aboard they improved billing procedures. (New Def. Ex. 144, at 88–91)

111. Desnick also confirmed that Doctors Hospital would occasionally experience cash flow issues, given its reliance on third-party payors, which is common in the industry, and which was one of the reasons for the MMA Funding, LLC Loan. (New Def. Ex. 143, at 24–25)

112. Michael Nelson, CFO of Doctors Hospital from October, 1998 to May, 1999, testified that while during this period some checks were held, he did not believe checks were held most of the time, nor was it a standard practice to issue checks without sufficient funds in the Doctors Hospital account. (New Def. Ex. 82, ¶ 254; Pl. Ex. 29, at 33–36)

113. Stephen Weinstein, the President of Doctors Hospital who left for Michael Reese Hospital in October, 1998, and who reviewed Doctors Hospital's financial statements monthly, testified that he did not recall Doctors Hospital having difficulty paying its bills, holding checks, or having negative fluctuations in cash flow while he was employed by Doctors Hospital. (New Def. Ex. 82, ¶ 250; Def. Ex. 44), at 69–70, 78, 83.

114. Based on the stipulated facts as noted in his Expert Report on Remand, the Remand Opinion and the Rehearing Denial Order, it was McDonough's conclusion that Doctors Hospital was paying its debts as they came due up to the time of

the filing of the bankruptcy petition. (New Def. Ex. 66, at 23; 12 Tr. Vol. V: 651–52)

#### DEFENDANT'S EXPERT REPORT ON REMAND

#### Insolvency Experts

115. Edward McDonough ("McDonough"), a Managing Director at Alvarez & Marsal's Dispute Analysis & Forensic Services, LLC, submitted an expert report on remand ("Defendant's Expert Report on Remand") (New Def. Ex. 66) as well as a supplemental report on behalf of the Defendant ("Defendant's Supplemental Expert Report on Remand"). (New Def. Ex. 130)

116. McDonough has a BA in Accounting, an MBA, is a Certified Public Accountant ("CPA"), has provided audit consulting and forensic accounting services in his professional career, was a partner at Price Waterhouse Coopers, has been a CFO, and has conducted thirty-five to forty business valuations, including nursing homes. (12 Tr. Vol. IV: 521–27)

117. Based on this experience, McDonough analyzed and critiqued both Peltz and Lane's Expert Report on Remand and Plaintiff's First Expert Report in conjunction with the Remand Opinion to determine if Doctors Hospital was insolvent during any period after August 1997 until it filed for bankruptcy. (*Id.*)

118. McDonough has no specific healthcare expertise. (12 Tr. Vol. V: 659–61) His analysis began with Peltz/Lane's conclusions and made adjustments, concluding that the Hospital was solvent as of September 30, 1999. McDonough gave no opinion concerning the Hospital's solvency from October 1, 1999 to April 17, 2000 (New Def. Ex. 66)

#### Re–Admission of Defendant's Prior Expert Report at First Trial

119. Defendant's solvency expert in the initial trial, Thomas Blake ("Blake") of Charles River Associates, submitted an expert report ("Defendant's First Expert Report") and testified at the First Trial on behalf of the Defendant. (Jt. Ex. 31) Blake's solvency analysis, testimony and conclusions were re-admitted on remand pursuant to pretrial order.

120. Blake concluded that Doctors Hospital was solvent as of September 30, 1997 and September 30, 1998, under the balance sheet test of Section 101(32) of the Bankruptcy Code, as well as the adequate capital and cash flow tests under Bankruptcy Code Sections 548(a)(1)(B)(i)(II) and (III). (Jt. Ex. 31, at 15–20, and Exs. 2.0 and 3.0 thereto).

#### Defendant's Expert Report on Remand

121. McDonough criticizes Peltz and Lane's Expert Report on Remand on a number of bases, as set forth at pages 5–10 of Defendant's Expert Report on Remand. (New Def. Ex. 66, at 5–10)

#### 1. *No Material Change in Doctors Hospital's Financial Condition Between August 28, 1997 and October 1, 1997, the First Measurement Date*

122. The Remand Opinion determined that the methodology used by each expert at the first trial, the discounted-cash-flow analysis, "showed that Doctors Hospital was solvent in August 1997—indeed, comfortably solvent." *Paloian v. LaSalle N.A.*, 619 F.3d 688, 693 (7th Cir.2010). And in its Rehearing Denial Order the Court of Appeals stated, without making a finding, that Doctors Hospital was paying its debts as they became due until the bankruptcy filing. (New Def. Ex. 81) In conformance with these rulings, this Court previously entered its Motion in Limine Order (New Def. Ex. 86) on April 7, 2011, ruling that Doctors Hospital was solvent as of August 28, 1997 under any solvency test, including the. balance-sheet test.

123. Peltz acknowledged that he had Doctor's Hospital's internal financials for the period August 28, 1997 through October 31, 1997, and that other than the execution of the HPCH Lease as part of the Nomura Loan, he did not recall any material changes in Doctor Hospital's financial condition from August 28, 1997 to October 31, 1997. (12 Tr. Vol. II: 293–94, 296–97)

124. Peltz admitted that the internal financials for Doctors Hospital reflect that for the period August 1997 through October 1997, Doctors Hospital's financial performance actually improved. (12 Tr. Vol. III: 328–29; *see also* Jt. Ex. 195)

125. Peltz admitted that the execution of the HPCH Lease did not render Doctor's Hospital insolvent between August 28, 1997 and September 30, 1997. (12 Tr. Vol. II: 292–93) The parties stipulated that Doctors Hospital was paying approximately the same amount of rent for years both prior to and then after August 28, 1997, when the HPCH Lease was entered into. (New Def. Ex. 82 ¶¶ 35, 36, 37, 38, 39, 40)

126. Lane similarly could not recall anything "in real terms" that occurred between August 28, 1997 and October 31, 1997 that would have materially impacted Doctor Hospital's financial condition during that period. (12 Tr. Vol. VI: 896–97)

## 2. *Deduction for Reserve for Contingent Upcoding Findings in Coopers & Lybrand Report Without Consideration of Desnick's Ability to Pay Same as a Contingent Asset*

127. Peltz and Lane deducted $4.638 million from Doctors Hospital's income on a monthly basis in their TTM Methodology starting as of October 31, 1997 (with this deduction then amortized over a twelve month period beginning in May 1998 through March 1999) (New Pl. Ex. 1, Tab 1), and also deducted that amount under

their Audited Financials as Adjusted Methodology as of September 30, 1997 (a deduction of $4.638 million) and September 30, 1998 (a deduction of $2.319 million). (New Pl. Ex. 1 and Tabs 1 and 11 thereto; 12 Tr. Vol. I: 52–53, 12 Tr. Vol. II: 369–70)

128. These deductions are taken from the $4.638 million identified in the Coopers & Lybrand Report as a "reserve," representing a contingent liability based on potential future reductions in Doctors Hospital's income for upcoding in the event that a federal investigation ensued and Doctors Hospital's liability for upcoding. (Jt. Ex. 177; 12 Tr. Vol. III: 373, 375–77, 392–93, 415)

129. The deduction of $2.319 million as of September 30, 1998 in Peltz's Audited Financials as Adjusted Methodology, versus the full $4.638 million, is based on Peltz's belief that at some point the upcoding activity would cease after a hypothetical buyer purchased the Hospital; accordingly, the $2.319 million figure is his "best guess" as to what the deduction for upcoding should be as of September 30, 1998. (New Pl. Ex. 1, Tab 11 and n.13; 12 Tr. Vol. I: 93–94; 12 Tr. Vol. III: 409)

130. The $4.638 million deduction in Plaintiff's Expert Report on Remand, as derived from the Coopers & Lybrand Report (and as confirmed in the depositions of the Coopers and Lybrand employees responsible for the Report), is based upon the same potential upcoding exposure for simple and complex pneumonias that was eventually settled in 1999 for $4.5 million, and which was paid for in its entirety by Desnick. (Jt. Ex. 177; 12 Tr. Vol. III: 393–98; 06 Tr. Vol. IV: 17 New Def. Ex. 147, at 45–46; New Def. Ex. 146, at 43)

131. Peltz testified that while he was aware of the Coopers & Lybrand Report when he prepared Plaintiff's First Expert

Report, and cited to and utilized it in Plaintiff's First Expert Report, he did not deduct any of the $4.638 million from the Coopers & Lybrand Report when normalizing income in his First Expert Report, but rather used the $4.5 million upcoding settlement as the basis for the deduction for upcoding when normalizing income in Plaintiff's First Expert Report. (12 Tr. Vol. III: 389–90)

132. Peltz testified that the Coopers & Lybrand Report only mentioned a "reserve," even thought he labeled the reserve as "fraudulent earnings". (12 Tr. Vol. I: 93)

133. Peltz also testified that the KPMG audited financial statements from 1997, 1998 and 1999 did not create any kind of reserve for potential upcoding. (Jt. Ex. 28, 37; 12 Tr. Vol. III: 415)

134. McDonough testified that all valuators are required to reach valuation conclusions in conformance with binding legal precedent. (12 Tr. Vol. V: 739)

135. Peltz and Lane further acknowledged that if the $4.638 million was simply added back to Doctors Hospital's income in 1997 and 1998, with no other adjustments to their methodology as reflected on Tab 11 to the Expert Report on Remand, Doctors Hospital would have a positive Indicated Fair Value of Equity for 1997 and 1998. (12 Tr. Vol. III: 405; 12 Tr. Vol. VI: 930)

136. New Def. Ex. 137 provided McDonough's calculations of Doctors Hospitals' Fair Value of Equity, using the identical amounts set forth in Tab 11 to Peltz and Lane's Expert Report on Remand, but now both added back the $4.638 million deduction, and utilized the capitalization multipliers previously used by Peltz and Lane in their First Expert Report authored in 2005. McDonough calculated that Doctors Hospital had a positive Fair

Value of Equity of $14.362 million as of September 30, 1997, and $11.712 million as of September 30, 1998. (New Def. Ex. 137)

### (a) Coopers & Lybrand Report

137. On July 30, 1997, prior to the Nomura Loan, Coopers & Lybrand was engaged by Nomura to conduct a market/competitive review, and financial review, of Doctors Hospital, to: (i) verify projected net income to support the $50 million loan, (ii) determine if any significant regulatory, market or competitive factors would impact on on-going operations and the prospective financial performance of Doctors Hospital, and (iii) whether any significant internal factors would preclude Nomura from entering into the $50 million loan. (Jt. Ex. 25)

138. In September, 1997, Coopers and Lybrand prepared a report ("*Coopers & Lybrand Report*"), entitled "Summary of Information for Desnick Refinancing: $50,000,000." (Jt. Ex. 177)

139. The Coopers & Lybrand Report reflected its site visits to Doctors Hospital, review of financial information, analysis of the Hospital's competitive environment, potential reserve adjustments upward and downward to Doctors Hospital's prospective income, including a potential reserve to account for, *inter alia*, possible prospective investigation relating to up-coding. (Jt. Ex. 177, at I–1 to I–3)

140. Coopers & Lybrand also calculated the Doctor Hospital's EBIDTA and Adjusted NOI (net operating income), and determined that it had sustained a debt service coverage of 2.12 for the prior twelve months ending July 31, 1997. (*Id.* at I–3)

141. Coopers & Lybrand concluded that Doctors Hospital would be able to achieve profit margins going forward that

would be similar to the adjusted net operating income for the trailing twelve months, and should be able to generate cash flows in amounts in excess of what was needed to meet the debt service requirements of the Nomura Loan. (*Id.* at II–5)

142. Lane testified at the First Trial that he could not recall if either he or Peltz undertook any independent analysis, for example the calculation of Doctor Hospital's EBITDA as of August, 1997, to contest the determination by Coopers & Lybrand that Doctors Hospital could cash flow the debt created by the Nomura transaction. (06 Tr. Vol. IV, at 13–14)

143. Coopers & Lybrand also addressed the up-coding issue in their report and determined Doctors Hospital's potential exposure and the amount that it might be expected to pay if the government chose to examine and thereafter determine its coding practices were improper. (Jt. Ex. 177, at II–3; New Def. Ex. 147, at 53–54, 130) Based on this approach, Coopers & Lybrand's best estimate was that there may be $4.638 million in potential liability for upcoding for a four year period spanning from 1993 to 1997. (Jt. Ex. 177, at II–3; New Def. Ex. 147, at 53–54)

144. In 1999, Doctors Hospital agreed to settle a federal government pneumonia upcoding investigation for $4.5 million, without admission of any liability. (Jt. Ex. 161)

*(b) No Use of Reserve in Coopers & Lybrand Report in Plaintiff's First Trial Report to Reduce Doctors Hospital's Normalized Income*

145. Peltz and Lane testified that they chose not to deduct any amounts from Doctors Hospital's earnings between 1997 and 2000 in their report in connection with the first trial based on the Cooper & Lybrand Report despite having the Coopers & Lybrand Report and all related materials and deposition testimony available when preparing their report in connection with the first trial, including the estimate of $4.638 million as a reserve for contingent liability for upcoding. (12 Tr. Vol. III: 388, 390–92; 12 Tr. Vol. VI: 904–08)

### Defendant's Supplemental Expert Report on Remand

146. Prior to the Remand Trial, McDonough submitted a supplemental report correcting an error in his original calculation of insolvency. (New Def. Ex. 130) "In his original report, he double-counted certain assets designated 'Due from majority shareholder' and 'Receivable from related organization' by including them both in his net working capital calculation and as an "Addback of Non–Operating Assets." (*Id.*) The amount of these assets $5.874 million for 1997, $5.185 million for 1998, and $3.676 million for 1999. (*Id.*)

147. After correcting this error, McDonough's computation of fair value of equity showed the Hospital was insolvent during the fiscal year 1999. (*Id.*) However, McDonough did not concede insolvency for that year. Instead, he re-stated his disagreement with Peltz/Lane's use of a 10% specific company risk premium in calculating the Hospital's weighted average cost of capital. (*Id.*) He also questioned the basis for the industry level of working capital used in Peltz/Lane's calculation of the Hospital's net working capital. (*Id.* at 5)

### Plaintiff Has Failed to Meet His Burden of Proving Insolvency for the Entire Measurement Period

148. For the period October 1, 1997 through March 2000, the solvency measurement dates used by Plaintiff's experts, Plaintiff has failed to present facts sufficient to meet its burden to prove that Doctors Hospital was insolvent at all

points during this period. Plaintiff has met its burden with respect to the period beginning October 1, 1999.

FINANCIAL PERFORMANCE OF THE HOSPITAL

### Fiscal Year 1997

149. From 1997 to 1998, Doctors Hospital's gross and net incomes improved. (New Def. Ex. 82 ¶ 235)

150. Lane admitted that in 1997 he could not identify any issues regarding Doctors Hospital's projected versus actual performance. (06 Tr. Vol. III: 171)

151. Lane testified he had no evidence to suggest that during calendar year 1997 Doctors Hospital was having any difficulty in paying their bills as they became due in the ordinary course of business. (06 Tr. Vol. III: 171–72)

152. Peltz admitted that his report did not cite evidence that Doctors Hospital was unable to pay its debts as they became due in calendar year 1997. (06 Tr. Vol. IV: 196–97)

153. In 1997 Doctors Hospital's accounts payable days outstanding were significantly below (better than) the CHIPS–Urban hospital data for that period. (New Def. Ex. 82 ¶ 238; Jt. Ex. 159, Exhibit B(1) thereto; 06 Tr. Vol. III: 153–56)

154. Doctors Hospital's days receivables outstanding were less (better) that the 1997 RMA and CHIPS–Urban averages. (New Def. Ex. 82 ¶ 239; Jt. Ex. 159, Ex. B(1) thereto; 06 Tr. Vol. III: 153–56)

155. Of the eight hospitals within a five-mile radius of Doctors Hospital, in 1997 and 1998 Doctors Hospital had better occupancy rates than five of those eight. (New Def. Ex. 82 ¶ 242; Jt. Ex. 159, at 9)

156. Doctors Hospital had an occupancy rate of 64% in 1997, which was better than its closest competitors and better than the 61% average rate of occupancy for Chicago, Illinois hospitals. (New Def. Ex. 82 ¶ 243; 06 Tr. Vol. III: 145–46)

157. As of September 30, 1997, Doctors Hospital had close to average accounts payable days outstanding. (06 Tr. Vol. III: 153, 156)

158. As of September 30, 1997, Doctors Hospital had accounts payable statistics that were seventeen days better than the average accounts payable days outstanding for urban hospitals. (06 Tr. Vol. III: 154–56)

159. As of September 30, 1997, Doctors Hospital's days receivables outstanding were very close to the average for urban hospitals. (New Def. Ex. 82 ¶ 244; 06 Tr. Vol. III: 155–156)

160. Cash available to Doctors Hospital was better than the industry average in 1996 and 1998, and was worse in 1997; however, Plaintiff's experts had not undertaken any analysis of the cause of these variances at the first trial. (06 Tr. Vol. IV: 200–01)

161. Doctors Hospital's net working capital for 1998 was not materially below the industry average. (New Def. Ex. 82 ¶ 245; 06 Tr. Vol. IV: 203)

162. Doctors Hospital's audited financials showed a revenue increase of over $2.6 million from 1997 to 1998. (Jt. Ex. 37)

163. Doctors Hospital's net working capital as a percentage of its revenues improved from 1997 to 1998 as compared to industry averages. (New Def. Ex. 82 ¶ 246; 06 Tr. Vol. IV: 204)

164. Doctor Hospital's EBITDA improved from 1997 to 1998. (New Def. Ex. 82 ¶ 247; 06 Tr. Vol. IV: 208–09).

165. Doctor Hospital's funded debt decreased (improved) and its funded debt over the book value of invested capital

improved from 1997 to 1998. (New Def. Ex. 82 ¶ 248; 06 Tr. Vol. IV: 208–09)

166. Doctors Hospital's interest coverage and debt service ratio improved from 1997 to 1998. (New Def. Ex. 82 ¶ 249; 06 Tr. Vol. IV, at 208–09)

167. Stephen Weinstein, the President of Doctors Hospital who left for Michael Reese Hospital in October, 1998, and who reviewed Doctors Hospital's financial statements monthly, testified that he did not recall Doctors Hospital having difficulty paying its bills, holding checks, or having negative fluctuations in cash flow while he was employed by Doctors Hospital. (New Def. Ex. 82 ¶ 250; Def. Ex. 44, at 69–70, 78, 83)

### Fiscal Year 1998

168. Phil Robinson, CFO of Medical Management of America, Inc., who provided financial advices and oversight for Desnick's companies, including the Debtor, testified that Doctors Hospital improved its financial condition in 1998 (06 Tr. Vol. II: 77; New Def. Ex. 144, at 97–98), and had an operating profit during the first three months of 2000 prior to the bankruptcy filing. (New Def. Ex. 144, at 97–98)

169. In 1998, Doctors Hospital's receivables days outstanding were better than the RMA and CHIPS–Urban averages. (New Def. Ex. 82 ¶ 241; Jt. Ex. 159, Ex. B(1) thereto; 06 Tr. Vol. III: 155–56)

170. From April through September, 1998, the accounts receivable aging of Doctors Hospital improved. (Pl. Ex. 26, at 71–72)

### Fiscal Year 1999 and First Half of Fiscal Year 2000

171. Robinson testified that Doctors Hospital was profitable for the time period January through March 2000. (New Def. Ex. 95, at 1–2; New Def. Ex. 144, at 97–98)

172. Desnick testified that leading up to March 2000 Doctors Hospital was in a positive cash flow position. (New Def. Ex. 143, at 115–116)

### Withdrawals and Contributions by Desnick

173. It was stipulated by the parties that between January 1, 1997 and 2000, Desnick withdrew approximately $14.2 million from Doctors Hospital. (New Def. Ex. 82 ¶ 268; Jt. Ex. 32, Schedule 1 thereto, at 5–8; 06 Tr. Vol. II: 70; 06 Tr. Vol. III: 164, 175–76)

174. Peltz, upon questioning by this Court, could not quantify what amounts Desnick owed to Doctors Hospital, stating that he did not engage in an accounting examination of what Desnick owed Doctors Hospital, but admitted Desnick at all relevant times owed money to Doctors Hospital (12 Tr. Vol. I: 100–02; 12 Tr. Vol. II: 165)

175. However, Felbinger, CFO of Doctors Hospital from April to September, 1998, attributed the cash flow issues experienced during that time period at least in part to these significant withdrawals by Desnick, who again desired to take "certain amounts out of the business." (Pl. Ex. 26, at 45–46)

176. Felbinger indicated the amounts taken out monthly by Desnick were up to $400,000. (Def. Ex. 38, at 70–71)

177. Robinson also confirmed that Desnick was taking out substantial amounts of money during this period. (06 Tr. Vol. II: 29; 71–73)

178. Plaintiff's expert, Lane, testified he had not tried to determine how those large withdrawals would have impacted on Doctor Hospital's ability to manage cash on a daily basis, and to pay debts as they became due. (06 Tr. Vol. III: 177–79)

179. Desnick made certain capital contributions to Doctors Hospital from 1998 to April 2000, prior to the bankruptcy filing. (Jt. Ex. 32, Schedule 1 thereto, at 5–8)

180. Robinson confirmed Desnick would commonly provide working capital to Doctors Hospital from 1997 to 2000. (New Def. Ex. 144, at 76)

181. Several witnesses employed by Doctors Hospital who were involved in making periodic requests to Desnick for cash payments from 1998 to 2000 testified that Desnick would contribute cash when needed. (06 Tr. Vol. I: 159–60; Pl. Ex. 26, at 74; Pl. Ex. 29, at 13–14, 26; Pl. Ex. 35, at 22–23)

182. Desnick also testified that there was never an occasion when he was asked to provide money to Doctors Hospital between 1997 and 2000 and he refused or failed to do so; in fact, Desnick funded these requests from Doctors Hospital up until the bankruptcy filing. (New Def. Ex. 143, at 93–94; 98–104)

183. Desnick stated that he never thought in terms of whether there was a limit as to what amount he would transfer to Doctors Hospital if requested; he further states it simply never occurred that the amount requested was so high that he refused to do so. (New Def. Ex. 144, at 119–20)

184. Desnick confirmed that he would occasionally follow up requests for payments to Doctors Hospital by preparing written requests to transfer monies from his personal Grand National Bank account to Doctors Hospital's operating account, also at Grand National Bank. (New Def. Ex. 143, at 94–95)

185. Desnick also confirmed, as reflected by his account statements, that he withdrew $600,000 from his Goldman Sachs account in September 1999, and then $800,000 in November 1999, and transferred these amounts into his personal Grand National Bank account, which correlated with his then making contributions to Doctors Hospital. (New Def. Ex. 98; New Def. Ex. 143, at 48–50)

186. Desnick would also on occasion confirm transfers to Doctors Hospital with memos to the file. (New Def. Ex. 37; New Def. Ex. 143, at 99–100)

187. Desnick further confirmed that when Nelson Vasquez asked for $1.2 million on December 9, 1999, Desnick funded that request. (New Def. Ex. 104; New Def. Ex. 143, at 110–12)

188. Desnick also testified, and Vasquez confirmed, that Desnick funded the last payroll for Doctors Hospital just prior to the closing of Doctors Hospital, as well as one payroll after the bankruptcy filing in the amount of $610,000.00. (Pl. Ex. 35, at 24; New Def. Ex. 143, at 100–01)

189. Robinson confirmed that Desnick had funded the next payroll due after the bankruptcy filing. (New Def. Ex. 144, at 75)

190. When Plaintiff's expert, Peltz, was asked at the 2006 trial why he did not take into account these capital contributions from Desnick from 1998 to 2000, he stated that he believed "most" of the payments were made "post filing" (06 Tr. Vol. IV: 95–96), and that since Desnick had no contractual obligation to make these payments, they should not be considered. (06 Tr. Vol. IV: 95–97)

191. However, at the trial on remand, Peltz admitted in response to questioning by this Court that a debt need not be evidenced by a contractual obligation, but could also be established between Desnick and Doctors Hospital by virtue of a recurring behavior between these parties. (12 Tr. Vol. II: 238)

192. Peltz further admitted that he was unaware of any learned treatise setting out a standard methodology that suggests a valuator cannot or should not consider the capital contributions of shareholders in conducting an insolvency analysis. (06 Tr. Vol. IV: 195–96) Rather, Peltz again said it was simply his "judgment call" not to do so, given the facts of this case. (*Id.*)

### Desnick's Funding of Contingent Upcoding and Kickback Settlements

193. Desnick personally funded the $4.5 million up-coding settlement in 1999. (Jt. Ex. 161; *see also* New Def. Ex. 144, at 73)

194. Desnick also confirmed he personally funded the $14 million kickback settlement reached in December, 2000 with the federal government (New Def. Ex., at 86–88) and the State of Illinois. (Jt. Ex. 162)

### Desnick's Personal Funding of $6 Million to Settle Claims Brought Against Him by the Estate

195. Desnick also confirmed he reached a $6 million settlement with the estate concerning the claims the Debtor had brought against him, and that he funded this settlement with his own money. (New Def. Ex. 102; New Def. Ex. 143, at 90–91)

196. The estate sued Desnick for, *inter alia*, his liability for loans made by Doctors Hospital to Desnick from 1996 through March 2000. (Jt. Ex. 141 ¶¶ 93–95, 266–67)

197. The estate and Desnick settled the claims against Desnick for $6 million; $3 million of the settlement payment represented a partial settlement of the loans that Doctors Hospital had made to Desnick for the period 1997 to 2000. (Jt. Ex. 141; New Def. Ex. 102; New Def. Ex. 143, at 90–91)

### Desnick's Liabilities to Doctors Hospital as Reflected on Audited Financial Statements

198. Doctors Hospital's audited financial statements reflected that $4,950,000 was due and owing from Desnick in 1997 as a receivable, $5,185,408 was due and owing from Desnick in 1998 as a receivable, and $3,767,398 was due and owing from Desnick in 1999 as a receivable. (Jt. Ex. 28)

199. Robinson confirmed that the audited financials for 1997, 1998 and 1999 showed the amounts that Desnick owed Doctors Hospital, and that he and other staff prepared internal sheets and then sent them to KPMG to reflect these receivables due from Desnick to allow KPMG to insert those amounts in the audited financials. (New Def. Ex. 144, at 77–86)

200. Desnick confirmed that the amounts listed in the 1997, 1998 and 1999 audited financials were amounts due from him as majority shareholder for those periods. (New Def. Ex. 143, at 104–06)

### Desnick's Legal Liability for Contingent Upcoding and Kickbacks

201. Desnick confirmed that the United States Attorney's office had conveyed during settlement discussions that he could be held personally liable for any upcoding or kickback liability determined at Doctors Hospital. (New Def. Ex. 143, at 126–27)

### Financial Wherewithal of Desnick to Fund Doctors Hospital's Operating Needs and Contingent Liabilities

#### 1. *Desnick's Receipt of Proceeds from $50 Million Nomura Loan*

202. Desnick testified that he received $48,525,749.23 on August 28, 1997, representing almost all of the funds generated as part of the Nomura transaction, which were deposited in his personal account at

Goldman Sachs on August 28, 1997, as reflected by his August 1997 Goldman Sachs account statement. (Jt. Ex. 182; New Def. Ex. 97; New Def. Ex. 143, at 29–31, 39)

203. Desnick also confirmed the use of certain of these proceeds from the Nomura Loan as reflected on the schedule attached to his Supplemental Answers to Interrogatories filed in the Adversary Proceeding brought against him by the estate. (New Def. Ex. 99; New Def. Ex. 143, at 35–37)

204. Based on this schedule, Desnick received a net amount of $43,226,436 from the Nomura transaction, after payment of these listed expenses. (New Def. Ex. 99; New Def. Ex. 143, at 37–38)

205. In May 1998, Desnick caused a personal financial statement to be prepared and sent to Daiwa by Robinson, which reflected a net worth of over $214,000,000, including the value attributed to Doctors Hospital, and a net worth of over $134,000,000 excluding the value attributed to Doctors Hospital. (New Def. Ex. 50; New Def. Ex. 143, at 47–48; New Def. Ex. 144, at 55–56)

206. Robinson, who was Desnick's "right hand man" regarding monitoring Doctors Hospital's cash on hand, was personally aware of Desnick's personal financial worth in the 1997 through 2000 time frame because he oversaw certain of Desnick's financial activities, helped prepared his personal tax returns, and interacted with Desnick's investment managers. (New Def. Ex. 144, at 48)

207. Robinson also confirmed that Desnick had received approximately $45 million from the proceeds of the Nomura loan. (New Def. Ex. 144, at 51)

208. Desnick testified that even absent the value attributed to Doctors Hospital, he had a net worth of over $130 million as of February 1998. (New Def. Ex. 143, at 63)

209. In December 1999, Desnick caused a personal financial statement, dated as of May 1999, to be sent to David Hyams at Daiwa, which reflected a net worth of approximately $210,000,000, including the value attributed to Doctors Hospital, and a net worth of approximately $140,000,000 to $145,000,000, excluding the value attributed to Doctors Hospital. (New Def. Ex. 143, at 69–74; New Def. Ex. 144, at 67–69)

210. Desnick also confirmed the accuracy of the values in this statement sent to Daiwa in December 1999. (New Def. Ex. 143, at 71–72)

211. Desnick stated that as of December 1999, he had no debts other than those listed on this personal financial statement, other than the Daiwa guaranty. (New Def. Ex. 144, at 73)

212. Desnick confirmed that even if the value for Doctors Hospital was removed from his personal financial statement, he would have had a net worth of $145 million as of December 1999, and further confirmed his net worth was between $140 and $145 million from October 1997 through April 2000. (New Def. Ex. 143, at 73–74)

### 2. Desnick's Personal Wealth

213. In May 1998, Desnick caused a personal financial statement to be prepared and sent to Daiwa by Robinson, which reflected a net worth of over $214,000,000, including the value attributed to Doctors Hospital, and a net worth of over $134,000,000 excluding the value attributed to Doctors Hospital. (New Def. Ex. 50; New Def. Ex. 143, at 47–48; New Def. Ex. 144, at 55–56)

214. Robinson, who was Desnick's "right hand man" regarding monitoring

Doctors Hospital's cash on hand, was personally aware of Desnick's personal financial worth in the 1997 through 2000 time frame because he oversaw certain of Desnick's financial activities, helped prepared his personal tax returns, and interacted with Desnick's investment managers. (New Def. Ex. 144, at 48)

215. Robinson also confirmed that Desnick had received approximately $45 million from the proceeds of the Nomura loan. (New Def. Ex. 144, at 51)

216. Desnick also confirmed the accuracy of this personal financial statement as of February 1998. (New Def. Ex. 143, at 58)

217. Desnick testified that even absent the value attributed to Doctors Hospital, he had a net worth of over $130 million as of February 1998. (New Def. Ex. 143, at 63)

218. This February 1998 personal financial statement of Desnick was sent to Daiwa in connection with a potential subfacility with Daiwa. (New Def. Ex. 92; New Def. Ex. 144, at 61–62; New Def. Ex. 143, at 52–54)

### 3. *Other Cash Assets of Desnick*

219. Desnick confirmed he also received a $5.4 million payment from AIG pursuant to a claim made against the directors and officers liability insurance for Doctors Hospital, as a repayment of litigation costs and expenses he had previously incurred. (New Def. Ex. 143, at 92)

220. Desnick also testified, and his account statements reflected, that $8.5 million was transferred from his Goldman Sachs account into his personal bank account at Grand National Bank in September 1997. (New Def. Ex. 143, at 33–34, 41; New Def. Ex. 98)

221. Desnick also confirmed, and his account statements reflected, a transfer of about $10,000.00 from his Goldman Sachs account into his Northern Trust personal bank account at this time. (New Def. Ex. 143, at 31–33, 42; New Def. Ex. 98)

222. Desnick testified, and his account statements reflected, that about a month later in October 1997 he transferred an additional $1.4 million from his Goldman Sachs account into his Grand National Bank account, and another $177,000 into his Northern Trust account. (New Def. Ex. 143, at 43; New Def. Ex. 98)

223. Desnick also identified and authenticated all of his other Goldman Sachs bank statements for the period November 1997 through April 2000 (New Def. Ex. 98), which included transfers to his personal account at Grand National Bank, and his written requests to have funds transferred from his account at Grand National Bank to Doctors Hospital's operating account at Grand National Bank to fund Doctors Hospital's operations. (New Def. Ex. 143, at 46–47; New Def. Ex. 105,110)

### Termination of MMA Funding, LLC Loan as Determining Factor Lending to Bankruptcy Filing

224. Daiwa did not attempt to terminate the credit facility up to March 31, 2000. (06 Tr. Vol. II: 70–71)

225. On February 25, 1999, Daiwa and MMA Funding extended the Daiwa facility to March 31, 2001. (New Def. Ex. 82 ¶ 258; Jt. Ex. 6)

226. Robinson testified that no payment defaults existed when the Daiwa facility was terminated. (New Def. Ex. 82 ¶ 259; 06 Tr. Vol. II: 82, 85–88) Rather, he testified that Daiwa's termination of the Daiwa Securitization was based on a minor mechanic's lien issue ($13,000), and Doctors Hospital being late in delivering financial statements. (New Def. Ex. 82 ¶ 259; Jt. Ex. 163; 06 Tr. Vol. II: 85–88; 06 Tr. Vol. IV: 144)

227. Accordingly, Robinson testified, as he had previously testified in the Daiwa lawsuit against Desnick, that the termination of the Daiwa facility was the reason for Doctors Hospital's bankruptcy filing, given the termination was sudden and without any prior notice, such that Doctors Hospital had no time to obtain alternative sources of financing to replace the Daiwa facility. (New Def. Ex. 82 ¶260; 06 Tr. Vol. II: 80–81; New Def. Ex. 95; New Def. Ex. 144, at 99)

228. Desnick also testified the only reason for the bankruptcy filing was the termination of the Daiwa facility at the end of March 2000, and that if Daiwa had not terminated its facility Doctors Hospital would have been able to continue in business. (New Def. Ex. 143, at 116–17)

229. There were also enough borrowing base certificates available under the MMA Funding, LLC Loan in April, 2000 to support the balance of $10.3 million on that facility at that time. (06 Tr. Vol. II: 89)

**Implementation of Balanced Budget Act in 1998**

230. On August 5, 1997, Congress passed the Balanced Budget Act (the "BBA"). *Doctors Hosp. of Hyde Park, Inc. v. Desnick et al.* (*In re Doctors Hosp. of Hyde Park, Inc.*), 360 B.R. 787, 835 (Finding #386) (Bankr.N.D.Ill.2007) Although it passed in 1997, the BBA's changes did not take effect until the beginning of Doctors Hospital fiscal year 1998, and many changes were to be phased in over the following five years. (New Def. Ex. 82 ¶386; Def. Ex. 1, at 1).

231. Arthur Gimmy said that the BBA was "the biggest financial news event in years during the first half of 1997" and "had the potential to bankrupt hospitals like [Doctors Hospital]." (New Def. Ex. 82 ¶387; Jt. Ex. 53, at 24). "Numerous articles and analyses during and at the

time of the passage of the [BBA] proclaimed that numerous inefficient, older, freestanding hospitals would likely go out of business as a result of measures in the act which affect hospitals." (New Def. Ex. 82 ¶387; Jt. Ex. 53, at 117). As early as October 1995, an article entitled "Illinois Hospitals Brace For Medicare Cutbacks" appeared in *Crain's Chicago Business.* (New Def. Ex. 82 ¶387; Jt. Ex. 53, at 58–60).

232. In May 1997 Doctors Hospital's CEO wrote to U.S. senators and congressmen to express his concern about the proposed act, saying there was "no longer any more to cut from hospitals." (New Def. Ex. 82 ¶388; Jt. Ex. 36).

233. At the time of enactment, the industry was not able to clearly quantify the impact the BBA would have on hospitals. (Def. Ex. 2, at 1–2; 06 Tr. Vol. III: 167–69)

234. Lane testified most of the BBA's substantive provisions had an initial effective date of July 1, 1998, so that any impact, if at all, of the BBA on Doctors Hospital would not have started to occur until about one year after the Nomura Transaction. (06 Tr. Vol. III: 164–65)

235. Lane testified two of the major components of the BBA, *i.e.* reductions in in-patient rates and reimbursements for bad debts, were to be phased in over a two-year period starting on July 1, 1998. (06 Tr. Vol. III: 105, 166)

236. Lane also testified the effects "the largest component" of the BBA, the reduction in in-patient reimbursement rates, could not be known at the time the BBA was signed into law in 1997. (06 Tr. Vol. III: 167–69)

237. Lane never attempted to quantify any reductions in the Doctors Hospital's

revenues to the implementation of the BBA. (06 Tr. Vol. III: 168–69)

238. Peltz did not quantify the impact of the BBA on the Debtor's financials from 1997 to 2000, and he agreed that the impact of the BBA was not entirely measurable as of August, 1997. (06 Tr. Vol. IV: 206–07)

239. Although Lane projected a possible loss in revenue over a five year period based on certain aspects of the BBA, Lane did not correlate this projected loss to any lost revenue of Doctors Hospital in 1997, 1998 or 1999. (06 Tr. Vol. III: 168–69)

240. Even though the BBA was signed into law in 1997, Lane testified that his analysis of the Hospital's value improved from 1997 to 1998. (06 Tr. Vol. IV: 207)

241. While the BBA had an impact on Doctors Hospital's cash flow, Vasquez, CFO of Doctors Hospital from April, 1999 to the bankruptcy filing, testified it was not a "primary reason" for cash flow issues experience by the Hospital in 1998. (PL Ex. 35, at 32)

**The Dobson Report**

242. Dr. Allen Dobson, Senior Vice President and Director of the Healthcare Finance Practice at The Lewin Group issued a report (the "Dobson Report") on September 29, 2003 in which he analyzed the factors that contributed to the bankruptcy of the Debtor. (Def. Ex. 1)

243. Dobson, one of Nomura's experts in its litigation with Defendant, calculated in a retrospective analysis that in 1997 Doctors Hospital stood to lose $1.3 million in Medicare payments in 1998 and $3.7 million in 1999 as a result of the BBA. *Doctors Hosp. of Hyde Park, Inc.,* 360 B.R. at 836 (Finding # 390); (New Def. Ex. 82 ¶ 390; Def. Ex. 2, at 3) In fact, as Dobson also observed, the decrease in disproportionate share payments alone went from $7.2 million in 1997 to $4.3 million in 1999. (New Def. Ex. 82 ¶ 390; Jt. Ex. 31, Tab C at 23)

244. Dobson determined that the Debtor's bankruptcy filing was caused by: (1) the departure of key management executives including hospital CEO Stephen Weinstein, (2) the departure of at least ten key admitting physicians, (3) overly cautious billing practices by physicians aware of federal investigations of hospital billing practices, (4) a decline in Medicaid cases and Medicare case mix, (5) lack of cost control following the departure of Debtor executives, and (6) ultimately, the immediate, complete loss of cash flow following the loss of the Daiwa Securitization in March, 2000. (Def. Ex. 1, at 1)

245. Dobson also concluded that the six factors listed above and their ultimate impact were not foreseeable as of the fall of 1997. (*Id.*)

246. In reaching these conclusions, Dobson analyzed the Debtor's financial statements from 1994 through 1997, as well as background information, including review of the Nomura loan documents and the Daiwa Securitization, and concluded that as of September 30, 1997, the Debtor was a "going concern business", with a "strong financial base." (*Id.,* at 3–5; 7–34)

247. Dobson also concluded that from the date the Nomura Loan was sold on October 24, 1997 to September 30, 1998, Doctors Hospital continued to perform well financially, with net income of $3.56 million and a margin (net income/revenues) of 5.0 percent. (*Id.,* at 5)

248. Dobson attributed the financial issues addressing the Debtor in 1999 as resulting from the CEO, Steven Weinstein, leaving the Debtor, together with ten high revenue producing doctors. This led to an increase in professional fee expenses and a reduction in revenues, contributing to a

net operating loss of $11.5 million in 1999. (*Id.*, at 6)

249. Robinson confirmed at the first trial that while Doctors Hospital did lose money in 1999, as reflected on its audited financials, one of the reasons it lost money during that period was as a result of Stephen Weinstein, the President of Debtor, resigning in October, 1998 and going to a direct competitor of Doctors Hospital, Michael Reese Hospital. (06 Tr. Vol. II: 89–90) The departing doctors began admitting the majority of their patients at Michael Reese. (06 Tr. Vol. II: 90, 93)

250. Robinson also agreed at the first trial that the loss of Weinstein and the admitting doctors resulted in a "noticeable drop-off" in the Doctors Hospital's admissions in 1999, (06 Tr. Vol. II: 90), with the primary loss in the geriatric population. (06 Tr. Vol. 11:94)

251. Robinson further testified at the First Trial that in addition to the loss of its President, up to ten admitting physicians left with Weinstein for Michael Reese, and these doctors began admitting the majority of their patients at Michael Reese. (06 Tr. Vol. II: 90, 93)

252. Dobson was also asked to examine the factors that lead to Doctors Hospital's bankruptcy filing in April 2000, and to determine if the most significant factors leading to the filing were foreseeable when Nomura entered into the loan with HPCH for $50 million on August 28, 1997, and on October 24, 1997. (Def. Ex. 1, at 1)

253. Robinson then quantified the loss of this revenue at the first trial as between 10 to 15% of the gross revenues of Doctors Hospital in 1998 (06 Tr. Vol. II: 98–99).

254. Doctors Hospital had gross revenues in 1998 of $71.3 million. (Jt. Ex. 37). Thus the estimated loss of revenue attributable to the loss of Weinstein and the admitting physicians, according to Robin-

son's calculation, would be between $7.1 and $10.6 million. Doctors Hospital in fact showed a loss of $7.9 million in gross revenues from 1998 to 1999. (Jt. Ex. 28)

255. Lane, however, testified that the composition and strength of a hospital's medical staff would impact on the patient base and number of admissions, and that admissions were very important to Doctors Hospital. (06 Tr. Vol. III: 184–85)

256. As to termination of the MMA Funding, LLC Loan, Dobson believed the Doctors Hospital had regained partial financial footing as of the spring 2000. (Def. Ex. 1, at 6) Daiwa had, however, packaged certain of its healthcare receivables for sale, including the Daiwa Securitization, and the potential purchaser of the health care receivables portfolio did not want to have receivables dependent upon Medicaid. (*Id.*) Although Doctors Hospital had made efforts to meet conditions by Daiwa to extend the Daiwa Securitization, Daiwa terminated the Daiwa Securitization on March 30, 2000, leaving the Debtor without an immediate source of capital. (*Id.*)

257. Dobson concluded that "in the final analysis", the loss of the MMA Funding, LLC Loan was the deciding factor leading to Doctors Hospital's bankruptcy, since it was likely Doctors Hospital could have continued to operate had the MMA Funding, LLC Loan continued. (Def. Ex. 1, at 32)

**Reduction in the Multiplier Used in Plaintiff's First Expert Report, Even Though No Change Occurred in Doctors Hospital's Circumstances**

258. The second adjustment that Peltz made in Plaintiff's Expert Report on Remand was to reduce the capitalization multiplier used in Plaintiff's First Expert Report, which has the effect of reducing the value of Doctors Hospital for each of the

solvency measurement points. (New Pl. Ex. 1, at 18)

259. The reduction of the capitalization multiplier in Plaintiff's Expert Report on Remand was a decision made by Peltz alone, without input from Lane. (12 Tr. Vol. VI: 927)

260. Upon questioning by the Court as to how Peltz could decrease the multiplier when he had the same information at his disposal when preparing Plaintiff's First Expert Report, Peltz had no answer other than it was a "judgment" call. (12 Tr. Vol. I: 53–56)

261. Peltz made this reduction in the multiplier by applying a different tax rate and, more importantly, altering the "size premium" utilized in calculating the "weighted average cost of capital" ("WACC") from a "micro cap size premium" to a "10th decile size premium." (12 Tr. Vol. I: 66, Vol. III: 427–28)

262. Peltz could not point to any literature that specifically supported changing the size premium based on the existence of unreliable internal financial statements. (12 Tr. Vol. III: 429–30)

263. Lane confirmed that he had no involvement in increasing the size premium based on this "new" risk in the form of unreliable internal financial statements. (12 Tr. Vol. VI: 927)

**Failure to Maintain Positive $12.997 Million Adjustment to 1999 Income that Peltz Made in Plaintiff's First Expert Report**

264. Plaintiff's Expert Report on Remand eliminates a positive $12.997 million adjustment to fiscal year 1999 income for Doctors Hospital when implementing the TTM Methodology. (12 Tr. Vol. III: 437–39)

265. Peltz testified that he thought reapplying this $12.997 million adjustment in 1999 would be "duplicative" of other cred-its he already had given Doctors Hospital in 1999. (12 Tr. Vol. II:218)

**Plaintiff's Conclusions in the Expert Report on Remand as to Cash Flow and Adequate Capital**

266. Based on the same financial data used for the balance sheet approach (as now adjusted by Peltz), Peltz concluded in Plaintiff's Expert Report on Remand that, as was his conclusion in Plaintiff's First Expert Report, Doctors Hospital was also insolvent under the cash flow and capitalization tests between September 30, 1997 and March 31, 2000. (New Pl. Ex. 1, Section VI, ¶¶ 43 and 44)

267. Peltz and Lane acknowledged that Doctors Hospital had made all payments called for under the Daiwa and Nomura transactions through March, 2000. (Jt. Ex. 159, at 17–18; 12 Tr. Vol. III: 456–58)

DEFENDANT'S EXPERT REPORT ON REMAND

**Re–Admission of Defendant's Prior Expert Report at First Trial**

268. Blake's solvency analysis, testimony and conclusions were re-admitted on remand pursuant to the Pretrial Order, but are not set forth herein in the interests of brevity, except in summary form immediately below.

269. Blake concluded that Doctors Hospital was solvent as of September 30, 1997 and September 30, 1998, under the balance sheet test of Section 101(32) of the Bankruptcy Code, as well as the adequate capital and cash flow tests under Bankruptcy Code Sections 548(a)(1)(B)(i)(II) and (III). (Jt. Ex. 31, at 15–20, and Exs. 2.0 and 3.0 thereto)

**Defendant's Additional Expert Report on Remand**

270. Based on this experience, McDonough analyzed and critiqued both Peltz and Lane's Expert Report on Remand and Plaintiff's First Expert Report in conjunc-

tion with the Remand Opinion to determine if Doctors Hospital was insolvent during any period after August 1997 until it filed for bankruptcy. (New Def. Exs. 66 and 130; 12 Tr. Vol. IV: 521–27)

271. McDonough reviewed documents produced in this matter, including: (a) the documents listed on Exhibit A to Defendant's Expert Report on Remand; (b) review of Peltz and Lane's Expert Report on Remand; and (c) review of various depositions, trial transcripts, and judicial rulings. (New Def. Exs. 66 and 130; 12 Tr. Vol. IV: 521–27)

### McDonough's Criticisms of Plaintiff's Expert Report on Remand

272. McDonough criticizes Plaintiff's Expert Report on Remand on a number of bases, as set forth at pages 5–10 of Defendant's Expert Report on Remand. (New Def. Ex. 66, at 5–10) The main criticisms relate to Peltz's balance sheet test of insolvency, as set forth below.

### Improper Reliance on Data Deemed Unreliable

273. McDonough, a CPA and provider of audit consulting and forensic accounting services, criticized Peltz's attempt to calculate the value of Doctors Hospital on a monthly basis from October 31, 1997 through March 2000 utilizing the TTM Methodology, on the basis that Peltz utilized internal monthly financial statements, computed financial results for a trailing twelve month period, and then, based on the release date of a year-end audit (not its effective date), made adjustments to attempt to reconcile the monthly amounts to year-end audit results. (New Def. Ex. 66, at 5–7; 12 Tr. Vol. IV: 539–40)

274. However, as McDonough highlighted, the internal monthly financial statements used by Peltz are the very same financial statements that Peltz previously testified at the First Trial were not

reliable. (New Def. Ex. 66, at 5; 12 Tr. Vol. IV: 539–40)

275. McDonough also noted in his report that in Peltz's deposition taken before the first trial, Peltz professed doubt about the integrity of the audited financial statements themselves:

*Q. What do you mean when you say to believe that there were problems with the audits, but you 're not offering an opinion on that?*

*A. I have not documented a professional opinion on whether there was clearly an audit failure or not. I believe there's a lot of indicia that the audits were not properly done.*

(New Def. Ex. 66, at 5)

276. McDonough further observed that since Peltz is a CPA, working for a CPA firm, all CPA's are subject to certain professional standards, one of which is the General Standard dealing with sufficient relevant data. General Standard 201.01 states:

*0.1 Rule 201—General standards: A member shall comply with the following standards and with any interpretations thereof by bodies designated by Council. Sufficient Relevant Data. Obtain sufficient relevant data to afford a reasonable basis for conclusions or recommendations in relation to any professional services performed. [As adopted January 12, 1988.]*

(New Def. Ex. 66, at 5)

277. McDonough further criticized that Peltz did not explain how he has now "obtained sufficient relevant data" to arrive at his valuation conclusions, nor explained what work or procedures were performed which now allow Peltz to rely on the unreliable internal monthly financial statements. (New Def. Ex. 66, at 5–6)

278. McDonough further criticized Peltz for using audited financials only as of

their "release date," which occurred months after the fiscal year end for any period, when making adjustments to the internal financials, since it led to applying one year's audit to a different year's internal financials. (12 Tr. Vol. IV: 551)

279. McDonough also testified that, in response to this Court's question, there were adjustments of over 10% being made by Peltz as compared to the internal financials, and that in his many years of experience he has never seen anyone do anything similar when valuing a company. (12 Tr. Vol. IV: 544)

280. McDonough criticized that there is no accepted methodology in any accounting or valuation literature to support the TTM Methodology Peltz used to arrive at his monthly estimates, and that there are no Generally Accepted Auditing Standards (GAAS) which support Peltz's TTM as Adjusted Methodology, or the validity of his final revised accounts. (New Def. Ex. 66, at 6; 12 Tr. Vol. IV: 540–42)

281. McDonough testified that no hypothetical buyer would ever rely on the internal financials; rather, the buyer would simply have an audit done or would not have proceeded with the transaction. (12 Tr. Vol. IV: 548)

**McDonough's Criticism of Peltz's Change to Discount/Capitalization Rate**

282. McDonough criticized the multiples utilized by Peltz in both Plaintiff's First Expert Report and Plaintiff's Expert Report on Remand were based on Peltz's weighted average cost of capital ("WACC") calculations. (New Def. Ex. 66, at 9) Peltz adjusted the calculation of his WACC for each of his three valuation dates (September 30, 1997, 1998, and 1999) to account for the Remand Opinion as to taxes, but also made two other adjustments. (*Id.*)

283. McDonough noted that in calculating the WACC for September 30, 1997,

Peltz increased the risk adjustment for size from 3.50% to 5.78% (or to the "10th decile", the highest risk category available). (New Def. Ex. 66, at 9) The second change was increasing the Beta from .65 to .76. (*Id.*) However, Peltz used the same guideline companies in both Plaintiff's First Expert Report and Expert Report on Remand, and as such there should be no change to the Beta. As McDonough pointed out, both of these changes increased the WACC for each of the three valuation years, and in turn reduced the value of Doctors Hospital. (*Id.*; 12 Tr. Vol. IV: 567–69)

**Change in Assumptions from Plaintiff's First Expert Report for the 1999 Measurement Period**

284. McDonough also criticized elimination of a positive $12.997 million adjustment to fiscal year 1999 income for Doctors Hospital that was made in Plaintiff's First Expert Report. (New Def. Ex. 66, at 9–10; 12 Tr. Vol. IV: 571–72)

285. McDonough observed that there was no explanation in Peltz's analysis as to why this prior adjustment was eliminated in Plaintiff's Expert Report on Remand, and that by eliminating just this one item, Peltz now ensured in Plaintiff's Expert Report on Remand that Doctors Hospital was insolvent for each month in fiscal 1999. (New Def. Ex. 66, at 9–10; 12 Tr. Vol. IV: 571–72)

**McDonough's Conclusions Regarding Peltz and Lane's Expert Report on Remand**

286. McDonough concluded that the solvency opinions in Plaintiff's Expert Report on Remand based on the balance sheet test were flawed, since they were not calculated with a reasonable degree of certainty, and were based upon internal financial data that had been deemed "not to be reliable" by Peltz and Lane. The methodology applied, *i.e.* adjusting the monthly

data for year-end audit results, cannot fix the unreliable nature of the data, and there is no support in any professional literature to support this approach. Additionally, Peltz introduced new facts/data that he originally did not use in Plaintiff's First Expert Report, and altered other assumptions. (New Def. Ex. 66, at 10; 12 Tr. Vol. IV: 572–73)

287. McDonough concluded that it appears that Peltz and Lane were attempting to manipulate the data to arrive at a predetermined result. (New Def. Ex. 66, at 10)

**McDonough's Independent Analysis of Doctors Hospital's Solvency during the Measurement Periods**

288. At pages 10–12 of Defendant's Expert Report on Remand, and pages 2–5 of McDonough's supplement to his Expert Report on Remand, McDonough provides a solvency analysis of Doctors Hospital based upon the methodology previously used at the first trial by all experts, with certain adjustments to Plaintiff's First Expert Report based on the Remand Opinion, and other adjustments he viewed as necessary in order to analyze the solvency of Doctors Hospital. (New Def. Ex. 66, at 10–12, Def. Ex. 130, at 2–5; 12 Tr. Vol. IV: 573, 574–605)

**Adjustments to Plaintiff's
First Expert Report**

*(a) Add Back for Wrongful Deduction of Taxes When Normalizing Income*

289. Given the Remand Opinion that it was a mistake to allow the 40% reduction in cash flows, McDonough removed this deduction from his balance sheet solvency analysis. (New Def. Ex. 66: 10–11; 12 Tr. Vol. IV: 579)

*(b) Add Back for Wrongful Deduction for Alleged Fraudulent Earnings*

290. In Plaintiff's Expert Report on Remand Peltz deducted significant amounts from Doctors Hospital's income from 1997 to 1999 based on a reserve for contingent upcoding liability appearing in the Coopers & Lybrand Report. McDonough's Report confirmed that these deductions had a material impact on Peltz's solvency analysis. (New Def. Ex. 66, at 7; 12 Tr. Vol. IV: 554)

291. McDonough first noted that there is no finding in the Coopers & Lybrand Report that this $4.638 million had been determined to be "fraudulent earnings"; but only should be treated as a reserve for potential future reductions. (12 Tr. Vol. IV: 554–55; 12 Tr. Vol. V: 665)

292. Peltz testified that the Coopers & Lybrand Report only mentioned a "reserve," even thought he labeled the reserve as "fraudulent earnings". (12 Tr. Vol. I: 93)

293. McDonough testified that, given his accounting background, a "reserve" means the amount reserved is not written off the books of a company, or treated as uncollectible but is treated as a future contingent liability. (12 Tr. Vol. IV: 555, 565–66)

294. McDonough further observed that in Plaintiff's First Expert Report Peltz made a similar deduction for a contingent upcoding liability in 1997 and 1998, but that the Remand Opinion held that deduction did not take into account Desnick's contingent assets to satisfy such potential contingent liabilities. (New Def. Ex. 66, at 7–8)

295. McDonough stated that Peltz was now trying to support the same basic upcoding deduction that Peltz and Lane used in Plaintiff's First Expert Report by now substituting the reserve for contingent upcoding liability in the Coopers & Lybrand Report. (New Def. Ex. 66, at 7)

296. Peltz himself admitted he substituted the $4.638 million from the Coopers & Lybrand Report in Plaintiff's Expert Report on Remand for the upcoding deduction he made in his First Expert Report. (12 Tr. Vol. III: 381)

297. McDonough noted that, in contrast to Coopers & Lybrand, KPMG did conduct an audit of the financial statements of Doctors Hospital, and did opine for years ending September 30, 1997 and 1998, stating that:

> In our opinion the financial statements referred to above present fairly, in all material respects, the financial position of the Hospital as of September 30, 1998 and 1997 and the results of its operations and its cash flows for the years then ended in conformity with generally accepted accounting principles,
>
> In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of the Hospital as of September 30, 1997 and 1996, and the results of its operations and its cash flows for the years then ended, in conformity with generally accepted accounting principals.

(New Def. Ex. 66: 8–9; Jt. Ex. 177; 12 Tr. Vol. IV: 566)

298. Accordingly, McDonough agreed that the audited financial results would reflect appropriate reserves or write offs for what was known or knowable for fiscal years ending September 1997 and 1998, and they contain no such reserves or write offs (New Def. Ex. 66, at 9; 12 Tr. Vol. IV: 566) as Peltz admitted. (Tr. Vol. VI: 931)

299. McDonough stated that Peltz's calculation of normalized net income in Plaintiff's First Expert Report included reductions in net income related to alleged fraudulent earnings impacting the period of August 1997 through March 1999. (New Def. Ex. 66, at 11) Because this adjustment occurred prior to the application of the capitalization multiple, the impact of the adjustment on Pelt's concluded fair value of equity, and therefore his solvency conclusion, was much greater. (*Id.*)

300. McDonough concluded that it was inappropriate to reduce net income due to alleged fraudulent earnings because the amounts by which Peltz reduced net income due to alleged fraudulent earnings were based on an August 19, 1999 letter from the U.S. Department of Justice detailing the government's estimate of losses due to the alleged fraud. The amounts detailed in this letter, as well as the both the $4.5 million settlement agreement and the $14 million settlement agreement between Doctors Hospital and the government, were not known or knowable until at least 1999 at the earliest. (New Def. Ex. 66, at 11–13; 12 Tr. Vol. IV: 579–80)

301. Furthermore, McDonough noted that the Remand Opinion concluded that the civil penalties paid in 1999 and 2000 related to the government's investigations could not be considered without also considering the contingent asset in the form of the personal liability and wealth of Desnick. (12 Tr. Vol. IV: 579–80) He also stated that it is particularly important to note that Desnick paid out of his own resources the entirety of the settlement amounts totaling $18.5 million. (New Def. Ex. 66, at 11)

302. McDonough noted the evidence reflecting Desnick's significant personal wealth and his legal obligations to Doctors Hospital, providing an economic incentive to Desnick to ensure that Doctors Hospital paid its debts. (New Def. Ex. 66, at 12–13; 12 Tr. Vol. IV: 580)

303. McDonough further noted that Desnick at all times infused cash into Doctors Hospital when requested, and personally paid the upcoding settlement of $4.5 million, the kickback settlement of $14 mil-

lion, and a $6 million settlement with the estate. (New Def. Ex. 66, at 12–13; 12 Tr. Vol. IV: 580–82)

304. McDonough further noted that even after the bankruptcy filing, Desnick funded payroll obligations out of personal assets. (New Def. Ex. 66, at 13; 12 Tr. Vol. IV: 582)

305. McDonough concluded that, based on Desnick's personal wealth, his history of infusing cash into Doctors Hospital, his legal liabilities owing to the Doctors Hospital, and his personal payment of the settlement amounts with the U.S. government and the estate, the Remand Opinion is clear that these factors must be considered as an offset to any contingent liability arising from upcoding. (New Def. Ex. 66, at 11–12; 12 Tr. Vol. IV: 580–82)

(c) *Add Back of $1.2 Million in 1999 as Extraordinary Litigation Expense*

306. McDonough also added back $1.2 million when normalizing Doctors Hospital's revenues for 1999, since that amount represented an extraordinary litigation expense that only appears once (in 1999) in the history of Doctors Hospital's audited financial statements. (New Def. Ex. 66, at 15; 12 Tr. Vol. V: 684, 740–41; 12 Tr. Vol. V: 686–89)

307. McDonough explained that when an expense is not recognized on a regular and recurring basis, it is to be deemed an extraordinary expense and removed when normalizing income. (12 Tr. Vol. V: 740–41) Shannon Pratt, in a passage read into the record from his book "Valuing a Business", confirmed that non-recurring expenses should be eliminated when normalizing adjustments. (12 Tr. Vol. IX: 1174)

308. Peltz agreed this $1.2 million only appeared once, in Doctors Hospital's 1999 audited financials, and not in any prior years. (12 Tr. Vol. III: 419–20) Lane admitted they did no further investigation

on this issue, nor did he know if Doctors Hospital self insured for such litigation expenses. (12 Tr. Vol. VI: 874–75, 933; 12 Tr. Vol. IX: 1221)

309. McDonough further indicated he saw no connection between this $1.2 million extraordinary litigation expense incurred in 1999, and the $12.997 million in expenses Peltz had previously removed from Doctors Hospital's 1999 expenses when completing his First Expert Report. (12 Tr. Vol. V: 741)

310. McDonough also further assumed that Desnick actually paid for the $1.2 million in litigation costs, again supporting, in his opinion, the add-back of this expense. (12 Tr. Vol. IV: 585–88)

(d) *Alleged Net Working Capital Excess/Shortfall*

311. McDonough also criticized Peltz's inclusion of a calculated net working capital shortfall in calculating claims on enterprise value in order to arrive at his indicated fair value of equity. The impact of his calculated net working capital shortfall is a reduction in the enterprise value and resulting fair value of equity in amounts ranging from just $8,000 for the year-ended September 30, 1998, to as much as $11,428,000 for the year-ended September 30, 1999. (New Def. Ex. 66, at 13–14; 12 Tr. Vol. IV: 582–85)

312. McDonough's criticism centers on four main points: (i) Peltz's failure to include amounts due from Desnick as working capital; (ii) Peltz's failure to include receivables from related organizations (*i.e.* Desnick) from working capital; (iii) Peltz's exclusion of the upcoding settlement amount paid by Desnick from working capital; and (iv) Peltz's exclusion of the $1.2 million in litigation upcoding expenses (paid by Desnick) from Doctors Hospital's working capital. (New Def. Ex. 66, at 14–15; 12 Tr. Vol. V: 692–704)

622

313. Peltz's justification for excluding the upcoding settlement paid by Desnick was that he was not obligated to pay this amounts, contractually or otherwise. (12 Tr. Vol. II: 237–38; 12 Tr. Vol. IX: 1198) However, Peltz also testified Desnick was obligated to Doctors Hospital per its audited financials for millions of dollars in 1997, 1998 and 1999, and Peltz opined that Desnick owed Doctors Hospital over $5 million at various points over this period, with Peltz also taking part in the settlement between the estate and Desnick based in part on claims that Desnick owed millions of dollars to Doctors Hospital that had been advanced to Desnick. (Jt. Ex. 28, 37; 12 Tr. Vol. II: 240–45). Further, Peltz acknowledged that Doctors Hospital's audited financials listed the amounts due from Desnick as current assets. (12 Tr. Vol. IX: 1221)

314. Peltz testified that he ultimately ignored Desnick's wealth as an asset in his working capital calculation (12 Tr. Vol. III: 444) even though he was aware that millions of dollars were due the Hospital from Desnick and Peltz treated such amounts as fully collectible from Desnick. (New Pl. Ex. 1, Tab 11, Ex 1 thereto; 12 Tr. Vol. III: 411)

**McDonough's Adjusted Fair Value of Equity Based on These Adjustments**

315. In his unrevised report, McDonough found a negative Indicated Fair Value of Equity for 1999 (as of September 30) in the amount of ($461,000). (New Def. Ex. 130, at 5)(*Id.*)

316. In Defendant's Supplemental Expert Report on Remand, McDonough found a positive Indicated Fair Value of Equity of $3.55 as of September 30, 1999 because the Hospital had positive working capital in the amount of $655,000 at that point and therefore Plaintiff's Expert Report on Remand improperly deducted $4 million as a working capital shortfall in 1999. (*Id.*)

317. Accordingly, since the adjusted fair value of Doctors Hospital's equity is positive as of September 30, 1997, September 30, 1998, and September 30, 1999, it was McDonough's opinion that Doctors Hospital was solvent at each of these points in time and all points in time between those noted based on the theory of retrojection. (12 Tr. Vol. IV, p. 604). He concluded that there is nothing to suggest that the financial condition of Doctors Hospital changed during the Interim Period such that the company would be insolvent. (New Def. Ex. 66, at 18; 12 Tr. Vol. IV: 604)

**Solvency Conclusion for October 1999 through March 31, 2000 under Balance Sheet Test**

318. Due to the unreliability of Doctors Hospital's internal financial statements, McDonough was unable to form a solvency conclusion as of March 31, 2000. (New Def. Ex. 66, at 18; 12 Tr. Vol. IV: 603–04)

319. Peltz testified that Doctors Hospital had operating profits of $411,000 in January, 2000, and $290,000 in March, 2000. (12 Tr. Vol. IX: 1217–18)

**McDonough's Further Criticism of Peltz's Methodology Capitalizing the "Over Market" Lease Obligation, and Revised Solvency Conclusions upon Proper Treatment of Lease Payments under Balance Sheet Test**

320. McDonough further noted that in Peltz's calculation of normalized net income and the resulting indicated fair value of equity in Peltz's TTM as Adjusted and Audited Financials as Adjusted Methodologies, (New P.Ex. 1, Tab 1 and Tab 11), Peltz made adjustments to account for the alleged market value of Doctors Hospital's annual payments made under the Lease with HPCH. The result of this adjustment

is to reduce the fair value of Doctors Hospital's equity by $31.429 million starting in 1997. (New Def. Ex. 66, at 19–21; 12 Tr. Vol. V: 611)

321. McDonough stated that Peltz's treatment of the annual payments under the HPCH Lease was not supported, for a number of reasons. First, Peltz bifurcated the annual payment into an operating lease payment, and a capitalized lease obligation. (12 Tr. Vol. V: 611; New Def. Ex. 66, at 19) KPMG treated this obligation as an operating lease, and did not capitalize any portion of these payments. (Jt. Ex. 28)

322. Second Peltz could not recall ever using such a methodology in any prior valuation assignments. (New Def. Ex. 66, at 19; 12 Tr. Vol. III: 459; 12 Tr. Vol. V: 621 Tr. Vol. IX: 1210)

323. Peltz also admitted that the audited financials by KPMG treated the HPCH Lease as an operating lease. (12 Tr. Vol. IX: 1209–10) Although he believed this was a mis-characterization. (*Id.* at 1209)

324. Third, as further discussed by McDonough upon questioning by this Court, the HPCH Lease between Doctors Hospital and HPCH was executed on August 28, 1997, and had an initial term ending August 28, 2012. (Jt. Ex. 73). McDonough stated that any hypothetical buyer of Doctors Hospital would be subject to the terms of this Lease, since it could not be altered, amended or cancelled without the consent of Nomura under the Nomura Loan Documents. (New Def. Ex. 66, at 19; 12 Tr. Vol. V: 612–17) Peltz testified that the HPCH Lease payment was "sized" so that it serviced the monthly payments on the $50 million loan made to HPCH. (12 Tr. Vol. I: 84)

325. Peltz testified that Shannon Pratt's discussion as to the proper characterization of leases requires an analyst to see if such lease terms can be altered. (12 Tr. Vol. IX: 1225–27) He also testified that the Pratt discussion says to evaluate whether the lease amount is equivalent to what a company would pay in an arm's-length transaction and, if not, to make an "appropriate adjustment." (*Id.*)

326. As McDonough was of the opinion that because the HPCH Lease payment had to be made (even the above market rent component) by the hypothetical buyer, the full payment should flow through Doctors Hospital's financials as a current expense. (New Def. Ex. 66, at 19; 12 Tr. Vol. V: 612–14, 707–09)

327. McDonough added that a hypothetical buyer would even want to and require that the full Lease payments be deducted as a current expense, because it would actually reduce the cash flow of Doctors Hospital from about $22 million to $5 million, which would lower the value of the assets by reducing the bottom line net cash flow. (12 Tr. Vol. V: 614–19, 708)

328. For these reasons, McDonough concluded that the adjustments made by Peltz related to the alleged market value of rent, and the associated capitalized excess lease payments, did not reflect the economic substance that a hypothetical buyer would face, since: (i) the hypothetical buyer would be subject to the terms of the Lease, and (ii) even though Doctors Hospital made only one lease payment, not two (*e.g.* one for rent and one for capitalized lease debt), Peltz had discounted two hypothetical payments (one for lease payments, one for the capitalized lease liability) with two different rates, a lower discount rate for Peltz's excess rent payment and a higher rate for the remainder lease payment. This dual discount rate served to artificially increase the calculated liability and reduce the ending value. (New Def. Ex. 66, at 19; 12 Tr. Vol. V: 619–20)

329. McDonough calculated the Indicated Enterprise Value of Doctors Hospi-

tal by allowing the entire HPCH Lease payment to flow through the cash flow. (New Def. Ex. 66, at 19; 12 Tr. Vol. V: 621–22)

**McDonough's Criticism of Continued Use of 10% Company Specific Risk Premium in Plaintiff's Expert Report on Remand**

330. As Defendant's expert at the first trial, Blake, criticized Peltz's use of a 10% company specific risk premium, McDonough as well concluded that the 10% risk premium was and is too high, and that the 5% risk premium adopted by Blake is more appropriate. (New Def. Ex. 66, at 16; Ex. 130, at 5; 12 Tr. Vol. V: 633, 641–49, 711–23)

331. McDonough contended that business valuation literature suggests that a valuator should "rarely" go above 5% on a company specific risk premium, given that the risks are already reflected in the cash flows or size premium attributed to the subject company. (12 Tr. Vol. V: 648–49)

**Doctors Hospital's Ability to Repay Obligations as They Are Due and Adequate Capitalization**

332. Based on the stipulated facts as noted in his Expert Report on Remand, the Remand Opinion and the Rehearing Denial Order, it was McDonough's conclusion that Doctors Hospital was paying its debts as they came due up to the time of the filing of the bankruptcy petition. (New Def. Ex. 66, at 23) (12 Tr. Vol. V: 651–52)

333. Peltz admitted, upon questioning from the Court, that he had done no analysis of late bill payments during any period. (12 Tr. Vol. I: 110–13)

**PLAINTIFF HAS ESTABLISHED THAT THE HOSPITAL WAS INSOLVENT AT ALL TIMES BEGINNING SEPTEMBER 30, 1999 UNTIL MARCH 2000.**

**Healthcare Industry**

334. Medicare and Medicaid reimbursement rates are lower than those for commercial insurance, in large part because Medicare and Medicaid reimbursement is determined by the patient's diagnosis at discharge—regardless of the length or cost of the stay. (New Def. Ex. 82, ¶ 377; 06 Tr. III: 81–85; Def. Ex. 1 at 17)

335. Doctors Hospital's revenues from Medicare and Medicaid ranged from 85 to 89 percent while those revenues for the average Chicago hospital were approximately 50 percent. (New Def. Ex. 82, ¶ 377; 06 Tr. III: 77–79; Jt. Ex. 72, at 9; New Pl. Ex. 1, ¶ 24.4) Doctors Hospital's Medicare revenues ranged from 54 to 59 percent in 1997 and 1998, while the national average was 45—55 percent. (06 Tr. III: 79; Jt. Ex. 72, Tab A3) Doctors Hospital's Medicaid revenues for that period were 25 to 33 percent, while the national average was only 12 to 15 percent. (New Def. Ex. 82, ¶ 377; 06 Tr. III: 79–80; Jt. Ex. 72, Tab A3).

336. Doctors Hospital's audited financial statement for fiscal years 1996 through 1999 showed the following percentages of the hospital's gross patient revenue from Medicare and Medicaid:

| | 1996 | 1997 | 1998 | 1999 |
|---|---|---|---|---|
| Medicare | 58% | 59% | 54% | 57% |
| Medicaid | 27% | 25% | 33% | 26% |
| Total | 85% | 84% | 87% | 83% |

(New Def. Ex. 82, ¶ 378)

**Case Mix**

337. A "case mix index" is an overall indicator of the acuity level of patients treated by the hospital. (New Def. Ex. 82, ¶ 379; 06 Tr. III: 81). In 1996 Doctors Hospital's case mix index was 1.5, which was about average. (New Def. Ex. 82, ¶ 379) By 1999, its case mix had declined to about 1.1. (New Def. Ex. 82, ¶ 379; 06 Tr. III: 85–87) The decline re-

sulted from a reduction in the hospital's medical/surgical business and an increase in lower severity cases such a psychiatric, skilled nursing and substance abuse. (New Def. Ex. 82, ¶ 379; 06 Tr. III: 87).

338. When the case mix shifts from medical/surgical to lower acuity services such as psychiatric, skilled nursing, and substance abuse, there is a reduction in the reimbursement level per case. (Jt. Ex. 72, at 10).

339. Lane testified that the decline in the case mix index led to a reduction in the Hospital's revenues. In 1996, the Hospital's average reimbursement per case was $9,189; in 1999 it fell to $6,704 per case. (06 Tr. III: 87–88) He approximated the total loss of revenue to be $7.4 million because of the decline in the case mix index. (*Id.*)

SUMMARY OF FINDINGS ON SOLVENCY

Based on the above, the following is a summary of key findings in this case:

1. Doctors Hospital was solvent from August 28, 1997 until September 30, 1999.

2. Doctors Hospital was insolvent at all times from October 1, 1999 through April 17, 2000.

## IV.

### CONCLUSIONS OF LAW ON SOLVENCY

INTRODUCTION

Plaintiff seeks to recover fraudulent transfers made to Defendant during the period from October 1, 1997 through the date of the bankruptcy of the Debtor, Doctors Hospital of Hyde Park, Inc. The fraudulent transfers allegedly consisted of payments of rent, to the extent that they exceeded fair market value, during a period of time when Doctors Hospital was insolvent.

After the First Trial, it was held that Plaintiff had proved insolvency during the entire period from August 1997 to April 2000, but judgment was entered only as to fraudulent transfers of rent that Doctors Hospital made directly to Defendant before July 1998. As to the transfers after that date, it was determined that the transfers were not made with assets of the Hospital, but of an entity named MMA Funding, LLC. MMA Funding, LLC was created in 1997 to act as a special purpose borrower on a loan from Daiwa–Healthco–2 LLC secured by Doctors Hospital's accounts receivable.

Doctors Hospital of Hyde Park, Inc. ("Doctors Hospital" or "Hospital") filed a Chapter 11 Bankruptcy case on April 17, 2000. On March 28, 2001, LaSalle filed its proof of claim in the bankruptcy case in the amount of $60,139,317.04 based on asserted obligations of Doctors Hospital arising from its guarantee of a loan. Doctors Hospital filed the above titled Adversary Complaint pleading 28 counts against a number of individuals and entities, Dr. James Desnick and many others.[7] However-

---

7. On or about April 1, 2004, Doctors Hospital filed with this Court a Settlement Agreement between Doctors Hospital, Desnick, and all the other defendants except LaSalle, Stephen Weinstein, and Robert Krasnow. The Hospital's claims against Weinstein and Krasnow were severed from Counts against LaSalle for purposes of trial. *In re Doctors Hosp. of Hyde Park, Inc.*, 360 B.R. 787, 798 ¶ 30 (Bankr. N.D.Ill.2007). Krasnow was dismissed as a party to the case and all counts against him dismissed, both with prejudice on May 21, 2007. (Dkt. No. 653) Counts against Weinstein were dismissed, and he from the case, with prejudice on October 22, 2007. (Dkt. No. 702). Additionally, LaSalle filed a counterclaim in the Adversary proceeding, seeking approximately $60 million based on the guaranty and security agreement related to the loan. (Dkt. No. 183). All Counts of that Coun-

er, Counts VIII, IX, and X of the Adversary Complaint asserted claims only against LaSalle Bank National Association, f/k/a LaSalle National Bank as trustee for certain asset certificate-holders of Asset Securitization Corporation Commercial Mortgage Pass–Through Certificates, Series 1997, D5 ("LaSalle"). Those counts serve as a counterclaim to the LaSalle claim. On April 22, 2004, Gus A. Paloian ("Chapter 11 Trustee" or "Trustee Paloian") was appointed as Chapter 11 Trustee for Doctors Hospital, and he became responsible for those counts.

Counts VIII, IX, and X against LaSalle seek (1) to void as fraudulent transfers a guaranty and related security agreement that Doctors Hospital made in connection with a loan from LaSalle's predecessor, Nomura Asset Capital Corporation, to Doctors Hospital's landlord (Count VIII) and (2) to void a lease held by Defendant as Nomura's assignee or to recover as fraudulent transfers payments of rent that Doctors Hospital had made to LaSalle in excess of the property's fair market rental value (Counts IX and X). Count X was brought pursuant to 11 U.S.C. § 548(a)(1)(B). Counts XIII and IX were brought pursuant to the Illinois Uniform Fraudulent Transfer Act and 11 U.S.C. § 544(b)(1), which is asserted to permit the trustee to avoid a transfer of the debtor's property under applicable non-bankruptcy law.

The First Trial on these counts took place in 2006. Findings of Fact and Conclusions of Law were made and entered and a Final Judgment Order entered. *In re Doctors Hosp. of Hyde Park, Inc.*, 360 B.R. 787 (Bankr.N.D.Ill.2007). It was held

therein that rental payments made after July 7, 1998 were not fraudulent transfers because they were not made with assets of Doctors Hospital. *Id.* at 853. LaSalle's request to void the lease pursuant to which rental payments were made was denied in the Judgment and not appealed. For rental payments made prior to July 7, 1998, the Chapter 11 Trustee was awarded damages to the extent that rental payments were found to have exceeded fair market value plus interest, resulting in judgment in favor of the Chapter 11 Trustee allowing his counterclaim in the amount of $4,342,238.43. Both parties filed motions to alter or amend the judgment, which were denied in Additional Findings of Fact and Conclusions of Law dated July 25, 2007. *In re Doctors Hosp. of Hyde Park, Inc.*, 373 B.R. 53 (Bankr. N.D.Ill.2007). Separate appeals were filed and were consolidated by a District Court Judge. That Judge affirmed all Findings and Conclusions. *LaSalle N.A. Bank v. Paloian*, 406 B.R. 299, 310 (N.D.Ill.2009) ("*District Court Opinion*").

## Remanded Issues

At issue following remand is the holding following trial here that post-July 1998 rental payments were not fraudulent transfers. The remand order sought further consideration of two issues: *First,* whether Doctors Hospital was insolvent at any time before filing for bankruptcy. Solvency is a significant issue because if the Hospital was not insolvent when the payments in issue took place, then Trustee Paloian may not recover as fraudulent transfers under 11 U.S.C. §§ 544(b)(1) and 548(a)(1)(B) the payments that were made

---

terclaim were dismissed on February 26, 2004 except for LaSalle's breach of guaranty claim (Count II) against Doctors Hospital. (Dkt. No. 309). The grant of Summary Judgment entered against LaSalle on Count II of its counterclaim was affirmed by the District

Court Judge on appeal and was undisturbed by the Remand Opinion. *LaSalle N.A. Bank v. Paloian*, 406 B.R. 299, 310 (N.D.Ill.2009); *Paloian v. LaSalle Bank, N.A.*, 619 F.3d 688, 692 (7th Cir.2010).

to LaSalle even if those payments are found to have been from property of the Debtor. *Second,* whether there was a true sale of accounts receivable from the Hospital, and that issue further involves the question whether MMA Funding, LLC was in fact an actual business entity and not a part, department, or function of the Debtor. *Paloian,* 619 F.3d at 696. The status of MMA Funding, LLC is therefore relevant to Counts IX and X of the adversary complaint, because if it was not a true business entity dealing with its own funds, then payments made by it to LaSalle were from the Debtor's assets and may be recoverable by the Trustee.

### Summary of Key Findings

1) Doctors Hospital was insolvent at all times from September 30, 1999 through April 17, 2000. (Opinion Parts III and IV)

2) MMA Funding, LLC was a legitimate bankruptcy remote entity that bought the Hospital's receivables in a "true sale." (Opinion Parts V and VI)

## CONCLUSIONS OF LAW ON SOLVENCY ISSUES

Conclusions of law concerning the remanded issues will be discussed first. Previous conclusions as to other claims brought by Plaintiff will then be restated in summary fashion.

### Scope of Remand

The parties disagree in many respects on the meaning and impact of the Remand Opinion on remand. As to solvency, LaSalle argues that Opinion conclusively decided several issues, and in so doing precluded those issues from consideration herein. The Trustee argues that only two discrete issues were remanded on the subject of solvency. Discussion of the particular matters identified by LaSalle would unnecessarily confuse the analysis at this point. However, the Remand Opinion has created some confusion as to precisely what was decided that must be addressed at the outset.

The parties do agree that the Remand Opinion disagreed in two specific ways with the methodology used by the trial experts in their insolvency analysis. First, the Opinion disapproved of the experts' adjustment of the Hospital's net income for a portion of the amount that the Hospital paid in fines based on alleged Medicare/Medicaid fraud. The Opinion ruled that the solvency analysis recognize as a contingent asset Desnick's wealth to repay the contingent liability of the Hospital stemming from the fraud claims. *Paloian,* at 318–320. Second, the Opinion criticized the experts' application of a 40 percent federal income tax to the Hospital's net income. The Opinion found that most potential buyers of hospitals are non-profit organizations that do not pay income tax. *Paloian,* at 321–323. Finally, both parties agree that everything else "pretermitted" by the Opinion was law of the case. *Paloian v. LaSalle Bank N.A.,* 619 F.3d 688, 692 (7th Cir.2010). The parties do not, however, agree on what was pretermitted by that Opinion.

The Trustee seeks to limit the scope the inquiry on remand to a calculation of the Hospital's solvency with those two changes only. He asks that the same methodology for determining insolvency that was applied in the First Trial be used again with appropriate adjustments made based on the Remand Opinion's criticisms. (Pl. Mem. on Issues for Trial on Remand, Dkt. No. 736, 10) The Trustee also asserts that he can show insolvency for the entire period after October 1, 1998 because, he argues, LaSalle did not contest insolvency for that time period. (*Id.*) He argues that simply reversing the adjustments for income tax after October 1, 1998 will not render the Hospital solvent because the

income for that time period was not adjusted for Medicare/Medicaid fraud. (*Id.*) At the Remand Trial, Peltz admitted that the Hospital would be solvent as of September 30, 1997 and 1998 if simply add-back the deduction for tax effecting and zeroing out the upcoding and kickback deductions. (12 Tr. Vol. III: 405)

 "When a court of appeals has reversed a final judgment and remanded the case, the [trial] court is required to comply with the express or implied rulings of the appellate court." *Moore v. Anderson,* 222 F.3d 280, 283 (7th Cir.2000). The Court of Appeals does not remand issues that have been conclusively decided by the Court and those issues are not within the scope of issues to be considered by the trial court on remand. *U.S. v. Husband,* 312 F.3d 247, 250–51 (7th Cir. 2002). The Court of Appeals does not remand issues that are "law of the case." *Id.* As stated by the Remand Opinion, issues "pretermitted" by that Opinion have been decided, are law of the case, and are not within the scope of remand. Likewise, those issues actually addressed and decided are not within the scope of the remand. To determine whether an issue has been decided, the opinion must be "looked at as a whole." *Id.* at 251. "[I]f the opinion identifies a discrete, particular error that can be corrected on remand without the need for a redetermination of other issues, the [trial] court is limited correcting that issue." *U.S. v. Parker,* 101 F.3d 527, 528 (7th Cir.1996).

LaSalle compares this situation to that in *In re S & P, Inc. v. Pfeifer et al.,* 189 B.R. 173 (N.D.Ind.1995). In that case, the District Judge considered an appeal made from the decision of a bankruptcy judge. Appellants argued there that the bankruptcy judge exceeded the Seventh Circuit's mandate on remand. *Id.* at 176. On appeal from the district court's affirmance of the bankruptcy judge's decision, the Seventh Circuit concluded that two of the bankruptcy judge's original findings as to solvency and damages were clearly erroneous. *Id.* at 178. The Seventh Circuit reversed the bankruptcy judge's original decision and remanded the case to the bankruptcy judge for "reconsideration of damages" and "whether reorganization would have been possible" if certain figures used by the bankruptcy judge were corrected. *Id.* On remand, the bankruptcy judge used the figures as found by the Seventh Circuit but reached the same conclusion as in the original trial. *Id.* In the remand trial, the bankruptcy judge did not use precisely the same calculation as used during the original trial. *Id.*

On appeal from the second decision of the Bankruptcy Judge, in *S & P* the District Judge considered whether the Bankruptcy Judge deviated from the law of the case as determined by the Seventh Circuit by altering the original calculation. *Id.* at 179. The appellant argued that the Seventh Circuit's instructions to the bankruptcy judge on remand showed implicit approval of the original formula used by the bankruptcy judge. *Id.* Appellant argued that the Bankruptcy Judge should simply have inserted the correct figures into the original calculation to decide the case. *Id.* at 180. The District Judge noted that the Seventh Circuit never explicitly approved the bankruptcy judge's original formula. *Id.* The District Judge then considered whether the Seventh Circuit's opinion "by necessary implication adopted" the Bankruptcy Judge's original formula. *Id.*

 The District Judge first considered the scope of the Seventh Circuit's mandate to the Bankruptcy Judge on remand. *Id.* "The so-called 'mandate rule,' of which the law of the case is a corollary, 'simply embodies the proposition that "a [trial] court is not free to deviate from the

appellate court's mandate." ' " *Id.* (citing *U.S. v. Polland,* 56 F.3d 776, 779 (7th Cir.1995); *Barber v. Int'l Brotherhood of Boilermakers,* 841 F.2d 1067, 1070 (11th Cir.1988).) The application of the mandate rule depends considerably on the language of the appellate court's opinion. *S & P,* 189 B.R. at 180 (citing *Barber,* 841 F.2d at 1071). The District Judge concluded that if the Seventh Circuit had been convinced of the original calculation's accuracy it would have had no reason to instruct the bankruptcy judge to "reconsider" the calculation. *Id.* at 181. The District Judge also stated that the methodology used by the bankruptcy judge was not essential to the Seventh Circuit's finding of clear error on certain figures used by the bankruptcy judge. *Id.* Ultimately, the fact that "figures corrected by the Seventh Circuit constituted clear error by the bankruptcy judge, and thus could not be used as a basis for final determination of … damages." *Id.* "That these figures were clearly erroneous does not in itself mandate a finding that the Court of Appeals adopted the original formula in which they were used." *Id.*

■■■ Although the facts of *S & P* do not mirror precisely those in this case, the analysis used by the District Judge in that Opinion is instructive. As in *S & P,* there was no indication in the Remand Opinion that the Seventh Circuit approved of Plaintiff's experts' initial report or their methodology. Rather, the Opinion explicitly rejected two aspects of the calculation. The Opinion then criticizes one particular adjustment, the $18.5 million deduction for the fraud settlement. The Opinion continued, "[b]ut this adjustment was not enough to turn the Hospital's bottom line red. What did the trick was lopping 40% off the portion of the Hospital's assets that represented the present value of future income." *Paloian v. LaSalle Bank, N.A.,* 619 F.3d

688, 693 (7th Cir.2010). According to LaSalle, these statements show that the Seventh Circuit was highly suspicious of the Trustee's experts' report as a whole.

As to the methodology itself, the Remand Opinion stated only, "[d]iscounted-cash-flow analysis is sensitive to assumptions about the discount rate and expected future income, but these need not detain us." *Id.* In sum, the Remand Opinion never commented approvingly on Trustee's experts' report. It cannot be said that the Opinion remanded the solvency issue simply for re-computation according to Trustee's methodology. Rather, the Remand Opinion instructed that "the first task on remand will be to determine whether the Hospital was insolvent at any time before filing for bankruptcy" and that the "case is remanded … for proceedings consistent with this opinion." *Id.* at 696. As in *S & P,* if the Seventh Circuit had been convinced of the original calculation's accuracy it would have had no reason to instruct the bankruptcy judge to "determine" whether the Hospital was insolvent at any time before filing for bankruptcy. As in *S & P,* the Seventh Circuit held that it was error to accept two specific inputs used by the Trustee's experts' in reaching their solvency conclusion. Thus, those figures cannot be used in the solvency determination on remand. However, neither is there a mandate to otherwise accept Plaintiff's experts' analysis from the First Trial. The only possible reference supportive of that position lies in the Opinion's statement that "[t]he subjects that this opinion pretermits are the law of the case…." *Id.* at 692. However, the subject of the Hospital's solvency was not "pretermitted" but was questioned at length by the Opinion and remanded for determination. Therefore, the Trustee's narrow view of the scope of remand is rejected and this Court is not

bound by its earlier acceptance of the Trustee's experts' report.[8]

In addition, the Trustee's narrow view is belied by his expert's report on remand. That report employs a new test on remand, the "trailing-twelve-month" analysis. It also relies on a new and lower capitalization multiple in determining the Hospital's solvency. The report states that changes made to the solvency calculation were necessary following the Opinion's criticisms. (PL Ex. 1) As described further below, no new information or documents were used by the Trustee's experts for Plaintiff's Expert Report on Remand. Essentially the Trustee argues that it should not be bound by the calculation and methodology employed by its expert at the First Trial but that LaSalle should be (with the exception of the two identified figures). This inconsistency is not explained and so it is not accepted. On remand, the entire solvency analysis is reviewed to determine if and when the Hospital became insolvent before filing for bankruptcy in April 2000.

### Count VIII Was Abandoned by the Trustee and is Thereby Removed from Consideration on Remand

■ In a footnote, LaSalle claims that Count VIII of the Trustee's adversary complaint "is no longer in play on remand." (Solvency Brief 16 n.5) In Count VIII, the Trustee alleged that the Guaranty and the liens and security interests granted to secure it were avoidable as constructively fraudulent under the Illinois UFTA, 740 ILCS 160/1 et seq. Constructive fraud may only be established where the debtor was insolvent at the time of the transaction or was rendered insolvent by the transaction. 740 ILCS 160/6. The Remand Opinion ruled that the Hospital was solvent in August 1997. *Paloian v.*

*LaSalle Bank, N.A.,* 619 F.3d 688, 695 (7th Cir.2010). Pursuant to that holding, a Motion in Limine was granted herein and ordered that the Trustee was prohibited from arguing the Hospital was insolvent, under any theory, on or before August 28, 1997. (02 A 00363, Dkt. No. 780) As a result, the Guaranty and related liens and security interests cannot be voided because the Debtor was solvent on the date it was executed.

■ The Trustee argues that a part of Count VIII remains alive on remand. Specifically, the Trustee argues that its request to recover aggregate payments made on the Nomura Loan to the extent those payments exceeded fair market rental value can be resolved on remand. (Trustee's Proposed Findings and Conclusions, Dkt. No. 895, at 36) (Adversary Complaint, 02 A 363, Dkt. No. 1, at 40) However, that request for relief was earlier explicitly waived by the Trustee. After the First Trial was completed but prior to a decision being entered, an Order dated January 11, 2007 required the Trustee to file something showing the precise relief sought by the Trustee in Count VIII. (Dkt. No. 566) That Order noted that no argument was made at trial or proposed by the Trustee with respect to Count VIII. (*Id.*) The Order requested either argument or a statement by the Trustee that the relief requested in Count VIII was abandoned. (*Id.*) The Trustee responded by expressly abandoning his claim to recover aggregate payments because he did not seek to prove at trial that he was entitled to those payments. (Dkt. No. 568, at 2)

### Fraudulent Transfer Elements

Two Counts remain pending against LaSalle. Count IX seeks recovery of month-

---

8. Neither is there support for LaSalle's argument that the Opinion reversed entirely the insolvency determination from the first trial. (Solvency Brief 13).

ly payments made to LaSalle[9] pursuant to the Illinois UFTA ("IUFTA"). Count X seeks recovery of monthly payments made to LaSalle pursuant to Section 548 of the Bankruptcy Code.

■ To establish a claim under § 548, the Trustee must show: (1) a transfer of the debtor's property; (2) made within one year of the filing of the bankruptcy petition. This adversary proceeding was filed before enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, which extended the one-year look-back period under § 548 to two years. Count X of the Complaint applies to monthly payments made in the one year prior to Debtor's bankruptcy filing. Count IX, which applies Illinois law, applies to recovery of the monthly payments made prior to the one year look-back period of § 548; (3) for which the debtor received less than reasonably equivalent value in exchange for the transfer; and (4)(a) either the debtor was insolvent when the transfer was made or was rendered insolvent thereby, or (b) the debtor was engaged or about to become engaged in a business or transaction for which its remaining property represented an unreasonably small capital, or (c) the debtor intended to incur debts beyond its ability to repay them as they matured. *In re Eckert*, 388 B.R. 813, 831 (Bankr.N.D.Ill. 2008); *In re General Search.com*, 322 B.R. 836, 842 (Bankr.N.D.Ill.2005).

■ Under the Bankruptcy Code, a "transfer" is broadly inclusive and means in part every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property. 11 U.S.C. § 101(54). The IUFTA defines a transfer in essentially the same way. 740 ILCS 160/2(1). After the First Trial it was concluded that all rent payments made by the Hospital to LaSalle via HPCH were transfers. *Doctors Hosp. of Hyde Park, Inc.*, 360 B.R. at 841.

After the First Trial it was also determined that the Hospital received less than reasonably equivalent value for rental payments made pursuant to the HPCH Lease. *Id.* at 840–41. That conclusion was not disturbed by the Remand Opinion. Therefore, as to the solvency issues on remand, the critical issue is the fourth element.

■ Under § 6(a) of the IUFTA, the Trustee must show that: (1) his claim arose before the transfers; (2) the debtor made the transfers without receiving reasonably equivalent value in exchange for the transfers; and (3) the debtor was either insolvent at the time of the transfers or became insolvent at the time of the transfers or became insolvent as a result of the transfers. *In re Roti*, 271 B.R. 281, 304 (Bankr.N.D.Ill.2002). The question on remand is if and when the Hospital became insolvent before filing for bankruptcy on April 17, 2002.

■ If a transfer is fraudulent under § 548 or the IUFTA, the Trustee may recover the value of the property transferred either from the transferee or from "the entity for whose benefit such transfer was made," pursuant to § 550(a) of the Code. Section 9(b)(1) of the IUFTA provides essentially the same relief as that accorded by § 550(a). 740 ILCS 160/9.

**Burden of Proof**

■ The Trustee has the burden of proof on all elements of a fraudulent transfer and of the grounds for recovery. *In re McCook Metals*, 319 B.R. 570, 587 (Bankr. N.D.Ill.2005). Under the Bankruptcy

---

9. The Remand Opinion held that LaSalle was the "initial transferee" of the payments pursuant to § 550(a) of the Code. *Paloian v. LaSalle Bank, N.A.*, 619 F.3d 688, 692 (7th Cir.2010).

Code, the Trustee must establish insolvency by a preponderance of the evidence, *i.e.*, that the Hospital was more likely insolvent than not at the time of the transfers. *In re KZK Livestock, Inc.*, 290 B.R. 622, 625 (Bankr.C.D.Ill.2005); *In re Joy Recovery*, 286 B.R. 54, 77 (Bankr.N.D.Ill.2002).

There appear to be no decisions discussing the applicable standard of proof on constructive fraud claims brought pursuant to the IUFTA. *Chapter 11 Trustee of Longview Aluminum, LLC v. Samuel*, Nos. 04 A 00276, 04 A 00279, 04 A 01051, 2005 WL 3021173, at *5 n. 6, 2005 Bankr.LEXIS 1312, at *15 n. 6 (Bankr. N.D.Ill. July 14, 2005). Most decisions from other jurisdictions apply the preponderance standard to state law constructive fraud claims. *Id.* (citing cases). In this case, both parties argue the preponderance standard and that standard will therefore be used here. (Def. Solvency Brief 17; PL Brief 8)

### Standard and Tests for Insolvency

The Bankruptcy Code defines "insolvent" as a "financial condition such that the sum of [an] entity's debts is greater than all of such entity's property, at a fair valuation...." 11 U.S.C. § 101(32). The IUFTA defines insolvency in the same way. 740 ILCS 160/3. Fair valuation of a business entity reflects the price a willing buyer would pay in an arm's length transaction. A business should be valued on a going concern basis unless the business is "on its deathbed." *In re Taxman Clothing*, 905 F.2d 166, 169–70 (7th Cir.1990). Under the Bankruptcy Code and the IUFTA, there are three tests to determine whether an entity is insolvent: (1) the "balance sheet" test; (2) the "inadequate capital" test; and (3) the "inability to pay debts as they become due" test. *See* 11 U.S.C. S. 101(32); 740 ILCS 160/3. A bankruptcy judge has broad discretion in deciding a question of solvency. Insolven-

cy is a question of fact. *Klein v. Tabatchnick*, 610 F.2d 1043, 1048 (2d Cir.1979).

### Balance Sheet Test

Under the balance sheet test for insolvency, an entity is insolvent if it has a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation...." 11 U.S.C. § 101(32)(A); *see also* 740 ILCS 160/3(a).

Whether a debtor is insolvent under the balance sheet test is determined by analyzing what a willing buyer would have given for the debtor's entire package of assets and liabilities at the relevant time. *Joy Recovery*, 286 B.R. at 77.

The fair market value of property must be measured by what the property would bring if actually sold on the market at the time of the transfer, assuming an informed, hypothetical willing seller and an informed, hypothetical willing buyer not under compulsion to buy or sell, and having a reasonable amount of time to sell the property. *In re WRT Energy Corp.*, 282 B.R. 343, 369 (Bankr.W.D.La.2001).

### Consideration of Contemporaneous Market Evidence

The Trustee contends that LaSalle improperly seeks to embroider upon the above standard an actual examination of any arms'-length transactions between willing buyers and sellers. This issue was raised by LaSalle after the First Trial. Now, as then, LaSalle argues that the solvency analysis should not exclusively rely on expert testimony in reaching a solvency conclusion. Rather, "[i]f value can be established by an actual arms'-length transaction between a willing buyer and willing seller, the judiciary should not reject that valuation." (Def. Solvency Brief 19) LaSalle argued on ap-

peal after the First Trial that there was a growing body of law "favoring contemporary market evidence over post facto expert testimony prepared in anticipation of litigation." *LaSalle Nat. Bank. Ass'n v. Paloian*, 406 B.R. 299, 351 (N.D.Ill.2009). LaSalle argues that there are two marketplace indicators of the positive enterprise value of the Hospital during the relevant period. (Def. Solvency Brief 20) First, LaSalle argues that the Nomura Loan, made on August 28, 1997, was based on the lenders conclusion that the loan could and would be repaid. LaSalle also points out that the Hospital never missed a payment on the loan. (New Def. Ex. 82 P. 233) LaSalle further argues that the Nomura Loan was made at arms'-length.

Similarly, LaSalle argues that Daiwa entered into a loan with MMA Funding in March 1997. LaSalle acknowledges that this Loan was not made to the Hospital but nonetheless argues that Daiwa would not have renewed the loan if believed the Hospital was insolvent because the assets that secured the Loan were originated by the Hospital before being sold to MMA Funding. (Def. Solvency Brief 20) The Daiwa Loan was renewed in August 1997 and also in February 1999. (Jt. Ex. 2, 3, 4) Doctors Hospital was not a signatory to any of these agreements. (*Id.*)

The District Judge agreed with LaSalle's argument, stating that "[e]xpert testimony is often prepared many years after the events at issue, and the temptation to indulge in hindsight bias may be greater where the absence of an actual buyer requires a certain amount of speculation concerning what a 'hypothetical buyer' would have known at the time." *Id.* However, the District Judge ultimately did not find that reliance on expert appraisals was clear error in this case. *Id.* at 352. One reason was because there is no re-

quirement that contemporaneous data be given greater weight than expert testimony, especially where there is an indication of a flaw in the methodology used at the time. *Id.* LaSalle purchased the Loan from Nomura just after it was made in 1997 and later sued Nomura for breach of contractual warranties, alleging that the Loan was based on an appraisal that was "deficient in almost every material respect." (Jt. Ex. 137 P. 28; Jt. Ex. 138, at 2) In addition, the District Judge noted that "Nomura's $50 million loan to HPCH did not put it in the shoes of an actual buyer of Doctors Hospital, regardless of how extensively Nomura reviewed Doctors Hospital's financial health." *LaSalle Nat. Bank. Ass'n*, 406 B.R. at 351.

LaSalle cites post-remand support of the use of market evidence, *Malik v. Falcon Holdings, LLC*, 675 F.3d 646, 647 (7th Cir.2012). That case involved breach of contract for sale of stock in a limited liability company. *Id.* at 647. Summary judgment was granted against some of the Plaintiffs in the District Court because they had not adequately estimated damages sustained. *Id.* The Plaintiffs calculated their damages based on price paid for a percentage of ownership interest in the LLC. *Id.* The District Judge rejected that approach, reasoning that the value of the LLC as a whole could not be determined by the price paid for a portion of ownership interest and because the price paid simply reflected what the buyers could borrow. *Id.* at 647–48. On appeal, the Remand Opinion disagreed with the District Judge's view, stating that it "supposes that there is some measure of 'true' value that differs from what a willing buyer will pay a willing seller in an arms'-length transaction. Yet that is the gold standard of valuation; other measures are approximations. The value of a thing *is* what people will pay. The judiciary should not

reject actual transactions prices when they are available." *Id.* at 648.

LaSalle also cites *In re Boston Generating, LLC et al.,* 440 B.R. 302, 325–26 (Bankr.S.D.N.Y.2010) for the proposition "[i]t is generally accepted that, absent a clear market failure, the behavior in the marketplaces is the best indicator of market value." That case involved the debtor's motion to sell substantially all of its assets pursuant to 11 U.S.C. § 363. *Id.* at 306. Valuation of the debtor's business was necessary because certain creditors of the debtor objected that the sale of the assets was not at fair market value. *Id.* at 323. In considering this objection, the bankruptcy judge reviewed a competing valuation that concluded the debtor's assets were worth $250,000 more than the actual proposed sale price. *Id.* at 323–24. In rationalizing the discrepancy, the bankruptcy judge concluded that the difference was simply that the competing expert "believes he is right and the market is wrong." *Id.* at 325. The bankruptcy judge then did go on to cite caselaw holding that exposure to the market is the best way to determine value where available. *Id.* (citing cases).

The Trustee argues that there is no such evidence available in this case. He asserts that the two supposed "marketplace indicators," the Nomura and Daiwa Loans, in this case are irrelevant. First, the Trustee contends that neither involved a transaction between a buyer and seller of the Hospital property. One was a mortgage loan made to a separate entity, HPCH, LLC and guaranteed by the Hospital. The other was a loan secured by the Hospital's receivables. The Trustee argues that LaSalle has not cited caselaw equating loans made with an actual sale of property for purposes of valuation but it is not apparent why LaSalle would need to make such a showing.

Moreover, the Trustee contends that LaSalle admitted that the Nomura Loan was based on an extreme over-valuation of the Hospital. After purchasing the Loan from Nomura in 1997, LaSalle sued Nomura for breach of contractual warranties, alleging that the Loan was based on an appraisal that was "deficient is almost every material respect" that resulted in an 25% over-valuation of the Hospital. (Reply at 10; Jt. Ex. 137 ¶ 28; *see also* Jt. Ex. 138, at 2) Furthermore, the Trustee asserts, experts hired by LaSalle in its litigation against Nomura were highly critical of Nomura's disregard of "red flags" in the loan origination and underwriting process.

The Trustee also argues that LaSalle's insolvency expert gave no testimony concerning actual transactions and did not fault Peltz for failing to consider actual transactions. LaSalle's expert, McDonough, used the same valuation methodology that Peltz did, without reference to actual transactions. The Trustee argues that LaSalle's argument is not supported by expert testimony that relevant transactions took place or how they impacted valuation of the Hospital.

There is ample authority for use of marketplace indicators of value in a solvency analysis. However, the Nomura and Daiwa Loans were not made with the Debtor, but with affiliated entities. One of those Loans, the Daiwa Loan, was structured in an attempt to avoid the possibility and consequences of a bankruptcy filing by the Hospital. The other Loan, made by Nomura, was later the basis of a lawsuit by LaSalle. There is extensive evidence that the Loan made by Nomura was based on a faulty methodology. (Jt. Ex. 137 ¶ 28; *see also* Jt. Ex. 138, at 2) Therefore, evidence regarding the two Loans is of questionable utility in the solvency analysis here.

### Unreasonably Small Capital Test

 Under the Bankruptcy Code and the IUFTA, a transaction may be avoided if immediately after the transaction the debtor was left with "unreasonably small capital." 11 U.S.C. § 548(a)(1)(B)(ii)(II); 740 ILCS 160/5(a)(2)(A). "Unreasonably small capital" is not defined in either § 548 or the IUFTA. *See In re Vadnais Lumber Supply, Inc.,* 100 B.R. 127, 137 (Bankr. D.Mass.1989). Unreasonably small capital involves financial circumstances in which the debtor is left barely solvent and in a condition where bankruptcy or liquidation is substantially likely. *Official Comm. of Unsecured Creditors of Toy King Distributors, Inc. v. Liberty Savings Bank (In re Toy King Distributors, Inc.),* 256 B.R. 1, 142 (Bankr.M.D.Fla.2000). As described after the First Trial, the proper analysis is "forward-looking, requiring consideration of liabilities the debtor 'would incur' or contemplated transactions for which the remaining assets were 'unreasonably small.'" *In re Thunderdome Houston Ltd. P'ship,* No. 98 C 4615, 2000 WL 889846, at *10 (Bankr.N.D.Ill. June 23, 2000). "Unreasonably small capital" refers to an inability to generate sufficient profits to sustain operations. *Moody v. Sec. Bus. Credit, Inc.,* 971 F.2d 1056, 1070 (3d Cir. 1992).

After the First Trial, it was determined that the Trustee proved that the Hospital was engaged in business for which its remaining property constituted unreasonably small capital from August 1997 to April 2000. 360 B.R. at 870. This conclusion was based on the Peltz/Lane expert report that concluded that the Hospital had inadequate working capital, unacceptable levels of debt as a percentage of total invested capital, unacceptable levels of debt as a percentage of total invested capital, significant losses on operations, wor-

sening accounts payable days outstanding, and extensive physical deterioration and functional obsolescence of its facilities. *Id.* It was also determined that as for the Hospital's cash available to fund principal and interest on its debt obligations, that Peltz/Lane showed the Hospital's interest coverage ratio was highly volatile and generally at or below industry averages and that its days cash on hand steadily declined from 1996 on. 360 B.R. at 870.

The Trustee argues that at the Remand Trial, Peltz/Lane confirmed their earlier opinion on the issue as to the period from October 1, 1997 to April 17, 2000 (New PL Ex. 1 P. 43) Therefore, he argues, he should prevail on this issue this time around.

The conclusion on this issue from the First Trial was secondary to the balance sheet analysis. Accordingly, analysis was sparse such that discussion of this test occupied half a page of an eighty-five page opinion. On remand, the parties barely addressed the issue and the Trustee's experts simply reiterated their findings from the First Trial. (New Pl. Ex. 1 ¶ 43) As a result, any conclusion as to solvency based solely on this test would be inadequate in light of the Remand Opinion's mandate that the question of insolvency be reviewed on remand.

### Paying Debts as Come Due

 Constructive fraud may also be proven if there is a lack of reasonably equivalent value and if the debtor "intended to incur or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured." 11 U.S.C. § 548(a)(1)(B)(ii)(III). It has been held that the intent requirement can be inferred where the facts and circumstances surrounding the transaction show that the debtor could not have reasonably believed that it would be able to pay its debts as

they matured. *Barrett v. Continental Illinois Nat. Bank and Trust Co.*, 882 F.2d 1 (1st Cir.1989), *cert. denied*, 494 U.S. 1028, 110 S.Ct. 1476, 108 L.Ed.2d 613 (1990).

A transfer may also be avoided if, at the time of the transfer, the debtor intended to incur, or reasonably believed that it would incur, debts beyond the debtor's ability to pay. 11 U.S.C. § 548(a)(1)(B)(ii)(III); 740 ILCS 160/5(a)(2)(B). The analysis focuses on the time of the transfer and on what the debtor's intended at that point, not at some later point in time. *In re Pajaro Dunes Rental Agency, Inc.*, 174 B.R. 557, 591 (Bankr.N.D.Cal.1994).

### 1. Findings and Conclusions Following First Trial

Following the First Trial, it was determined that the Hospital had debts beyond its ability to pay as they matured at all times from August 28, 1997 to April 17, 2000. *Doctors Hosp. of Hyde Park, Inc. v. Desnick*, at 868. That conclusion was based on several exhibits admitted in to evidence at the First Trial and re-admitted at the Remand Trial. The evidence can be grouped in the following way: (1) evidence of Desnick's cash withdrawals from the Hospital (Jt. Ex. 85, Sch. 1, at 5; 2006 Tr. Vol. IV: 97); (2) evidence of negative daily cash on hand (Jt. Exs. 105 and 195; Jt. Ex. 72, Tab B.5); evidence of cash infusions from Desnick (2006 Tr. Vol. I: 156–57; 2006 Tr. Vol. IV: 97; 2006 Tr. Vol. I: 85); (3) evidence of overdrafts (Jt. Ex. 59), held checks (checks prepared for vendors but held until sufficient funds became available to pay them) (Jt. Exs. 60, 62, 64; Pl. Ex. 26 (Felbinger) 42–43, 44, 54), and placement of a credit hold on the Hospital by its vendors (Jt. Ex. 67; Pl. Ex. 26 (Felbinger), at 59). In sum, the evidence indicated that the Hospital chronically suffered from a lack of cash and that its on-going survival depended on cash infusions from Desnick. *Doctors Hosp. of Hyde Park, Inc. v. Desnick et al.*, at 868–69.

On remand, the Trustee argues that he has presented evidence on this alternative test of insolvency. (Reply 14) (citing Pl. Br. 40–42; Jt. Ex. 72, at 20; New Pl. Ex. 1, at 10–15, 22) He argues that instead of dealing with this evidence head on, LaSalle relies on a mischaracterization of the Remand Opinion. Indeed, LaSalle states that, without citation to any particular piece of evidence, it does rely on evidence presented at both the First and Remand Trials. (*Id.*) That evidence, LaSalle argues, establishes that the Hospital always had sufficient cash flow to pay its debts as they came due. It is not clear exactly what evidence LaSalle relies on for this assertion.

LaSalle instead relies on its contention that the Remand Opinion and the Rehearing Denial Order indicate a determination by the Seventh Circuit that the Hospital was paying its debts as they became due up to the filing of its bankruptcy petition. (Solvency Brief 24) (citing *Paloian v. LaSalle Bank N.A.*, 619 F.3d 688, 692–93 (7th Cir.2010); Def. Ex. 81) The Trustee argues that statements made the Remand Opinion on this issue involve nothing more than the court "merely setting up its insolvency analysis." (Reply 14) The Remand Opinion states: "the Hospital was current in paying its creditors.... Yet the bankruptcy judge concluded that it had been insolvent for almost three years. How was that possible." *Paloian*, 619 F.3d at 692–93. The Trustee argues this does not constitute a "determination" that the Hospital was paying its debts as they came due. Rather, he states, this language is simply a rhetorical device and unsupported by anything in the record. The Rehearing Denial Order reads as follows:

Trustee Paloian filed a petition for rehearing on September 10, 2010. The Trustee contends that the panel overlooked two alternative grounds for the bankruptcy judge's finding of insolvency: the Hospital failed to pay its debts as they came due and had unreasonably little capital. Yet the bankruptcy judge found that the Hospital *did* pay its debts in timely fashion until it filed for bankruptcy; these "alternative grounds" turn out to be restatements of the bankruptcy court's principal findings and are inadequate for the reasons given in the panel's opinion. The petition for rehearing is denied.

(New. Def. Ex. 81)

As noted earlier, it was found here after the First Trial that the Hospital was not able to pay its debts as they came due. *Doctors Hosp. of Hyde Park, Inc. v. Desnick, et al.,* 360 B.R. 787, 868–69 (Bankr. N.D.Ill.2007). The Seventh Circuit Panel had authority to come to a difference conclusion from all the evidence. Although the Rehearing Denial Order did not constitute a "determination" on the issues addressed by it, it certainly does raise some questions as to treatment of the findings and conclusions made on this issue after the First Trial.

The Trustee argues the Rehearing Denial Order did nothing to disturb the earlier findings and conclusions made after the First Trial. He contends the Remand Opinion expressly confined itself to three questions on appeal. One issue was "whether the Hospital was insolvent in August 1997." *Paloian,* 619 F.3d at 692. With respect to that issue, the Remand Opinion only considered and remanded issues relating to the balance sheet test for insolvency. The Trustee argues, therefore, as to the two alternative solvency tests considered after the First Trial, that findings and conclusions made earlier by

this Court are law of the case. If this proposition were accepted, then there would be no need to analyze solvency at all because that can be established under any of the available tests found in the Bankruptcy Code and the IUFTA. If that were the case, however, there would have been no point for the Remand Opinion in remanding the proceeding for a determination as to solvency. The Remand Opinion treated the test as to whether the Hospital was paying its debts on time as an "alternative" and a restatement of the main solvency conclusion. The earlier findings by this Court were found inadequate and therefore, the Trustee's contention cannot be accepted.

### 2. *Trustee's Evidence on Remand*

In the alternative, the Trustee states that even if the findings and conclusions on the Hospital's ability to pay its debts must be re-examined, that he proved on remand that the Hospital was insolvent under this test and that LaSalle has failed to contradict that evidence.

The Trustee's evidence on this issue is the Plaintiff's First Expert Report and Plaintiff's Expert Report on Remand. In their First Expert Report, Peltz/Lane pointed to declining profitability, undercapitalization, insufficient capital to fund obligations, and business risk associated with the fraud allegations. (Jt. Ex. 72, at 20) In that report, Peltz/Lane also stated that they could find no event or transaction that would have altered those conclusions between August 28, 1997 and April 17, 2000. (*Id.* at P. VII.B.7) In Plaintiff's Expert Report on Remand, Peltz/Lane cite much of the same evidence cited in the 2007 Opinion. (*See* New Pl. Ex. 1, at 13, 22)

Conclusions from the First Trial conflict with the finding that the Hospital was not paying its debts as they came due. For

example, Finding No. 239 states that the "Hospital never defaulted on any payments under the Daiwa Loan or the HPCH Lease...." Number 250 states, "Weinstein, the President of Doctors Hospital ... testified that he did not recall the Debtor having difficulty paying its bills, holding checks, or having negative fluctuations in cash flow...." Number 252 states, "Felbinger [CFO for the Hospital in 1998] ... testified that overdrafts were not continuous during his time at Doctors Hospital...." Number 254 states, "Nelson [CFO for the Hospital from late 1998 to 1999] testified that while during this time period some checks were held, it was not standard practice to issue checks without sufficient funds in the Doctors Hospital account." That evidence undermines the contention that the Hospital was not paying its debts as they came due. Therefore, the Trustee has not met his burden of proof on remand on this test of insolvency.

**Solvency Evidence**

The Trustee seeks to meet his burden of proof on the balance sheet solvency test by expert testimony of Scott Peltz and Michael Lane, the same experts the Trustee used in the First Trial. Peltz and Lane authored on remand Plaintiff's Expert Report on Remand (New PL Ex. 1) to follow up on their expert report submitted at the First Trial. Pelt and Lane's Expert Report on Remand concluded that the Hospital was insolvent from October 1, 1997 to March 31, 2000 under the balance sheet, adequate capital, and cash flow tests for insolvency.

**Summary of Plaintiff's Experts' Opinion**

The Chapter 11 Trustee presented evidence purporting to show that Doctors Hospital was insolvent at all times from October 1, 1997 through expert testimony of Scott Peltz and Michael Lane. Peltz's and Lane's opinions are contained in their original expert report, dated February 4, 2005 (Jt. Ex. 72), their testimony at the First Trial, and their November 15, 2011 supplemental expert report (New PL Ex. 1), and their testimony at the Remand Trial.

Plaintiff's experts used the balance sheet test for insolvency, and valued Doctors Hospital as a going concern. Using a capitalization of cash flow method, Plaintiff's experts concluded that Doctors Hospital had a negative fair value of equity from October 1, 1997 through April 17, 2000. (New Pl. Ex. 1 ¶¶ 9, 17, 41). Plaintiff argues that Doctors Hospital was thus insolvent during that time period.

Peltz and Lane started their analysis for the Remand Trial based on their calculation of insolvency presented during the First Trial. (New PL Ex. 1, Tab 10) That calculation was based on the fiscal year-end audited financial statements as of September 30, 1997, 1998, and 1999. Their report also used monthly, unaudited, statements for the partial year 2000. In Plaintiff's Expert Report on Remand, Peltz/Lane state that they made adjustments as directed by the Seventh Circuit, in addition to other "appropriate" adjustments. (New PL Ex. 1) The revised calculation, with footnotes showing adjustments, appears in Exhibit 11 of Plaintiff's Expert Report on Remand.

Peltz/Lane tested their insolvency conclusion by examining Doctors Hospital's "as of the current month" internal financial statements, applying a trailing-twelve-months methodology to determine the annualized income used to compute the fair value of Doctors Hospital's equity. The monthly revenues and expenses were then adjusted to match the most current available audited financial statements, based on the date that the audit was issued. That adjustment was based on the percentage difference between the audited and inter-

nal financial statements applied each month. (New Pl. Ex. 1, at 8, 16–17, Tabs 3, 13) According to Plaintiff, the trailing-twelve-month analysis confirmed that Doctors Hospital was insolvent from October 1, 1997 through April 17, 2000. (*Id.*)

**Peltz's Methodology in Plaintiff's Expert Report on Remand**

Peltz used the "capitalization of cash flow" method in Plaintiff's Expert Report on Remand. The first phase of this computation normalizes the company's cash flow. The process of normalization incorporates the value of assets needed to produce cash flow but excludes non-operating assets and liabilities. (12 Tr. Vol. IV: 481–82) Once the cash flow is normalized to reach "Debt–Free Cash Flow," a growth rate and a capitalization multiple are applied to reach an "Indicated Enterprise Value, Before Adjustments." Next, non-operating assets are added to the value to obtain the "Indicated Enterprise Value." Subtracted from that amount are "Claims on Enterprise Value" to reach the final "Indicated Fair Value of Equity."

**Defendant's Challenges to Plaintiff's Expert Report on Remand**

*Admissibility of Plaintiff's Expert Report on Remand*

■ At the trial on remand, LaSalle objected to admissibility of Plaintiff's Expert Report on Remand on the grounds that it does not satisfy the test established by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). That objection was overruled and the Plaintiff's Expert Report on Remand was admitted into evidence. Defendant argues that even though the Plaintiff's Expert Report on Remand was admitted at trial that the sufficiency and weight of that Report and supporting testimony should be considered. (Solvency Brief 27) *Wechsler v.*

*Hunt Health Sys., Ltd.,* 381 F.Supp.2d 135, 141 (S.D.N.Y.2003) "The 'admissibility' and 'sufficiency' of technical evidence necessitate different inquiries and involve different stakes. Admissibility entails a *threshold* inquiry over whether a certain piece of evidence ought to be admitted at trial. The *Daubert* opinion was primarily about admissibility." *In re Joint Eastern and Southern Dist. Asbestos Litigation v. United States Mineral Products Co.,* 52 F.3d 1124, 1132 (2d Cir.1995). An expert's opinion may be admissible but such admissibility does not equate with its utility in satisfying a burden of proof. *In re Lake States Commodities, Inc.,* 272 B.R. 233, 243 (Bankr.N.D.Ill.2002) (citing *Mid–State Fertilizer Co. v. Exchange Nat. Bank of Chicago,* 877 F.2d 1333, 1338 (7th Cir.1989)). The fact finder must still consider the credibility of the expert and determine the weight to be accorded their testimony and report. *Id.* (citing *City of Tuscaloosa v. Harcros Chemicals, Inc.,* 158 F.3d 548, 564 (11th Cir.1998)).

Defendant argues that the unreliability of underlying date used by Peltz renders conclusions made in Plaintiff's Expert Report on Remand of little probative value, such that the Chapter 11 Trustee has not met its burden as to solvency during any measurement period. Specifically, LaSalle argues that the Plaintiff's Expert Report on Remand relies on internal financial statements that the Trustee's experts previously testified are unreliable. Additionally, LaSalle contends that Peltz/Lane attempted to make the internal financials more reliable by making adjustments based on a percentage difference between the amounts reflected on the internal financials as compared to the Hospital's audited financials. LaSalle argues that this is not a generally accepted valuation methodology.

### The TTM Methodology Was a Test of Peltz/Lane's Main Solvency Conclusion

The Trustee disagrees with this assessment and argues that Plaintiff's Expert Report on Remand's use of the unaudited monthly reports was limited to their analysis in the TTM Methodology. That methodology was used as a test on the solvency conclusion reached using the audited financial statements.[10] In general, the trailing-twelve-month methodology is used to determine a company's annualized income in order to compute its fair value of equity. As described by Peltz and Lane, the "fundamental principle of [trailing-twelve-month] is that every month end [the 'Valuation Date'] can be seen as the end of a twelve month period and this twelve month period, as adjusted to normalize the income, is representative of the future earning potential of the company." (New PL Ex. 1, ¶ 33)

In the Expert Report on Remand, Peltz used both internal financial statements and the most recent available audited statements for each valuation date. Peltz then estimated the size of potential audit adjustments based on the release date of the most recent available audited financial statements. (*Id.* at ¶ 34) The estimates applied to the internal financial statements to determine annual results of operations at each valuation date. The adjustment was based on the percentage difference between the audited and internal financial statements applied each month.

The Trustee contends that LaSalle never addresses the justifications for using unaudited monthly financial statements. The Trustee states that Peltz/Lane recognized the limits of their reliability but that the unaudited statements were the only interim records available for checking annual conclusions. In addition, the Trustee argues that Peltz/Lane accounted for the unreliability of the records by adjusting them according to the most current available audited financial statements.

To support its argument that use of unreliable underlying data rendered the Plaintiff's Expert Report on Remand inadmissible LaSalle cited two cases that are distinguishable from the circumstances presented here. For example, in *In re TC Liquidations LLC,* 463 B.R. 257, 272–73 (Bankr.E.D.N.Y.2011), the Bankruptcy Judge rejected an expert's evaluations of intangibles of the debtor because, the judge found, the valuation was based on unreliable information in the form of sales projections and a budget that were themselves founded unreasonable assumptions and speculation. The expert's valuation in *TC Liquidations* relied on future events and predictions of future sales. *Id.* In Plaintiff's Expert Report on Remand, Peltz/Lane used available documentation from past events. Similarly, in *In re American Chemical Works Co.,* 235 B.R. 216, 226–27 (Bankr.D.R.I.1999), the District Judge rejected damage calculations as based upon unreliable sales data that could not provide a reasonable degree of certainty. The expert's report in that case, however, was based on an entirely different (although related) company than

---

10. The parties dispute at great length whether the TTM Methodology is the Trustee's experts' "primary" test of insolvency. LaSalle argues the TTM Methodology is primary because of its placement as the first exhibit within Plaintiff's Expert Report on Remand. The Trustee disputes that characterization and stresses that the TTM Methodology was used only as a test to Peltz/Lane's main solvency analysis that relied on audited financial statements. Despite the apparent controversy, it is unimportant to determine whether the TTM Methodology is in fact Peltz/Lane's "primary" test because the contested adjustments appear in both analyses.

the debtor. *Id.* Again, Peltz/Lane used the actual financial reports prepared by the Hospital and compared those reports to audited reports. These opinions therefore do not support LaSalle's contention that Plaintiff's Expert Report on Remand should be rejected outright based on the use of unaudited internal financial statements. Neither Opinion involves circumstances such as those here, where a valuation expert has employed his professional judgment to develop a methodology comparing unaudited financials against audited financials as a test of solvency.

In fact, Shannon Pratt, an expert in valuations, supports the use of internal financial reports in his treatise, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies.* During trial and in their briefs, both parties repeatedly cited Dr. Pratt as an authority on the subject of valuation. He has stated, "analysis of interim statements can give a more timely indication of the financial performance of the subject company...." (Pl. Brief, at 34, quoting Shannon Pratt, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* (5th Ed. 2007)). However, this statement does not address situations where those interim statements have been deemed unreliable by the person using those reports to make a solvency conclusion. Nevertheless, Peltz/Lane do not base their conclusion wholly on the analysis using the unaudited financials. In addition, Peltz/Lane attempted to diffuse the impact of the suspect financial information by adjusting the figures in them according to financial statements audited by KPMG.

As noted above, LaSalle argues Peltz/Lane's adjustment of the flawed internal reports uses an untested methodology never employed by Peltz before. Peltz/Lane could not point to any specific academic or judicial support of the way they adjusted the Hospital's internal reports. Rather, Peltz testified that: "In [my] opinion, given the facts and circumstances of this case and the multiple mid-year valuation dates, this approach is a reasonable and consistent method to determine the annual income used in the valuation analysis across multiple consecutive valuation dates." (New Pl. Ex. 1, ¶ 34) This indicates that Peltz developed this methodology based on his professional expertise.

The Trustee could not cite any court or professional valuation expert that has explicitly rejected the type of adjustments Peltz/Lane made to the internal financial reports. However, LaSalle has not cited any authority that the TTM Methodology used by Peltz/Lane is untrustworthy.

Regardless, Plaintiff's Expert Report on Remand treats the TTM Methodology as a test to the main solvency analysis. That analysis is sufficient to reach a conclusion on the date of the Hospital's date of insolvency. Much of LaSalle's and McDonough's criticism of the Peltz/Lane Report is directed at calculation of the TTM Methodology.

*Add-back of $12.997 Million to 1999 Normalized Net Income*

LaSalle argues Peltz improperly eliminated a positive $12.997 million adjustment in fiscal year 1999 income for the Hospital in his TTM Methodology. LaSalle contends there is no explanation for this change other than that he felt that reapplying this $12.997 million adjustment in 1999 would be "inappropriate." (12 Tr. Vol. III: 437–39) According to LaSalle, by eliminating this item, Peltz assured in Plaintiff's Expert Report on Remand that the Hospital was showing as insolvent for each month of fiscal year 1999 under the TTM Methodology. (New Def. Ex. 66, at 9–10; *see also* 12 Tr. Vol. IV: 571–72)

The Trustee responds that Peltz and Lane did make this adjustment in their

principal analysis that relied on audited financial statements. The Trustee admits that Peltz and Lane did not make the same adjustment in the TTM as Adjusted Method because it was "appropriate to do so." (PL Post–Trial Brief 20) Peltz testified that the adjustments were not made in the TTM as Adjusted analysis because the final audit adjustments were not known at that time. (12 Tr. Vol. IX: 1186–87) In any event, the Trustee argues, inclusion of the $12.997 million adjustment for 1999 does not render the Hospital solvent. (12 Tr. Vol. IX: 1191–92)

There are valid concerns regarding Peltz's failure to include this adjustment in the TTM as Adjusted Methodology. However, Peltz and Lane based their ultimate solvency conclusion on the analysis relying on audited financials, as discussed above. Peltz retained the adjustment in that analysis so further discussion on this issue will not impact the ultimate solvency conclusion.

*Period From August to October 1997*

On remand, Peltz and Lane concluded that the Hospital was insolvent by over $17.5 million as of September 30, 1997 and by over $17.2 million as of October 31, 1997. LaSalle questions how this could be so because the Remand Opinion found the Hospital to be "comfortably solvent" on August 28, 1997. LaSalle argues this conclusion cannot be correct as neither Peltz nor Lane could identify any change in financial condition of the Hospital between August 28 and October 31, 1997.

The Trustee responds that the Hospital's apparent quick descent into insolvency "is simply the result of the Seventh Circuit's unsupported finding." (PL's Executive Summary of Final Argument, at 6) Accepting that the Seventh Circuit's finding is binding on remand, LaSalle contends that two anomalies in the Opinion create a misleading perception that the Hospital experienced a sudden financial deterioration.

According to the Trustee, the Remand Opinion first incorrectly found that this Court found the Hospital insolvent only as of August 28, 1997. In fact, insolvency was found in the earlier opinion by this Court from that date to the date of the Hospital's bankruptcy petition in April 2000. Peltz and Lane felt free to examine the Hospital's financial status at any date after August 28, 1997 for this reason. The Trustee now argues that his experts could not ignore evidence of insolvency because the Opinion made a finding limited to one date.

Secondly, the Trustee disputes the Opinion's demand that Peltz/Lane add an $18.5 million asset to the Hospital's August 1997 balance sheet in order to offset a liability that Peltz and Lane argue they did not treat as a liability. The Trustee states that Peltz/Lane had actually made a normalizing adjustment to the Hospital's income for fraudulent earnings, something he argues is quite different from a liability.

For reasons stated above, Peltz and Lane were unable to satisfactorily explain during the appeal the Hospital's apparent quick descent into insolvency from August to October 1997. Furthermore, as explained below, Peltz's arguments against consideration of Desnick's wealth were rejected by the Remand Opinion. His attempts to reargue the issue as determined in the Remand Opinion are unavailing in light of that Opinion.

**LaSalle's Challenges to Peltz/Lane's Capitalization of Normalized Cash Flow Analysis**

*Normalization of Hospital's Income: $4.638 Million Deduction*

LaSalle argues the Trustee's experts have ignored the Remand Opinion in preparing their Expert Report on Remand.

In their Capitalization of Normalized Cash Flow Analysis, Peltz and Lane normalized the Hospital's cash flow by adjusting its net income to exclude earnings assertedly derived from fraudulent upcoding. (New Pl. Ex. 1, Tab 11; Pl. Post–Trial Brief 13) The adjustment was $4.638 million for 1997 and $2.319 million for 1998. (New Pl. Ex. 1, Tab 11) Peltz and Lane reduced that amount from the Hospital's income based on an estimate of contingent liability for upcoding that appears as a reserve in the Coopers & Lybrand Report prepared in connection with the Nomura Loan in 1997. LaSalle argues Peltz and Lane failed to account for Desnick's financial ability to pay as a contingent asset. This failure, LaSalle contends, runs directly counter to the Remand Opinion.

As described above, at the time of the Nomura Loan in August 1997, Doctors Hospital was the subject of a federal investigation into billing irregularities known as "upcoding." *Doctors Hosp. of Hyde Park, Inc. v. Desnick et al. (In re Doctors Hosp. of Hyde Park, Inc.)*, 360 B.R. 787, 836 (Bankr.N.D.Ill.2007). "Upcoding" occurs when a healthcare provider receives reimbursements from Medicare and Medicaid based on a more acute (and therefore more costly) diagnosis than the patient's condition warranted. *Id.* In 1999, the Hospital settled with state and federal authorities, agreeing to pay a fine of $4.5 million for upcoding overcharges that occurred from 1993 through 1998. *Id.* A separate federal investigation focused on (1) kickbacks paid to Doctors Hospital's physicians in exchange for medically unnecessary patient admissions; and (2) the hospital's inability to establish medical necessity and Medicare eligibility requirements for certain physicians' services. *Id.* In December 2000, the Hospital entered into a $14.5 million settlement regarding the kickback and other fraud allegations, again for events occurring from 1993 through 1998.

*Id.* The Hospital thus owed a total of $18.5 million in fines for Medicare and Medicaid-related violations. Desnick ultimately paid both fines.

The Trustee maintains that Peltz/Lane treated Desnick's wealth as a contingent asset where it was appropriate to offset the contingent liabilities related to upcoding and kickbacks. The upcoding reserve described in the Coopers & Lybrand Report is different from those cited by Peltz and Lane in their Expert Report on Remand. (New PL Ex. 1, at 8, ¶ 14; *see also* Jt. Ex. 72, Tab C–2) In their First Report, Peltz/Lane reduced the Hospital's income based on two separate U.S. government investigations and the associated settlement documents. (Jt. Ex. 72, Tab C–2) More specifically, Peltz/Lane considered the final settlement of alleged kickbacks in the amount of $14 million and settlement of alleged upcoding in the amount of $4.5 million. (*Id.*) In their Expert Report on Remand, Peltz/Lane rely instead on the Coopers & Lybrand Report.

The Remand Opinion rejected Peltz/ Lane's deductions from the Hospital's 1997 and 1998 income based on contingent liabilities for upcoding and kickbacks without considering as a contingent asset Desnick's liability and ability to pay for those contingent liabilities. *Paloian v. LaSalle Bank, N.A.*, 619 F.3d 688, 693–94 (7th Cir.2010). It stated that it was a "glaring error" to fail to account for Desnick's liability and ability to pay for fraud and upcoding claims as a contingent asset. The Opinion stated:

> If Desnick caused the Hospital to submit excessive claims for federal payments, then he and the Hospital were jointly and severally liable for restitution. So if $18.5 million goes on the liability side of the Hospital's balance sheet, the asset side must contain an estimate (as of

644

mid–1997) of how much Desnick would chip in, either directly or via contribution or indemnity (for, if the Hospital paid, then it would have a claim against Desnick). As it happened, Desnick paid the whole $18.5 million out of his own resources. Paloian contends that none of the money that Desnick supplied belonged on the asset side of the balance sheet as of mid–1997, because it was speculative how much he could or would pay. Yet Desnick's personal wealth is not pie in the sky; it is the sort of thing that banks would loan money against (and did). If Desnick had made out a note, in the Hospital's favor, for $18.5 million, a court would not ignore it when toting up the Hospital's assets. The judge would discount the note to reflect the probability that it could be collected. The discount might be substantial, but the court would not value the note at zero. Yet that's what the bankruptcy court did: it valued contingent liabilities at 100 [cent] on the dollar and contingent assets at 0 [cent] on the dollar. The treatment must be symmetrical. (So too with hindsight: If a court uses hindsight to value the liability at $18.5 million, it must use hindsight to value Desnick's share at $18.5 million, for a net zero effect on the Hospital's balance sheet.)

*Id.*

■ As noted, the allegations of upcoding and kickbacks were settled in 1999 and 2000 for $18.5 million. In their Expert Report on Remand, Peltz/Lane reproduced their mistake but this time they imposed a contingent liability based on a different piece of information, a reserve for upcoding from the Coopers & Lybrand Report. This change was argued to have been made to avoid hindsight bias. (New Pl. Ex. 1, Tab B) However, as described below, Peltz and Lane simply reproduce the

mistake made in their First Expert Report by not valuing Desnick's wealth as a contingent asset to potentially offset that contingent liability.

*Argument that Offset for Desnick's Wealth Wrong as a Matter of Methodology*

As in the First Trial, the Trustee advances several arguments why Desnick's wealth should not be considered to offset the upcoding reserve from the Coopers & Lybrand Report. The Trustee first argues that the offset is improper as a matter of methodology. According to the Trustee, such an offset is an improper attempt to inject a non-operating asset into the revenue and expense analysis in the normalization of cash flow. Such an addition, the Trustee contends, misses the whole point of the normalization process, which measures does not measure assets and liabilities like a balance sheet, but rather measures an income stream that a hypothetical buyer could expect on a long-term basis after removing one-time or unusual items. (12 Tr. Vol. I: 74; 12 Tr. Vol. II: 192) Peltz and Lane viewed the "fraudulent earnings" as just such an item and so removed them from the Hospital's revenues. According to Peltz and Lane, it is only in the later part of the analysis, after "Indicated Enterprise Value, Before Adjustments" is calculated, that it becomes appropriate to add back non-operating assets such as Desnick's wealth. The Trustee's experts argue that it is in this phase of the analysis that the claims of the government against the Hospital for fraudulent billing and any corresponding claims of the Hospital against Desnick should be considered.

LaSalle rejects this argument, reasoning that regardless of how the methodology is defined, assets should be included in the analysis just as liabilities are. Second,

LaSalle asserts that the Remand Opinion requires that Peltz/Lane symmetrically value Desnick's contingent assets against contingent liabilities were appropriate. Peltz and Lane treated the kickback and (different) upcoding liabilities in the exact same way in their First Report. (Jt. Ex. 72, Tab C–2) Their reasoning and treatment was explicitly rejected by the Remand Opinion and cannot be accepted on remand.

On remand, Peltz also testified that inclusion of fraudulent earnings would be magnified once a capitalization multiple was applied—thereby inflating the Hospital's income. According to Peltz, "no one is going to pay you five times that multiple for fraudulent, unsustainable revenue." (12 Tr. Vol. II: 192–93) Peltz further testified that he did not include an assumed payment from Desnick because "a buyer is not going to pay a price with a multiple based on the fact that some third party might pay the liability." (12 Tr. Vol. II: 94) Peltz concluded, "you must decouple the concept of normalization with the concept of reimbursement and that no rational buyer would pay a multiple of fraudulent billings regardless of whether someone had to reimburse the entity for them." (12 Tr. Vol. III: 383) This argument must also be rejected as a capitalization multiplier was applied to the Hospital's income in the First Expert Report, which was criticized by the Remand Opinion.

*Argument That Wrong to Assume that Desnick Would Always Fund the Hospital*

The Trustee also contends that the adjustment for fraudulent earnings should not be offset by a presumed payment from Desnick because it is, the Trustee asserts, wrong to assume that Desnick could be counted on to pay all of the Hospital's liabilities. McDonough's analysis counted on his view that Desnick who was assertedly very wealthy, had a history of infusing cash into the Hospital and presumably would have paid any amounts owing to the government. (New Def. Ex. 66, at 11–13; 12 Tr. Vol. IV: 556–64) McDonough testified that Desnick had never refused a request for funds from the Hospital so it would be fair to assume that he would continue to provide funds as needed. The Trustee contends that McDonough also ignored the adjustment for fraudulent earnings in Defendant's Supplemental Expert Report on Remand because he believed it would be offset by a payment from Desnick because the Hospital would have a claim against Desnick, who was allegedly jointly liable for the fraud. These assumptions are wrong, the Trustee argues because there were no notes or any other documentation obligating Desnick to fund the Hospital. (12 Tr. Vol. II: 159) Peltz testified that he did reflect Desnick's obligations to or loans from the Hospital as assets to the extent that they were actually reflected in the Hospital's books and records but at the Remand Trial he could specify where in his analysis these obligations were reflected. (12 Tr. Vol. I: 101; 12 Tr. Vol. II: 158–65)

The Trustee points out that Desnick never committed that he would always put money into the Hospital when needed. Desnick only testified as to his history of infusing cash into the Hospital. (*See* 12 Tr. Vol. IV: 562–63) It was previously concluded herein that Desnick's mere status as the Hospital's sole shareholder "did not transform him into a source of 'contingent payments'" *Doctors Hosp. of Hyde Park, Inc. v. Desnick, et al.*, at 857.

The Trustee further argues that Desnick's assumed willingness to pay is meaningless from the perspective of a hypothetical buyer. That buyer would value the Hospital on a going-forward basis, *i.e.*, after the buyer purchases it. However, af-

ter a buyer would purchase the Hospital, Desnick would be gone with no reason to provide funding for the Hospital's needs. After the First Trial, it was concluded that "[t]here was no reason to assume absolutely ... that a putative investor would assume that Desnick would make contributions in the years in issue." *Id.* at 860.

*Argument that Upcoding Liability was a Real Liability*

The Trustee contends that there is no doubt that the upcoding liability in the Coopers & Lybrand Report was a quantification of actual upcoding issues at the Hospital, implying that the liability was not contingent. John Baran, the lead Coopers & Lybrand partner on the Hospital project, testified that two medical record specialists from Coopers & Lybrand reviewed the Hospital's records underlying its case coding. (New PL Ex. 39, at 49–55, 97–98) The $4.638 million adjustment in the Coopers & Lybrand Report was calculated based on their findings. (*Id.* at 115–20) Baran testified that the "4.6 million related solely to those existing billing, coding issues." (*Id.* at 129) The Trustee argues that Baran clarified that he was not talking about "the possibility of future reductions in patient revenue," but rather "[o]nce settled, it would be reflected as a reduction in patient revenues in the year it got settled." (*Id.* at 130) In the Trustee's view, Peltz/Lane were correct to rely on the Coopers & Lybrand Report that the Trustee argues provided a conservative view, untainted by hindsight, of the Hospital's exposure to liability for fraudulently obtained earnings. The Trustee states that it was found here after the First Trial that the Coopers & Lybrand number was "only Coopers & Lybrand's 'best case;' its 'worst case' was a reduction in revenues of $29 million. And that was only for twelve months (ending July 31, 1997) covered by the Coopers & Lybrand report and only for Medicare, not Medicatid." *Doctors*

*Hosp. of Hyde Park, Inc. v. Desnick, et al.,* at 863. Peltz and Lane testified that their adjustment was, therefore, conservative. (12 Tr. Vol. I: 61; 12 Tr. Vol. II: 219; 06 Tr. Vol. III: 117–22)

LaSalle argues that the Trustee's contention that the reserve in the Coopers & Lybrand Report represented a "known" amount that a hypothetical buyer would account for is simply not true. LaSalle argues that the reserve was a contingent liability that was not known until settled in 1999. (*See* Jt. Ex. 161) It would therefore only support a deduction in that year, not in 1997 or 1998.

■■■■■ A determination of insolvency as of a particular date should not be influenced by events that occurred beyond that point in time. *In re Taxman Clothing Co.,* 905 F.2d 166, 170 (7th Cir.1990) (cautioning against the tendency of courts to deem a firm insolvent because hindsight makes obvious the path to financial ruin.) Thus, "information that the hypothetical willing buyer could not have known is obviously irrelevant," and "subsequent events are not considered in fixing fair market value," except to the extent that they were reasonably foreseeable at the date of the valuation. *Doctors Hosp. of Hyde Park, Inc.,* 360 B.R. at 858 (quoting *First Nat'l Bank of Kenosha v. U.S.,* 763 F.2d 891, 893–94 (7th Cir.1985)). The analysis permits consideration of "information originating subsequent to the transfer date if it tend[ed] to shed light on a fair and accurate assessments of the asset or liability as of the pertinent date." *In re W.R. Grace & Co.,* 281 B.R. 852, 869 (Bankr.D.Del.2002) (quoting *In re Mama D'Angelo, Inc.,* 55 F.3d 552, 556 (10th Cir.1995)). Courts should consider contemporaneous evidence "untainted by hindsight or post-hoc litigation interests" when evaluating a company's financial condition. *Kipperman v.*

*Onex Corp.,* 411 B.R. 805, 836 (N.D.Ga. 2009) (quoting *In re Iridium Operating LLC,* 373 B.R. 283, 346 (Bankr.S.D.N.Y. 2007)).

Despite the Trustee's arguments to the contrary, the $4.638 million reserve in the Coopers & Lybrand Report cannot be considered to have been a known quantity in 1997. Following the First Trial, the District Judge upheld the initial conclusion as to the Hospital's insolvency despite a charge of hindsight brought by LaSalle. Specifically, LaSalle complained that the following example of "hindsight bias" in Peltz/Lane's First Expert Report: Peltz/Lane's reduction of the Hospital's net income as of September 30, 1997 after adjusting for certain settlements entered into in May 1999 and December 2000 related to investigations of Medicare/Medicaid fraud. *LaSalle Nat'l Bank Ass'n v. Paloian (In re Doctors Hosp. of Hyde Park, Inc.),* 406 B.R. 299, 352 (N.D.Ill.2009). The District Judge rejected LaSalle's argument that the reduction relied on hindsight reasoning in part that LaSalle's own expert, Blake, "believed some reduction was warranted on known future liability for the Medicare/Medicaid violations." *Id.* However, the Remand Opinion disagreed that accounting for such future liability was not improper use of hindsight. *Paloian,* 619 F.3d at 693.

The Trustee's attempt to avoid this ruling by relying on the Coopers & Lybrand Report on remand is unavailing. The Coopers & Lybrand Report itself states that "an estimate of future reductions in patient revenue was made at approximately $4.638 million for the trailing twelve month period to account for risks associated with federal and state imposed regulations." (Jt. Ex. 177, II–3–II–4) A plain reading of this statement shows the contingent nature of the reductions in revenue. Furthermore, the Coopers & Lybrand Report does not

even provide an opinion that the reserve relates to fraudulent earnings; rather that the reserve reflects the risk associated with government regulations. (New Def. Ex. 66, at 8)

As such, Peltz and Lane should have analyzed the chances of Desnick paying for the liability. The Trustee argues that it is not certain from the record if Desnick did in fact pay all of the $4.5 million upcoding settlement. Desnick testified at the Remand Trial that he paid all of the $4.5 million, not just a portion of it. (New Def. Ex. 143, at 80–82) Therefore, if Peltz/Lane wanted to treat the upcoding reserve as a real liability they should have factored in the evidence that Desnick did in fact pay for the liability.

### Sub–Conclusion Regarding $4.638 Reduction in Income

In their Expert Report on Remand, Peltz and Lane valued the chance of recovering from Desnick at zero without providing any analysis as to this result. Conversely, McDonough effectively valued the chance of recovering from Desnick as 100%. He based that conclusion on an analysis of whether Desnick's wealth was sufficient to cover potential liability for upcoding allegations. He considered Desnick's past infusions of cash into the Hospital and pointed to statements made by Desnick indicating that he was likely to continue providing cash as needed. McDonough's approach satisfies the Remand Opinion's mandate that contingent liabilities be balanced against contingent assets. Reversing Peltz and Lane on this issue and adding back the $4.638 million deduction does not render the Hospital solvent. (Stip. ¶ 183) Therefore, other adjustments made by Peltz and Lane must be examined to determine the solvency issue.

### McDonough's Addback of $1.2 Million in Litigation Expenses

In Defendant's Expert Report on Remand, McDonough added back $1.2 mil-

lion for litigation expenses when normalizing the Hospital's income for the year 1999. He based that adjustment on his view that the amount represented an extraordinary litigation expense that appeared only once in the history of the Hospital's audited financials records. (New Def. Ex. 66, at 15; 12 Tr. Vol. V: 684, 740–41; 12 Tr. Vol. V: 686–89) McDonough explained that when an expense is not recognized on a regular and recurring basis, it is deemed an extraordinary expense and removed when normalizing income. He testified that this approach is endorsed by Dr. Pratt. (12 Tr. Vol. IX: 1174)

LaSalle contends McDonough is correct because Peltz and Lane agreed that the $1.2 million appeared only once in the Hospital's financial records. (12 Tr. Vol. III: 419–20; 933; 12 Tr. Vol. IX: 1221) Lane did testify as such and also stated that he did no further investigation on this issue. (12 tr. Vol. VI: 933) Lane also did not know if the Hospital's self-insured for litigation expenses. (*Id.* at 874–75)

Finally, LaSalle argues that case law supports the conclusion that the $1.2 million add back as an extraordinary litigation expense is appropriate. LaSalle cites *Dore Energy Corp. v. Prospective Investment & Trading Co., Ltd.*, No. 2:05 cv 1657, 2010 WL 4068802, at *7 (W.D.La. 2010). That case states that, under general accounting principles, only recurring expenses are normal operating expenses.

The Trustee argues that McDonough's treatment of the litigation expenses is improper for a number of reasons. First, the Trustee argues that McDonough has once again assumed payment from Desnick using impermissible hindsight. Relatedly, the Trustee contends that there is no basis for even using hindsight in this instance as there is no proof either way as to whether Desnick ever paid the $1.2 million in litiga-

tion expenses. Furthermore, the Trustee argues that Peltz/Lane already made a positive adjustment of $12.997 million in 1999. That adjustment, according to Peltz's testimony was for an unexplained "huge increase in expenses in 1999 that we couldn't understand as compared to other years, and, therefore, we lowered expenses on the audited financial statements in order to create a similar type of relationship between the numbers." (12 Tr. Vol. II: 218) Peltz believed that an additional adjustment for the $1.2 million in litigation expenses would be duplicative. (*Id.*) Finally, the Trustee argues that the expenses were not extraordinary as healthcare expert Lane testified. (12 Tr. Vol. VI: 874–75) The Trustee points out that the Hospital's audited financials provide that the Hospital incurred expenses in litigation in the ordinary course of business, including the $1.2 million amount. (Jt. Ex. 28, Year 1999)

This expense did not appear in any prior year audited financials and Peltz was wrong to value the potential recovery from Desnick at zero for reasons already discussed. Peltz/Lane could not adequately explain why this line-item should not be included in adjusting the Hospital's net income for 1999 and it is therefore added back in the solvency calculation. However, this adjustment is not enough to alter the solvency conclusion for that year by itself.

**Treatment of Over–Market Lease Payments**

■ LaSalle critiques another aspect of Peltz/Lane's calculation of the Hospital's normalized net income. It argues that in their calculation of normalized net income and the resulting Indicated Fair Value of Equity, Peltz/Lane did add back, in a bifurcated manner, the annual payment made under the HPCH Lease.

After the First Trial, it was concluded herein that the Hospital did not receive "reasonably equivalent value" for its monthly lease payments to Nomura because the payments far exceeded the fair market rental value of the Hospital property. *Doctors Hosp. of Hyde Park, Inc. v. Desnick, et al.,* 360 B.R. 787, 840–41 (Bankr.N.D.Ill.2007). That conclusion was based on the testimony of the Trustee's real estate and appraisal expert, Gary DeClark. He testified that that the fair market rental value of the real property subject to the Lease on a net basis as of August 1, 1997, was $2,110,000 per year. (06 Tr. Vol. II: 141; Jt. Ex. 160, at 3) Based on that appraisal, the monthly fair market rental for the property was $175,833.33. (06 Tr. Vol. II: 141; Jt. Ex. 160, at 3)

In calculating insolvency in Plaintiff's Expert Report on Remand, Peltz and Lane adjusted the Hospital's net income by excluding from expenses the excess market-value lease payments. (New PL Ex. 1, Tabs 1, 3, and 7) They also capitalized the excess lease payments and deducted that amount from the "Indicated Enterprise Value" of the Hospital. Peltz and Lane treated the lease payments in this way because they did not believe that a hypothetical buyer would assume the payment of over-market rent in assessing the value of the Hospital. Peltz and Lane made the same adjustments in their First Expert Report. (12 Tr. Vol. I: 83–84) Those adjustments were accepted here. *Doctors Hosp. of Hyde Park, Inc. v. Desnick et al. (In re Doctors Hosp.),* at 863–64. LaSalle did not appeal that conclusion and so it was not addressed by the Remand Opinion. The Trustee therefore argues that this issue is not subject to analysis on remand. However, for reasons discussed earlier, the subject of solvency was remanded generally. Therefore, analysis is appropriate.

As it did at the First Trial, LaSalle again disagrees with Peltz/Lane's bifurcation of the payments made under the Lease. He argues that this treatment is not in accord with GAAP treatment for operating leases, nor is this how the Hospital and its auditor treated the lease payments. Further, the Trustee contends that bifurcation itself is not supported by any valuation methodology and Peltz could not recall having used this approach prior to his involvement in this case. Relatedly, the Trustee argues that Peltz did not review IRS guidelines to determine when it may be appropriate to treat lease payments as something other than a current expense for tax purposes. Finally, the Trustee cites authority he asserts rejects attempts by experts to capitalize future lease obligations when doing so would artificially decrease the value of the company as part of a solvency analysis.

Addressing the last point first, the Trustee cites *Eerie World Entertainment, LLC v. Bergrin,* No. 02 Civ. 6513, 2004 WL 2712197, at *1 n. 25, 2004 U.S. Dist. LEXIS 23882, at *3 n. 25 (S.D.N.Y. Nov. 29, 2004) for the proposition that it is improper to capitalize future rent obligations. In that case, the District Judge stated that "if accounting to render all future rents immediately payable could be done as to rent, it could be so done with respect to any projectable future expense. This would render any business with substantial protectable future expenses artificially deemed insolvent." *Id.* at *1, 2004 U.S. Dist. LEXIS 23882, at *3 (quoting *Official Comm. of Former Partners v. Brennan (In re LaBrum & Doak, LLP),* 227 B.R. 383, 389 (Bankr.E.D.Pa.1998)). In *In re Labrum & Doak, LLP,* 227 B.R. 383, 389 (Bankr.E.D.Pa.1998), the District Judge also rejected an attempt by an expert to add all future rent obligations to balance

sheet of debtor in an attempt to prove insolvency.

As at the First Trial, LaSalle proffers several arguments against the treatment Peltz/Lane give to the lease payments. First, LaSalle argues that Peltz/Lane's treatment is not in accordance with GAAP treatment for operating leases and it is not how the Hospital's auditor treated the payments. It next argues that bifurcation of the lease payments is not supported by any valuation methodology and that Peltz himself has not used this approach before. Finally, LaSalle argues that any hypothetical buyer would be bound by the terms of the lease and would require that the full lease payments be deducted as a current expense. Peltz/Lane made adjustments for the Hospital's lease payments, which were found in the First Trial to be substantially over market value. Peltz/Lane justified their adjustments by stating that a hypothetical buyer would not agree to pay a price for the Hospital that is based on a valuation using over market lease payments. Although a buyer might be bound to make the payments under the lease, Peltz/Lane contend that a buyer would only pay a price for the Hospital that compensated for paying the over-market rent.

The lease between HPCH and the Hospital was executed on August 28, 1997 with an initial term ending August 28, 2012. (Jt. Ex. 73) LaSalle argues that any hypothetical buyer would be subject to terms of the Lease because it could not be altered, amended, or cancelled without the consent of Nomura under the Nomura Loan Documents. (*See* Jt. Ex. 18, § 16.8; Jt. Ex. 89, at 4, ¶ 3; Jt. Ex. 88, at 6) According to LaSalle, Peltz admitted the Lease was "sized" so that it serviced the monthly payments on the $50 million loan made to HPCH. (New Def. Ex., at 19; 12 Tr. Vol. I: 84; 12 Tr. Vol. V: 612–17)

Additionally, McDonough believed that a hypothetical buyer would also require that the full Lease payments be deducted as a current expense, because it would actually reduce the Hospital's cash flow from $22 million to $5 million, thereby lowering the value of the assets by reducing the bottom line cash flow. (12 Tr. Vol. V: 614–19, 708) By letting the expense flow through, the value paid by a buyer would be less because, as McDonough testified, "[t]he assets are worth less because you have less cash flow." (*Id.* at 616) For these reasons, in his own Report, McDonough calculated the Hospital's Fair Value of Equity with the full rent expense flowing through—*i.e.*, he treated the full rental expense as the amount paid.

The Trustee argues that Peltz's approach, which applies different discount rates to the bifurcated lease payment, serves artificially to increase the calculated liability and reduce the ending value. Peltz's approach removes an expense and artificially increases the cash flow. When a multiple is applied, a higher value is derived. (12 Tr. Vol. V: 614)

The Trustee argues that use of the full lease payment is improper for several reasons. According to the Trustee, the central inquiry is whether a hypothetical buyer would assume payment of over-market rent in assessing the value of the hospital. The Trustee credibly contends that a buyer valuing the hospital would recognize that the over-market payments are not entirely acceptable in determining the real value of the hospital without regard to whether the lease is legally binding.

Further, the Trustee argues that KPMG, the Hospital's auditors, did not capitalize any portion of the lease payments because the auditor's believed the Lease lasted only one year. (Jt. Ex. 28) The Lease in fact had a fixed term of fifteen years. (Jt. Ex. 18, at 1) KPMG's

treatment of the Lease payments was therefore based on a factual error.

LaSalle does not cite reasons why the adjustments for rent are not acceptable. Instead, LaSalle argues that Peltz could cite no direct support for his treatment of the Lease payments. Peltz, however, did testify that valuation treatises are not "cookbooks." (12 Tr. Vol. III; 351) Rather, "[t]hey describe methodology which I use my judgment to deploy." (*Id.* at 356) As at the First Trial, Peltz used his judgment to bifurcate the lease payments and that each adjustment is itself supported by authority—even if no authority by treatise or otherwise exists stating they should be used together. (12 Tr. Vol. IX: 1169–76, 1178–81) Peltz admittedly could not recall using this methodology in a solvency report, but he testified to prior use in valuing leases in other contexts. (*Id.* at 1182–87).

LaSalle argues that other courts have rebuffed experts' attempts at capitalizing future rent obligations when doing so would artificially decrease the value of the company in a solvency analysis. In *Eerie World Entertainment, LLC v. Bergrin,* the District Judge did criticize an expert's opinion regarding future lease payments by stating, "future rent obligations . . . should not be included in an insolvency analysis." No. 02 Civ. 6513, 2004 WL 2712197, at *2 n. 25, 2004 U.S. Dist. LEXIS 23882, at *3 n. 25 (S.D.N.Y. Nov. 29, 2004) The *Eerie* Opinion then cites a bankruptcy judge's opinion that "if accounting to render all future rents immediately payable could be done as to rent, it could be so done with respect to any projectable future expense. This would render any business with substantial projectable future expenses artificially deemed insolvent." *Id.* (quoting *Official Comm. of Former Partners v. Brennan (In re LaBrum & Doak, LLP),* 227 B.R. 383, 389 (Bankr.E.D.Pa.

1998)). *Eerie's* categorical rejection of inclusion of future rent expense in a solvency analysis is located in a footnote and provides no analysis where, as in this case, the debtor did not receive reasonably equivalent value for the rental payments made pursuant to the Lease. In a case such as this, where the lease was not made at arms' length, it is appropriate to make some adjustment to reach a fair value of equity. LaSalle's expert at the First Trial admitted as much. *Doctors Hosp. of Hyde Park, Inc,* at 864. At the Remand Trial, LaSalle's new expert disagreed with the precise approach adopted by Peltz/Lane but did not offer an alternative approach. Rather, McDonough simply allowed the entire lease payment to flow through, without adjustment for the fact that the Lease was far in excess of the fair rental value.

Perhaps more critical of Peltz's approach is *In re Labrum & Doak,* 227 B.R. 383, 389 (Bankr.E.D.Pa.1998). *Labrum* involved an action to recover fraudulent transfers from former law firm partners. *Id.* at 384. The Plaintiff's expert, in conducting a solvency analysis, designated as future lease obligations as present liabilities. *Id.* at 386. The bankruptcy judge was highly skeptical of this treatment and rejected the expert's analysis in part because, the judge opined, that assessing future rent obligations in a solvency analysis is inappropriate and not in conformance with GAAP. *Id.* at 389. The Opinion went on to say,

[w]hen an accountant leaves behind the standards of his profession, additional scrutiny is necessary. Thus actions taken by accountants in an insolvency analysis which are contrary to GAAP principles should be eminently logical and supportable as an exception for good cause. It will not do to abandon GAAP principles to illogically embrace whatev-

er "voodoo economics" an accountant can conjure.

*Id.*

*Labrum* is distinguishable, however. In that case, the expert treated all future rent obligations as a contingent liability without providing any corresponding value to those leaseholds. *Id.* Here LaSalle has vociferously objected to Peltz's bifurcation of the Lease payments based on this court's finding that a portion was over-market. He did not therefore treat the full Lease as a present liability, but only that part found to have been above market rate.

Furthermore, although neither Peltz nor the Trustee could point to any case in which lease payments were bifurcated, Peltz did cite support from valuation treatises in cases involving material transactions involving owners or management. Referring again to literature from Dr. Shannon Pratt, Peltz acknowledged in testimony that Pratt's treatise on business valuations did not explicitly approve of the bifurcation of lease payments. (12 Tr. Vol. IX: 1176–77; 1207–12) However, a text by Pratt does state that an analyst should evaluate whether lease amounts "are equivalent to what the company would pay at an arms' length basis" and make adjustments accordingly. (12 Tr. Vol. V:705–06) The text does not specify what adjustments should be made. Rather "the appropriate adjustment will depend on the situation, especially the length of time over which the present lease arrangements can be expected to continue and the ability of the stockholder whose stock is being valued to change the arrangement." (*Id.*) Peltz/Lane also relied on a statement by Pratt that, in normalizing income, an analyst should adjust a leasehold interest "to market value." (12 Tr. Vol. IX: 1174) The Trustee's experts also found support for capitalizing lease payments in a statement by Pratt. (*Id.* at 1175–76) Pratt advises

analysts to examine leases to determine whether the lease should be accounted for as an operating lease ("that is, the lease payments are simply expensed as they are incurred") or whether the lease should be capitalized as an asset of the lessee's balance sheet. (*Id.* at 1176) Capitalization is appropriate, according to Pratt, when the lease is of a financial nature. (*Id.* at 1175) The Trustee established at the First Trial that the over-market portions of rent paid on the HPCH Lease were in fact payments of debt.

In addition, LaSalle's argument that a hypothetical buyer would have to pay the over-market Lease payments and so must be accounted for in valuing the Hospital misses the point of valuation. That argument ignores the likelihood that a hypothetical buyer seeks to determine the normalized cash flow of the company being purchased. Such a buyer need not take the over-market portion of the Lease into account when deciding what to pay for the Hospital. The buyer could apply a discount to the additional liability associated with the above-market rent, and would be foolish not to do so.

In sum, there is no reason to disturb the prior finding that Peltz/Lane appropriately accounted for the Lease payments in their First Expert Report. They were therefore correct to apply the same treatment in Plaintiff's Expert Report on Remand. McDonough's decision to simply allow the full Lease payments to be treated as market rent assumes that the excess Lease payments are treated as rent and does not account for the decision that payments in excess of market rent were in fact payments of debt due on the Nomura Loan. For these reasons, Peltz and Lane's treatment of the Lease payments is more credible.

### Lowering of Capitalization Multiplier on Remand

LaSalle takes issue with Peltz's reduction of the capitalization multiplier from that used in his First Expert Report. The effect of this change, according to LaSalle, was to reduce the value of the Hospital for each of the solvency measurement periods. (New Pl. Ex. 1, at 18).

The reductions in the multipliers, as confirmed by Peltz, are summarized as follows:

| | *1997* | *1998* | *1999* | *2000* |
|---|---|---|---|---|
| First Expert Report | 6.90 | 6.67 | 6.54 | 6.13 |
| Expert Report on Remand | 5.68 | 5.56 | 5.52 | 5.18 |

(New Pl. Ex. 1, Tab 11; 12 Tr. Vol. III: 425–29)

In the valuation analysis, after the company's income is normalized, the next steps involve calculation of "Debt–Free Cash Flow." Once "Debt–Free Cash Flow" is calculated, this number is multiplied by the "Long Term Growth Rate" and is then multiplied by the "Capitalization Multiple." That multiple is the inverse of the weighted average cost of capital ("WACC") minus a three percent long-term growth rate. That quotient is then multiplied by 100. WACC represents the after-tax cost of equity and debt weighted for the average industry capital structure. (Jt. Ex. 72, Tab C2, at 3; 12 Tr. Vol. IV: 497–98) After the "Capitalization Multiple" is applied, the methodology calls for an "Add-back of Non–Operating Assets" to reach the "Indicated Enterprise Value."

LaSalle criticizes several aspects of Peltz/Lane's calculation of the "Capitalization Multiplier." First, LaSalle attacks application of a 10% "Company Specific Risk Premium" used in calculating WACC.

The Capital Asset Pricing Model ("CAPM") estimates the required rate of return of an equity investor given a level of risk. This is the most widely used technique to estimate the cost of equity. The equity risk premium is the expected rate of return of diversified equity portfolio over the risk-free rate of return.

In the First Expert Report, the cost of equity was calculated using the Adjusted Capital Asset Pricing Model ("ACAPM") that incorporated a specific company risk premium. (*Id.*) The Hospital's "unlevered beta" (a measure of risk) and optimal capital structure was derived from Peltz and Lane's analysis of publicly-traded companies holding and operating a number of hospitals. (*Id.*) In Peltz and Lane's opinion, an investment in the Hospital was subject to significantly more risk than the risk reflected in the betas of publicly-traded companies comparable to the Hospital. (*Id.*) Those risks included the Hospital's uncertain revenue base, rising operating costs, an increasing risk of bankruptcy, loan obligations, allegations of overbilling, and the many financial and legal obligations to related parties. (*Id.*) Peltz and Lane stated in the First Expert Report that they compared the cost of equity for the Hospital to the required rate of return achieved on publicly-traded companies classified as High Financial Risk in the Ibbotson Associates Risk Premium Report. That study presented a cost of equity rate for companies with high financial risk in the low 20% range.

The changes to the capitalization rate calculation were made, according to Peltz, to account for changes required by the Remand Opinion. Peltz testified that he made this reduction by applying a different tax rate and by altering the "size premium" used in calculating the "weighted average cost of capital" ("WACC") from

a "micro cap size premium" to a "10th decile size premium." (12 Tr. Vol. 1:66; 12 Tr. Vol. III: 427–29).

Peltz also testified that he made the change to the size premium because the Hospital's internal financial records reflected great variations from the audited financial records. This, in his view, made it appropriate in his judgment to place the Hospital in a riskier category. LaSalle questions how this change makes sense because Peltz had the same internal financial records to review when he prepared his First Expert Report. (12 Tr. Vol. III: 424–28).

At the Remand Trial, Peltz was asked by the trial judge how he could justify changing the size premium of the Hospital when he had the same information available to him when he prepared the First Expert Report. (12 Tr. Vol. I: 55–56) Peltz attempted to explain but ultimately admitted that "at the end of the day, it's a judgment issue." (*Id.*) Peltz also testified that he could not point to any learned treatise that specifically supported changing the size premium based on the existence of unreliable internal financial statements. (12 Tr. Vol. III: 429–30).

LaSalle's expert, McDonough, pointed out that the multiples used by Peltz in both the First Expert Report and the Expert Report on Remand were based on his WACC calculation. McDonough criticized that in calculating the WACC for September 30, 1997, Peltz increased the risk adjustment for size from 3.50% to 5.78% (or, to the 10th decile, a riskier category). Peltz also changed the "Beta" from .65 to .76. McDonough noted, however, that Peltz used the same guidelines companies in both the First Expert Report and the Expert Report on Remand. According to McDonough, then, there should not have been any change in the "Beta" used. McDonough argued that both of these

changes increased WACC for each of the valuation years, which in turn reduced the value of the Hospital. (New Def. Ex. 66, at 9; 12 Tr. Vol. IV: 567–69).

**Increased Size Premium**

■ LaSalle criticizes Peltz/Lane's use of the "10th Decile Equity Size Premium" in calculating "After Tax Cost of Equity" as part of his calculation of WACC. McDonough testified that use of the 10th Decile premium resulted in a higher risk adjustment (the riskiest category, according to McDonough) in relation to guidelines companies. (New Def. Ex. 66, at 9; 12 Tr. Vol. IV: 567–71) In the First Expert Report, Peltz/Lane used a lower adjustment rate, applying what is known as the "micro cap" equity size premium. (Jt. Ex. 72, Ex. C2).

Peltz testified that he changed the size premium as part of his WACC calculation because the Hospital's internal Financials varied greatly from the audited financials, making it appropriate in his view, to now place the Hospital in the riskiest category. (12 Tr. Vol. III: 424–28) LaSalle counters that Peltz had those same internal financial records when he prepared the First Expert Report. (*See id.*)

LaSalle argues that courts should be skeptical of expert valuations that impose different subjective capitalization rates between initial and subsequent analysis when there has been no change in the underlying facts or circumstances to the asset being valued. LaSalle cites *Development Specialists, Inc. v. Weiser Realty Advisors, LLC,* No. 09 Civ. 4084(KBF), 2012 WL 242835, at *8, and n. 2 (S.D.N.Y. Jan. 24, 2012). In that case, the District Judge rejected an expert's valuation of a leasehold interest, noting that the expert's report was unreliable given that the expert changed the capitalization rate between initial and rebuttal reports. There, as here,

there were no changes in facts or circumstances between reports.

Of course, there was one change in the circumstances present here. The Remand Opinion rejected Peltz's tax rate, requiring Peltz to amend that input on remand. Peltz testified that the "primary change" was the change to the tax rate, which automatically changes the capitalization multiple. (12 Tr. Vol. III: 426) However, this does not explain the change in size premium used in calculating WACC. The tax rate change required by the Remand Opinion is reflected in another part of Peltz/Lane's valuation analysis ("Estimated Effective Tax Rate", New Pl. Ex. 1), Peltz/Lane could not adequately explain why the change in the tax rate would change the size premium applied to the Hospital. Rather, the change is suspect and it not supported by any change in facts. *See Dev. Specialists Inc.*, 2012 WL 242835, at \*3. For this reason, Peltz and Lane's change to the equity size premium used in calculating WACC in the Expert Report on Remand is rejected. Reversal of this change, in conjunction with reversal of the deduction from normalized income discussed above, results in determination that the Hospital was solvent in 1997 and 1998.

**10% Company Specific Risk Premium**

 LaSalle criticizes Peltz/Lane's adherence to a 10% Company Specific Risk Premium on remand in light of the Remand Opinion. As described in one opinion, the "company specific risk premium" "provides for additional risks posed by uncertainties concerning operational performance, financial, status, and management capabilities." *Lane v. Cancer Treatment Centers of Am., Inc.*, C.A. No. 12207-NC, 2004 WL 1752847, at \*15 n. 82, 2004 Del. Ch. LEXIS 108, at \*55 n. 82 (Del.Ch. July 30, 2004). The company specific risk premium is used in calculating

WACC. The appropriate premium was disputed at the First Trial. LaSalle's expert at the First Trial, Blake, applied a 5% premium, whereas Peltz/Lane applied a 10% premium. Peltz and Lane used the same percentage in their Supplemental Expert Report.

As explained at the First Trial, Blake based his choice of premium on "the nature of the related party transactions with Desnick and his associated entities." (06 Tr. Vol. VI:73–75) Blake testified that he ignored all other risks associated with the Hospital, including management problems, Medicare/Medicaid fraud allegations, and the unreliability of the Hospital's internal financial records. (06 Tr. Vol. IV: 129–31) Blake justified his approach by testifying that "adjustments have been made to normalize historical performance, industry factors are already 'baked into' the beta factor affecting the equity risk premium and a size adjustment has already been incorporated." (CITE) After the First Trial, Peltz and Lane's approach was adopted because they cited risks that were not otherwise accounted for in calculating WACC. It was therefore concluded that "Peltz was thus conservative in choosing a 10 percent risk premium" 360 B.R. at 861.

LaSalle reargues the issue on remand, stating that for many of the same reasons Blake criticized Peltz's use of a 10% company specific risk premium (Jt. Ex. 31, at 25), McDonough also concludes that the 10% risk premium was and is too high. (New. Def. Ex. 66, at 16) McDonough, like Blake, concludes that a 5% risk premium is more appropriate. (*Id.*) Ex. 130, at 5; 12 Tr. Vol. V:633, 637–49, 711–23.

LaSalle argues that a 5% premium is more appropriate because: (i) the risks facing the Hospital were already reflected in its operating results; (ii) Peltz's claim that unreliable data requires a higher risk factor is belied by the KPMG audited fi-

nancial statements available to everyone, including a hypothetical buyer; and (iii) Peltz did not undertake any quantitative analysis to see how a 10% risk premium related to other companies in the marketplace.

LaSalle also argues that Dr. Pratt is of the opinion that a company specific risk premium should "rarely" go above 5% because risks are already built into the company's size premium. (12 Tr. Vol. V: 648–49; 12 Tr. Vol. IX: 1241–43) LaSalle further argues that courts are also skeptical about the use of a company specific risk premium in business valuations. One Delaware Chancery court stated:

> [courts have been] understandably ... suspicious of expert valuations offered at trial that incorporate subjective measures of company-specific risk premia, as subjective measures may easily be employed as a means to smuggle improper risk assumptions into the discount rate so as to affect dramatically the expert's ultimate opinion to value.

*Solar Cells v. True North Partners, LLC,* No. Civ. A. 19477, 2002 WL 749163, at *9 n. 11 (Del.Ch.2002) Likewise, in *Delaware Open MRI Radiology Assoc., P.A. v. Kessler,* 898 A.2d 290, 299 (Del.Ch.2006), the court addressed the untrustworthiness of such premia, stating:

> The calculation of a company specific risk is highly subjective and often is justified as a way of taking into account competitive and other factors that endanger the subject company's ability to achieve its projected cash flows. In other words, it is often a back-door method of reducing estimated cash flows rather than adjusting them directly. To judges, the company specific risk premium often seems like the device experts employ to bring their final results into line with their clients' objectives, when

other valuation inputs fail to do the trick.

LaSalle contends that based on such skepticism, Delaware courts routinely eliminate or cut in half the company specific risk premium assess by business valuators. *See, e.g., ONTI, Inc. v. Integra Bank,* 751 A.2d 904 (1999) (reducing proposed specific company risk premium by half because many reasons cited by expert, such as competition and risk of obsolescence, were not specific to the company in question); *In re Loral Space & Commc'n Inc.,* C.A. Nos. 2808–VCS, 3022–VCS, 2008 WL 4293781, at *23 (Del.Ch.2008) (criticizing application of 5% company specific risk premium as proposed without basis in academic theory or market returns and instead determining that expert's use of 5% company specific risk premium was an example of the expert's willingness to come up with a pre-determined conclusion rather than willingness to perform real valuation work); *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.,* 855 A.2d 1059, 1077 (Del.Ch.2003) (determining that if a beta factor was derived by examining comparable companies in discounted cash flow analysis then it is not appropriate to make an adjustment for company specific risk premium because any risks specific to the business were already accounted for in the estimation of the beta factor).

Each case cited by LaSalle does support the contention that choice of a company specific risk premium should be carefully scrutinized. Such scrutiny was applied at the First Trial and Peltz amply supported his choice of company specific risk premium. The Trustee asserts that there is ample evidence to support use of a 10% company specific risk premium. Specifically, the Trustee cites the following risks associated with the Hospital: (i) the threat of and actual lower reimbursements under the Balances Budget Act of 1997 (06

Tr. Vol. III: 71–78, 106–07); (ii) the Hospital's declining case mix index resulting in lower reimbursements (*Id.* at 80–88, 94); (iii) the high Medicare/Medicaid payor mix (*Id.* at 91); (iv) the overbedded market surrounding the Hospital (*Id.* at 118; 06 Tr. Vol. IV: 127); (v) the Hospital faced strong competition (06 Tr. Vol. III: 28, 88–89, 103–04); (vi) the Hospital had a high average length of stay (*Id.* at 94–95); (vii) the Hospital's suspiciously high level of revenues (*Id.* at 108–09); (viii) alleged Medicare/Medicaid fraud (*Id.* at 77, 99, 120); (ix) plant and equipment obsolescence (*Id.* at 90–91); (x) rising costs (*Id.* at 107–08); (xi) failure to use out-patient services (*Id.* at 94–95; Jt. Ex. 72, at 7); and Desnick's reputation that made it difficult to recruit the best physicians, clinicians, and nurses (06 Tr. Vol. III: 97–98).

The Initial Opinion thoroughly examined this evidence and found it to be credible. 360 R. 787, 861–62. On remand, LaSalle seeks a blanket rule that a company specific risk premium should rarely rise above 5%. At the Remand Trial, LaSalle sought support for this rule in a valuation newsletter authored by Dr. Pratt. That newsletter was not admitted into evidence; it merely gave a conclusory opinion that "the specific company risk would rarely rise to 5 percent." (12 Tr. Vol. IX: 1239) That statement does not foreclose the possibility that an evaluated company would be more than 5% riskier than guidelines companies. For reasons discussed in the Initial Opinion, the evidence supports application of a higher premium as applied to the Hospital.

Furthermore, LaSalle does not fully challenge the underlying rationale for application of a 10% company specific risk premium in this case. At the First Trial, Peltz specifically testified that he applied a 10% premium based on "specific issues relating to the hospital." (06 Tr. Vol. IV: 91–93) In addition, Peltz had extensive experience with the Hospital's financial health, having represented the unsecured creditors committee (12 Tr. Vol. II: 239). In one case cited by LaSalle, *Solar Cells,* the expert witness admitted on examination that he had no experience with the relevant industry and only limited knowledge of the specific company. 2002 WL 749163, at *6. Lane, the Trustee's health expert, bolstered the use of the 10% risk premium by testifying at the Remand Trial to the risks from fraud. (12 Tr. Vol. VI: 941).

McDonough challenged only two of the reasons for use of the 10% risk premium. First, he argued that the risk premium analysis should not account for the Hospital's unreliable financial data and its poor operating results because, he opined, the audited financial records are sufficient to overcome the unreliable data concern and the poor operating results are included elsewhere in Peltz's analysis. (12 Tr. Vol. V: 633, 641–42) Even if those arguments were accepted, McDonough does not account for the many of reasons for use of the 10% risk premium. He offers no calculation indicating how removal of those two factors from the analysis justifies application of a 5% company specific risk premium. In its post-trial brief, LaSalle suggests this court could select a middle point 7.5% company specific risk premium. (Def. Post-trial Brief on Solvency 45) However, LaSalle has not persuasively shown why Peltz/Lane's choice of a 10% risk premium should be rejected. For these reasons, there is no reason to change the prior finding that Peltz/Lane appropriately applied a 10% company specific risk premium in preparing their calculation of the capitalization rate to be applied to the Hospital's cash flow.

### Net Working Capital

█ McDonough criticized Peltz's inclusion of a "Net Working Capital Short-

fall" ("NWC" or "NWC Shortfall") for the Hospital in calculating "Claims on Enterprise Value." In Peltz/Lane's solvency analysis, after "Indicated Enterprise Value" is computed, the last step of the calculation calls for the deduction of "Claims on Enterprise Value" to reach the company's "Fair Value of Equity." (*See* New Pl. Ex. 1, Tab 11) One type of "Claim on Enterprise Value" is "Net Working Capital Excess/Shortfall." (*Id.*) The excess or shortfall is calculated by deducting current liabilities from current assets and then comparing that result to the "Industry Level of Working Capital." (*Id.*) LaSalle argues that the impact of the shortfall was to reduce the enterprise value and resulting "Fair Value of Equity" for the Hospital in amounts ranging from $8,000 for the year-ending September 30, 1998 up to $11,428,000 for the year-ending September 30, 1999. (New Def. Ex. 66, at 13–14; 12 Tr. Vol. IV: 582–85)

LaSalle, through McDonough, criticized Peltz and Lane's failure to consider Desnick's wealth as an asset for purposes of the NWC calculation. McDonough identified four specific aspects of the NWC calculation subject to this criticism: (i) failure to include amounts due from Desnick as working capital; (ii) failure to include receivables from related organizations (*i.e.,* Desnick) from working capital; (iii) exclusion of the *qui tam* settlement amount paid by Desnick from working capital; and (iv) exclusion of the $1.2 million in litigation expenses (paid by Desnick) from working capital. Each of these issues is really a question of whether it is appropriate to include Desnick's wealth as an asset and, if so, how his wealth should be factored into the solvency analysis.

### Settlements Paid by Desnick

The notes to the Hospital's audited financial statements for fiscal year 1999 contain the following statement:

The hospital is involved in a *qui tam* legal action that was filed against a number of hospitals across the country concerning certain billing practices. In 1999, the Hospital executed an agreement (Settlement Agreement) with the United States Attorney's Office for the Northern District of Illinois, Civil Division; the United States Department of Health and Human Services, Office of Inspector General; the State of Illinois; and the Realtor, Health Outcomes Technologies. The Settlement Agreement requires the Hospital to pay $4,500,000 over a twenty-four month period. At September 30, 1999 and 1998, the amount of this settlement obligation outstanding was $3,100,000 and $4,500,000, respectively, and is included with estimated third-party payor settlements in the accompanying balance sheets.

*Doctors Hosp. of Hyde Park, Inc. v. Desnick, et al. (In re Doctors Hosp. of Hyde Park, Inc.),* 360 B.R. 787, 837 ¶ 401 (Bankr.N.D.Ill.2007).

McDonough's NWC calculation is adjusted by crediting "Estimated Third–Party Payor Settlements" for the government's claim of $4.5 million in 1998 and $3.1 million in 1999 (New Def. Ex. 66, at 14–15) McDonough justified these changes by arguing that the *qui tam* settlement amounts "were ultimately paid by Dr. Desnick personally." (*Id.*) LaSalle argues that Peltz/Lane were wrong in not making this same adjustment.

The Trustee claims that McDonough improperly relies on Desnick's wealth to add an asset to the Hospital's value. The Trustee contends that Desnick had no contractual obligation to pay the *qui tam* settlement amount. With respect to the *qui tam* settlement, Desnick signed the settlement agreement in his capacity as the Hospital's president, not in his personal capacity. (Jt. Ex. 161) The Trustee also

questions whether Desnick did in fact pay the settlement and, if so, if he paid it in full. (*See* New Def. Ex. 103) (showing only partial payment) Moreover, Peltz testified that there was little or no evidence that the *qui tam* settlement amounts were even recorded as an expense on the Hospital's books. (12 Tr. Vol. II: 249–50)

Finally, the Trustee asserts that the expense for 1999 have already been accounted for in the $12.9 million in unexplained expenses, so any adjustment based on the *qui tam* settlement would be redundant. In support of this argument, the Trustee cites a portion of the transcript in which Peltz discusses his view on how to treat certain litigation costs. (12 Tr. Vol. II: 218) In his testimony, Peltz very generally explained a $12.997 million reduction to the Hospital's expenses. (*Id.*) Peltz testified that he made that reduction based on unexplained increase in the Hospital's expenses. (*Id.*) Peltz stated that he included the litigation expenses into the $12.997 million amount and therefore did not make another deduction based on those expenses elsewhere in his report. (*Id.*) In this portion of the testimony, Peltz did not explain what other expenses he lumped into that figure.

**Amounts Due From Desnick/Related Organizations**

McDonough also criticizes Peltz/Lane for failing to include in their NWC calculation a line item for "Amounts Due from Related Organization" and "Due from Majority Shareholder". LaSalle contends that Peltz/Lane provide no explanation in their Expert Report on Remand for excluding amounts due from Desnick in their calculation of NWC Shortfall. Peltz/Lane assertedly did not include amounts due from Desnick despite Peltz's testimony that Desnick owed the Hospital (per audited financials) millions of dollars in 1997, 1998, and 1999. (*See* Jt. Ex. 28, 37; 12 Tr.

Vol. II: 240–45) In that testimony, Peltz in fact opined that Desnick owed the Hospital over $5 million at various points over this period. (12 Tr. Vol. II: 240–45) LaSalle argues exclusion of these amounts from NWC is perplexing because Peltz was familiar with amounts due from Desnick as he participated in the settlement between the bankruptcy estate and Desnick. (*Id.*) That settlement was based in part on claims that Desnick owed millions of dollars to the Hospital. (*Id.*) LaSalle also points out that Peltz testified that the Hospital's audited financials treated the amounts due from Desnick as current assets. (12 Tr. Vol. IX: 1221).

LaSalle makes the same argument with respect to each of these issues. The Trustee asserts that Peltz testified that he reflected Desnick's obligations to or loans from the Hospital as assets to the extent that they were actually reflected in the Hospital's books and records. (12 Tr. Vol. I: 101; 12 Tr. Vol. II: 158–65) Peltz testified that the Hospital records reflected amounts owing from Desnick at fiscal year-end 1997, 1998, and 1999. (12 Tr. Vol. II: 240–41) Peltz further stated that those amounts were actually reflected in his calculations. (12 Tr. Vol. I: 101; 12 Tr. Vol. II: 158–65).

Peltz did testify as to how he considered Desnick's wealth in preparing his NWC calculation. He stated:

we are aware of Dr. Desnick's wealth and considered that, and then considered how a hypothetical buyer would look at the issue. A hypothetical buyer would—assuming they were buying the entity—would look at the entity and say this is what the entity reflects. This is the working capital the entity reflects. It would not make an adjustment assuming a shareholder would simply add more working capital. If that were the case, perhaps they would require that

that done in a contract. But in my opinion, no hypothetical buyer would say Dr. Desnick has $80 million of gold. Any time we need working capital, we'll get it, particularly after I buy it.

(12 Tr. Vol. III: 445).

The Trustee contends that Peltz/Lane properly included amounts allegedly due from Desnick in their NWC calculation as "Estimated Third–Party Settlement" in "Current Liabilities." The Trustee reasons that Desnick had no obligation to pay these amounts. As just discussed, however, Peltz/Lane should not have simply treated the loans as completely uncollectable. Peltz/Lane do not adequately explain why Desnick's wealth should not to some degree be considered an asset of the Hospital for purposes of the NWC calculation, though their assumptions was valid that a hypothetical buyer would not assume in the absence of contractual liability that Desnick owed unlimited amounts to the Hospital.

Further, the Trustee claims that to the extent the *qui tam* liability was paid by Desnick, the reduction of the obligation is reflected in the reduction of the debt from $4.5 million in 1998 to $3.1 million in 1999. The Trustee cites in support of this assertion the First Expert Report prepared by Peltz and Lane for the First Trial. (Jt. Ex. 72, Tab B–2) Peltz/Lane used the figures from the First Report in their Capitalization of Normalized Cash Flow analysis in their Expert Report on Remand. (*See* New Pl. Ex. 1, Tab 11). A review of Peltz/Lane's NWC calculation does not clearly reflect any reduction in debt owed for settlements.

### McDonough Double–Counted in Defendant's Expert Report on Remand

The Trustee points out that McDonough double-counted certain assets in his Defendant's Expert Report on Remand. In that Report, McDonough applied the Capitalization Multiple and then added back certain "Non–Operating Assets" for 1997, 1998, and 1999. These amounts were categorized as "Due From Majority Shareholder" and a receivable "Due From Related Organization." (New Def. Ex. 66, Tbl. 4) McDonough then used those same assets in his calculation of NWC. After he was made aware of this error, McDonough removed the assets from the "Addback of Non–Operating Assets" but kept them as current assets used to calculate NWC. (New Def. Ex. 130, 12 Tr. Vo. IX: 1993) Peltz/Lane treated those assets as non-operating assets.

The Trustee argues that the assets should not be treated as current assets. Both Peltz and Lane testified that the *qui tam* settlement and the $1.2 million in litigation costs were real obligations of the Hospital. (12 Tr. Vol. II: 237, 248–52; 12 Tr. Vol. VI: 879–83). The Trustee argues that although Desnick signed the Settlement Agreement, he did so only in his capacity as President of the Hospital, and not individually.

 Neither party sought to define "current asset." Black's Law Dictionary defines a "current asset" as "[a]n asset that is readily convertible into cash, such as a marketable security, a note, or an account receivable." *Black's Law Dictionary* 126 (8th Ed. 2004). One Opinion from the Third Circuit noted that "[t]he standard definition of 'current assets' is 'cash and other assets or resources commonly identified as those which are reasonably expected to be realized in cash or sold or consumed during the normal operating cycle of the business.'" *In the Matter of Penn Central Transp. Co.*, 570 F.2d 1189, 1196 n. 14 (3d Cir.1978) (*citing* American Institute of Certified Public Accountants, *Accounting Research Bulletin No. 43*, at 20 (1961)). Identification of the

status of an asset should be made on a case-by-case basis. *Penn*, 570 F.2d at 1196–97. Unfortunately, neither party briefed this issue in depth. LaSalle has not provided any clear basis for treating Desnick's wealth as a current asset in the NWC calculation. The Remand Opinion specified that Peltz and Lane were wrong not to value Desnick's wealth as a contingent asset, not as a current asset. Although LaSalle has shown Desnick had a history of infusing cash into the Hospital it has not shown any reason to believe he would always continue to add funds on a 100% basis. Therefore, Peltz/Lane's treatment in their NWC calculation remains credible.

### Industry Level of Working Capital

In Defendant's Supplemental Expert Report on Remand, the Hospital is said to be insolvent for fiscal year 1999. (New Def. Ex. 130, at 3, 5) McDonough states this is the result "only to the fact that I have applied Mr. Peltz's $4,016,000 Industry Level of Working Capital (a deduction from the indicated enterprise value)." (*Id.*) He contends that he saw no support or analysis for Peltz's number. (*Id.*) At trial, however, Peltz explained how he calculated the Industry Level of Working Capital using a compendium of accepted financial statements for general medical and surgical hospitals. (12 Tr. Vol. II: 812–86) Moreover, McDonough did not suggest a number or otherwise analyze this issue. For this reason, there is no reason to discredit Peltz's choice of Industry Level of Working Capital.

For reasons just stated, Peltz and Lane's calculation of NWC is held to have been appropriate.

### Miscellaneous Issues

LaSalle asserts, as it did at the First Trial, that the Trustee's Complaint is barred by the doctrines of equitable estop-pel and estoppel by contract. *Doctors Hosp. of Hyde Park, Inc. v. Desnick, et al. (In re Doctors Hosp. of Hyde Park, Inc.)*, 360 B.R. 787, 878 (Bankr.N.D.Ill.2007). In particular, LaSalle argues that the Hospital represented that it was solvent in contracts that it voluntarily entered into. Further, because LaSalle relied on such representations in good faith to its detriment it is inconsistent with the Trustee's current position. As at the First Trial, LaSalle has not proved any elements of estoppel. *Id.*

LaSalle asserts that there was no causal connection was established at trial between the Hospital's bankruptcy in April 2000 and any of the challenged payments. It contends, without further argument, that there is a requirement that there is a causal connection between the transfer called into question and the allegedly constructively fraudulent result. LaSalle cites *In re Bergman*, 293 B.R. 580 (Bankr. W.D.N.Y.2003) but does not provide analysis of the issue. *Bergman* contains no reference to any requirement as stated by LaSalle. Without more, there is no basis to rule in LaSalle's favor on this argument.

### INSOLVENCY AFTER SEPTEMBER 30, 1999 (FISCAL YEAR 2000)

At the First Trial, it was held that the Trustee established that the Hospital was insolvent at all times from August 28, 1997 until the time the Hospital filed its bankruptcy petition in April 2000. *Doctors Hosp. of Hyde Park, Inc. v. Desnick, et al. (In re Doctors Hosp. of Hyde Park, Inc.)*, 360 B.R. 787 (Bankr.N.D.Ill.2007). LaSalle has now persuasively shown that the Trustee has not met his burden to show that the Hospital was solvent with respect to the last part of fiscal year 1997 and all of 1998. However, LaSalle's arguments do not address the reasons for finding the Hospital insolvent for fiscal year 1999. As

described below, prior findings from the First Trial establish the Hospital's insolvency beginning in September 30, 1999.

At the First Trial, LaSalle's expert Thomas Blake also did not address the issue of insolvency after September 30, 1998. (Jt. Ex. 31, at 28) Similarly, LaSalle's expert McDonough did not reach a solvency conclusion regarding the period after September 30, 1999. (*See* New Def. Ex. 66) McDonough declined to analyze solvency after that period because no audited financials were available for review and he was unwilling to use the Hospital's available internal financial records. (*Id.*) In preparing Defendant's Supplemental Expert Report on Remand, McDonough's revised calculations for 1999 show the Hospital to be insolvent. (New Def. Ex. 130, at 3).

LaSalle argues that McDonough was right to refuse to reach a conclusion on solvency for this period because of the lack of reliable financial records. However, such records need not be admitted so we can conclude that the Hospital was insolvent merely due to a lack of audited financial records.[11] Furthermore, both the Trustee and LaSalle repeatedly cite to Dr. Shannon Pratt, who states that analysts may rely on internal financial records, even though they may not be the most reliable, as they may provide the timeliest picture of a company's financial status.

Peltz/Lane relied on available financial records in reaching his solvency conclusion for this period. They then adjusted those records by comparing them to available audited financials of years past. This is the same approach applied in Plaintiff's Expert Report. (Jt. Ex. 72, Tab 6)

Several findings from the Opinion of this Court following the First Trial support a finding of insolvency beginning September 30, 1999. There is ample evidence that the Hospital faced serious financial difficulties beginning in 1999 with the departure of the Hospital's CEO, Steven Weinstein, who also took ten key admitting physicians with him to another Hospital. (Def. Ex. 1, at 1) During this time period, the Hospital lost its accounts receivable funding from Daiwa and experienced difficulty paying its bills. (12 Tr. Vol. I: 97–98; New Pl. Ex. 1, at 18–19 and Tab 9).

Furthermore, the Hospital's auditors included a note in the September 30, 1999 financial statements questioning the Hospital's ability to continue operations. (Jt. Ex. 28, Independent Auditor's Report for March 31, 2000) That report stated that the Hospital "suffered a significant loss from operations in 1999 and has deficits in both working capital and shareholder's equity at September 30, 1999 that raise substantial doubt about its ability to continue as a going concern." (*Id.*)

The Hospital's internal financial statements reflected profits in January and March 2000. However, Daiwa expressed serious doubts about the accuracy of those financials. (New Def. Ex. 46).

The Hospital's bankruptcy petition reported total assets of $44 million and liabilities of $80 million—an equity deficit of $36 million before considering the fair value of the Hospital's assets. (00 B 11520, Dkt. No. 131; Jt. Ex. 72, at 17).

---

11. Use of internal financial statements in this instance is different than use of those statements in using the TTM Methodology. Here, the internal records are the only ones available. It would be strange to hold that the Trustee has not met his burden with respect to solvency due to the lack of audited financial records. LaSalle has cited no authority for that proposition. In contrast, Peltz cited to Dr. Shannon Pratt who, as previously discussed, states that internal records should be viewed with some skepticism but that an analyst should rely on available documents and make adjustments accordingly.

Dr. Allen Dobson, Senior Vice President and Director of the Healthcare Finance Practice at The Lewin Group issued a report (the "Dobson Report") on September 29, 2003 in which he analyzed the factors that contributed to the bankruptcy of the Debtor. (Def. Ex. 1) Dobson determined that the Debtor's bankruptcy filing was caused by: (1) the departure of key management executives including hospital CEO Stephen Weinstein, (2) the departure of at least ten key admitting physicians, (3) overly cautious billing practices by physicians aware of federal investigations of hospital billing practices, (4) a decline in Medicaid cases and Medicare case mix, (5) lack of cost control following the departure of Debtor executives, and (6) ultimately, the immediate, complete loss of cash flow following the loss of the Daiwa Securitization in March, 2000. (Def. Ex. 1, p. 1). In reaching these conclusions, Dobson analyzed the Debtor's financial statements from 1994 through 1997, as well as background information, including review of the Nomura loan documents and the Daiwa Securitization, and concluded that as of September 30, 1997, the Debtor was a "going concern business", with a "strong financial base". (Def Ex. 1, at 3–5; 7–34).

As to termination of the MMA Funding, LLC Loan, Dobson believed the Doctors Hospital had regained partial financial footing as of the spring 2000. (Def. Ex. 1, at 6) Daiwa had, however, packaged certain of its healthcare receivables for sale, including the Daiwa Securitization, and the potential purchaser of the health care receivables portfolio did not want to have receivables dependent upon Medicaid. (*Id.*) Although Doctors Hospital had made efforts to meet conditions required by Daiwa to extend the Daiwa Securitization, Daiwa terminated the Daiwa Securitization on March 30, 2000, leaving the Debtor without an immediate source of capital. (*Id.*) Dobson concluded that "in the final analy-sis", the loss of the MMA Funding, LLC Loan was the deciding factor leading to Doctors Hospital's bankruptcy, since it was likely Doctors Hospital could have continued to operate had the MMA Funding, LLC Loan continued. (Def. Ex. 1, at 32).

Philip Robinson, VP of Finance of MMA, confirmed at the First Trial that while Doctors Hospital did lose money in 1999, as reflected on its audited financials, one of the reasons it lost money during that period was as a result of Stephen Weinstein, the President of Debtor, resigning in October, 1998 and going to a direct competitor of Doctors Hospital, Michael Reese Hospital. (06 Tr. Vol. II: 89–90) The departing doctors began admitting the majority of their patients at Michael Reese. (06 Tr. Vol. II: 90, 93) Robinson also agreed at the first trial that the loss of Weinstein and the admitting doctors resulted in a "noticeable drop-off" in the Doctors Hospital's admissions in 1999, (06 Tr. Vol. II: 90), with the primary loss in the geriatric population. (06 Tr. Vol. II: 94) Doctors Hospital had gross revenues in 1998 of $71.3 million. (Jt. Ex. 37). The estimated loss of revenue attributable to the loss of Weinstein and the admitting physicians, according to Robinson's calculation, would be between $7.1 and $10.6 million. Doctors Hospital in fact showed a loss of $7.9 million in gross revenues from 1998 to 1999. (Jt. Ex. 28).

As described by Robinson, "[t]he hospital had started to struggle in the fall of 1998, which is the beginning of the [1999] fiscal year." On the departure of Weinstein, Robinson stated, "it was hurting the financial results of the hospital." Furthermore, "[a]t the same time there were certain aspects of the Balanced Budget Act that had just kicked in particularly related to the skilled nursing facilities and reimbursements that hurt Doctors Hospital."

Adding to the Hospital's troubles, Robinson stated, "[a]t some point in 1999 there was ... an announcement of a federal investigation against Doctors Hospital that I think intimidated some of the physicians and caused them to slow down the admissions to Doctors Hospital, and all of those things were happening to affect 1999...." (Jt. Ex. 31, at 6) (*citing* deposition transcript of Philip J. Robinson, Aug. 28, 2003, at 150–51)

The authority repeatedly cited by Peltz was Dr. Shannon Pratt's "Valuing a Business," 5th ed. While acknowledging that interim financial statements may present a more timely picture than year end financials, that treatise cautioned that the usefulness of interim financials is limited by their quality; a business valuator may need additional information to approximate year-end adjustments that are typically made. (12 Tr. Vol. I: 123–24) Dr. Pratt has stated, "analysis of interim statements can give a more timely indication of the financial performance of the subject company...." (*See id.*)

### CONCLUSION ON SOLVENCY

Therefore, the Trustee has not met his burden of proving that the Hospital was insolvent before September 30, 1998. The entire solvency analysis was reviewed to determine whether the Hospital became insolvent before filing for bankruptcy in April 2000. The Trustee's experts Peltz and Lane were mistaken in not valuing Desnick's wealth as a contingent asset to potentially offset a contingent liability for upcoding issues. However, Peltz and Lane showed that their treatment of over-market Lease payments was credible. Peltz and Lane's increase in the equity size premium used in calculating the Hospital's Weighted Average Cost of Capital is rejected because the experts could not cite any reason for their change from their

First Expert Report. LaSalle could not persuade this Court to overturn its prior finding that Peltz and Lane appropriately applied a 10% Company Specific Risk Premium in determining a capitalization rate used in calculating the Hospital's value. The Trustee has established insolvency after that date up until the time of the filing of bankruptcy petition based on evidence showing the Hospital's troubled financial situation beginning October 1, 1999. See Exhibit A attached hereto for solvency calculation with changes required by the Remand Opinion and this ruling.

### V.

## FINDINGS OF FACT ON BANKRUPTCY REMOTE ENTITY ISSUES

LaSalle's Bankruptcy Remote
Entity Issues Witnesses at
the Trial on Remand

1. At the trial following remand, LaSalle introduced the deposition testimony of Isaac Soleimani ("Soleimani"). Soleimani was in charge of running the Healthcare Finance Group for Daiwa Securities America, Inc. ("Daiwa") during the existence of the Daiwa Loan. (New Def. Ex. 141, at 14) Soleimani's deposition was taken in this case on November 21, 2011. Soleimani submitted an affidavit in support of LaSalle's opposition to Plaintiff's motion for summary judgment. Soleimani's affidavit has been admitted as New Def. Ex. 89.

2. LaSalle also introduced the deposition testimony of David Hyams ("Hyams"). Hyams was employed by Daiwa as the Chief Credit Officer in the Healthcare Finance Group. He held this position at all times relevant to the Daiwa Loan. (New Def. Ex. 142, at 12–13, 30, 33) Hyams' deposition was taken in this case on November 21, 2011.

3. LaSalle also introduced the newest deposition testimony of Robinson. Robin-

son's most recent deposition was taken in this case on November 29, 2011. Robinson testified in person at the First Trial.

4. LaSalle also introduced the deposition testimony of Desnick. Desnick's deposition was taken in this case on November 17, 2011.

6. LaSalle also called Gregg Szilagyi ("Szilagyi") to testify. Szilagyi was an attorney at Shefsky & Froelich at the time he and his firm prepared the legal opinion of Shefsky & Froelich, dated March 31, 1997, in which Shefsky & Froelich concluded that the transfer of healthcare receivables from Doctors Hospital to MMA Funding, LLC was a "true sale," and that MMA Funding, LLC would not be substantively consolidated into Doctors Hospital. (12 Tr. Vol. VII: 1004, 1007) The Shefsky & Froelich opinion was required by Daiwa as a condition to the MMA Funding, LLC Loan and admitted at the trial on remand as New Jt. Ex. 12.

### General Principles of Securitization

7. Consistent with the Pretrial Order, LaSalle designated Soleimani and Hyams as "lay" experts on "securitization" transaction structures pursuant Federal Rule of Evidence 701. (Dkt. No. 858 ¶ 3) The basis for the findings of fact in this Part are contained in the testimony of Soleimani and Hyams. Plaintiff did not object to these lay expert designations.

### Soleimani's Testimony About Securitization

8. Over the course of his career, Soleimani has originated, structured and closed over $1 billion in asset backed securities and general corporate financing transactions. (New Def. Ex. 141, at 11).

9. During the time of Soleimani's employment at Daiwa, Daiwa's healthcare securitization business involved one-tier and two-tiered structured finance transactions. (New Def. Ex. 141, at 14).

10. Soleimani testified that both one and two-tiered healthcare finance structures involve a transfer of assets that separates those assets from the healthcare provider, and also from the credit risk of the healthcare provider. (New Def. Ex. 141, at 18).

11. He also testified that both one and two-tiered structures would provide a lower cost of financing relative to a straight loan to the healthcare provider. (New Def. Ex. 141, at 18).

12. Soleimani testified that in one-tiered structured financing involving healthcare providers, the financing entity or the buyer buys receivables directly from the healthcare provider. (New Def. Ex. 141, at 14).

13. Soleimani testified that in two-tiered structure the financing source would involve a hospital or other healthcare provider setting up a wholly owned special purpose entity and then transferring its receivables to that special purpose entity. (New Def. Ex. 141, at 15–16).

14. Soleimani testified that special purpose entities or "SPEs" ("SPE")—sometimes interchangeably called special purpose vehicles—are commonly used in asset-backed securities and structured finance transactions; they are set up specifically for the purpose of financing a specific group of assets and isolating those assets from the originator of those assets. (New Def. Ex. 141, at 12–13).

15. Of the thirty healthcare securitization transactions Soleimani was involved in at Daiwa America, roughly half were two-tiered financing. (New Def. Ex. 141, at 19).

16. Soleimani testified that in two-tiered transactions, a special purpose entity's single purpose is to acquire assets, pledge the assets, and borrow money

against the assets. (New Def. Ex. 141, at 26).

17. Soleimani testified that when a special purpose entity was created in conjunction with a financing transaction, lawyers on behalf of the lender would perform due diligence on a prospective borrower or healthcare provider. Lawyers would examine the documentation and structure of the potential borrower SPE, to ensure that the entity was in fact, a special purpose entity. (New Def. Ex. 141, at 27–28).

18. The SPE would typically be a new entity because a lender would want the SPE to be pristine and have no other business. (New Def. Ex. 141, at 19).

19. He further testified that after the SPE was created, the financing source would loan money to the SPE that was wholly owned by the healthcare provider. That loan would be secured by all the receivables generated by the provider and transferred to the SPE. (New Def. Ex. 141, at 15–16).

20. Soleimani testified that the nature of an SPE is generally intended to be a "bankruptcy remote entity." (New Def. Ex. 141, at 21).

21. Soleimani testified that a bankruptcy remote entity is intended to have a lower chance of having its assets administered in a bankruptcy case, and that this is accomplished by ensuring (a) the SPE has no other business other than that which is defined and permitted; and (b) there are provisions in the entity's formation documents which make it more difficult for the SPE itself to file a voluntary bankruptcy. (New Def. Ex. 141, at 21).

22. Soleimani testified that it is customary for an SPE to be managed by an individual connected with the healthcare provider. (*Id.* at 25).

23. Soleimani testified that is also common to have the same individuals serving as officers of the healthcare provider and also serving as agents of the SPE. (*Id.* at 25).

24. Soleimani testified that it is not uncommon for representatives of a provider to be authorized to act for an SPE. (*Id.* at 62–63.)

25. Soleimani testified that if the SPE created was a limited liability company, it would be managed by a manager, and that the parent of the SPE is commonly appointed to serve as the manager of the SPE. (*Id.* at 62).

26. Soleimani testified that typically, SPEs do not lease separate office building space. Instead, it is common for the SPE to have the same address as the parent. (*Id.* at 80).

27. Soleimani testified that an SPE does not necessarily have to maintain a separate suite, room, or office for the entity to function, and it is typical for them to share offices with the healthcare provider. (*Id.* at 80).

28. Soleimani testified that in a "true sale," the transaction consists of the healthcare provider actually selling its receivables to the SPE and getting paid for it. In a "true contribution," the provider contributes its receivables to the capital of the SPE and in return receives the equity interest in the SPE in lieu of a cash payment. (*Id.* at 30) Soleimani believed that the Daiwa Loan involved a "true contribution" because Illinois law required that structure. (*Id.* at 30–31).

29. Soleimani testified that in two-tiered transactions, funds typically flow back to the healthcare provider. (*Id.* at 47) In a "true sale," the healthcare provider typically gets paid for the value of the assets that it sells to the SPE; in a "true contribution," the value of the SPE increases as a result of that contribution and

then the healthcare provider, as the owner of the SPE, can receive a distribution from the SPE. (*Id.* at 47–49).

30. Soleimani further testified that a healthcare provider can receive a dividend from the SPE if the parent healthcare provider and borrower SPE decide to structure the subsidiary's use of the loan proceeds as a dividend payment to the parent. (*Id.* at 68–69).

31. Soleimani testified that a dividend to a parent is but one appropriate way for a borrower SPE to use loan proceeds; Soleimani reiterated that the borrower, here MMA Funding LLC, had the right to direct proceeds of the loan to a particular source. (*Id.* at 68–69).

32. Soleimani testified that he did not recall whether the loan proceeds were structured as a dividend between MMA Funding, LLC and Doctors Hospital, or how the loan proceeds were used in MMA Funding, LLC Loan. (*Id.*)

33. Soleimani testified that when dealing with providers in the State of Illinois, Daiwa and their lawyers organized the transactions to be true contributions rather than true sales, to comply with Illinois law governing the transfer of healthcare receivables. (*Id.* at 24–25).

**Hyams' Testimony About Securitization**

34. LaSalle's lay expert Hyams was employed by Daiwa as the Chief Credit Officer in the Healthcare Finance Group. He held this position at all that the Daiwa Loan was in effect. (New Def. Ex. 142, at 12–13, 30, 33).

35. As Chief Credit Officer in the Healthcare Finance Group, Hyams managed the accounts for many of Daiwa's healthcare borrowers on a day-to-day basis and would often be one of the borrowers' main contacts at Daiwa America. (*Id.* at 13–14).

36. Daiwa Healthco–2 and Daiwa Healthco–3 were special purpose entities, affiliated with Daiwa, and used by Daiwa as a vehicle to lend money. (*Id.* at 17).

37. In documenting two-tiered structured finance transactions, attorneys are primarily responsible for setting up the separate entities. (*Id.* at 53) The SPE would be specifically set up by the healthcare provider or its counsel to facilitate the financing. (*Id.* at 18–20)

38. During his tenure at Daiwa, Hyams was involved in fifteen to twenty, "maybe" twenty-five, two-tiered structured financing transactions. (*Id.* at 18).

39. Hyams understood that the sole purpose of the SPE would be to obtain receivables from the healthcare provider; pledge the receivables to Daiwa; and then borrow money from Daiwa against the receivables pledged as collateral for the loan. (*Id.* at 18–20) The SPE was intended to have no creditors other than the lender. (*Id.*)

40. In addition, the SPE was always to have ownership of the accounts receivable, and the value of the accounts receivable should was to exceed the loan that is made to the SPE. Therefore, the SPE was intended to always have positive equity. (*Id.* at 27).

41. Hyams testified that a special purpose entity should only have one creditor, and that creditor should be the lender. (*Id.* at 26)

42. Hyams also testified that it is common for SPEs and the healthcare provider to be affiliated. (*Id.* at 19–20)

43. In his involvement in fifteen to twenty-five two-tiered structured finance transactions, Hyams could not recall any instances where the SPE and healthcare provider were not affiliated. (*Id.* at 21)

FACTS DEMONSTRATING THAT MMA FUNDING, LLC WAS A SPECIAL PURPOSE BANKRUPTCY REMOTE ENTITY, SEPARATE AND DISTINCT FROM DOCTORS HOSPITAL

## A. Facts As of March 31, 1997 Demonstrating that MMA Funding, LLC was a Special Purpose Bankruptcy Remote Entity, Separate and Distinct from Doctors Hospital

44. In responses to Requests for Admission the Trustee conceded that on March 31, 1997, the date on which the Daiwa Loan closed, MMA Funding, LLC existed as a limited liability company organized under Illinois law. The Trustee further admitted that at all relevant times between March 31, 1997 and the Petition Date, MMA Funding, LLC existed as a limited liability company organized under Illinois law. (New Def. Ex. 85 ¶ 5, 6)

45. At the trial on remand, the Trustee's counsel conceded that each and every one of the entities created in connection with the Daiwa Loan complied with all of the necessary formalities required by the Illinois Secretary of State. (12 Tr. Vol. VIII: 1105)

1. *Evidence Documenting the Creation and Governance of MMA Funding, LLC as a Special Purpose Bankruptcy Remote Entity, Separate and Distinct from Doctors Hospital*

 *(a) MMA Funding, LLC Articles of Organization*

46. The Articles of Organization for MMA Funding, LLC were filed with the Illinois Secretary of State's office on March 25, 1997. (New Def. Ex. 82; ¶ 78, New Jt. Ex. 53)

47. The Illinois Secretary of State authorized MMA Funding, LLC to transact business in the State of Illinois on March 26, 1997. (Jt. Ex. 173)

48. The MMA Funding, LLC Articles of Organization provided that its principal place of business would be located at 930 N. Michigan Avenue, Suite 1665, Chicago, Illinois, 60611 (New Jt. Ex. 53) [12]

49. The MMA Funding, LLC Articles of Organization named Andrew Tecson as the registered agent for MMA Funding, LLC. (New Jt. Ex. 53)

50. The MMA Funding, LLC Articles of Organization provided that the purpose of MMA Funding, LLC was "[f]o accept accounts receivable of Members, to administer the servicing, financing, collection and distribution of proceeds of such receivables, and to do such other acts and things incidental to the foregoing single purpose." (New Jt. Ex. 53)

51. The MMA Funding, LLC Articles of Organization vested management of MMA Funding, LLC in MMA Funding, Inc. (New Jt. Ex. 53)

52. Item 8 of the MMA Funding, LLC Articles of Organization provided that the latest date the company was to dissolve was December 31, 2006, supplemented by reference to an "Articles of Organization Attachment." (New Jt. Ex. 53)

53. The MMA Funding, LLC Articles of Organization Attachment provided that MMA Funding, LLC could only be dissolved as follows:

 (a) *Other Events of Dissolution.*

 (a) The Company shall be dissolved only upon the occurrence of any of the following events:

 Def. Ex. 143, at 91–93).

---

12. "930" was an error and the actual street address was 980 N. Michigan Avenue. (New

When the period fixed for the duration of the Company shall expire;

Upon the bankruptcy of the Manager, unless the business of the Company is continued by the consent of all the remaining Members within ninety days thereafter. Each of the Members hereby agrees that within the ninety days after the occurrence of the bankruptcy of the initial Manager or any other Manager, they will promptly consent, in writing, to continue the business of the Company.

(b) Subject to (a)(ii) above, the resignation, retirement, bankruptcy, death, dissolution, liquidation, termination, or adjudication of incompetency of a Member shall not cause the termination or dissolution of the Company and the business of the Company shall continue. Upon any such occurrence, the trustee, receiver, executor, administrator, committee, guardian or conservator of such Member shall have all the rights of such Member for the purpose of settling or managing its estate or property, subject to satisfying conditions precedent to the admission of such assignee as a substitute Member. The transfer by such trustee, receiver, executor, administrator, committee, guardian or conservator of any Membership Interest shall be subject to all of the restrictions hereunder to which such transfer would have been subject if such transfer bad been made by such bankrupt, deceased, dissolved, liquidated, terminated or incompetent Member." (*Id.*)

### (b) MMA Funding, LLC Operating Agreement

54. In March 1997, Desnick executed the Operating Agreement for MMA Funding, LLC on behalf of its members, Medical Management and Doctors Hospital (the "*MMA Funding, LLC Operating Agreement*"). (New Jt. Ex. 54, Ex. A thereto).

55. The MMA Funding, LLC Operating Agreement specified that Medical Management had a 1% membership interest in MMA Funding, LLC and Doctors Hospital had a 99% membership interest in MMA Funding, LLC. (*Id.*)

56. The MMA Funding, LLC Operating Agreement specified that Andrew Tecson was the registered agent. (*Id.* ¶¶ 2.03, 2.04)

57. The MMA Funding, LLC Operating Agreement specified that MMA Funding, LLC would have no employees. (*Id.* at 5)

58. Article III of the MMA Funding, LLC Operating Agreement provided that the sole and exclusive business of MMA Funding, LLC would be:

To accept contributions from Members of Receivables (as defined in the Loan Agreement), to administer the servicing, collection and distribution of proceeds of the Receivables (in accordance with restrictions set forth in the Receivables Contribution Agreement and the Loan Agreement), to borrow money in accordance with the Loan Agreement and to take any and all actions in furtherance of or incidental to any of the foregoing, including without limitation entering into the Receivables Contribution Agreement and the Loan Agreement and all transactions contemplated thereby.

(*Id.* at 4)

59. Article III of the MMA Funding, LLC Operating Agreement provided that:

(15) Without the affirmative consent of all of the Managers of the Company (including MMA Funding, Inc. or any successor Manager), the Company shall not file or consent to or acquiesce in the

filing of a petition in bankruptcy with respect to the Company.

(*Id.* at 6)

60. Article III of the MMA Funding, LLC Operating Agreement provided that:

(16) The Company will at all times be managed by a Special Purpose Manager, which will have at least one member of its board of directors who is not a current or former officer, director employee, creditor, partner or stockholder of the Company, Medical Management of America, Inc., any Provider or any of their respective Affiliates (except that such member of the board of directors may be the "independent" director of a limited purpose subsidiary or Affiliate of Medical Management of America, Inc. established for the purpose of acting as a special purpose entity in another securitization transaction).

(*Id.*)

61. Section 5.01 of the MMA Funding, LLC Operating Agreement provided that MMA Funding, Inc. was the manager of MMA Funding, LLC, and that "the Manager shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of [MMA Funding, LLC], to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of [MMA Funding, LLC's] business." (*Id.*)

62. Section 5.03 of the MMA Funding, LLC Operating Agreement provided that "[w]ithout limiting the generality of Section 5.01, the Manager [MMA Funding, Inc.], subject to Article III (and to the terms of the MMA Funding, LLC Loan Agreement and the Contribution Agreement), would have the power and authority, on behalf of the Company [MMA Funding, LLC], to (among other things):

(j) Only upon the unanimous consent of the Members and the Manager, to file or consent to or acquiesce in the filing of a bankruptcy or insolvency petition or otherwise institute insolvency proceedings with respect to itself. . . ."

(*Id.* at 8)

63. In March 1997 Desnick signed a "*Pre–Organization Subscription Agreement*" in which he subscribed to purchase 1,000 shares of MMA Funding, Inc. (New Jt. Ex. 32).

64. The Pre–Organization Subscription Agreement provided that MMA Funding, Inc. "shall be organized as a Single Purpose Entity for the purpose of serving as Manager of MMA Funding, LLC, an Illinois limited liability company." (*Id.*)

65. MMA Funding, Inc. filed its Articles of Incorporation with the Illinois Secretary of State on March 21, 1997 (the "*MMA Funding, Inc. Articles of Incorporation*"). (New Jt. Exs. 29, 30)

66. On March 26, 1997, the Secretary of State for the State of Illinois issued a certificate of good standing for MMA Funding, Inc. (New Jt. Ex. 39)

67. The MMA Funding, Inc. Articles of Incorporation provided that MMA Funding, Inc. was authorized "to transact any and all lawful business for which corporations may be organized under the Business Corporation Act of 1983." (New Jt. Ex. 30)

68. The MMA Funding, Inc. Articles of Incorporation named Andrew Tecson as the initial registered agent for MMA Funding, Inc. (New Jt. Ex. 30)

69. Article II, Section 2 of the By-Laws for MMA Funding, Inc. (the "*MMA Funding, Inc. By–Laws*") provided as follows:

"*Section 2. Restrictions.* So long as the Company [MMA Funding, Inc.] serves

as Manager of MMA Funding, LLC (the "*SPV*"), the Board of Directors shall at all times cause the Company to comply with the following restrictions:

(1) The Company will at all times comply (and cause the SPV to comply) with the provisions of (x) the Operating Agreement of the SPV; (y) that certain Healthcare Receivables Contribution Agreement among the members of the SPV, the SPV and Medical Management of America, Inc. (the "*Contribution Agreement*") and (z) that certain Loan and Security Agreement between the SPV and Daiwa Healthco–2 LLC (the "*Loan Agreement*").

(2) The Company will not amend, modify or supplement its Articles of Incorporation or these Bylaws, except with the written consent of Daiwa Healthco–2 LLC and the unanimous advance written consent of all of the members of the board of directors of the Company (including the Independent Director).

(3) The Company will not have any Subsidiaries.

(4) The Company will not, without the unanimous advance written vote of the Board of Directors, including the Independent Director, either for the Company or on behalf of the SPV: (x) make an assignment for the benefit of creditors, file or consent to or acquiesce in the filing of a petition in bankruptcy, petition or apply to any tribunal for the appointment of a custodian, receiver or any trustee for all or a substantial part of their respective properties, commence any proceeding under any bankruptcy, reorganization, arrangement, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction, whether now or hereafter in effect, consent or acquiesce in the filing of any such petition, application or proceeding or appointment of or taking possession by the custodian, receiver, liquidator, assignee, trustee, sequestrator (or similar official) of the Company or the SPV or any substantial part of their respective properties, or admit inability to pay debts generally as they become due or authorize any of the foregoing to be done or taken on behalf of the Company the SPV; (y) be a party to, or cause or permit the SPV to be a party to, any merger or consolidation or sell, transfer, assign, convey or lease any substantial part of the assets of the Company or the SPV, or directly or indirectly purchase or otherwise acquire all or substantially all of the assets or any stock of any class of corporation, partnership, joint venture or any other entity; or (z) dissolve or liquidate, in whole or in part."

(New Jt. Ex. 31) (emphasis added).

70. Article II, Section 4 of the MMA Funding, Inc. By–Laws provided that at least one director of MMA Funding, Inc. was to be an "Independent Director" as that term is defined therein. (New Jt. Ex. 31)

71. Article III, Section 2 of the MMA Funding, Inc. By–Laws provided that the President of MMA Funding, Inc. would have the authority to appoint agents and officers of MMA Funding, Inc., except for officers to be elected by the Board of Directors pursuant to Section 1, Article III of the By–Laws. (New Jt. Ex. 31)

72. In March 1997, Desnick executed a "Written Consent of Sole Shareholder of MMA Funding, Inc." (New Jt. Ex. 34)

73. The Written Consent of Sole Shareholder of MMA Funding, Inc. approved the MMA Funding, Inc. Articles of Incorporation and the MMA Funding, Inc. By–Laws. (New Jt. Ex. 34)

74. The Written Consent of Sole Shareholder of MMA Funding, Inc. also appointed Desnick as a Director and Fred

Scher ("*Scher*") as the Independent Director of MMA Funding, Inc. (New Jt. Ex. 34)

75. The Written Consent of Sole Shareholder of MMA Funding, Inc. provided that the directors of MMA Funding, Inc. were authorized to issue stock certificates to the subscribers for shares of MMA Funding, Inc. upon receipt of payment for same (New Jt. Ex. 34)

76. A stock certificate for 1,000 shares of MMA Funding, Inc. was issued to Desnick on or about March 21, 1997. (New Jt. Ex. 35)

77. In March of 1997, Desnick and Scher executed a "Unanimous Written Consent of Board of Directors of MMA Funding, Inc." (New Jt. Ex. 33)

78. The Unanimous Written Consent of Board of Directors of MMA Funding, Inc. approved the form of stock certificates; approved the By–Laws; and approved the Pre–Incorporation Subscription Agreement. (New Jt. Ex. 33)

79. The Unanimous Written Consent of Board of Directors of MMA Funding, Inc. authorized the secretary of MMA Funding, Inc. to procure the necessary corporate books and records for MMA Funding, Inc, and authorized payment for organizational expenses to be expended from MMA Funding, Inc.'s corporate funds. (New Jt. Ex. 33)

80. The Unanimous Written Consent of Board of Directors of MMA Funding, Inc. appointed Desnick as the President, Vice President, Secretary and Treasurer of MMA Funding, Inc. (New Jt. Ex. 33)

81. The Unanimous Written Consent of Board of Directors of MMA Funding, Inc. provided that "the officers of this corporation are hereby authorized and directed, on behalf of this corporation, to accept the office of Manager of MMA Funding, LLC, an Illinois limited liability company...." (New Jt. Ex. 33)

82. In March 1997, Desnick signed a "Certificate of Manager of MMA Funding, LLC", in which he certified that he was the duly elected secretary and president of MMA Funding, Inc., Manager of MMA Funding, LLC, an Illinois limited liability company." (New Jt. Ex. 37)

83. Tecson was the initial registered agent for MMA Funding, Inc. (New Jt. Ex. 31)

2. *Opinion Letters Issued in Connection with the MMA Funding, LLC Loan*

(a) *Shefsky & Froelich Opinion Letters*

84. In connection with the Daiwa Securitization, the law firm of Shefsky & Froelich was retained by Medical Management of America, Inc. to provide their legal opinion with respect to the Daiwa Loan. (12 Tr. Vol. VII: 979)

85. Gregg Szilagyi of Shefsky & Froelich prepared the opinion of counsel letter (the "*Shefsky & Froelich Opinion*"). (New Jt. Ex. 12)

86. During the course of his career, Szilagyi has represented borrowers and lenders in asset based loans; real estate related loans; and all other types of commercial loans, and has negotiated the terms of such deals on behalf of borrowers and lenders. (12 Tr. Vol. VII: 984–85)

87. During the course of his career, Szilagyi has authored approximately twelve opinion of counsel letters. (12 Tr. Vol. VII: 978)

88. Szilagyi was the primary drafter of the Shefsky & Froelich Opinion and the Officer's Certificate signed by Desnick prepared in connection therewith. (12 Tr. Vol. VII: 983)

89. Szilagyi volunteered to testify during the remand trial and had no direct or indirect financial or other interest in the outcome of the litigation. (12 Tr. Vol. VII: 975–76)

90. Szilagyi testified that he and his firm were retained to opine on (a) whether the contributions of accounts receivable from Doctors Hospital and other providers were true sales or true contributions of those receivables; (b) if one or more of the related parties to the MMA Funding, LLC transaction found their way into bankruptcy, whether their assets and liabilities would be substantively consolidated in those bankruptcy cases; and (c) whether the contribution of receivables would have violated the provisions for Medicare and Medicaid receivables under federal and state law. (12 Tr. Vol. VII: 1004)

91. Szilagyi testified it was his understanding that the Shefsky & Froelich Opinion was to be issued in connection with a transaction involving a "true contribution," and he developed that understanding through his review of the loan documents, entity organization documents, and conversations with the borrower and the borrower's representatives. (12 Tr. Vol. VII: 1006–07)

92. Szilagyi testified that the Shefsky & Froelich Opinion was required by Daiwa as a condition to closing the Daiwa Loan. (12 Tr. Vol. VII: 986)

93. Szilagyi testified that in connection with preparing the Shefsky & Froelich Opinion, he conferred with the attorneys for MMA Funding, LLC, who explained the deal structure to him and provided him a term sheet or deal memorandum; draft loan documents; and other corporate documents for his review. Szilagyi also testified that he consulted with counsel for MMA Funding, LLC and with Desnick to obtain the factual information necessary to

prepare and issue the Shefsky & Froelich Opinion. (12 Tr. Vol. VII: 987–88)

94. Szilagyi testified that he conducted the legal research necessary to update cases and statutes that govern the areas of the law on which he provided the Shefsky & Froelich Opinion. (12 Tr. Vol. VII: 987)

95. Szilagyi testified that he has created eight to ten officers certificates in his career. (12 Tr. Vol. VII: 1015)

96. In order to prepare the Officer's Certificate, Szilagyi reviewed the summary of the transaction; the loan documents; the draft organizational documents of the entities that were existing or to be formed in connection with the transaction; and incorporated the comments and statements of the borrower with respect to the details that needed to be included. (12 Tr. Vol. VII: 1014–15)

97. After preparing the initial draft of the Officer's Certificate, Szilagyi tendered it to Dr. Desnick and to Andrew Tecson, as counsel to Doctors Hospital and MMA Funding, LLC, then subsequently had a conference call to discuss the content of the Officer's Certificate and the details contained therein. (12 Tr. Vol. VII: 1015–17)

98. Szilagyi relied on Desnick's ratification of the document, and the representations therein, when preparing the Shefsky & Froelich Opinion. (12 Tr. Vol. VII: 1016–17)

99. On March 28, 1997, Desnick executed an Officer's Certificate in support of the Shefsky & Froelich Opinion. (New Def. Ex. 82 ¶ 65; New Jt. Ex. 13)

100. In the Officer's Certificate, Desnick confirmed (among other things) that:

(a) MMA Funding, LLC was a newly formed limited liability company with a limited purpose as stated in its Articles of Organization. (*See* New Jt. Ex. 13, at 1, 7–8)

(b) MMA Funding, LLC was managed by MMA Funding, Inc., of which he was President. (*See id.* at 1, 7)

(c) MMA Funding, LLC shared officers and directors with MMA, MMA Funding, Inc. and Doctors Hospital, and these entities shared an integration of business functions with MMA Funding, LLC; nevertheless, MMA Funding, LLC was an entity separate and distinct from Doctors Hospital on the closing date of the MMA Funding, LLC Loan, and Daiwa relied on MMA Funding, LLC's separateness. (*Id.* at 9–15)

(d) The books and records relating to the healthcare receivables transferred to MMA Funding, LLC would be retained by Doctors Hospital because a transfer of possession of the books and records would be administratively burdensome and would interfere with Doctors Hospital's performance of its servicing responsibilities relating to the healthcare receivables. (*Id.* at 5, 15)

(e) The consolidated financial statements of the Related Parties (defined in Desnick's officer's certificate as MMA, MMA Funding, Inc. and Doctors Hospital) may include the assets and liabilities of MMA Funding, LLC. (*Id.* at 13)

(f) The MMA Funding, LLC Loan permitted MMA Funding, LLC to obtain loans on more favorable terms than if Doctors Hospital had itself obtained loans secured by the healthcare receivables. (*Id.* at 9)

(g) The MMA Funding, LLC Loan was made to MMA Funding, LLC in reliance on MMA Funding, LLC's separate existence, and that Daiwa would be prejudiced if MMA Funding, LLC's separate existence were disregarded. (*Id.* at 13)

101. Szilagyi would not have issued the Shefsky & Froelich Opinion if he had not received an executed version of the Officer's Certificate. (12 Tr. Vol. VII: 1017)

102. The Shefsky & Froelich Opinion and the Officer's Certificate, signed by Desnick, were accepted by Daiwa and the MMA Funding, LLC Loan ultimately closed. (12 Tr. Vol. VII: 987)

*(b) Chuhak & Tecson Opinion Letters*

103. The Law Firm of Chuhak & Tecson, P.C. was retained by Doctors Hospital to provide their legal opinion with respect to the Daiwa Loan. (12 Tr. Vol. VII: 979)

104. Chuhak & Tecson, P.C., issued an opinion letter dated March 31, 1997, in which it rendered opinions about corporate matters relating to MMA Funding, LLC and MMA Funding, Inc. (New Def. Ex. 82 ¶ 62; New Jt. Ex. 15)

105. Chuhak & Tecson, P.C. opined that both MMA Funding, LLC and MMA Funding, Inc. were duly organized, validly existing and in good standing under the laws of the State of Illinois. (New Jt. Ex. 15 ¶ 1)

106. Chuhak & Tecson, P.C. also opined that the execution, delivery and performance by MMA Funding, LLC under the MMA Funding Loan Agreement was duly authorized by all requisite action on the part of MMA Funding, LLC, and that the Daiwa Loan Agreement was duly executed and delivered by MMA Funding, LLC. (New Jt. Ex. 15, at 3–4, ¶¶ 4, 6)

107. Chuhak & Tecson, P.C. also opined that MMA Funding, LLC had the power and authority to hold and own the Receivables (as defined below) transferred by Doctors Hospital. (New Jt. Ex. 15, at 3, ¶ 3)

108. On March 31, 1997, Desnick executed an Officer's Certificate in support of the Chuhak & Tecson, P.C. legal opinion. (New Def. Ex. 82 ¶ 63; New Jt. Ex. 16)

*(c) Daiwa's Reliance on Opinion of Counsel Letters*

109. Daiwa customarily sought and relied upon opinion of counsel letters indicat-

ing that there would be no grounds for consolidation. (New Def. Ex. 141, at 24, 27)

110. Soleimani testified that Daiwa relied on counsel to establish a structure under which SPEs would not be consolidated with the healthcare providers. (New Def. Ex. 141, at 24)

111. Soleimani testified that Daiwa would ensure that a valid special purpose entity was created through the use of legal opinions regarding: (a) the true contribution or true sale of the receivables from the healthcare provider to the special purpose entity; and (b) the separateness of the special purpose entity in the context of substantive consolidation. (New Def. Ex. 141, at 27–28)

### 3. *The Loan Agreement and Related Documents Demonstrating That MMA Funding, LLC was Separate from Doctors Hospital*

#### *(a) The MMA Funding, LLC Loan Agreement*

112. The introductory paragraph of the MMA Funding, LLC Loan Agreement identifies MMA Funding, LLC as the "Borrower." (New Def. Ex. 82 ¶ 45)

113. The MMA Funding, LLC Loan Agreement was signed by two parties: MMA Funding, LLC and Daiwa (identified as the *"Lender"*). (Jt. Ex. 202 ¶ 46)

114. Section 4.01 of the MMA Funding, LLC Loan Agreement provides that "[a]s collateral security for [MMA Funding, LLC's] obligations to pay the Lender Debt when due and payable hereunder, [MMA Funding, LLC] hereby grants to [Daiwa] a first priority Lien on and security interest in and right of setoff against all of the rights, title and interest of [MMA Funding, LLC] in and to (i) the [Contribution Agreement], (ii) ... the Provider Lockbox and Provider Lockbox Account, (iii) all of the [receivables] and (iv) all Proceeds of the foregoing." (New Def. Ex. 82 ¶ 49)

115. Section 2.05 of the MMA Funding Loan Agreement provided in part that "[d]istributions to [MMA Funding, LLC] on each Funding Date shall be deposited in an account designated by [MMA Funding, LLC]." (New Def. Ex. 82 ¶ 88)

116. An Account Agreement was executed on March 28, 1997 by MMA Funding, LLC, establishing Account No. 6700010103 at Grand National Bank. This Account Agreement, designated that the account was a checking account, for a commercial purpose. (Jt. Ex. 71). This account agreement was executed on behalf of MMA Funding, LLC by Desnick and Robinson. (New Def. Ex. 82 ¶ 77)

117. The closing statement dated March 31, 1997 reflected that $1,371,665.66 from the initial funding of the Daiwa Loan was transferred into MMA Funding, LLC's Account No. 6700010103 at Grand National Bank. (New Def. Ex. 22)

118. Pursuant to Section 1.01 of the MMA Funding, LLC Loan Agreement, Daiwa agreed "to lend to [MMA Funding, LLC] ... such amounts as may be requested by [MMA Funding, LLC]. By the terms of Section 1.02(a) of the MMA Funding, LLC Loan Agreement, the aggregate unpaid principal of the loan from Daiwa was not to exceed $25,000,000. (Remand Stipulation (New Def. Ex. 82 ¶ 47)

119. Section 1.02(b) of the MMA Funding, LLC Loan Agreement provided: "[MMA Funding, LLC] may borrow, repay, (without premium or penalty) and reborrow the Revolving Loan." (Remand Stipulation (New Def. Ex. 82 ¶ 48)

120. Exhibit III to the MMA Funding, LLC Loan Agreement contained representations and warranties made by MMA Funding, LLC to Daiwa, and were made part of the MMA Funding, LLC Loan

Agreement pursuant to Section 3.01. (Remand Stipulation (New Def. Ex. 82 ¶ 50)

121. In Subsection (k) to Exhibit III of the MMA Funding, LLC Loan Agreement, MMA Funding, LLC warranted to Daiwa in connection with the MMA Funding, LLC Loan that MMA Funding, LLC was "the legal and beneficial owner of the [receivables] free and clear of any Lien." (New Def. Ex. 82 ¶ 51)

122. Exhibit IV to the MMA Funding, LLC Loan Agreement contained covenants which MMA Funding, LLC agreed to observe. Such covenants were made part of the MMA Funding, LLC Loan Agreement pursuant to Section 3.01. (New Def. Ex. 82 ¶ 52)

123. In subparagraph (p) of Exhibit IV of the MMA Funding, LLC Loan Agreement, MMA Funding, LLC covenanted to Daiwa that it would observe all of its obligations under the Contribution Agreement. Such obligations included all of the "Special Covenants Corporate Separateness" in Exhibit IV to the Contribution Agreement (the *"Separateness Covenants"*)—pursuant to which MMA Funding, LLC agreed to be a separate and distinct corporate entity from Doctors Hospital. (New Def. Ex. 82 ¶ 53)

*(b) Notice to "All the World" Filed Pursuant to the Uniform Commercial Code Demonstrating that MMA Funding, LLC was Separate from Doctors Hospital*

124. On March 31, 1997, Doctors Hospital executed and filed with the Illinois Secretary of State Office a UCC–1 statement. (New Def. Ex. 82 ¶ 70; New Jt. Ex. 9) The attachment thereto indicated that the filing was made under the requirements of Section 9–102 of the Uniform Commercial Code and indicated that Doctors Hospital had transferred its Receivables to MMA Funding, LLC. (New Jt. Ex. 9)

125. The UCC–1 filing statement described Doctors Hospital's transfer of Receivables to MMA Funding, LLC pursuant to the Contribution Agreement as a sale. (New Jt. Ex. 9)

126. In connection with the closing of the Securitization, MMA Funding, LLC executed a separate UCC–1 financing statement granting security interests in the Receivables to Daiwa. (New Def. Ex. 82 ¶ 71)

#### 4. *Robinson's Testimony Recognizing Separateness as of March 31, 1997*

127. Philip Robinson, VP of Finance of MMA, testified at the First Trial that MMA Funding, LLC was newly formed in March, 1997, to fit the securitization structure of the Daiwa transaction. (*Id.* ¶ 66)

128. Robinson testified at the First Trial that MMA Funding, LLC was the borrower on the MMA Funding, LLC Loan, not Doctors Hospital or HPCH, LLC or any other Desnick-related entity. (06 Tr. I: 175–76) According to Robinson, the "documented" borrower under the MMA Funding, LLC Loan Agreement was always MMA Funding, LLC (06 Tr. I: 178) and on March 31, 1997 there was "no doubt" that Doctors Hospital and MMA Funding, LLC were separate corporate entities. (New Def. Ex. 82 ¶ 72)

129. Robinson believed MMA Funding, LLC was set up to be a bankruptcy remote entity. (New Def. Ex. 144, at 123)

#### 5. *Daiwa's Requirement that MMA Funding, LLC Be Structured as a Bankruptcy Remote Entity, Separate from Doctors Hospital*

##### *(a) Soleimani's Testimony*

130. Soleimani testified that MMA Funding, LLC was a SPE created for the Daiwa Loan, and that its only purpose was

to acquire Doctors Hospital's Receivables, borrow money from Daiwa, and pledge the Receivables to Daiwa to secure the Daiwa Loan (New Def. Ex. 141, at 38–39)

131. Soleimani stated that from the inception of the Daiwa Loan, Daiwa considered MMA Funding, LLC to be the borrower thereunder, and at no time did Daiwa ever consent to allow a modification to have any other party serve as the borrower. (*Id.* at 47)

132. Soleimani further testified that the Daiwa Loan was not a loan to Doctors Hospital, and Doctors Hospital was not the borrower. (*Id.* at 40)

133. Soleimani testified that Daiwa insisted that Doctors Hospital set up an SPE as the borrower. (*Id.* at 41)

134. If Doctors Hospital had not agreed to set up an SPE and make a true sale of its Receivables to the SPE, Daiwa would not have made the Daiwa Loan. (New Def. Ex. 141 (Soleimani) at p. 40).

135. Soleimani testified that it would be incorrect to refer to the Daiwa Loan Agreement between Daiwa and Doctors Hospital; rather, pursuant to the Daiwa Loan Agreement, it was between Daiwa and MMA Funding, LLC to which Doctors Hospital contributed its Receivables. (New Def. Ex. 82 ¶ 61)

*(b) Hyams' Testimony*

136. Hyams stated that at no time was any entity other than MMA Funding, LLC the borrower under the Daiwa Loan, (New Def. Ex. 142, at 39–40), nor did anyone ask to change the borrower under the Daiwa Loan (*Id.* at 50)

137. Regarding the Daiwa Loan, Hyams identified MMA Funding, LLC as the borrower and SPE, and identified Doctors Hospital as the healthcare provider. (*Id.* at 33) He further testified that he had no doubt of these roles throughout the course of the three year loan. (*Id.* at 103)

**B. Facts Demonstrating that MMA Funding, LLC was an entity, Separate and Distinct from Doctors Hospital After March 31, 1997**

**1.** ***Evidence Documenting the Post–Closing Governance Actions of MMA Funding, LLC, MMA Funding, Inc., Medical Management of America, Inc. and Doctors Hospital Demonstrating Continued Separateness of "Desnick Entities"***

*(a) Evidence Illustrating that MMA Funding Inc., as Manager of MMA Funding, LLC, Observed Separate Corporate Formalities, Kept Separate Records, and Had Separate Operations*

138. On February 16, 1998 Tecson sent correspondence to Desnick requesting that Desnick take various steps to ensure that the 1998 MMA Funding, Inc. Annual Report was properly filed with the Illinois Secretary of State. (New Jt. Ex. 40)

139. Tecson's February 16, 1998 correspondence also requested that Desnick execute and return the 1998 MMA Funding, Inc. Shareholder Resolutions and the 1998 MMA Funding, Inc. Director Resolutions so that Tecson could place them in the MMA Funding, Inc. corporate minute book. (New Jt. Ex. 40)

140. On March 2, 1998, Seth Gillman responded to Tecson's February 16, 1998 correspondence. (Jt. Ex. 42) Gillman's March 2, 1998 response included the check sent to the Illinois Secretary of State accompanying the 1998 MMA Funding, Inc. Annual Report, drawn on the bank account of Medical Management of America, Inc. (*Id.*)

141. The executed 1998 MMA Funding, Inc. Annual Report listed Desnick as the President, Secretary, and Treasurer of

MMA Funding, Inc., and also listed Desnick and Scher as the directors of MMA Funding, Inc. (New Jt. Ex. 41)

142. The 1998 MMA Funding, Inc. Shareholder Resolutions ratified all actions of the directors and officers of MMA Funding, Inc. and appointed Desnick and Scher as the directors of MMA Funding, Inc. (New Jt. Ex. 43)

143. The 1998 MMA Funding, Inc. Director Resolutions ratified all actions of the officers of MMA Funding, Inc. and appointed Desnick as the President, Vice President, Secretary and Treasurer of MMA Funding, Inc. (New Jt. Ex. 44)

144. On or about March 3, 1999, the 1999 MMA Funding, Inc. Annual Report was signed and filed with the Illinois Secretary of State. It listed Desnick as the President, Secretary, and Treasurer, and also listed Desnick and Scher as the directors. (New Jt. Ex. 46)

145. On or about March 1, 1999 Desnick executed an Action by Written Consent of the Sole Shareholder of MMA Funding, Inc. (in Lieu of 1999 Annual Meeting) (the "1999 MMA Funding, Inc. Shareholder Resolutions"). (New Jt. Ex. 45)

146. The 1999 MMA Funding, Inc. Shareholder Resolutions ratified all actions of the directors and officers of MMA Funding, Inc. and appointed Desnick and Scher as the directors of MMA Funding, Inc. (New Jt. Ex. 45)

147. On or about March 1, 1999, Desnick and Scher executed a Unanimous Written Consent of the Board of Directors of MMA Funding, Inc. (in Lieu of 1999 Annual Meeting) (the "*1999 MMA Funding, Inc. Director Resolutions*") (New Jt. Ex. 47)

148. The 1999 MMA Funding, Inc. Director Resolutions ratified all actions of the officers of MMA Funding, Inc. and appointed Desnick as the President, Vice President, Secretary and Treasurer of MMA Funding, Inc. (New Jt. Ex. 47).

149. On February 2, 2000 Tecson sent correspondence to Desnick attaching execution versions of: (a) 2000 Annual Report for MMA Funding, Inc. (the "2000 MMA Funding, Inc. Annual Report"); (b) an Action by Written Consent of the Sole Shareholder of MMA Funding, Inc. (in Lieu of 2000 Annual Meeting) (the "2000 MMA Funding, Inc. Shareholder Resolutions"); and (c) a Unanimous Written Consent of the Board of Directors of MMA Funding, Inc. (in Lieu of 2000 Annual Meeting) (the "2000 MMA Funding, Inc. Director Resolutions") (New Jt. Ex. 48)

150. Tecson's February 2, 2000 correspondence requested that Desnick take various steps to ensure that the 2000 MMA Funding, Inc. Annual Report was properly filed with the Illinois Secretary of State. (New Jt. Ex. 48)

151. Tecson's February 2, 2000 correspondence also requested that Desnick execute and return the 2000 MMA Funding, Inc. Shareholder Resolutions and the 2000 MMA Funding, Inc. Director Resolutions so that Tecson can place them in the MMA Funding, Inc. corporate minute book. (New Jt. Ex. 48)

152. The 2000 Annual Report for MMA Funding, Inc. was filed with the Illinois Secretary of State. (New Def. Ex. 51)

*(b) Evidence Demonstrating that MMA Funding, LLC, Observed Separate Corporate Formalities, Kept Separate Records, and Had Separate Operations*

153. On or about December 8, 1999, MMA Funding, LLC filed Articles of Amendment (the "1999 MMA Funding, LLC Articles of Amendment"). (New Jt. Ex. 56)

154. The 1999 MMA Funding, LLC Articles of Amendment changed the registered agent of MMA Funding, LLC to Seth Gillman, and listed his address as 980 N. Michigan Avenue, Suite 1665, Chicago, Illinois 60611. (*Id.*)

155. The 1999 MMA Funding, LLC Articles of Amendment were signed by Desnick, as "Manager". (*Id.*)

156. On or about December 8, 1999, MMA Funding, LLC filed a Domestic Limited Liability Company Annual Report for 1998 (the "1998 MMA Funding, LLC Annual Report"). (*Id.*)

157. On or about December 8, 1999, MMA Funding, LLC filed a Domestic Limited Liability Company Annual Report for 1999 (the "1999 MMA Funding, LLC Annual Report"). (New Jt. Ex. 57)

158. The 1998 MMA Funding, LLC Annual Report was filed on the same date as the 1999 MMA Funding, LLC Articles of Amendment and specified that Gillman was the registered agent of MMA Funding, LLC. (New Jt. Ex. 56, 59)

159. The 1998 MMA Funding, LLC Annual Report listed MMA Funding, Inc. as the Manager of MMA Funding, LLC and stated that the Manager's address was 980 N. Michigan Avenue, Suite 1665, Chicago, Illinois 60611. (New Jt. Ex. 59)

160. The 1999 MMA Funding, LLC Annual Report accompanied the 1999 MMA Funding, LLC Articles of Amendment and specified that Gillman was the registered agent of MMA Funding, LLC. (New Jt. Ex. 56, 57)

161. The 1999 MMA Funding, LLC Annual Report listed MMA Funding, Inc. as the Manager of MMA Funding, LLC and stated that the Manager's address was 980 N. Michigan Avenue, Suite 1665, Chicago, Illinois 60611. (New Jt. Ex. 57)

162. Gillman personally observed mail addressed to MMA Funding, LLC delivered to the Medical Management office.

(12 Tr. Vol. VIII: 1112) Further, once mail was delivered to the offices of Medical Management, if it was financial in nature, it would be handed to Robinson; if it was more correspondence in nature, it would be handed to Desnick. (12 Tr. VIII: 1058–59)

(c) *Evidence Showing that Medical Management of America, Inc., and Doctors Hospital, Observed Separate Corporate Formalities, Kept Separate Records, and Had Separate Operations from other "Desnick Entities"*

163. Throughout the life of the Daiwa Loan, Doctors Hospital filed domestic annual reports with the Illinois Secretary of State. (New Jt. Ex. 70)

164. Seth Gillman, in house counsel for Medical Management, believed MMA Funding, LLC, MMA Funding, Inc., Medical Management, Doctors Hospital, and HPCH, to be separate and distinct entities. As part of his job responsibilities, Gillman prepared and submitted the various entities' annual reports to keep each of these entities in good standing. (12 Tr. Vol. VIII: 1074)

## 2. Separate Bank Accounts of MMA Funding, LLC

165. MMA Funding, LLC maintained a separate checking account, Account No. 6700010103, at Grand National Bank from March 31, 1997 through April 2000. Copies of the statements for this account from March 31, 1997 through April 2000 were admitted into evidence at the First Trial as Jt. Ex. 57. These statements reflect account activity during the entire period between March 31, 1997 and April 2000. (Jt. Ex. 71; New Def. Ex. 82 ¶ 77)

166. In opening the MMA Funding, LLC bank account, at Grand National Bank, an Account Agreement was executed by Desnick and Robinson on behalf of MMA Funding, LLC. This account was identified as a checking account on the

face of the bank account application. (*See* Jt. Ex. 71; New Def. Ex. 82 ¶ 77)

167. Robinson received bank statements from Grand National Bank for MMA Funding, LLC at 980 N. Michigan Avenue, Suite 1665, Chicago, Illinois. (New Def. Ex. 144, at 221–23)

168. Robinson eventually requested that the Grand National account statements for MMA Funding, LLC be sent to the hospital instead of to 980 N. Michigan Avenue. (*Id.*)

169. From the period of March 31, 1997 (the inception of the MMA Funding, LLC Loan) through June 1998, Daiwa transferred new borrowings under the MMA Funding, LLC Loan Agreement directly to Grand National Bank Account No. 6700010103. (New Def. Ex. 82 ¶ 89)

170. Robinson testified that Daiwa never made any advances from Daiwa directly to a Doctors Hospital bank account. (06 Tr. Vol. I: 207)

### 3. Evidence that MMA Funding, LLC Submitted Advance Requests; Borrowing Base Certificates; and other Writings Demonstrating that MMA Funding, LLC was an Entity Separate and Distinct from Doctors Hospital

171. At the First Trial, LaSalle introduced into evidence Borrowing Base Certificates from MMA Funding, LLC to Daiwa for each of the months of August, 1998 through March, 1999. (Def. Ex. 9; New Def. Ex. 82 ¶ 80) In addition, Jt. Ex. 61 represents a Borrowing Base Certificate dated June 28, 1998.

172. Between March 31, 1997 and April 17, 2000, Daiwa received at least 515 requests for advances on the MMA Funding, LLC Loan and/or Borrowing Base Certificates, all of which were admitted into evidence at the trial on remand as New Def. Ex. 123–126. These Borrowing Base Certificates are summarized in New Jt. Ex.

23. Each of the 500 Borrowing Base Certificates submitted by MMA Funding LLC designates in two places that the borrower is MMA Funding, LLC. Each Borrowing Base Certificate covers a discrete period of time on which the borrowing base is predicated for the purpose of calculating the borrowing ability of MMA Funding, LLC under the MMA Funding, LLC Loan Agreement; lists the amount of accounts receivable of MMA Funding, LLC to be pledged to Daiwa; details the amount of the outstanding MMA Funding, LLC Loan Agreement during the subject period; calculates the borrowing base, the eligible amount of accounts receivable and the amount of borrowing available to MMA Funding, LLC; represents that the information contained in the Borrowing Base Certificate is true and correct; and represents that the collateral complies with the terms, conditions, and warranties. (New Jt. Exs. 23–28)

173. Each time Daiwa received a Borrowing Base Certificate, MMA Funding, LLC was thereby reaffirming its representations, warranties and covenants under the MMA Funding, LLC loan documents. (New Def. Ex. 141, at 57)

174. Robinson testified that each Borrowing Base Certificate was delivered to induce further loans by Daiwa. (06 Tr. Vol. I: 200, 211)

175. Michael Nelson, the CFO of Doctors Hospital from October, 1998 to May, 1999, testified that advances from Daiwa were not made to Doctors Hospital; rather, the loans were made to MMA Funding, LLC as a separate corporation. (Def. Ex. 39, 12–13)

176. On December 17, 1999, Hyams sent a fax to Henry Brown, President of Doctors Hospital, regarding the Advance Request and Borrowing Base Certificates. (New Def. Ex. 40)

177. In this correspondence, Hyams stated that the "Eligible ENV is your rep-

resentation of the net value of eligible accounts receivable and your representation that those receivables meet the representations and warranties specified in the loan documents." (*Id.*)

178. This correspondence also stated that Daiwa needed "the signature of the borrower (MMA Funding, LLC) certifying that the September financials represented a fair and accurate presentation of the financial results of the Borrower and that the Borrower is in compliance with all financial covenants." (*Id.*)

179. Hyams testified that he sent this correspondence because he needed an officer of the Borrower, MMA Funding, LLC, to verify the financials. (New Def. Ex. 142, at 85–86)

180. On March 28, 2000, Hyams received correspondence from Henry Brown certifying that "MMA Funding, LLC (Borrower) as stated in the Loan and Security Agreement dated March 31, 1997 is in compliance through the date of the letter, with all of the covenants and events of default of the Agreement except for the following:" This correspondence letter listed six specific defaults arising under Exhibits IV and V of the Loan Agreement, none of which included the separateness covenants set forth in Exhibit IV to the MMA Funding, LLC Loan Agreement. (New Def. Ex. 142, at 99, New Def. Ex. 45)

181. Hyams testified that he believed Henry Brown was acting for MMA Funding, LLC when Brown sent the letter March 28, 2000, even though it was written on Doctors Hospital's letterhead. (New Def. Ex. 142, at 99–100)

182. Hyams further testified that it was not at all unusual, and it was indeed common, for an SPE to use stationery of the healthcare provider, and that Daiwa did not object to that. (*Id.*)

183. Hyams also stated that he did not "think the stationery was really considered

a big deal" and that it was more important to have a representative of the borrower signing and making representations. (New Def. Ex. 142, at 101)

184. Soleimani testified that the fact that documents were sent to Daiwa on Doctors Hospital letterhead would not have impacted the MMA Funding, LLC two-tiered structured finance. (New Def. Ex. 141, at 63–64)

185. Soleimani explained that Daiwa was more concerned with the signature block on the borrower's correspondence than the letterhead. (*Id.* at 64) The most consistent correspondence between Daiwa and MMA Funding, LLC came in the form of more than 500 Advance Requests and Borrowing Base Certificates. In this correspondence, the signature block on almost all of the Advance Requests and Borrowing Base Certificates read MMA Funding, LLC. (New Jt. Ex. 23–28)

186. Soleimani opined that a that borrower has the right to request that the lender send loan proceeds anywhere the borrower desires. Provided that a borrower is within its borrowing base and not in default, it is customary for Daiwa to honor written directions regarding disbursements of the loan—and it is not unusual for a borrower to request the lender to remit the proceeds to third parties. (New Def. Ex. 141, at 51–52)

187. Soleimani testified that had Daiwa received a payment direction letter from Doctors Hospital as opposed to MMA Funding, LLC, Daiwa would not have honored it because MMA Funding, LLC was the borrower. (*Id.* at 52–53)

188. Pursuant to the MMA Funding, LLC Loan Agreement, Daiwa issued new borrowings from account # 205779 at the Bank of New York. (New Def. Ex. 82 ¶ 85)

189. The new borrowings forwarded from Daiwa represented new borrowings

by MMA Funding, LLC under the Daiwa Loan Agreement. (New Def. Ex. 82 ¶ 86)

#### 4. Facts Demonstrating a Few Minor Errors in Failing to Treat MMA Funding, LLC as a Separate and Distinct Entity in the Doctors Hospital Audited Financials

190. At the First Trial, Robinson testified that even though Doctors Hospital was not a party to the Daiwa Loan Agreement, the loan was reflected as a liability on the hospital's balance sheet because of what KPMG believed to be a parent subsidiary relationship between the two entities. (06 Tr. Vol. II: 19–20)

191. Robinson became involved with the audited financial statements of Doctors Hospital for September 30, 1999 when KPMG had some potential adjustments to the preliminary financial statements. (New Def. Ex. 144, at 32)

192. Robinson sent KPMG the Daiwa Loan Agreement and amendments thereto, and discussed them with KPMG. (Id. at 199)

193. On November 24, 1999, Jim Morgridge, the controller of Doctors Hospital, sent Hyams a document requesting that Hyams verify the amount of money due from *Doctors Hospital* to Daiwa (the "*Audit Request*"). (New Def. Ex. 39)

194. Hyams corrected the Audit Request to reflect that *MMA Funding, LLC,* and not *Doctors Hospital,* owed Daiwa the sum of $9,622,813. Hyams testified that he made this correction because he knew MMA Funding, LLC to be the borrower and that MMA Funding, LLC and Doctors Hospital were separate entities. (New Def. Ex. 142, at 83–84; New Def. Ex. 39)

195. Doctors Hospital's audited financial statements for years 1997, 1998 and

1999 did not reflect any accounts receivable transferred to MMA Funding, LLC (New Def. Ex. 82 ¶ 93) and stated that Doctors Hospital "maintains a revolving line of credit arrangement pursuant to a Loan and Security Agreement dated March 31, 1997, and that "[a]ll eligible patient accounts receivable of the Hospital are pledged as collateral to secure the revolving line of credit." (Id. at ¶ 98)

196. Hyams testified that the financial statements of Doctors Hospital for September 30, 1999 and 1998 were incorrect and that note (6) entitled long term debt improperly characterized Doctors Hospital as the borrower under the MMA Funding, LLC Loan. (New Def. Ex. 142, at 152–53)

197. The Debtor's Statement of Financial Affairs, Docket No. 133 in the main bankruptcy case,[13] reflects (in response to question number 17(d)), that Daiwa, Nomura and the Illinois Department of Public Aid were the only creditors who received a copy of Doctors Hospital's financial statements in the two years preceding the Petition Date.

#### 5. Doctors Hospital's Role As "Primary Servicer" Pursuant to the Contribution Agreement

199. Pursuant to Section 1.05(b) of the Contribution Agreement, MMA Funding, LLC appointed Doctors Hospital as the Primary Servicer, its agent for the administration and servicing of the Receivables. (Jt. Ex. 5 ¶ 1.05(b))

200. Section 1.05 of the Contribution Agreement, states that as the provider, Doctors Hospital, "hereby accepts such appointment and agrees to perform the Primary Servicer Responsibilities." (Id.)

201. As the Primary Servicer, Doctors Hospital was required to perform "Pri-

---

**13.** This Court takes judicial notice of Doctors Hospital's Statement of Financial Affairs. *In re Kanan,* Bankr.No. 09–33071, Adv. No. 09– 02167, 2010 WL 1063576, *2 (Bankr.N.D.Ill. Mar. 18, 2010) (Schmetterer, J.).

mary Servicer Responsibilities" which included the administration and servicing of the contributed Receivables. (*Id.*) Exhibit IX to the Contribution Agreement set forth Doctors Hospital's primary servicing obligations. (Jt. Ex. 5, Ex. IX)

202. Doctors Hospital's role as Primary Servicer is further contemplated in Desnick's executed Officer's Certificate, which provides, "To carry out the servicing responsibilities, the books and records relating to the healthcare receivables transferred to MMA Funding, LLC would be retained by Doctors Hospital because a transfer of possession of the books and records would be administratively burdensome and would interfere with Doctors Hospital's performance of its servicing responsibilities relating to the healthcare receivables." (New Jt. Ex. 13, at 5, 15)

203. Hyams testified that a healthcare provider would typically service receivables after they have been transferred to the SPE. (New Def. Ex. 142, at 27)

204. Soleimani stated that since SPEs do not have employee, Daiwa would work with the healthcare provider's employees, typically those familiar with the financial aspects of the provider's company, to facilitate the business of the SPE. (New Def. Ex. 141, at 25–26)

FACTS DEMONSTRATING THAT DOCTORS HOSPITAL'S TRANSFER OF ITS RECEIVABLES TO MMA FUNDING, LLC WAS A TRUE SALE

**A. The Facts Demonstrating that Doctors Hospital Transferred Its Receivables to MMA Funding, LLC in a True Sale**

**1. *The MMA Funding, LLC Loan Agreement and Related Documents at Closing Demonstrating the Structure of the Transaction as a True Sale***

205. On March 31, 1997, Daiwa, pursuant to a healthcare receivables securitiza-

tion program (the *"Daiwa Securitization"*), agreed to lend up to $25,000,000 to MMA Funding, LLC (the *"MMA Funding, LLC Loan"*). Under the language of the loan transaction documents, Doctors Hospital contributed the accounts receivable generated from its provision of medical services (the *"Receivables"*) to MMA Funding, LLC, and Daiwa, in turn, loaned funds to MMA Funding, LLC according to specified formulae. (New Def. Ex. 82 ¶ 41)

206. At the Remand Trial, the entire closing binder for the MMA Funding, LLC/Daiwa Securitization was stipulated to by the parties for admission into evidence. (New Jt. Ex. 1–22) At the First Trial, the closing binder was not admitted in its entirety; only the index to the closing binder and a few select documents were admitted into evidence. (Jt. Ex. 170)

207. The Daiwa Loan was memorialized in several key documents, including: (a) the Healthcare Receivables Contribution Agreement between Doctors Hospital and MMA Funding, LLC (the "Contribution Agreement"); (b) the Loan and Security Agreement between MMA Funding, LLC and Daiwa (the "MMA Funding, LLC Loan Agreement"); (c) the Depositary Agreement between Doctors Hospital, Medical Management, MMA Funding, LLC, Daiwa and Grand National Bank (*"Daiwa Lockbox Agreement"*); and (d) the Assignment of Healthcare Receivables Contribution Agreement as Collateral Security by MMA Funding, LLC in favor of Daiwa ("MMA Funding, LLC Assignment"). (New Def. Ex. 82 ¶ 43)

208. On March 31, 1997 Doctors Hospital executed the Contribution Agreement in favor of MMA Funding, LLC. (Jt. Ex. 5)

209. Section 1.01 of the Contribution Agreement stated that "[Doctors Hospital]

agrees ... to contribute all of its Receivables to [MMA Funding, LLC], and [MMA Funding, LLC] agrees ... to accept the Contribution by [Doctors Hospital] of such Receivables." (New Def. Ex. 82 ¶ 54; Jt. Ex. 5 ¶ 1.01)

210. Section 1.03 of the Contribution Agreement provided that transfers of the healthcare Receivables occurred on March 31, 1997 and thereafter on each "Transfer Date." (Jt. Ex. 5 ¶ 1.03)

211. "Transfer Date," as defined in Exhibit I to the Contribution Agreement, contemplated weekly transfers of healthcare Receivables. (Jt. Ex. 5, Ex. I) The initial transfer date took place on March 31, 1997. (New Jt. Ex. 21; Jt. Ex. 5 ¶ 1.03)

212. Section 1.03 of the Contribution Agreement further provided that "[MMA Funding, LLC] hereby accepts and receives, as absolute owner, all right, title and interest in and to such Receivables on such Transfer Date." (Jt. Ex. 5 ¶ 1.03)

213. Section 1.01 of the Contribution Agreement stated that "[Doctors Hospital] agrees ... to contribute all of its Receivables to [MMA Funding, LLC], and [MMA Funding, LLC] agrees ... to accept the contribution by [Doctors Hospital] of such Receivables." (New Def. Ex. 82 ¶ 54)

214. Section 1.03 of the Contribution Agreement provided:

*Section 1.03. The Contributions.* Effective on each Transfer Date, all right, title and interest in and to the Offered Receivables shall be transferred by the applicable [Doctors Hospital] as a contribution and [MMA Funding, LLC] hereby accepts and receives, as absolute owner, all right, title and interest in and to such Receivables on such Transfer Date (such Offered Receivables being referred to herein as a *"Transferred Batch"*). On or prior to each Transfer Date, the conditions in Exhibit II shall be satisfied.

(*Id.* at ¶ 56) (emphasis added).

215. Exhibit III to the Daiwa Loan Agreement contains representations and warranties made by MMA Funding, LLC to Daiwa, and are made part of the Daiwa Loan Agreement pursuant to Section 3.01. (*Id.* at ¶ 50; Jt. Ex. 1, Ex. III thereto)

216. In Subsection (k) to Exhibit III of the MMA Funding, LLC Loan Agreement, MMA Funding, LLC represented and warranted to Daiwa that on March 31, 1997, the initial funding date for the Daiwa Loan, MMA Funding, LLC was "the legal and beneficial owner of the [receivables] free and clear of any Lien." (New Def. Ex. 82 ¶ 51; Jt. Ex. 1, Ex. III thereto)

217. On March 31, 1997, a balance sheet for MMA Funding, LLC was prepared, which showed MMA Funding, LLC as owner of Receivables with a value of $9,382,941. (New Jt. Ex. 20)

218. Section 1.03 of the Daiwa Loan Agreement required that MMA Funding, LLC submit Borrowing Base Certificates to Daiwa in connection with each advance under the Daiwa Loan Agreement. (New Def. Ex. 82 ¶ 79)

219. On March 31, 1997, a Borrowing Base Certificate was prepared which showed Receivables with a value of $9,382,941 and a corresponding availability on the Daiwa Loan of $7,975,500. (New Jt. Ex. 21)

220. On March 31, 1997, Daiwa funded $7,975,500.00 to MMA Funding, LLC. (New Def. Ex. 82 ¶ 90) A closing statement for MMA Funding, LLC was prepared on March 31, 1997 that showed the disbursement of these funds. (New Jt. Ex. 22)

221. Hyams identified the closing statement (*Id.*) as coming from Pat Kowalski on behalf of MMA Funding, LLC, and

testified that Daiwa relied upon the closing statement in making the initial disbursement under the Daiwa Loan. (New Def. Ex. 142, at 51–52)

222. $6,523,833.34 was disbursed to Grand National Bank, as successor-in-interest to First National Bank of Northbrook, in accordance with a payoff statement from Grand National Bank dated March 27, 1997. (New Jt. Ex. 8, 22) This payoff retired loans made by First National Bank of Northbrook to Doctors Hospital. These loans were secured by Doctors Hospital's healthcare receivables and by a mortgage on the Hospital Property. (New Jt. Ex. 8, 22; New Def. Ex. 56, 57, 61, 62) Following this payoff, Grand National Bank terminated its security interests in Doctors Hospital's receivables, and released its mortgage on the Hospital Property. (New Jt. Ex. 8, New Def. Ex. 56)

223. After payment of legal fees, the balance of the $7,975,500.00 funded by Daiwa, $1,371,666.66, was wired to MMA Funding, LLC's bank account at Grand National Bank. (New Def. Ex. 22)

224. Doctors Hospital contributed its Receivables to MMA Funding LLC from March 31, 1997 through April 17, 2000, as evidenced through the submission of Borrowing Base Certificates during this time period. (New Jt. Ex. 23–28)

### 2. Corporate Governance Actions and Resolutions Demonstrating the True Sale of the Hospital's Accounts Receivable to MMA Funding, LLC

225. On March 31, 1997, the Board of Directors for Doctors Hospital executed a "Unanimous Written Consent of Directors of Doctors Hospital of Hyde Park, Inc." (New Jt. Ex. 68)

226. The preamble to the Unanimous Written Consent of Directors of Doctors

Hospital of Hyde Park, Inc. stated as follows:

A. The officers of the Provider [Doctors Hospital] have negotiated with Daiwa Securities America Inc. in connection with the establishment of a healthcare receivables financing facility, as further described in that certain draft of Healthcare Receivables Contribution Agreement dated as of March 31, 1997 among Medical Management of America, Inc., the Provider, and MMA Funding, LLC, an Illinois limited liability company have presented to this board of directors forms of the [Contribution Agreement] and related transaction documentation, including without limitation, the operating agreement of the Borrower, the Depositary Agreement and related forms of documents, instruments and notices in connection therewith (the "Transaction Documents").

B. The directors have reviewed the Transaction Documents in considering the terms and conditions of the transactions contemplated to be entered into thereby."

(New Jt. Ex. 68)

227. The Unanimous Written Consent of Directors of Doctors Hospital of Hyde Park, Inc. resolved that:

1. The negotiation, execution and delivery of the Transaction Documents, and the performance of the obligations thereunder, is in the judgment of this Board of Directors to be in the best interests of the Provider.

2. Each and any officer of this Provider is hereby authorized and directed for and in the name of the Provider to execute and deliver the Transaction Documents containing substantially the terms, conditions and provisions set forth in the forms of Transaction Documents dated as of March 13, 1997 heretofore reviewed and approved by this

Board of Directors, together with such additional, modified or revised terms, conditions or provisions as may be acceptable to said officer as conclusively evidenced by said officer's execution thereof, including without limitation the grant of security interests and filing of financing statements securing obligations of the Provider as set forth in the Transaction Documents.

3. Each and any officer of the Provider is hereby authorized and directed for and in the name of the Provider to execute, deliver and cause to be filed such documents and instruments, as said officer may deem to be necessary or desirable in order to establish the Provider's participation in the Borrower as a limited liability member.

4. Each and any officer of this Provider is hereby further authorized and directed to execute such further documents and instruments, and to do such further acts and things, as said officer may deem necessary or desirable in order to accomplish the foregoing, as conclusively evidenced by said officer's execution thereof or action taken."

(New Jt. Ex. 68)

228. On March 31, 1997, Doctors Hospital expressly acknowledged that the transfer of the Receivables to MMA Funding, LLC was a "true sale" in Section 5.08 of the Contribution Agreement which provides that the parties "structured the transactions ... as a full and complete transfer of ownership and not a loan." (New Jt. Ex. 2 ¶ 5.08; Jt. Ex. 5 ¶ 5.08, Ex. IV thereto)

3. *Notice to "All the World" Filed Pursuant to the Uniform Commercial Code Demonstrating the True Sale of the Hospital's Accounts Receivable to MMA Funding, LLC*

229. On March 31, 1997, Doctors Hospital executed and filed with the Illinois Secretary of State Office a UCC–1 statement. (New Def. Ex. 82 ¶ 70; New Jt. Ex. 9) The attachment thereto indicated that the filing was made under the requirements of Section 9–102 of the Uniform Commercial Code and described the transfer of Receivables to MMA Funding, LLC pursuant to the Contribution Agreement as a sale. (New Jt. Ex. 9)

230. The Law Finn of Chuhak & Tecson, P.C. delivered a legal opinion, dated as of March 31, 1997, in which it opined, among other things, that the filing of UCC–1 Financing statements in connection with the Daiwa Securitization would result in MMA Funding, LLC being the owner of the Receivables. (New Def. Ex. 15)

B. **Facts After the Closing Date, March 31, 1997, Demonstrating that Doctors Hospital Transferred Its Receivables to MMA Funding, LLC In a True Sale**

1. *Announcement to Health Insurers and State Comptroller that Doctors Hospital Contributed its Receivables to MMA Funding, LLC*

231. On June 1, 1997, Stephen Weinstein, Chief Executive Officer of Doctors Hospital, sent a letter to Blue Cross/Blue Shield of Illinois stating in part that Doctors Hospital had "contributed to [MMA Funding, LLC] the currently existing receivables payable by you to [Doctors Hospital] and we intend to contribute to [MMA Funding, LLC] hereafter arising receivables payable by you to [Doctors Hospital]." (New Def. Ex. 82 ¶ 99)

232. On June 1, 1997, Stephen Weinstein, Chief Executive Officer of Doctors Hospital, sent a letter to the Comptroller for the State of Illinois stating in part that Doctors Hospital had "contributed to

[MMA Funding, LLC] the currently existing receivables payable by you to [Doctors Hospital] and we intend to contribute to [MMA Funding, LLC] hereafter arising receivables payable by you to [Doctors Hospital]." (New Def. Ex. 82 ¶ 100)

233. On June 1, 1997, Stephen Weinstein, Chief Executive Officer of Doctors Hospital, sent a letter to more than 100 private insurers stating in part that Doctors Hospital had "contributed to [MMA Funding, LLC] the currently existing receivables payable by you to [Doctors Hospital] and [Doctors Hospital] intend[s] to contribute to [MMA Funding, LLC] hereafter arising receivables payable by you to [Doctors Hospital]." (New Def. Ex. 82 ¶ 101)

234. Pursuant to these written notices, Doctors Hospital's obligors BlueCross/Blue Shield of Illinois and the Comptroller for the State of Illinois were instructed to wire the payments on the Receivables proceeds to Account # 6700010129 at Grand National Bank. (Jt. Ex. 19)

235. At all times between March 31, 1997 and the Petition Date cash originating from Medicare and Medicaid Receivables was indeed paid to Account # 6700010129 at Grand National Bank. (New Def. Ex. 82 ¶¶ 162, 165, 196)

## 2. *The Loan Documents, Advance Requests and Borrowing Base Certificates*

236. Hyams understood the nature of the Contribution Agreement to be that once executed, the document initiated the first transfer. (New Def. Ex. 142, at 34–35)

237. Soleimani was ultimately responsible for administering the MMA Funding, LLC Loan but had people, including David Hyams, who reported to him, handle the MMA Funding, LLC Loan on a day-to-day basis. (New Def. Ex. 141, at 14, 37)

238. Hyams was the Daiwa America employee responsible for day-to-day management of the MMA Funding, LLC Loan after its inception. (New Def. Ex. 142, at 38–39)

239. Hyams' day-to-day responsibilities in managing the MMA Funding, LLC Loan included analyzing collateral sent by MMA Funding, LLC; reviewing borrowing bases signed by MMA Funding, LLC; advancing funds pursuant to those calculations and borrowing bases; and receiving and reviewing financial statements, other informational documents, and occupancy information for Doctors Hospital. (*Id.* at 41)

240. Hyams testified that it was customary for Daiwa to require an Advance Request[14] to be tendered along with a Borrowing Base Certificate. The purpose of the Advance Request is to reaffirm certain representations and warranties in the loan agreement. (New Def. Ex. 142, at 55–57)

241. Hyams identified the form of the Advance Request admitted as New Def. Ex. 9 as the form typically required by Daiwa. (*Id.;* New Def. Ex. 9)

242. Hyams received Advance Requests and Borrowing Base Certificates in the ordinary course as part of his day-to-day management of the MMA Funding, LLC Loan. (New Def. Ex. 142, at 66)

243. The Advance Requests and Borrowing Base Certificates were signed by representatives of MMA Funding, LLC as

---

14. "Advance Request" and "Borrower's Certificate" can be used interchangeably to describe New Def. Ex. 9. For purposes of Defen-

dant's Post–Trial Findings of Facts on the bankruptcy remote entity issue, the term "Advance Request" will be used.

follows: from March 31, 1997 through June 30, 1997, Patrick Kowalski; from July 18, 1997 through April 17, 1998, Paul Ottoson; from April 20, 1998 through September 25, 1998, Richard Felbinger; from September 29, 1998 through May 14, 1999, Michael Nelson; and from May 17, 1999 through April 17, 2000, Nelson Vasquez (although on two occasions during Vasquez's tenure, the documents were executed by other representatives). (New Jt. Exs. 23–28)

244. It was the responsibility of the Hospital's CFOs to initiate the Advance Requests and Borrowing Base Certificates. (New Def. Ex. 144, at 180)

245. Vasquez submitted over 200 Advance Requests and Borrowing Base Certificates to Daiwa, drawing advances on the MMA Funding, LLC Loan. Vasquez testified that at all times while he was at Doctors Hospital Borrowing Base Certificates were sent to Daiwa either weekly or monthly. (New Jt. Ex. 28; New Def. Ex. 82 ¶ 81)

246. Nelson submitted approximately 132 Advance Requests and Borrowing Base Certificates to Daiwa, on behalf of MMA Funding, LLC, drawing advances on the loan during his employ at Doctor's Hospital. (New Jt. Ex. 27)

247. Felbinger submitted approximately 73 Advance Requests and Borrowing Base Certificates to Daiwa. He testified that he would send Advance Requests on behalf of MMA Funding, LLC on a weekly basis to Daiwa using the form provided by Daiwa, together with a Borrowing Base Certificate. (New Jt. Ex. 26; Def. Ex. 38, at 47–48)

248. Ottoson submitted approximately 101 Advance Requests and Borrowing Base Certificates to Daiwa, on behalf of MMA Funding LLC. (New Jt. Ex. 25)

249. Robinson testified that he believed Ottoson was provided authority to submit these fund requests through either Desnick or Steven Weinstein, who was CEO of Doctors Hospital. (New Def. Ex. 144, at 167–68)

250. Patrick Kowalski, the primary person working with Daiwa when the Daiwa Loan closed, submitted six Borrowing Base Certificates early in the life of the loan. Robinson testified that he believed Kowalski was given the authority to submit these fund requests by Desnick or Weinstein. (New Jt. Ex. 24; New Def. Ex. 144, at 176–77)

251. Robinson did not know Ottoson, Kowalski, Nelson, Felbinger, or Vasquez to ever have exceeded their authority during their employment. (New Def. Ex. 82 ¶ 82; New Def. Ex. 144, at 165, 170–71, 174–75)

252. The Borrowing Base Certificates delivered at the closing of the MMA Funding, LLC Loan on March 31, 1997; on May 6, 1997; and on July 30, 1997; were submitted to Daiwa with Doctors Hospital's name appearing in the signature block of the documents. (New Jt. Ex. 23; New Def. Ex. 142, at 72–77)

253. Hyams stated that Borrowing Base Certificates with Doctors Hospital's name appearing in the signature block of the documents would have been a mistake, and that it would be somewhat common for these types of errors to exist at the beginning of the lending relationship. (New Def. Ex. 142, at 71–72) With the exception of the three Borrowing Base Certificates listed above, all Advance Requests and Borrowing Base Certificates had MMA Funding, LLC in the signature block. (New Jt. Ex. 23–28)

254. Hyams stated that it is not atypical to take some time to work out the

kinks in two tiered structured financing arrangements. (New Def. Ex. 142, at 46)

255. Hyams elaborated that sometimes the people signing these types of documents are less familiar with the transaction, and these types of mistakes can happen frequently. (New Def. Ex. 142, at 111)

### 3. *Facts Demonstrating that Doctors Hospital Lost Control Over its Accounts Receivable, Further Demonstrating that a "True Sale" had been Effectuated*

256. After the Daiwa Loan in April 1997, cash originating from Medicare and Medicaid Receivables first went to a joint Doctors Hospital—Daiwa account, # 6700010129 at Grand National Bank. These receipts were then swept to another account at Grand National Bank, # 6700010022 in the name of Daiwa only. The latter account also received cash originating from payments made by insurance companies such as Blue Cross and Blue Shield. From account # 6700010022, the funds were swept to another Daiwa account at the Bank of New York. (New Def. Ex. 82 ¶ 159)

257. Desnick acknowledged in his deposition that after the Daiwa Loan was completed, Doctors Hospital lost access to and control of its Receivables, and the Receivables were no longer available to Doctors Hospital. (New Def. Ex. 143, at 230)

258. Robinson admitted that pursuant to the MMA Funding, LLC Loan documents Doctors Hospital gave up control over its Receivables. (New Def. Ex. 144, at 270)

259. Section 2.02 of the Daiwa Loan Agreement provided that all Receivables were to be applied to principal and interest repayments on the credit facility unless the balance of the Daiwa Loan had been paid in full. Only "[u]pon payment in full of all Lender Debt, all remaining amounts held in the [Daiwa Account] shall be delivered to [MMA Funding, LLC]" according to Section 2.02. (Jt. Ex. 202 ¶ 53)

260. Over the life of the loan, the principal of the Daiwa Loan was never paid down to $0. (New Def. Ex. 82 ¶ 83)

## THE TRANSFERS AT ISSUE IN THIS CASE WERE APPLIED TO PRINCIPAL AND INTEREST DUE ON THE NOMURA LOAN

### The Nomura Loan and the HPCH Lease

261. In approximately July or August 1997, HPCH acquired the record title of the Hospital Property from HPCH Partners, L.P. (New Def. Ex. 82 ¶ 4)

262. HPCH leased the Hospital Property to Doctors Hospital pursuant to a Lease Agreement dated August 28, 1997 (the *"Lease"*). (New Def. Ex. 82 ¶ 122)

263. On August 28, 1997, Nomura loaned the principal amount of $50,000,000 (the *"Nomura Loan"*) to HPCH. The obligations of HPCH under the Nomura Loan were secured, *inter alia*, by the Hospital Property and an assignment of rents under the Lease. (New Def. Ex. 82 ¶ 102)

264. On October 24, 1997, Nomura and Asset Securitization Corporation (*"ASC"*) entered a Mortgage Loan Purchase and Sale Agreement (*"MLPSA"*). Under Section 1 of the MPLSA, Nomura sold and transferred all of its right, title and interests in and to the Nomura Loan, along with numerous other mortgage loans, to ASC. (New Def. Ex. 82 ¶ 142)

265. Contemporaneously with the execution of the MLPSA, on October 24, 1997 ASC, LaSalle National Bank and others entered into a Pooling and Servicing Agreement (the *"PSA"*). (New Def. Ex. 82 ¶ 154)

266. In Section 2.01 of the PSA, ASC as "Depositor" sold to the Trust all of ASC's "right, title and interest ... in and to [the Nomura Loan]" along with all of the various other mortgage loans. (New Def. Ex. 82 ¶ 155)

267. Section 1.01 of the PSA originally named AMRESCO Services, L.P. ("AMRESCO") as the Special Servicer of the REMIC trust. (New Def. Ex. 82 ¶ 157)

268. ORIX is the successor-in-interest to AMRESCO Management, Inc. in its role as Special Servicer under the PSA. (New Def. Ex. 82 ¶ 158)

269. The Nomura Loan was memorialized in several key documents: (a) a Loan Agreement (the "Nomura Loan Agreement"); (b) a Promissory Note; (c) Mortgage, Assignment of Rents, Security Agreement and Fixture Filing (the "Mortgage"); an Assignment of Leases and Rents (the "Lease Assignment"); (d) a Guaranty and Suretyship Agreement (the "Guaranty"); (e) an Operator Security and Pledge Agreement (the "Pledge"); (f) an Assignment of Management Agreement and Agreements Affecting Real Estate (the "Assignment"); (g) an Equity Pledge Agreement; (h) an Intercreditor Agreement; (i) a Cash Collateral Account Agreement; and (j) a Collection Account Agreement (collectively, the "Nomura Loan Documents"). (New Def. Ex. 82 ¶ 108)

270. The Nomura Loan was evidenced by a Promissory Note in the principal sum of $50,000,000 in favor of Nomura (the "Promissory Note"). (Id. ¶ 109)

**The HPCH Lease Payment Matched the Monthly Nomura Loan Payment**

271. Exhibit B to the Nomura Loan Agreement established $471,630.19 as the base monthly payment of principal and interest under the Nomura Loan. (Id. ¶ 106)

272. In connection with the Nomura Loan, Doctors Hospital, as Operator, executed a Guaranty and Suretyship Agreement, dated August 28, 1997, in favor of Nomura (the "Guaranty"). By executing and delivering the Guaranty, Doctors Hospital guaranteed and became surety to Nomura for the entire amount of the Nomura Loan. The obligations under the Guaranty were secured by the equipment, accounts receivable and other intangibles owned by Doctors Hospital, all as more fully described in the Nomura Loan Documents. (Jt. Ex. 202 ¶ 73)

273. HPCH had no source of income other than the lease payments from Doctors Hospital. (New Def. Ex. 82 ¶ 111)

274. "Rent" under the Lease was defined as "Base Rent" plus all "Excess Cash Flow" plus any additional rent, fees or payments to be made by Doctors Hospital under the Lease. Base Rent, in turn, is defined as the sum of the "Basic Carrying Costs," "Operating Expenses," "Capital Reserve Amount," "Debt Service," and "Extra Funds" as each term is defined in the Nomura Loan Agreement. The Nomura Loan Agreement generally defined these terms as follows: (i) Basic Carrying Costs means real estate taxes for the Hospital Property and insurance required to be maintained by HPCH for the Hospital Property and Doctors Hospital for its operations; (ii) Operating Expenses means all costs of cleaning, repair, maintenance, employees, utilities, professional fees, security, garbage disposal, and environmental costs related to the Hospital Property or the operations of Doctors Hospital; (iii) Capital Reserve Account means the amount of reserve required to be maintained by either formula (i.e., $8,000.00 per bed) or as determined by an engineering report; and (iv) Debt Service means the principal and interest payments and cer-

tain other charges due and payable under the Nomura Loan Agreement. (*Id.* ¶ 125)

275. Section 2.1 of the Lease provided:

[HPCH] acknowledges, so long as the Loan is outstanding, that the Rent may be paid by way of transfer of funds by Daiwa to the Cash Collateral Account. To the extent that the aggregate amount of any such transfer shall exceed the Rent then due and subject to the terms of the Loan Agreement, Landlord agrees to promptly remit such excess to [Doctors Hospital].

(*Id.* ¶ 128)

**The Term of the Nomura Loan and the HPCH Lease Were Tied Together**

276. The Lease provided for "an initial term beginning August 29, 1997 and ending on August 29, 2012." (*Id.* ¶ 129)

277. The Nomura Loan matured on September 11, 2017. (Jt. Ex. 11, at 20) (definition of "*Maturity Date* "). However, the Optional Prepayment Date on the Nomura Loan was September 12, 2012, shortly after the expiration of the Lease. (*Id.* at 23)

278. The parties executed four documents for the purpose of integrating the Nomura Loan transaction into the pre-existing Daiwa Securitization: (1) the Intercreditor Agreement (Jt. Ex. 12), (2) the Cash Collateral Agreement (Jt. Ex. 13), (3) the Collection Account Agreement (Jt. Ex. 14), and (4) the Payment Direction Letter (Jt. Ex. 92) (collectively the "*Cash Flow Agreements* "). (New Def. Ex. 82 ¶ 166) Section 2.12 of the Nomura Loan Agreement reflects that Nomura specifically bargained for the cash flow mechanics which these documents established.

279. The Cash Flow Agreements required that two new bank accounts be established: (a) the Cash Collateral Account, and (b) the Collection Account. (New Def. Ex. 82 ¶ 167)

280. The Cash Collateral Account, Account No. 677802001, was governed by the Cash Collateral Account Agreement. LaSalle National Bank acted as Cash Collateral Account Bank. (*Id.* ¶ 168)

281. The Collection Account, Account No. 6700021493, was maintained at Grand National Bank in Northwood, Illinois. (*Id.* ¶ 169) The Collection Account was governed by the Collection Account Agreement. (Jt. Ex. 14) Grand National Bank served as Collection Account Bank. (Jt. Ex. 14) The Collection Account was also titled in Nomura's name, but the tax identification number of HPCH was used for the Collection Account. (Jt. Ex. 14 ¶ 2(c)) The monies deposited into the Collection Account were "Receipts", as defined in the Collection Account Agreement. These were checks or wires received by Grand National Bank for deposit in the Collection Account. (New Def. Ex. 82 ¶ 169)

**The Advances Under the MMA Funding, LLC Loan Agreement Were Deposited in the Cash Collateral Account and Used to Make the Monthly Nomura Loan Payments**

282. Contemporaneously with the Nomura Loan on August 28, 1997, Daiwa and Nomura entered into the Intercreditor Agreement whereby Daiwa and Nomura set forth their respective rights and obligations with respect to new borrowings under the MMA Funding Loan Agreement. Doctors Hospital executed an acknowledgement of its acceptance of the Intercreditor Agreement. (*Id.* ¶ 119)

283. Section 5(c) of the Intercreditor Agreement provided that Nomura "will not contest the validity of the true sale and contribution by [Doctors Hospital] to [MMA Funding, LLC] of the [Receivables]." (*Id.* ¶ 120)

284. Section 3 of the Intercreditor Agreement stated that "Daiwa has been directed by [MMA Funding, LLC] and [Doctors Hospital] to remit all funds which [MMA Funding, LLC] and/or [Doctors Hospital] are entitled to receive pursuant to [the MMA Funding Loan Agreement] to the [Nomura Cash Collateral Account]." (*Id.* ¶ 121)

286. Under Section 3(b) of the Cash Collateral Account Agreement, LaSalle Bank (as Cash Collateral Account Bank) was required to create several sub-accounts. These sub-accounts were documented by LaSalle Bank on a "ledger basis". The sub-accounts were not separate accounts with separate account numbers. Rather, they allowed for provisional allocations to be made within the Cash Collateral Account. (*Id.* ¶ 172)

287. Section 2.12 of the Nomura Loan Agreement dictated the creation of the Cash Collateral Account and the creation of the Reserve Accounts. (*Id.* ¶ 195)

288. Plaintiff's witness at the First Trial, Carrie Widman, prepared calculations of funds flowing into and out of the Cash Collateral Account. The spreadsheet in Ms. Widman's calculations entitled (in the lower right hand corner) "cash flow" calculates by month all funds received by the Cash Collateral Account (on the left side of the dark bar) and the allocation of such funds into the sub-accounts (on the right side of the dark bar) required by the Cash Collateral Account Agreement. (*Id.* ¶ 173)

289. Ms. Widman's spreadsheet reflects that between August 28, 1997 and the Petition Date, Doctors Hospital received distributions from the Cash Collateral Account in excess of $60 million. (*See* Jt. Ex. 158, HPCH, LLC Cash Collateral LaSalle Account # 677802001, Excess Remittance Column for DHHP: GNB # 6111100385).

290. Subsequent to HPCH's acquisition of the Hospital Property, rent due under the Lease continued to be reported on the tax returns of HPCH Partners, L.P. The tax returns of HPCH Partners, L.P. indicate receipt of rents, and it had no tenants other than Doctors Hospital. HPCH owned no property other than the Hospital Property. (New Def. Ex. 82 ¶ 135)

291. On February 12, 2004, ORIX conducted a "Litigation Webcast" on its website. The Webcast provided background information on the Nomura Loan and the Trust's litigation against Nomura. In the Webcast, Michael Wurst of ORIX made the following statements:

What Nomura did here was size the lease to the loan. They determined the amount of the proceeds they wanted to lend based on the business enterprise value, and then they structured the lease to make those debt service payments. In fact, if you read the lease, the lease doesn't contain a discrete amount due. In fact, the lease says lease payments will consist of the debt service due under the mortgage loan. In other words, there's a one-to-one debt service coverage ratio between the gross income that the borrower was entitled to receive and its debt service obligations.

(*Id.* ¶ 138)

292. Doctors Hospital's obligations to pay "Base Rent" under the Lease included the obligation to pay "Debt Service," defined as the principal and interest payments and certain other charges due and payable under the Nomura Loan Agreement. (*Id.* ¶ 125) The rent payable by Doctors Hospital under the Lease, on a net basis, equaled the debt service payment owed by HPCH to LaSalle under the Nomura Loan. (*Id.* ¶ 126)

293. Doctors Hospital would make rent payments to HPCH, LLC, which were then used to service the Nomura Loan,

such that the rent was sized to fit the Nomura Loan payments. (New Def. Ex. 144, at 50)

**Beginning in July 1998, the Cash Flow Structure Was Correctly Implemented and Payments on the Nomura Loan Were Made from Advances By Daiwa**

294. The Nomura Loan Documents called for the creation of certain restricted bank accounts and stipulated how cash was to flow through the various accounts. Those procedures were not implemented until July 1998. (Jt. Ex. 202 ¶ 114)

295. After July 7, 1998, money flows adhered to the terms of the Nomura Loan and the Intercreditor Agreement. One change was the use of Grand National Bank Account # 6700021493 titled in the name of Nomura as mortgagee of HPCH (the *"Collection Account"*). The Collection Account received miscellaneous receipts of Doctors Hospital that were not part of the Daiwa Securitization. These transfers from the Collection Account to the Cash Collateral Account were dictated by a Collection Account Agreement among Grand National Bank, HPCH, Doctors Hospital and Nomura. The Collection Account Agreement was one of the Nomura Loan Documents. (New Def. Ex. 82 ¶ 190)

296. After July 7, 1998, where previously the borrowings from Daiwa had gone directly from Daiwa's account at the Bank of New York to the MMA Funding, LLC Account and then to Doctors Hospital, now the borrowings from Daiwa were deposited, pursuant to the Intercreditor Agreement, into the Cash Collateral Account. Before reaching the Cash Collateral Account, the funds were routed through LaSalle National Bank Account # 2090067, which was a general ledger account that received all cash coming into LaSalle National Bank's Trust Department. The Cash Collateral Account thus received new borrowings under the Daiwa Loan as well

as receipts that had been deposited in the Collection Account. Each month LaSalle, as the Cash Collateral Account Bank under the Cash Collateral Account Agreement, allocated funds in the Cash Collateral Account in amounts sufficient to fund reserve accounts for capital improvements, taxes and insurance, and the debt service on the Nomura Loan (the *"Reserve Accounts"*). After payment of expenses and funding of the Reserve Accounts, the remainder of the funds in the Cash Collateral Account were then sent to Doctors Hospital's general operating account (Account # 6111100385). In addition, the MMA Funding, LLC Loan advances were no longer sent through the MMA Funding, LLC account. In summary, where Doctors Hospital had, between August 1997 and July 1998, made transfers directly to the Nomura Cash Collateral Account and the Trust accepted them as payments on the Nomura Loan, from July 1998 the Trust took payments owed it by HPCH from the deposits made into the Nomura Cash Collateral Account and applied them to the Reserve Accounts. (*Id.* ¶ 192)

297. In the post July 1998 timeframe, the flow of funds operated exactly as required under the Cash Flow Agreements. Pursuant to the Intercreditor Agreement and the Payment Direction Letter, all advances to which MMA Funding, LLC was entitled under the MMA Funding, LLC Loan Agreement were paid into the Cash Collateral Account. (*Id.* ¶ 198).

298. Gary Severyn, an employee of LaSalle Bank in 2000 who was familiar with the dictates of the Cash Collateral Account, testified that the Cash Collateral Account was created to "trap" cash from HPCH and advances from Daiwa before it was disbursed out, to allow for the management of cash in accordance with the Cash Collateral Account Agreement. (*Id.* ¶ 208)

299. The Cash Collateral Account Agreement would dictate what amounts needed to be placed in each of these reserve sub-accounts. As cash came into the Cash Collateral Account, the waterfall was created so that each of the sub-accounts were first satisfied and, after the dictated amount was filled in each sub-account, all excess funds were distributed out to the Debtor. (*Id.* ¶ 210)

300. After the sub-accounts were filled, all excess funds would automatically be paid to Doctors Hospital. There was no separate instruction required for that payment to be made to the Debtor. (*Id.* ¶ 211)

301. Additional facts in the Conclusions of Law will stand as Findings of Fact.

## VI.

### CONCLUSIONS OF LAW AS TO BANKRUPTCY REMOTE ENTITY ISSUES

#### INTRODUCTION

This dispute centers on two loan transactions involving the Hospital and two of its affiliates. The first transaction involved MMA Funding, LLC, a "special purpose entity" ("SPE") created as part of a receivables-financing transaction. The Hospital obtained a revolving line of credit from Daiwa Healthco–2, LLC (the "Daiwa Loan"), pursuant to which (i) the Hospital contributed its healthcare receivables on an ongoing basis to MMA Funding, LLC, (ii) MMA Funding, LLC granted a security interest in those healthcare receivables to Daiwa, (iii) Daiwa loaned funds to MMA Funding, LLC, and (iv) MMA Funding, LLC disbursed those funds to the Hospital and to the Hospital's creditors as the purchase price of the receivables.

The second transaction involved a $50 million loan from Nomura Asset Capital Corp. to HPCH, LLC, another affiliate of the Hospital. The Hospital operated in facilities that it leased from HPCH, LLC. Nomura Asset Capital Corporation ("Nomura") loaned $50 million to HPCH (the "Nomura Loan"). In exchange, HPCH granted Nomura security interests in the facilities it leased to the Hospital and the rent payments it received from the Hospital. The Hospital guaranteed HPCH's obligations to Nomura and secured that guaranty by granting Nomura security interests in certain of its personal property. The flow of funds used to pay HPCH's obligations under the Nomura Loan was complex and changed over time. *See Doctors Hosp. of Hyde Park, Inc. v. Desnick, et al. (In re Doctors Hosp. of Hyde Park, Inc.)*, 360 B.R. 787, 813 (Bankr.N.D.Ill. 2007). Initially, the Hospital paid HPCH's obligations under the Nomura Loan from cash that the Hospital received various third parties. Later, MMA Funding, LLC paid HPCH's obligations from proceeds of the Daiwa Loan. Nomura sold the Nomura Loan (together with the related security and credit enhancements) to Asset Securitization Corporation, which in turn sold it as part of a mortgage securitization pool to LaSalle Bank, N.A. ("LaSalle") as trustee. The parties have stipulated that the payments made to LaSalle beginning in July 1998 were made from loan advances by Daiwa under the Daiwa Loan Agreement. (New Def. Ex. 82 ¶¶ 194, 198) Daiwa advanced funds that were paid into the Cash Collateral Account and from that account to LaSalle. (*Id.*)

The Hospital filed for chapter 11 bankruptcy protection on April 17, 2000. A chapter 11 trustee ("Trustee") was appointed and filed an avoidance action against LaSalle. Among other things, the Trustee claimed that (1) the guaranty of the Nomura Loan given by the Hospital should be avoided as a fraudulent transfer because the Hospital incurred obligations

without receiving reasonably equivalent value in exchange, and (2) the bankruptcy estate should be allowed to recover purported rent payments made by the Hospital, which were apparently paid directly to LaSalle for repayment of the Nomura Loan, to the extent those payments exceeded the fair market rental value of the premises.

### Background From the First Trial

At the First Trial it was held that certain payments to LaSalle beginning in July 1998 were made with property owned by MMA Funding, LLC, not by the Hospital and therefore did not represent fraudulent transfers by the Hospital. *In re Doctors Hospital of Hyde Park, Inc.*, 360 B.R. 787, 847 (Bankr.N.D.Ill.2007). In support of this conclusion, it was held that (a) the post-agreement conduct of the parties did not modify the terms of the Loan and Security Agreement dated March 31, 1997 between Daiwa Healthco–2 and MMA Funding, *In re Doctors Hospital of Hyde Park, Inc.*, 373 B.R. 53, 60–63; (b) the loans by Daiwa pursuant to the MMA Funding Loan Agreement were not in substance a loan to Doctors Hospital, *In re Doctors Hospital of Hyde Park, Inc.*, 360 B.R. 787, 847–50 (Bankr.N.D.Ill.2007); (c) MMA Funding functioned as a special purpose entity, *Id.* at 851–52; (d) the transfer of the Doctors Hospital receivables was a true sale, *Id.* at 848; (e) MMA Funding was not the alter ego or instrumentality of Doctors Hospital, *Id.* at 849–52; and (f) viewing the agreements as written, the post-July 1998 transfers were not made with funds belonging to Doctors Hospital. *Id.* at 847–49.

As just stated, after the Hospital filed for bankruptcy, the Trustee asserted that the Hospital's bankruptcy estate could recover the payments to LaSalle made by MMA Funding, LLC as fraudulent transfers of property of the Hospital. The

Trustee argued that MMA Funding, LLC was simply an entity created to protect Daiwa's interest in the event the Hospital went bankrupt and asked that the court look beyond the loan documents to the form of the transaction. 360 B.R. at 847. That argument was rejected in the Initial Opinion and it was held that MMA Funding, LLC was a valid entity created for the purpose of owning receivables pledged for the Daiwa Loan. *Id.*

That decision was based in part on a straight-forward reading of the "Healthcare Receivables Contribution Agreement" ("Contribution Agreement") between MMA Funding, LLC and the Hospital. *Id.*; (New Jt. Ex. 2). Pursuant to that Contribution Agreement, the Hospital transferred the receivables to MMA Funding, LLC on a continuing basis as a "true sale." *Doctors Hosp. of Hyde Park, Inc.*, 360 B.R. at 848. "By virtue of the Contribution Agreement, the Hospital parted with all right, title, and interest in to the receivables." *Id.* The Contribution Agreement contained extensive detailed covenants requiring MMA Funding, LLC to be maintained as a separate legal entity from the Hospital for the duration of the Daiwa Loan. *Id.*

Furthermore, the Initial Opinion noted that a UCC–1 statement was filed in connection with the transfer of receivables. That statement stated, "The Company and the Provider intend and agree that the Contribution Agreement provides for bona fide contributions and a full and complete transfer of ownership by the Provider to the Company of all Receivables." *Id.* That expressly stated intent of the parties that the transfer of receivables be treated as a "true sale" was important to the Initial Opinion's conclusion as to the validity of MMA Funding, LLC's status as an independent entity. *Id.* at 848. "The UCC–1 statement also made clear that MMA

Funding [LLC] was the owner of the receivables to Daiwa." *Id.*

The Opinion also analyzed the question of whether MMA Funding, LLC was effectively organized as a special purpose entity. In concluding that it was, the Initial Opinion concluded that MMA Funding, LLC has a specific purpose in serving as a bankruptcy remote entity to isolate the receivables and thereby protect Daiwa from the bankruptcy risk of the Hospital. *Id.* at 847.

The Initial Opinion then considered whether MMA Funding, LLC should be treated as an alter ego of the Hospital or whether it was appropriate to pierce the corporate veil of MMA Funding, LLC. The Opinion ruled in the negative on both questions because the Trustee could not prove that treating MMA Funding, LLC as a distinct legal entity would promote a fraud or injustice. *Id.* at 851.

A District Judge affirmed the conclusions of the *Initial Opinion* and emphasized Daiwa's reliance on MMA Funding, LLC's separateness and the legal opinions delivered by law firms Shefsky & Froelich as well as Chuhak & Tecson in connection with the Daiwa Loan.

The principal non-solvency issue under the Remand Opinion is whether MMA Funding, LLC or the Hospital owned the funds transferred to LaSalle on a monthly basis beginning in July 1998. However, the parties have stipulated that the transfers of funds beginning in July 1998 were advances by Daiwa under the MMA Funding, LLC Loan Agreement.[15] The parties dispute the existence of MMA Funding, LLC as an entity separate and distinct from the Hospital. If MMA Funding, LLC existed as a separate entity, then as borrower on the MMA Funding, LLC Loan, the funds were its funds and not the Hospital's. Those funds would then not be recoverable by the Trustee through this adversary proceeding. As the Remand Opinion stated, "the parties agree that, if MMA Funding became a legitimate bankruptcy remote vehicle as part of the Daiwa loan, this prevents recovery of payments made on the Nomura loan from July 1998 forward." *Paloian v. LaSalle Bank, N.A.*, 619 F.3d 688, 695 (7th Cir.2010). That Opinion further stated that based on what it could "tell from this record" there was "scarcely any evidence in this record that LLA Funding even *existed.*" *Id.* at 696 (emphasis in original). The Opinion left for remand the questions of whether "there was a bona fide sale of accounts receivable from the Hospital to MMA Funding" and whether "MMA Funding was more than a name without a business entity to go with it." *Id.*

**Post–Remand Motion for Partial Summary Judgment**

After remand, the Chapter 11 Trustee moved for partial summary judgment under Fed.R.Civ.P. 56 (made applicable in bankruptcy by Fed. R. Bankr.P. 7056)

---

**15.** In summary, between August 28, 1997 and July 7, 1998, the Hospital made transfers directly to a "Cash Collateral Account," controlled by LaSalle, and LaSalle accepted these transfers and used them to make payments on the Nomura Loan. Under the Initial Findings and Conclusions, it is these transfers that were void to the extent they excluded fair market value of the rent on the Doctors Hospital property. From July 7, 1998 through April 2000, however, the Trust took payments owed under the Nomura Loan from deposits made by Daiwa into the "Cash Collateral Account" at the direction of MMA Funding. It then forwarded to the certificate-holders funds representing debt service payments. It was held that rent payments during this time period were not made with Doctors Hospital's assets but with MMA Funding LLC's and therefore not voidable as fraudulent transfers. *Doctors Hosp. of Hyde Park, Inc. v. Desnick, et al. (In re Doctors Hosp. of Hyde Park, Inc.),* 360 B.R. 787, 853 (Bankr.N.D.Ill.2007).

seeking a determination that "MMA Funding, LLC, from and after July 7, 1998, was not a bankruptcy remote entity and therefore that all payments of rent from Doctors Hospital of Hyde Park, Inc. after July 7, 1998 were transfers of Doctors Hospital's funds." The issue thus presented was whether MMA Funding was actually separate from Doctors Hospital so that it was a legitimate "bankruptcy-remote" entity, and if so whether there was a "true sale" of assets to it later used to make the payments in issue here.

That Motion was denied as stated in the Memorandum Opinion issued in connection with the Motion for Summary Judgment (02 A 00363, Dkt. No. 748), if MMA Funding became and remained a legitimate "bankruptcy-remote" vehicle arising out of the Daiwa loan, then payments by it would not have come from the Debtor's assets, so that the Chapter 11 Trustee would be prevented from recovering payments made on the Nomura loan. If, however, MMA Funding was separate from and not part of the Debtor, then payments made to LaSalle by it were not made with the Hospital's property. The Memorandum Opinion issued in connection with the Motion for Summary Judgment reserved for trial the issue of whether there was sufficient evidence to conclude that there was a "true sale" of the Hospital's receivables and if MMA Funding, LLC was a "legitimate" bankruptcy-remote entity. (02 A 00363, Dkt. No. 853)

**Governing Law Relating to Ownership of Funds Transferred to LaSalle**

LaSalle begins its argument on this issue by attempting to reframe the question presented. It contends that to succeed in avoiding the transfers the Trustee must collapse MMA Funding, LLC and the Hospital into one entity. According to LaSalle, this requires application of state and not federal law. Further, LaSalle asserts

that "there is only one body of state law that allows courts to disregard the existence of a valid, existing, and separate corporate entity: the 'alter ego' doctrine."

**1. Prior Decisions on Alter Ego and Piercing of Corporate Veil are Law of the Case**

As previously noted, the Remand Opinion stated that "[t]he subjects that this opinion pretermits are law of the case." *Paloian v. LaSalle Bank, N.A.*, 619 F.3d 688, 692 (7th Cir.2010). That Opinion did not disturb, or even address, the previous holding (affirmed by the District Judge) that the Trustee had not proved that MMA Funding, LLC was the alter ego of the Hospital. *Doctors Hosp. of Hyde Park, Inc. v. Desnick, et al. (In re Doctors Hosp. of Hyde Park, Inc.)*, 360 B.R. 787, 852 (Bankr.N.D.Ill.2007); *LaSalle Nat'l Bank Ass'n v. Paloian*, 406 B.R. 299, 341–42 (N.D.Ill.2009). Nowhere in the Remand Opinion is there a reference to "alter ego" or "piercing the corporate veil." That Opinion does not cite or mention any elements necessary for recovery under those doctrines. Oddly, LaSalle argues this very point in its post-trial brief arguing that "while the Court of Appeals preserved for remand the question of MMA Funding, LLC's 'separateness,' it established as 'law of the case' the Court's ruling after the First Trial, as affirmed by the District Court, that Plaintiff cannot satisfy the 'fraud or injustice' prong of the 'alter-ego' test." (Def's Post–Trial Brief on Non–Solvency Issues, Dkt. No. 917, at 42)

**2. The Standard for Analysis of a Bankruptcy Remote Entity**

The Remand Opinion did not specify by what standard MMA Funding should be judged to determine whether it became a "legitimate bankruptcy remote vehicle."

The Remand Opinion includes a statement that courts will review the "economic substance" of transactions to determine whether they are designed simply to evade bankruptcy laws. With respect to the validity of MMA Funding, LLC as a bankruptcy remote vehicle, the Remand Opinion stated:

> To make the idea work, the separate entity must be, well, separate. It must buy assets (here, accounts receivable). It must manage those assets in its own interest rather than the debtor's. It must observe corporate formalities, to prevent the court from rolling it back into the debtor under the approach of a decision such as *United Airlines*, which holds that debtors and creditors can't evade bankruptcy laws through clever choice of words, but must structure their transactions so that their economic substance lies outside particular sections of the Bankruptcy Code.
>
> If Daiwa had loaned $25 million to Vehicle, a corporation independent of Desnick, which then purchased the Hospital's accounts receivable for $22 million (using the proceeds of the loan) and stood to make a profit, or suffer a loss, depending on how much eventually came in, there would be little ground to treat Vehicle's payments on the loan as preferential transfers by the Hospital. The transfer by the Hospital would have occurred with the initial sale of the receivables, and, if that sale predated the Hospital's insolvency (or the bankruptcy filing) by enough time, it would be outside the bankruptcy trustee's avoiding powers, even though particular payments occurred within the look-back periods (90 days or one year under 11 U.S.C. § 547(b), two years under § 548(a)). And the parties agree that, if MMA Funding became a legitimate bankruptcy-remote vehicle as part of the Daiwa loan, this prevents recovery of payments made on the Nomura loan from July 1998 forward.
>
> As far as we can tell from this record, however, MMA Funding lacked the usual attributes of a bankruptcy-remote vehicle. It was not independent of Desnick or the Hospital; Desnick owned MMA Funding (99% of which was owned by the Hospital, and 1% of which was owned by a firm that Desnick owned directly or through some trusts), and MMA Funding operated as if it were a department of the Hospital. It did not have an office, a phone number, a checking account, or stationery; all of its letters were written on the Hospital's stationery. It did not prepare financial statements or file tax returns. It did not purchase the receivables for any price (at least, if it did, the record does not show what that price was). Instead of buying the receivables at the outset, MMA Funding took a small cut of the proceeds every month to cover its (tiny) costs of operation. The Hospital continued to carry the accounts receivable on its own books, as a corporate asset; it told other creditors that Daiwa had a security interest in the receivables, which is of course the sort of structure that makes the payments amenable to a preference-recovery action whether or not the receivables are remitted to a lockbox at a bank.
>
> There is scarcely any evidence in this record that MMA Funding even *existed*, except as a name that Daiwa's and Desnick's lawyers put in some documents.

*Paloian*, 619 F.3d at 695–96.

That Opinion was obviously skeptical that MMA Funding, LLC was a legitimate bankruptcy remote vehicle. Despite such skepticism, the Opinion remanded the separateness issue to see whether LaSalle could "offer on remand evidence to show

... that MMA Funding, LLC was more than a name without a business entity to go with it." *Id.* at 696.

■■■ The development of so-called "bankruptcy remote entities" has been driven by commercial lenders and lawyers usually seeking to shelter lender expectations in property or income from future bankruptcy fillings. The test of their validity is usually determined in a case-by-case basis to determine whether the entity was created in conformity with non-bankruptcy law and without violating both bankruptcy and federal law, and whether the entity is real and not a mere facade. Since the effort to create such entities is a common part of U.S. commercial and lending practice but is not defined by statute, review of the evidence in the face of an attack on such an entity must be thorough and recognize the adverse effect on lending to distressed companies that could result from a review that might reject even a carefully prepared entity. The evidence heard as part of this Court's review is set forth below. The weight of evidence from therein was heavily in favor of the conclusion here that the entity involved in this case was real and should be recognized as valid.

The Trustee contends that the standard articulated by the Remand Opinion requires examination of the original structure of the transactions at issue as well as the post-closing business operations of the BRE. The Trustee views the Remand Opinion as an expansion of the standard set forth in *United Airlines, Inc. v. HSBC Bank, N.A.,* 416 F.3d 609 (7th Cir.2005). It is asserted that the Remand Opinion set up a standard for application of this case to provide a remedy in cases where a party tries to avoid the consequences of the bankruptcy laws by hiding behind a "phony" SPE.

More specifically, the Trustee contends that the Remand Opinion articulated the following test to determine whether an entity is legitimately "bankruptcy remote:"

1. The BRE must be independent of the entity that generates the receivables and of the owner of that entity;

2. The BRE must remain separate from the generator of the receivables after the closing of the transaction;

3. The BRE must observe corporate formalities;

4. The BRE must exhibit indicia of separateness such as its own office, phone number, checking account, and stationary;

5. The BRE must prepare financial statements and tax returns;

6. The accounts receivable or loan obligation should not be carried on the records of the entity generating the receivables;

7. The BRE "must buy assets (here accounts receivable)" and "must manage [those assets] in its own interest rather than the debtor's."

These factors would focus the analysis only on whether MMA Funding, LLC was "operationally distinct" from the Hospital. However, the Trustee did not discuss adequately just what the "approach of a decision such as *United Airlines*" was. That requires further consideration before discussing the standard set by the Remand Opinion.

*Analysis of United Airlines Opinion*

■■■ In *United Airlines,* a Seventh Circuit Panel considered whether a sublease-leaseback transaction of property at the San Francisco International Airport between the debtor, United Airlines, and California Statewide Communities Development Authority ("CSCDA") was a "true lease" or instead secured financing for purposes of 11 U.S.C. § 365. *United Airlines, Inc. v. HSBC Bank USA, N.A. et al.,*

416 F.3d 609, 611–12 (7th Cir.2005). That issue was important to determine whether the debtor was required to make current payments on the lease during the bankruptcy case. In bankruptcy, a lessee must either assume the lease and fully perform all of its obligations, or surrender the property. 11 U.S.C. § 365. If the leasing arrangement between the debtor and CSCDA was a "true lease" then the debtor was required to make current payments of rent. *Id.* at 610. If the transaction was characterized as secured financing, then the debtor did not have to make current payments required by the terms of the lease. *Id.* In reaching its conclusion, the *United* Opinion took several analytical steps worth repeating here as they shed light on the approach to be taken in deciding whether MMA Funding ever became a "legitimate" bankruptcy remote entity.

*United* first considered whether form or substance controls in distinguishing "leases" from "secured credit" for purposes of § 365. *Id.* at 612. According to the Opinion, "[w]hether the word 'lease' in a federal statute has a formal or substantive connotation is a question of federal law; it could not be otherwise." *Id.* In considering the purpose of § 365 and bankruptcy policy more generally, the Opinion stated that "[i]t is unlikely that the Code makes big economic effects turn on the parties' choice of language rather than the substance of their transaction; why bother to distinguish transactions if these distinctions can be obliterated by the drafters' will?" *Id.* The Opinion concluded that substance triumphs over form as matter of federal law.

However, that conclusion did not answer what substance was needed to determine whether the transaction was a lease or not. *Id.* According to the *United* Opinion, "[b]ecause nothing in the Bankruptcy Code says which economic features of a transaction have what consequences, we turn to state law." *Id.* Supreme Court precedent has established that, in bankruptcy, property rights are defined by state law. *Butner v. United States,* 440 U.S. 48, 59, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). As such, property rights, including those subject to a lease, "have the same force they would have in state court, unless the Code overrides the state entitlement." *United Airlines,* 416 F.3d at 615. The *United* Opinion suggested that the Code would supersede state law were there a conflict between the two bodies of law. *See id.* The *United* Opinion stated that "[a] state law that identified a 'lease' in a formal rather than a functional manner would conflict with the Code, because it would disrupt the federal system of separating financial from economic distress; a state approach that gives a little more or a little less weight to one of several 'factors' does not conflict with any federal rule, because there is none with which it could conflict." *Id.* Curiously, that Opinion later also stated that "[i]f indeed California identifies leases in such a mechanical fashion, then its law must yield...." *Id.* That apparent inconsistency was irrelevant, however, as the *United* Opinion concluded that California law applied a functional definition of the word "lease" in the same way the Opinion had just decided that federal law does. *United* did not view California law to distinguish leases in a formal way from secured financing. *Id.* Rather, the Opinion looked to California statutes and legal precedent and determined that California law employs a functional approach to separate leases from secured credit. *Id.* at 612.

*United* concluded that the transaction between the debtor and CSCDA was, in substance, a secured financing despite the fact that the parties used the term "lease." *Id.* at 618. The Opinion cited the following factors, derived from California law, to

support that conclusion: (1) the "rent" was not measured by the value of the property but by the amount the debtor borrowed; (2) CDCDA had no reversionary interest in the property at the end of the lease; (3) the "lease" included a balloon payment to be made at the end of the lease, a common feature in secured credit but no parallel in a "true lease"; and, (4) prepayment of the "rent" resulted in termination of the purported lease. *Id.* at 617.

*United* is distinguishable in several respects from the case at hand here. Most obviously, the transaction at issue here is not a lease but perhaps most importantly, there is no applicable statute governing the issue presented, *i.e.*, what constitutes a "legitimate bankruptcy entity" and whether MMA Funding meets that standard.

However, the Remand Opinion's citation to *United* does clarify to some extent analysis to be used in this case. The parties have not suggested that a formalist or functionalist standard of judging the legitimacy of a bankruptcy remote entity would conflict with the text or policy of the Bankruptcy Code. Therefore, the analysis must begin with state law. All loans backed by securitization of assets deprive creditors of assets in a future bankruptcy. As noted by one author, the fact that "[t]he securitization structure has no purpose and no substantial effect other than to effect a waiver of [bankruptcy rules and rights]. . . ." *True Sale, infra* at 559. But it can hardly be argued that all secured loans are subject to attack for that reason. Without any violation of bankruptcy law having been shown analysis of state law is required.

The Trustee argues that Illinois law is consistent with *United* and other cases where the judge looked to substance over the form of the transaction and cites *Reese v. Melahn,* 53 Ill.2d 508, 513, 292 N.E.2d 375 (1973) ("the substance of the transaction, and not the form, is to be regarded in the determination of the rights of the parties. . . . It is the nature of the enterprise undertaken that controls, not the form of the agreement.") (*quoting Ditis v. Ahlvin Constr. Co.,* 408 Ill. 416, 425, 97 N.E.2d 244 (1951); *Pielet v. Hiffman,* 407 Ill. App.3d 788, 798, 350 Ill.Dec. 18, 948 N.E.2d 87 (1st Dist.2011); and *Central Prod. Credit Ass'n v. Hans,* 189 Ill.App.3d 889, 909, 137 Ill.Dec. 302, 545 N.E.2d 1063 (2d Dist.1989) ("Courts will disregard names and penetrate disguises to determine the substance of the act or transaction and will not be misled by devices and subterfuges.")). Although none of these cases involve the sale of receivables, they are indicative of the functionalist approach used by Illinois courts in examining economic transactions. Unfortunately, these cases do not suggest a test by which it can be determined whether MMA Funding, LLC was functionally a bankruptcy remote entity. To formulate such a test analysis should begin with a description of the entity and its function.

*What is a Bankruptcy Remote Entity?*

No authoritative precedence or statute appears to exist for bankruptcy remote entities. Some courts have accepted the existence of "bankruptcy remote" entities, and typically rely on outside commentary and literature as to the characteristics of those entities. *See, e.g., In re General Growth Properties, Inc.,* 409 B.R. 43, 49 (Bankr.S.D.N.Y.2009) (citing David B. Stratton, *Special–Purpose Entities and Authority to File Bankruptcy,* 23–2 AM. Bankr.Inst. J. 36 (March 2004); Standard and Poor's, *Legal Criteria for Structured Finance Transactions* (April 2002)); *In re LTV Steel Co. Inc.,* 274 B.R. 278, 280 (Bankr.N.D.Ohio 2001); *Roseton OL, LLC v. Dynegy Holdings Inc.,* C.A. No. 6689–VCP, 2011 WL 3275965, at *4–5, 2011 Del. Ch. LEXIS 113, at *12–15 (Del.Ch. July

29, 2011) (citing 1 Com. Real Estate Forms 3d § 4:2, and Drafter's Note).

▮▮▮▮ Although a "bankruptcy remote entity" is not defined in the Bankruptcy Code or other statute, it is recognized in the business world and literature as a structure designed to hold a defined group of assets and to protect those assets from being administered as property of a bankruptcy estate in event of a bankruptcy filing. Comm. Bankr.& Corp. Reorganization of Ass'n of Bar of N.Y.C., *Structured Financing Techniques,* 50 Bus. Law. 527, 528–29 (1995). A form of structured finance used in asset securitization, the idea is to separate the credit quality of identified assets upon which financing is based from the credit and bankruptcy risks of any entity involved in the financing. *Id.* at 529.

In practice, a company that wants to obtain financing through a securitization transaction begins by identifying assets, such a receivables, that can be used to raise funds. Steven L. Schwarcz, *The Alchemy of Asset Securitization,* 1 Stan. J.L. Bus. & Fin. 133, 134 (1994). The company that owns the receivables is called the "originator." *Id.* at 135. After identifying assets, the originator transfers the receivables to a newly formed special purpose vehicle or entity ("SPE"). *Id.* The transfer is intended to separate the receivables from risk associated with the originator, typically through a "true sale" of those receivables to the SPE. *Id.* The term "true sale" may include any given transfer depending on whether accounting, tax, or bankruptcy treatment applies, each of which proscribes different criteria. *Id.* n. 8.

A "bankruptcy remote special purpose vehicle" is an entity that is unlikely to become insolvent as a result of its own activities and that is intended to be insulated from the consequences of another par-

ty's bankruptcy. *Id.* at 533. One academic source suggests a few requirements for creating a bankruptcy remote entity. First, the transfer of assets that are the basis of the financing must be a "true sale," an actual sale, as opposed to a transfer of interests in assets that serve as collateral for a loan. *Id.* This transfer should be structured so that the originator retains no legal or equitable interests in the assets following transfer. *Id.* Second, the activities and relationship with the originator should be structured so that the special purpose vehicle's assets should not appear to be among assets of the originator and therefore relied on by creditors in event of the originator's bankruptcy. *Id.* Usually counsel for the borrower is asked for an opinion as to each of these concerns as a prerequisite to financing. *Id.* at 537.

To function properly, the purportedly remote entity must be legally separate from all related entities so that its property can be distinguished from property of a bankruptcy estate as defined in the Code in 11 U.S.C. § 541. The entity, if actually created, is a type of special purpose vehicle that holds the isolated assets being financed. *Id.*

The ALI–ABA Course of Study Materials cited in the Remand Opinion explains how special purpose vehicles ("SPVs") can be "bankruptcy proofed." Kenneth N. Klee & Brendt C. Butler, *Asset–Backed Securitization, Special Purpose Vehicles and Other Securitization Issues,* ALI–ABA Course of Study Materials SJ082 (June 2004). Recognizing that an SPV can never be fully shielded from the prospect of bankruptcy, the ALI–ABA materials nevertheless provide guidance on how to enhance the chance of a bankruptcy remote entity being recognized. Those materials suggest that treatment of the "remote" and original entities as if they were

substantively consolidated can be avoided if:

> ... the organizational documents ... require that the [special purpose vehicle] maintain all corporate formalities, such as maintaining separate books and records, maintaining separate accounts, preparing separate financial statements, avoiding commingling of its assets with those of any other person, acting solely in its own corporate name and through its own officers and agents, and conducting only arm-length transactions with affiliated entities.

*Id.*

One tactic in bankruptcy-proofing a special purpose vehicle is to limit the purpose and activities of the SPV to the purchase and ownership of securitized assets and any other functions related to these functions. According to Professor Plank, limiting the entity's functions is intentional— "because there should be no other activities or significant debt, the SPE [special purpose entity] will not have creditors other than the holders of the asset-backed securities." Thomas E. Plank, *The Security of Securitization and the Future of Security,* Cardozo L.Rev. 1655, 1665 (2004).

In other published commentary relied on by this court and the District Court Judge after the initial trial, Professor Plank discussed the trend of precedent to disregard the express form of a transaction when the substance of the transaction does not match that form. Thomas Plank, *The Security of Securitization and the Future of Security,* Cardozo L.Rev. 1655, 1683 (2004). While he opined that courts are correct to collapse a sale transaction where the seller retains all of the benefits and burdens of ownership, he argued that securitization transactions similar to the one in this case should be viewed differently because of the process that isolates assets sold from the seller's other assets. *Id.* at 1684.

It was suggested by this Court in the Memorandum Opinion on the Trustee's Motion for Summary Judgment that the Remand Opinion appeared to imply a broader standard for testing the legitimacy of purported bankruptcy-remote entities. This Opinion indicated that other "usual attributes" of a bankruptcy remote entity might be lacking in this case. *Paloian,* 619 F.3d at 696 (quoted *supra* ). According to one commentator, some aspects of the Remand Opinion expanded prior case law on issues of corporate separateness. Debora Hoehne, *Has Bankruptcy Remoteness Become, Well, More Remote in the Seventh Circuit?,* Bankruptcy Blog, http:// http://business-finance-restructuring.weil. com (last visited Oct. 31, 2011). Ms. Hoehne wrote that special purpose entities do not often send out correspondence, so they may not need their own stationary. But, these entities typically segregate their funds in separate accounts. She also notes that bankruptcy remote vehicles are sometimes part of a consolidated group for purposes of financial reporting and filing tax returns (LaSalle did not establish that this such occurred in this case). Finally, she notes that when the transferor of a financial asset holds the equity in a special purpose vehicle it does not always receive the purchase price in cash but instead may receive a combination of subordinated notes and cash. It was not clarified in the Remand Opinion whether a cash purchase sale is required to find the bankruptcy-remote entity separate from the transferor of assets.

Following remand, LaSalle essentially contested the Remand Opinion's list of attributes required to be a "legitimate bankruptcy remote entity." It did so' through testimony of individuals involved in the Daiwa Loan transaction, each with exten-

sive experience in the securitization industry. LaSalle also offered as argument the report of an expert in securitization, Craig Wolson, who described his understanding of the usual attributes of a bankruptcy remote entity. LaSalle's evidence and argument gives reason to more fully consider the Remand Opinion's understanding of the "usual attributes" of a "legitimate bankruptcy remote entity."

### Benefits of SPEs

The Remand Opinion questioned any use of a bankruptcy remote structure, commenting that:

> [T]he interests of [ ] outside creditors can't be ignored. The bankruptcy and district judges observed that treating MMA Funding as a bankruptcy-remote vehicle allowed Daiwa and Nomura to charge lower rates of interest—which is true enough but overlooks the fact that, if some creditors are protected from preference-recovery actions and thus can charge lower interest, other creditors bear higher risk and must charge higher interest. The net effect for operating firms is unclear.

619 F.3d at 696.

However, any tools for securitization of debt has several economic benefits including stimulating loan supply, increasing the liquidity, allowing a broader range of investors to access a class of assets usually limited to banks and, and increasing risk diversification. Ugo Albertazzi et al., *Securitization is Not That Evil After All*, BIS Working Papers, Bank for International Settlements (March 2011); Faten Sabry & Chudozie Okongwu, *Study of the Impact of Securitization on Consumers, Investors, Financial Institutions and the Capital Markets*, American Securitization Forum (June 17, 2009). Securitization of good collateral may often reduce interest rates.

Securitization has experienced substantial growth since 1998 when $488 billion of residential mortgage-backed securities, commercial mortgage-backed securities, and securities backed by auto loans were issued. That amount grew to $1.27 trillion in 2006. There was also a growth in use of securitization transactions involving credit card receivables, student loans, and equipment leases among others.

The most oft-cited benefit to these structures is that SPEs are able to receive financing at a lower interest rate than the originator of the receivables. The lower interest rate is a consequence of several factors. First, the credit rating of an SPE is generally higher than its parent because the PSE holds only one isolated asset and does not have any debt whereas the parent may already have various obligations to different lenders. Forrest Pearce, *Bankruptcy Remote Special Purpose Entities and a Business's Right to Waive Its Ability to File for Bankruptcy*, 28 Em. Bankr. L.J. 505, 526 (2012). Thus, it is easier for the SPE to attract investors and borrow at lower rates than the parent. *Id.*

Second, by virtue of its "bankruptcy remoteness," the SPE is designed to avoid the so-called "Bankruptcy Tax." Kenneth C. Kettering, *True Sale of Receivables: A Purposive Analysis*, 16 ABI L.R. 511, 555 (2008). When a borrower becomes a debtor in a bankruptcy case, the bankruptcy process can involve risks to a secured lender, even when its liens and security interests in the assets of its borrower are properly perfected and non-avoidable. *Id.*; (Def's Post–Trial Brief on Non–Solvency Issues, Ex 1 thereto ¶ 2.8) Such risks flow from the "automatic stay," restricting the ability of a secured lender to obtain repayment or to realize the value of the lender's collateral, and can include the borrower's right to use or sell the lender's collateral during the bankruptcy case and delayed repayment of the lender's loans. The secured lender also incurs additional expense

in protecting its interests in the bankruptcy case. By minimizing these risks, the lender can provide lower cost loans to SPEs.

Professor Schwarcz of Duke University School of Law attempted to examine the net effect of the use of BREs in his law review article *Securitization Post–Enron.* 25:5 Cardozo L.R. 1539, 1553–1573. Professor Schwarcz concluded that securitization is both fair and efficient. *Id.* at 1575. He further concluded that securitization enables companies to obtain low-cost financing, provides liquidity for otherwise viable companies unable to obtain financing, and all without prejudice to third parties, such as unsecured creditors. *Id.*

### Treatment of SPE's in the Courts

Although there are a number of opinions referencing bankruptcy remote entities or special purpose vehicles, there are few opinions dealing with the question of whether a particular BRE is validly composed.

For example, in *In re General Growth,* the parent corporation, General Growth, indirectly owned and managed over 200 shopping malls throughout the United States via hundreds of subsidiaries, many of which were organized as BREs. *In re General Growth Properties, Inc. et al.,* 409 B.R. 43, 47–48 (Bankr.S.D.N.Y.2009). The corporation was structured this way because it financed its operations by organizing the subsidiaries as bankruptcy-remote SPEs. When General Growth filed for bankruptcy, it brought those entities into its bankruptcy estate to the surprise of creditors who made loans to those entities on the assumption that they would remain bankruptcy remote. Also troubling was the fact that many of the SPEs were allowed to enter bankruptcy even though they had positive cash flows and no imminent risk of default. Arthur J. Steinberg & Scott I. Davidson, *Bankruptcy Remote*

*Entities: Not as Remote as You May Think,* N.Y.L.J., Nov. 18, 2009, at 4. Troubling to many was also the fact that the independent managers of most of the SPEs were replaced prior to the bankruptcy filings by new independent managers selected by General Growth without knowledge of the SPE's lenders. *Id.* at 67–68.

Following the bankruptcy filings, several creditors filed motions in *General Growth* to dismiss their borrower's bankruptcy cases on the ground that the cases had been filed in "bad faith." *Id.* at 46. The creditors argued that the cases had been filed prematurely because the SPEs were not in financial distress or in need of relief from the Bankruptcy Code. *Id.* at 57. The creditors also argued that the independent managers were replaced improperly on the eve of bankruptcy before negotiations could take place. *Id.* at 67.

The *General Growth* Opinion has been cited as calling into question the effectiveness of bankruptcy remote entities. Nevertheless, the Bankruptcy Judge opined that he had done no real violence to the bankruptcy-remote structure of the SPEs and that "[t]he salient point for purposes of these Motions is that the fundamental protections that the Movants negotiated and that the SPE structure represents are still in place and will remain in place during the Chapter 11 cases. This includes protection against the substantive consolidation of the project-level Debtors with any other entities. There is no question the principal goal of the SPE structure is to guard against substantive consolidation. . . ." *Id.* at 55. That statement has been of little comfort to participants of SPE transactions. Bankruptcy-remote entities are designed to avoid bankruptcy filings. If an SPE enters bankruptcy under the reasoning of *General Growth,* the fact that other aspects of the structure

survive is of little help. Richard F. Hahn & Maureen A. Cronin, *Court Denies Motions to Dismiss Bankruptcies of General Growth Special Purpose Entities: Are Bankruptcy–Remote Entities in Fact Bankruptcy–Remote?*, Debevoise & Plimpton Client Update, Sept. 11, 2009.

The Bankruptcy Judge denied the Motions to Dismiss in the bankruptcy case in *General Growth* because the creditors had failed to demonstrate the filings were made in bad faith. *Gen. Growth*, 409 B.R. at 72. In reaching that conclusion, the Bankruptcy Judge held that SPEs could consider the interests of the corporate group it is a part of in addition to its own interests. *Id.* at 50–51. The Bankruptcy Judge further rejected the creditors' argument that the SPE's failure to negotiate with their lenders constituted "bad faith." *Id.*

*General Growth's* disregard for the corporate separateness of the SPEs was significant. The Bankruptcy Judge explicitly stated that consideration of the corporate group's financial distress was enough to rebut the creditor's argument that the SPEs did not need bankruptcy protection. Even though the Bankruptcy Judge did not apply the law of substantive consolidation, he did view the entities as intimately connected and held that each SPE was justified in considering not only its own need for restructuring, but also the financial distress of the company as a whole. He reasoned that while the SPE structure was intended to insulate the financial position of each SPE, the creditors should have known that, given General Growth's integrated corporate structure, the financial situation of the parent would impact the SPEs. Brian M. Resnick & Steven C. Krause, *Not So Bankruptcy–Remote SPEs and* fn re General Growth Properties, Inc., 28–8 A.B.I.J. (2009). General Growth used an integrated cash management structure that commingled the income of many SPEs. William McInerney, *From Bankruptcy–Remote to Risk–Remote*, N.Y.L.J. (Aug. 23, 2010). The interactions between General Growth and the SPEs undermined the autonomy of those SPEs. In addition to commingling funds, General Growth also regularly made unsecured intercompany loans. *Id.*

**The Remand Opinion Did Not Call for Substantive Consolidation**

■ The Remand Opinion used in its reasoning some factors often considered in cases determining whether corporate entities should be substantively consolidated. In deciding whether two entities should be consolidated in bankruptcy, for example, opinions have examined at a variety of issues including: compliance with corporate formalities, separateness of decision-making, separateness of operations (including offices and financial statements), possession of assets, and whether the entities acted at arms-length in their dealings. Comm. Bankr.& Corp. Reorganization of Ass'n of Bar of N.Y.C., *Structured Financing Techniques*, 50 Bus. Law. 527, 560 (1995).

■ The Remand Opinion did not require substantive consolidation, and as that Opinion did not use language or cite to case precedent on the subject. *See* Aaron R. Cahn et al., *When Assets are "Sold" to Special Purpose Entities; Seventh Circuit Sheds Light on When Transaction May be Considered a Loan*, N.Y.L.J. (Dec. 13, 2010), *available at* http://www.newyorklawjournal.com/PubArticleNY.jsp?id=1202476011056. Substantive consolidation: "Substantive consolidation is the merger of separate entities into one entity so that the assets and liabilities of both entities may be aggregated in order to effect a more equitable distribution of property among creditors." *In re Baker & Getty Fin. Svs.,*

*Inc.,* 78 B.R. 139, 141 (Bankr.N.D.Ohio 1987).

■■■■■ Substantive consolidation is an extraordinary remedy because it affects the substantive rights of parties. Substantive consolidation is evaluated on a case-by-case basis and is fact-intensive. *Chemical Bank N.Y. Trust Co. v. Kheel,* 369 F.2d 845, 847 (2d Cir.1966). Inquiry when consolidation is sought generally focuses on the structure of entities to be consolidated, their interrelationship and their relationship with creditors and other third-parties. Courts have also focused on the impact of consolidation upon creditors of the entities to be consolidated and balance whether the creditors would be unfairly prejudiced or treated more equitably by substantive consolidation. *In re Augie/Restivo Baking Co. Ltd.,* 860 F.2d 515, 518 (2d Cir.1988)

■■■■ Opinions have recognized many factors in deciding whether substantive consolidation is proper. Under one test, articulated by Second Circuit Panel in *In re Augie/Restivo Baking Co. Ltd.,* 860 F.2d 515 (2d Cir.1988) the inquiry focuses on "whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit" or "whether the affairs of the debtors are so entangled that consolidation will benefit all creditors." The Third Circuit adopted a variation of that test in *In re Owens Corning,* 419 F.3d 195 (3d Cir. 2005).

■■■■ An alternative test, adopted by the District of Columbia Circuit in *Drabkin v. Midland–Ross Corp. (In re Auto–Train Corp.),* 810 F.2d 270 (C.A.D.C.1987) focuses on whether the economic prejudice of continued debtor separateness outweighs the economic prejudice of consolidation. The main difference between the *Auto–Train* reasoning and that in *Au-*gie/Restivo and *Owens Corning* is that *Auto–Train* creates the possibility of consolidation to avoid "economic prejudice," whereas the other tests focus on whether creditors relied on corporate separateness. Felton E. Parrish, *Feature: Paloian v. LaSalle Bank N.A.: Just How Remote Is that Bankruptcy–Remote Entity?,* K & L Gates (Feb. 2011).

None of the foregoing considerations were discussed in the Remand Opinion.

TRUE SALE

The Remand Opinion remanded the question of whether "there was a bona fide sale of accounts receivable from the Hospital to MMA Funding." *Paloian v. LaSalle Bank, N.A.,* 619 F.3d at 696. As earlier noted herein, "[i]f the transfer is a true sale the assets transferred should not be considered assets of the estate of the transferor under 11 U.S.C. § 541, and the transfer should not be subject to revocation as a fraudulent conveyance." *In re Doctors Hosp. of Hyde Park, Inc.,* 463 B.R. 93, 112 (Bankr.N.D.Ill.2011). In remanding the "true sale" question, the Remand Opinion noted that in a typical true sale the purchaser makes an upfront payment to purchase assets from the seller, assumes management of the assets, and makes a profit or loss, as the case may be, depending on how much value it can extract from the assets. *Paloian,* 619 F.3d at 696. The Remand Opinion concluded that the record did not indicate that MMA Funding, LLC ever actually purchased the Hospital's receivables for any particular price. Instead, that Opinion opined based on the record then presented that MMA Funding, LLC merely received a small portion of the proceeds of the receivables to cover its operating expenses. Moreover, the Hospital continued to carry the receivables on its books as assets.

### Requirements for a "True Sale"

██ As noted above, an SPE will own the financial assets only if the transfer of those assets from the originator of the SPE constitutes a "true sale." The Bankruptcy Code does not define "true sale"[16] and so presently, the matter of sale characterization is largely governed by state law.[17] Although the Bankruptcy Code does create a bankruptcy "estate" that includes "all legal or equitable interests of the debtor in property as of the commencement of the case," courts generally must look to non-bankruptcy law in order to determine whether and to what extent property of the debtor exists. *Butner v. United States*, 440 U.S. 48, 59, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). "Under the common law of most states, transfers of property—particularly property such as financial assets that are transferred in arm's length securitization deals—even though characterized as sales and made in exchange for reasonably equivalent value, may, in limited cases where the economic risks and rewards of the transferred asset are retained by the transferor, be re-characterized as secured loans." Steven L. Schwarcz, *Securitization Post–Enron*, 25:5 Cardozo L.R.1539, 1544–55 (2004). No Illinois cases could be found re-characterizing a "sale" as a "secured loan." However, both parties treat decisions from other jurisdictions as relevant to this dispute and

have not argued that Illinois law differs on the subject of "true sales."

A "true sale" is a crucial step in the formation of a valid BRE because "[o]nce formed, the new entity will take title to the [ ] property that serves as collateral for the loan. Transferring the [ ] property collateral to the newly formed entity accomplishes the goal of separating the [ ] property collateral from the bankruptcy risks of its prior owner." Adam B. Weissburg & John Matthew Trott, *Special Purpose Bankruptcy Remote Entities*, Los Angeles Lawyer (January 2004).

Article 9 of the Uniform Commercial Code ("U.C.C.") covers the sale of the rights to payments, including receivables, but does not state any rule on whether a given transfer should be characterized as a sale or grant of security interest. *True Sale, supra* 515. The comments note this omission and state that the subject is left to the courts. U.C.C. § 9–109 cmt. 4 (2007). The most guidance Article 9 provides is a comment that a transfer with recourse to the seller is not necessarily inconsistent with a "true sale." *True Sale, supra* at 515. According to Kenneth Kettering, Associate Professor at New York Law School:

> The courts thus have been on their own in true sale analysis, and they have not

**16.** An amendment to the Bankruptcy Code introduced in 1999 and again in 2001 but not passed would have declared assets securitized by the debtor pre-bankruptcy to be outside of the bankruptcy estate if certain conditions were met. Bankruptcy Reform Act of 2001, S. 220, 107th Cong. § 912 (2001); H.R. 333, 107th Cong. § 912 (2001); *see also True Sale, supra* at 517. The Senate Report to the proposed 1999 amendment stated the change was designed to "protect[ ] asset-backed securitization transactions from legal uncertainties and disruptions related to the bankruptcies of certain parties and allows for the further development of structure fi-

nance." S.Rep. No. 106–49 (1999); Comm. on Bankr.& Corp. Reorganization of Assoc. of the Bar of City of New York, *New Developments in Structured Finance*, 56 Bus. L. 95, 181 (Nov. 2000).

**17.** At least nine states, not including Illinois, have amended their state's Uniform Commercial Code to prohibit re-characterization of a sale of receivables absent "fraud or intentional misrepresentation." *See, e.g.,* La.Rev.Stat. Ann. § 10:9–109(e) (2002); Tex. Bus. & Com. Code Ann. § 9.109(e) (Vernon 2002); Del. Code Ann. Tit. 6, §§ 2701A–2703A (2005).

fared well.... [C]ourts generally proceed as they did in the early days of true lease adjudication: namely, they make an intuitive judgment about the similarity of the transaction in question to the court's notion of an ideal sale (lease) or ideal secured loan (sale with retained security interest), based on an ad hoc selection of factors that strike the court as relevant in the particular case.

*Id.* It is rare that any one factor has dictated characterization of a given transaction as a loan or a sale. Robert D. Aicher & William J. Fellerhoff, *Characterization of a Transfer of Receivables As a Sale or a Secured Loan Upon Bankruptcy of the Transferor,* 65 Am. Bankr.L.J. 181, 186 (1991).

■ According to one scholar, the assets transferred should not be considered assets of the estate of the transferor under 11 U.S.C. § 541, and the transfer should not be subject to revocation as a fraudulent conveyance, if the transfer meets the criteria for a "true sale" described below. Under foregoing authority, to create a "true sale," the parties must take steps to evidence that an actual sale is intended and carried out in detail as required by applicable law. The reviewing court will look to the substance of the transaction, rather than the form. Therefore, it is important to focus on whether the transaction is arms length and commercially reasonable as well as in proper form and subsequent acts actually treat the sale as real.

■ In ruling on the Trustee's Motion for Summary Judgment, it was earlier herein stated that to create a true sale, the parties must take steps evidencing that a true sale is intended. (02 A 00363, Dkt. No. 748) A court must look to the substance of the transaction as well as to its form. Comm. on Bankr.And Corp. Reorganization of the Assoc. of the Bar of the City of N.Y., *Structured Financing Techniques,* 50 Bus. Lawyer 527, 542 (1995). In general, review focuses on the economic substance of the transfer, particularly whether sufficient indicia of ownership of the assets shifted from the seller to the special purpose entity; giving less weight to labels attached to the transaction by the parties. *Id.* Therefore, it is important to focus on whether a transaction was at arms'-length and commercially reasonable.

■ Typically, the issues involved in determining whether a true sale occurred include:

- *Recourse:* Whether, considering the nature and extent of the recourse, direct and indirect against the transferor, the risk of loss is transferred to the SPE. The originator must retain little if any of the benefits and burdens of owning the receivables. If the originator retains too much risk or benefit from the receivables and later becomes a debtor in bankruptcy, there is a risk that the receivables will be included in the bankruptcy estate. *See, e.g., Fireman's Fund Ins. Co. v. Grover (In re Woodson Co.)* 813 F.2d 266, 269 (9th Cir.1987).

- *Post-transfer control over the assets and administrative activities:* Whether the transferor is permitted to service or collect the assets but must be removed if it defaults on those duties.

- *Accounting Treatment:* Whether the transfer must be treated as a sale on the transferor's books.

- *Adequacy of Consideration:* Whether the transaction is at arms'-length for adequate consideration (full market value) received by the transferor.

- *Parties intent:* Whether the documents reflect statements that the parties intend a sale.

*Structured Financing Techniques, supra* at 542; *see also* Sheryl A. Gussett, *Bankruptcy Remote Entities in Structured Financings,* Am. Bankr.L.J. 14 (March 1996) (listing recourse, post-transfer control; accounting treatment; adequacy of consideration; and parties intent as relevant factors). Other factors include: a seller's right to surplus collections after the buyer has collected a predetermined amount; the seller's retention of collection and servicing duties; and lack of notice to the account debtor or others of the purported sale. *Home Bond Co. v. McChesney*, 239 U.S. 568, 575, 36 S.Ct. 170, 60 L.Ed. 444 (1916); *NetBank v. Kipperman (In re Commercial Money Ctr., Inc.)*, 350 B.R. 465, 483 (9th Cir. BAP 2006); *In re Evergreen Valley Resort, Inc.*, 23 B.R. 659, 661 (Bankr. D.Me.1982).

█ It appears that neither party in this case disagrees with the view that "true sale" status is dependent on examining multiple aspects of a given transaction. This view is in accord with the *United Airlines* Opinion wherein several factors were analyzed to determine whether the subject transaction was properly characterized a "true lease" or not. In addition to the above-enumerated factors, of course, deference must be accorded the factors identified in the Remand Opinion. Those factors, as already stated, emphasize operational aspects of the transaction. The Trustee focuses his argument on those factors identified in the Remand Opinion while LaSalle also addresses those factors identified in this court's ruling on the Trustee's Motion for Summary Judgment. Neither party argued in favor of any other factor not previously identified and therefore discussion herein will be limited to consideration of the foregoing factors.

**The Transaction Was Made at Arms' Length**

Szilagyi of the law firms Shefsky & Froelich testified that he and his firm were retained to opine on (a) whether the contributions of accounts receivable from the Hospital were true sales or true contributions; (b) if one or more of the related parties to the Daiwa Loan found their way into bankruptcy, whether their assets and liabilities would be substantively consolidated; and (c) whether the contribution of receivables would have violated the provisions for Medicare and Medicaid receivables under federal and state law. (12 Tr. Vol. VII: 1004) Szilagyi testified that he understood that the Shefsky & Froelich Opinion was to be issued in connection with a transaction involving a "true contribution." (*Id.* at 1006–07)

The importance of these types of opinions was noted by one commentator who stated, "[s]ome degree of certainty is essential for the market's functioning because rating agencies and investors customarily require, as a condition of these deals, that counsel opine that the transfer of financial assets should indeed constitute a true sale. This opinion is intended to assure the parties that, in the event of the originator's bankruptcy, the transferred financial assets will be available to pay investors, and not treated as property of the originator's estate. Uncertainty would make it difficult if not impossible to render these opinions." *Securitization Post–Enron, supra* at 1555.

Szilagyi further testified that based on his involvement in the Daiwa Loan; the fact that all interested parties had separate counsel; and the fact that the loan documents and changes thereto were negotiated between the lender and the borrower (and their respective counsel), he had "no reason to believe it [the Daiwa Loan] was not an arms' length transaction." (12 Tr. Vol. VII: 990–91)

The Trustee argues that MMA Funding, LLC was not independent of the Hospital,

the entity that generated the receivables, or from Desnick, the owner of that entity because MMA Funding, LLC was 99% owned by the Hospital and 1% by Medical Management of America, Inc., both of which were owned and controlled by Desnick. (New Def. Ex. 82, ¶¶ 10, 12) According to the Trustee, this lack of independence was one of the Remand Opinion's primary concerns. However, Desnick's mere ownership interest is not enough to establish that the transaction was not made at arms'-length when there is evidence showing that the interests of each entity were separately represented. *See Old Orchard Urban Limited P'ship v. Harry Rosen, Inc.,* 389 Ill.App.3d 58, 328 Ill.Dec. 540, 904 N.E.2d 1050, 1061 (2009) (veil piercing case); *Forsythe v. Clark USA, Inc.,* 224 Ill.2d 274, 309 Ill.Dec. 361, 864 N.E.2d 227, 239 (2007) (stating, in a veil piercing case, "[t]he Court acknowledged the ' "well established principle [of corporate law] that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership." ' "). In addition, Desnick's activities were separately ratified by MMA Funding, Inc.'s and the Hospital's board of directors. Findings Nos. 143, 148, 225–27.

**The Hospital Received Consideration for Transfer of Its Receivables**

■ The Remand Opinion could not find any evidence that the Hospital received cash proceeds from its contribution of the receivables in the amount of $6.523 million that was disbursed to Grand National Bank to pay off a loan to the Hospital from First National Bank of Northbrook. *Paloian v. LaSalle Bank N.A., Ass'n,* 619 F.3d 688, 696 (7th Cir.2010) As recognized in one opinion, such a payoff was the "equivalent of paying a fixed price in money." *CB Richard Ellis Real Estate Svs., Inc. v. Spitz,* 950 A.2d 704, 713

(D.C.App.2008) The *CB Richard Ellis* Opinion relied in part on a statement in a Supreme Court Opinion that, although a tax decision, nevertheless recognized that "[a] sale, in the ordinary sense of the word, is a transfer of property for a fixed price in money or its equivalent." *Comm'r v. Brown,* 380 U.S. 563, 571, 85 S.Ct. 1162, 14 L.Ed.2d 75 (1965). Under Illinois law, the term "sale" is "broad enough to include the transfer of property for any sort of valuable consideration including the extinguishment of debts." *Blackhawk Hotel Assoc. v. Kaufman,* 80 Ill.App.3d 462, 35 Ill.Dec. 875, 400 N.E.2d 12, 15 (1980) *reversed on other grounds at* 85 Ill.2d 59, 51 Ill.Dec. 658, 421 N.E.2d 166 (1981). Therefore, payoff of the Hospital's old $6–plus million loan is fairly labeled as valuable consideration. Furthermore, the record shows that the Hospital also received approximately $1.371 million in cash that was wired from MMA Funding, LLC's account and then distributed to the Hospital. (New Def. Ex. 22)

LaSalle contends that a balance sheet was prepared in connection with the closing of the MMA Funding, LLC Loan on March 31, 1997 that showed MMA Funding, LLC's assets (including the value of the Receivables) and liabilities, and a closing statement shows that proceeds of the MMA Funding, LLC Loan were wired to a bank account maintained by MMA Funding, LLC at Grand National Bank on that date. (New Jt. Exs. 20, 22)

**MMA Funding, LLC Had No Recourse to the Hospital If the Receivables Were Not Collectible**

Several opinions have considered recourse to the seller for nonpayment of the transferred assets to be suggestive of a loan rather than a sale. Such recourse can take the form of a repurchase obligation or a guaranty of collectability by the seller,

among other forms. *Characterization of a Transfer, supra* at 186. Some courts will characterize a transaction as a loan when there is recourse involving repurchase obligations. *Major's Furniture Mart v. Castle Credit Corp.,* 602 F.2d 538, 546 (3d Cir.1979); *Ables v. Major Funding Corp. (In re Major Funding Corp.),* 82 B.R. 443, 448 (Bankr.S.D.Tex.1987). Others will not find a true sale where the seller obtained a guaranty of collectability. *Fireman's Fund Ins. Cos. v. Grover (In re Woodson),* 813 F.2d 266, 271 (9th Cir.1987); *Castle Rock Indus. Bank v. S.O.A. W. Enterprises (In re S.O.A. W. Enterprises),* 32 B.R. 279, 282–83 (Bankr.W.D.Tex.1983).

On the other hand, one opinion distinguished warranties of collectability from warranties as to quality or validity. That Opinion stated that presence of warranties as to quality or validity might be consistent with true sale treatment. *Major's Furniture Mart v. Castle Credit Corp.,* 449 F.Supp. 538, 543 (E.D.Pa.1978). The Opinion declined to adopt a per se rule requiring loan treatment whenever recourse of any kind was present. *Id.* Rather, it cited comment 4 to section 9–502 of the U.C.C. that provides that "there may be a true sale of accounts although recourse exists." *Id.* at 542.

At least one court has considered when a transferee has a right of recourse that it should consider the nature of the alleged recourse. As noted by a 10th Circuit Opinion:

> "Recourse" refers only to the liability of a seller of receivables to the purchaser if the underlying obligors fail to pay the receivables. A seller disclaims this liability, known as "credit liability," by selling the receivables "without recourse." However, although the sale of receivables "without recourse" releases the seller from liability in case of the debtor's insolvency, the seller retains liability

for breach of warranty, or "warranty liability."

*LifeWise Master Funding v. Telebank,* 374 F.3d 917, 925 (10th Cir.2004) (citations omitted); *see also Structured Financing Techniques,* 50 Bus. L. 527, 545 (1995) ("[w]arranties relating to title, validity, and eligibility of receivables (as opposed to collectability of receivables) normally do not have a loss recourse component. Rather, warranties of that nature assure that what is being sold conforms to the specifications between the parties.")

In this case, LaSalle argues that the risk of loss on the receivables was shifted from the Hospital to MMA Funding, LLC under terms of the Contribution Agreement. However, that Agreement did not provide recourse by MMA Funding, LLC to the Hospital with respect to the receivables if the underlying obligors did not pay, nor did the Contribution Agreement permit or require the Hospital to repurchase or substitute other receivables or property if the obligors did not pay. Accordingly, neither the Contribution Agreement nor the other transaction documents give rise to concerns expressed by courts that view recourse to a purported seller as indicating that the substance of the transaction is a financing.

Article IV of the Contribution Agreement ensured that receivables when transferred had characteristics required by Daiwa on the date of their transfer to MMA Funding, LLC. The Hospital's obligations under that provision would arise only where the Hospital breached a representation or warranty as to the quality or character of the receivables, not to their collectability. According to Wolson, these provisions are commonly found in securitization transactions but should not be considered a form of recourse, (Def.'s Post–Trial Brief on Non–Solvency Issues, Ex. 1 ¶ 3.3(iii))

The Trustee argues that the Hospital retained the benefits and burdens of the receivables, as demonstrated by the fact that "[i]f the accounts were not collected, Daiwa was still entitled to collect from MMA Funding, LLC all advances made pursuant to the [Daiwa Loan Agreement]." That did not constitute recourse to the Hospital.

Further, the Trustee incorrectly assigns significance to the fact that Daiwa's obligation to lend to MMA Funding, LLC terminated on the insolvency of the Hospital. The provision relied on for this contention simply recognized that MMA Funding, LLC would in that event cease to own receivables pursuant to which loan advances could me made.

For these reasons, there was recourse to the Hospital.

**The Hospital Lost Control of the Receivables Even Though it Serviced Them**

Among the indicia called for by the Remand Opinion is the requirement that a BRE "must manage its own accounts for its own benefit." *Paloian,* 619 F.3d at 695. Some courts have stated that a seller's continued servicing of transferred accounts suggests a loan rather than a sale. For example, in *Petron Trading Co. v. Hydrocarbon Trading & Transport Co.,* 663 F.Supp. 1153, 1159 (E.D.Pa.1986), the District Judge found no absolute assignment of contract payment rights where the assignor prepared the invoices for contract payments. That Judge was also persuaded by the fact that the assignor did not notify the account debtor of the assignment and also retained rights under the contract to ask the account debtor for price adjustments. *Id.*

Particularly problematic in cases involving seller as servicer have been situations where the seller commingled account proceeds with operating funds. *Southern Rock, Inc. v. B & B Auto Supply,* 711 F.2d 683, 685 (5th Cir.1983). In *Ables v. Major Funding Corp.,* the Bankruptcy Judge found a loan rather than a sale when, in addition to recourse to the seller, the seller commingled payments from mortgage repayments and investors. 82 B.R. 443, 448 (Bankr.S.D.Tex.1987).

One 9th Circuit Opinion concluded that a mortgage broker's continued servicing of mortgage payments pursuant to an agreement evidenced a sale when the agreement included a separate collection agent fee. *Bear v. Coben (In re Golden Plan of Calif., Inc.),* 829 F.2d 705, 709 (9th Cir.1986). That Opinion concluded that the transaction was a sale. *Id.* at 707.

MMA Funding, LLC did not service and collect the Receivables. Pursuant to Section 1.05(b) of the Contribution Agreement, MMA Funding, LLC appointed the Hospital as the "Primary Servicer" of the Receivables and pursuant to Section 1.05(c) the Hospital received a separate fee for its work as "Primary Servicer."

For duration of the Daiwa Loan, the Hospital's CFOs sent borrowing base certificates to Daiwa in order to request an advance of funds. (New Jt. Ex. 23) Some of those borrowing base certificates, including one in the Daiwa Loan closing documents, were signed by the CFO as an officer of the Hospital. (New Pl. Exs. 5–7) Although most of the borrowing base certificates bore the name "MMA Funding, LLC" below the signature of the Hospital's CFO signing the document, none of those CFOs were officers or employees of MMA Funding, LLC. (New Pl. Ex. 41, at 39–44) Rather, they were at all relevant times officers and employees of the Hospital. (*Id.*)

The latter arrangement was inconsistent with the MMA Funding, LLC Operating Agreement, which specified that the entity would have no employees. (New Jt. Ex.

54, Art. III § 2) Robinson testified that MMA Funding, LLC was never intended to be an operating company. (New Def. Ex. 82 ¶ 69) Rather, MMA Funding, LLC was limited to owning the receivables that served as collateral for the Daiwa Loan.

The Remand Opinion opined that a BRE should manage its own assets. That concept differs from other case authority on the subject cited above. Unlike those opinions, the Hospital notified insurers that the receivable accounts were transferred to MMA Funding, LLC. *Cf. Petron Trading Co.*, 663 F.Supp. at 1159. Further, there is no indication that the Hospital had any authority to negotiate a change in loan terms with Daiwa in its own name. *Cf. id.* There is also no evidence the Hospital commingled receivables-proceeds with operating income. *Cf. Southern Rock, Inc.*, 711 F.2d at 685. Rather, as in *Bear v. Coben*, MMA Funding, LLC contracted with the Hospital to service the receivables and was to pay a fee for that service. 829 F.2d at 709. The Trustee did not show that this fee was never paid but there was testimony that MMA Funding, LLC never reimbursed the Hospital for expenses incurred in managing the loan. (New Pl. Ex. 41, at 44)

According to ALL–ABA Course of Study Materials on Asset–Backed Securitization,

> In many securitization transactions the Originator acts as servicer of the cash flow produced by the securitized asset. The servicer's role is to monitor the assets and administer the income. It makes sense for the Originator to act as the servicer. Because the Originator initially generate or held the assets, the Originator is in the best position to understand the nature of the assets and how to best service them. Appointing a new servicer could result in increased expense and inefficiency.

*Asset–Backed Securitization, supra* at *4.

In addition, any analysis of whether MMA Funding, LLC managed its own accounts is just another way of asking whether the entity must exhibited control over the transferred asset. What matters greatly is whether the Hospital parted with control over the receivables after March 31, 1997. The evidence shows that to be the case here. After the Daiwa Loan closed, the parties stipulated that cash originating from the Medicare/Medicaid receivables first went to the Account # 6700010129 at Grand National Bank and then swept to another account at Grand National Bank held in Daiwa's name. (New Def. Ex. 82 ¶¶ 159, 194) The latter account also received cash originating from payments made by insurance companies such as Blue Cross and Blue Shield. Funds in Daiwa's account were then swept to another account also held by Daiwa at the Bank of New York. (*Id.*) Desnick testified that after the Daiwa transaction closed, the Hospital lost access to and control of the receivables (New Def. Ex. 143, at 230) and other evidence corroborated that testimony. (Findings Nos. 256–260)

**Operational Separateness**

■ Some of the Remand Opinion's analysis of the legitimacy of MMA Funding, LLC relates to whether that entity was operationally distinct from the Hospital. That analysis is supported by professional literature on BREs, which state that to reduce the risk that the bankruptcy remote structure is collapsed under any of the various theories courts use to disregard the corporate form, the borrower will need to maintain actual "separateness" from related entities. Authority suggest some provisions designed to achieve this goal, but typically they require the borrower to maintain its own separate ac-

counts, books, records, resolutions, and agreements to file its own separate tax returns. Adam B. Weissburg & John Matthew Trott, *Special Purpose Bankruptcy Remote Entities,* Los Angeles Lawyer (January 2004). Generally, the BRE will also need to pay its own liabilities and expenses, including the salaries of its own employees, out of its own funds and assets. *Id.* Furthermore, the BRE's assets must be held in its own name and its funds cannot be commingled with the funds of its parent or other affiliate. *Id.* To the extent any overhead costs are shared with related entities (for example, if there is shared office space with related entities or there are services performed by those entities), the costs should be allocated evenly. *Id.* The BRE will also will need to have separate letterhead and often a separate telephone number, and otherwise make it clear in all communications its separate identity. *Id.* A guaranty of the borrower's obligations to the lender and others by entities related to the borrower can pose a threat to the separateness of the borrower, and any such guaranty will be carefully considered by the lender in light of the risks of substantive consolidation. *Id.*

The separation between the Hospital and MMA Funding, LLC is strongly supported by most evidence as summarized below. Furthermore, as described below, there is no evidence that MMA Funding, LLC ever strayed from the single purpose for which it was formed: to purchase receivables and to be the borrower under the Daiwa Loan.

**Evidence That MMA Funding, LLC Observed Corporate Formalities, Kept Separate Corporate Records, and Had Separate Operations**

The Trustee argues that MMA Funding, LLC did not comply with several of the separateness covenants contained in the Contribution Agreement including its fail-

ure to conduct its business from a separate office, use its own stationary, checks, and business forms, maintain a post office box, and maintain "its own books of account, financial records, computer and operating systems and limited liability company records separate and distinct from the records and systems of other corporations." (New PL Ex. 41, at 25–28) Furthermore, MMA Funding, LLC had no separate phone number and its Board held no meetings. (*Id.* at 44) After the Daiwa Loan closed, no one prepared financial statements for MMA Funding, LLC. (06 Tr. Vol. I: 112)

LaSalle cites a string of documents that it argues show that the Hospital, MMA Funding, Inc. and MMA Funding, LLC did observe corporate formalities. Those documents do establish that each of those entities made the filings required by the Illinois Secretary of State following the March 31, 1997 Loan closing date. (Jt. Ex. 70; New Jt. Ex. 40–42, 46, 48, 51–52, 56–59, 65, 66)

MMA Funding, LLC adopted annual resolutions through the Board of Directors of its manager, MMA Funding, Inc. (New Jt. Ex. 44, 47, 50) Those resolutions approved and ratified Desnick's actions as well as those of his agents. (New Jt. Ex. 44, 47, 50) These ratifications were permitted, in lieu of annual meetings, by the Illinois Business Corporation Act, 805 ILCS 5/7.10, 8.45.

MMA Funding, LLC maintained a separate bank account, Account No. 6700010103, at Grand National Bank from March 31, 1997 through April 2000. Copies of statements for this account for that period were admitted into evidence at the First Trial as Jt. Ex. 57. Those statements show account activity during that entire period.

MMA Funding, LLC's principal place of business was located at 980 N. Michigan

Ave., Suite 1665, Chicago, IL 60611 (*See* New Jt. Ex. 53; New Def. Ex. 143, at 191–93) The MMA Funding, LLC Operating Agreement specified that Andrew Tecson was the registered agent. (New Jt. Ex. 54) Articles of Amendment filed in 1999 changed the registered agent to Seth Gillman and listed his address as 980 N. Michigan Ave, Suite 1665, Chicago, IL. (New Jt. Ex. 56) 980 N. Michigan Ave, Suite 1665, was also the address of Medical Management of America. (*See* New Def. Ex. 93) Gillman testified that he personally observed mail addressed to MMA Funding, LLC delivered to the address on Michigan Ave. (12 Tr. Vol. VIII: 1112) Soleimani testified that SPEs typically share office space with a parent company. (New Def. Ex. 141, at 80) Sharing the space makes sense in the context of MMA Funding, LLC's limited purpose. That entity served its purpose as a vehicle for transmission of receivables from the Hospital and loan advances from Daiwa.

The Trustee makes much of the fact that MMA Funding, LLC submitted loan advance requests using the Hospital's, and not its own, letterhead. The Trustee also relies on the fact that a few of the Borrowing Base Certificates issued in connection with advance requests were executed by the Hospital. However, the vast majority of those certificates were executed by MMA Funding, LLC representatives and did not use the Hospital's letterhead. Hyams testified that Borrowing Base Certificates purportedly submitted by the Hospital would have been a mistake but that such mistakes were somewhat common at the beginning of the lending relationship. (New Def. Ex. 142, at 71–72)

Hyams testified that more important to Daiwa than stationary was that the BRE's representative sign and make the necessary representations. (*Id.* at 101) That testimony was supported by Soleimani, who stated that Daiwa was more concerned with the signature block on the borrower's correspondence than the letterhead. (New Def. Ex. 141, at 63–64)

The Trustee emphasizes the fact that the receivables show up on the Hospital's audited financial statements as an asset of the Hospital, However, the U.C.C. financing statements signed by the Hospital and MMA Funding, LLC indicated to the outside world the true control of the interests in those receivables. (New Jt. Ex. 8; Jt. Ex. 175) According to Wolson, in securitization transactions involving healthcare receivables, "[a] Uniform Commercial Code Financing Statement is filed, as required by Article 9 of the [U.C.C], reflecting the absolute transfer of the receivables to the special purpose entity and putting all existing and future creditors and the rest of the world on notice of the transfer." (Def.'s Post–Trial Brief on Non–Solvency Issues, Ex 1 thereto ¶ 2.6) ("Wolson Report") As explained above, Article 9 of the U.C.C. governs sale of receivables as well as grants of security interests in receivables.

The Trustee also points out that the Daiwa Loan appeared as a liability on the Hospital's audited financial records. However, evidence was presented during the Remand Trial that the Hospital's auditors were made aware of the features of the Daiwa Loan transaction, including the fact that MMA Funding, LLC, and not the Hospital, was the actual borrower. (New Def. Ex. 142, 83–84; New Def. Ex. 39) Furthermore, Robinson testified that he provided KPMG (the Hospital's auditors) with the Daiwa Loan Agreement. (New Def. Ex. 144, at 199) Robinson testified to his belief that KPMG listed the Daiwa Loan as a liability to the Hospital because the auditors believed there to be some sort of parent subsidiary relationship at work. (*Id.* at 19–20)

In *In re Owens Corning,* 419 F.3d 195 (3d Cir.2005), the Third Circuit rejected an argument seeking substantive consolidation because the failure of bank creditors to obtain separate financial statements for each of the individual subsidiary guarantors post-closing demonstrated a lack of separateness. The *Owens Corning* Opinion stated:

> This argument is overly simplistic. Assuming the Banks did not obtain separate financial statements for each subsidiary, they nonetheless obtained detailed information about each subsidiary guarantor from Owens Corning, including information about that subsidiary's assets and debt. Moreover, the Banks knew a great deal about these subsidiaries.... Even assuming the Plan Proponents could prove prepetition disregard of Debtors' corporate forms, *we cannot conceive of a justification for imposing the rule that a creditor must obtain financial statements from a debtor in order to rely reasonably on the separateness of that debtor.* Creditors are free to employ whatever metrics they believe appropriate in deciding whether to extend credit free of court oversight.

*In re Owens Corning,* 419 F.3d 195, 214 (3d Cir.2005) (emphasis added). Although *Owens Corning* involved a question of substantive consolidation, the reasoning is applicable to this case. Daiwa had a contractual agreement with MMA Funding, LLC that required separate financial statements but did not enforce that agreement. That choice was its to make dependent on the information it needed in extending credit. Daiwa's failure to enforce that requirement should not, by itself, destroy the separateness of a validly composed corporate entity. MMA Funding, LLC's failure to observe its agreements with Daiwa may have given rise to a breach of contract claim but ordinarily will not give rise to

"alter ego" liability. *See U.S. v. Alfred L. Wolff GmbH,* 2011 WL 4471383, at *5 (N.D.Ill.2011).

**Evidence Regarding MMA Funding, LLC's Purpose**

LaSalle contends that MMA Funding, LLC was organized as a special purpose entity and that there is no evidence that MMA Funding, LLC ever strayed from its single purpose: to purchase the Receivables and to be borrower on the MMA Funding, LLC Loan. MMA Funding, LLC's Articles of Organization provides that its sole and exclusive business would be:

> To accept accounts receivable from members, to administer the servicing, collection and distribution of proceeds of the receivables, and to do such other acts and things incidental to the foregoing single purpose.

(New Jt. Ex. 53) Furthermore, Article III of MMA Funding, LLC's Operating Agreement provides that the sole and exclusive business would be:

> To accept contributions from Members of Receivables (as defined in the loan agreement), to administer the servicing, collection and distribution of proceeds of the Receivables (in accordance with restrictions set forth in the Receivables Contribution Agreement and the Loan Agreement), to borrow money in accordance with the Loan Agreement and to take any and all actions in furtherance of or incidental to any of the foregoing, including without limitation entering into the Receivables Contribution Agreement and the Loan Agreement and all transactions contemplated thereby.

(New Jt. Ex. 54)

 To determine whether MMA Funding, LLC was a "legitimate" bankruptcy remote entity, the limited, special

purpose function of the entity must be evaluated. As observed in the *Initial Opinion*, MMA Funding, LLC was not organized to function in a traditional business sense, *i.e.*, it was not "making widgets." 360 B.R. 787, 852 (Bankr.N.D.Ill. 2007). The Trustee cannot meet his burden to show that MMA Funding, LLC engaged in activity it was never designed to conduct.

Furthermore, MMA Funding, LLC was organized to comply with other BRE attributes. The entity's only creditor was Daiwa to limit the possibility of an involuntary bankruptcy filing. In addition, MMA Funding, LLC was structured, from an organizational standpoint, to require that its manager, MMA Funding, Inc. approve any voluntary bankruptcy. Such approval necessitated unanimous written approval of all of its directors, including the duly appointed "independent manager" Fred Scher. (New Jt. Ex. 31) The independent director provided a check on Desnick's control over MMA Funding, LLC by limiting his power to initiate a voluntary bankruptcy petition. Because MMA Funding, LLC was structured to minimize the risks that it would become a debtor in a bankruptcy case it was in fact a BRE. That fact does not fully answer the question presented here because, as LaSalle acknowledges, it does not logically or "legally follow" that a corporate entity that is successfully designed to be bankruptcy remote is in fact separate from its owner or affiliated entities. (Def.'s Post–Trial Brief on Non–Solvency Issues 40)

However, LaSalle contends that by virtue of its limited and discrete purpose and function, and the fact MMA Funding, LLC could not file a voluntary bankruptcy petition without the unanimous approval of the Board of Directors of MMA Funding, Inc., including approval of the Independent Director of MMA Funding, Inc., MMA Funding, LLC was a special purpose, bankruptcy remote entity.

LaSalle readily admits that a BRE is not completely "bankruptcy proof." As Szilagyi testified at Remand Trial, there is no absolute prohibition on the filing of a bankruptcy case; rather, there is a specified corporate governance process under which such an entity must obtain authority to commence a bankruptcy case. Furthermore, the board of directors of a BRE must still adhere to their fiduciary duties (12 Tr. Vol. VII: 1009–1011)

*Defendant's Expert on Securitization*

At the Remand Trial, LaSalle attempted to offer Craig A. Wolson as a "teaching expert" under Fed. R. Evidence 702. That attempt was denied and Wolson's testimony was not allowed and his report was not admitted into evidence. (12 Tr. Vol. VI: 797) However, LaSalle was permitted to adopt Wolson's report as argument, which it has done. (*Id.* at 792) In his report, Wolson said that:

A "bankruptcy remote" entity is one that is designed to have a "remote" chance of becoming a debtor in bankruptcy, either by a voluntary bankruptcy filing by the SPE itself or by an involuntary bankruptcy filing initiated by creditors. Despite this premise, however, the SPE is not "bankruptcy proof." The SPE remains at risk of being a debtor in a bankruptcy proceeding if the SPE's assets perform poorly and it defaults on the loans with its lender. If the lender were to seek to enforce its rights against the SPE and its assets (the lender's collateral), the SPE may have reason to file a voluntary bankruptcy proceeding. Likewise, the lender could seek to initiate an involuntary bankruptcy against the SPE. The SPE is additionally structured to minimize the risk that, if the Originator parent were to become a debtor in bankruptcy, the bankruptcy

court having jurisdiction over the Originator parent would use the court's power to consolidate substantively the assets and liabilities of the SPE with those of the Originator parent.

(Def.'s Post–Trial Brief on Non–Solvency Issues, Ex. 1 thereto ¶ 2.6)

Wolson also observed:

In order to effectuate the "bankruptcy remote" structure, the activities of the SPE typically are limited to (a) owning the receivables, (b) borrowing specifically limited to the relevant transaction and (c) taking action's consistent with the two preceding activities. Specific provisions in the organization documents and loan documents typically prohibit. . . .

(*Id.* at ¶ 2.7)

It cannot be assumed that transaction participants seek bankruptcy remoteness for nefarious purposes. Nor does it circumvent public policy permitting persons and entities to avail themselves of the protection of the Bankruptcy Code when necessary. Rather bankruptcy-remoteness is sought because "the bankruptcy process can involve risks to a secure lender, even when its liens and security interest in the assets of its borrower are properly perfected and non-avoidable ... By minimizing these risks through a 'bankruptcy remote' structure, the lender can provide lower-cost loans to the SPE." (*Id.* at ¶ 2.8)

LaSalle's lay expert Soleimani ran the Healthcare Finance Group for Daiwa America for the duration of the Daiwa Loan. (New Def. Ex. 141, at 14) Soleimani testified to various aspects of structured finance transactions involving healthcare receivables. He explained that healthcare securitization transactions involve either so-called "one tier" or "two-tiered" transactions. (New Def. Ex. 141, at 14) Both types involve a transfer of assets that separates those assets from the healthcare provider, and also from the credit risk of the healthcare provider. (*Id.* at 18) Both types of transactions provide a lower cost of financing relative to a straight loan to the healthcare provider. (*Id.*) Soleimani explained that in "one-tiered" transactions, the financing entity buys the receivables directly from the healthcare provider. (*Id.* at 14) In "two-tier" transactions, a hospital or other healthcare provider sets up a wholly owned special purpose entity ("SPE") and then transfers its receivables to that special purpose entity. (*Id.* at 15–16) After the special purpose entity was created, the financing source would loan money to that entity secured by receivables generated by the provider and transferred to the special purpose entity. (*Id.*)

Soleimani further testified that in transactions involving a "true sale," the transaction consists of the healthcare provider actually selling its receivables to the SPE and getting paid for it. (*Id.* at 30) In transactions involving a "true contribution," however, the provider contributes its receivables to the capital of the SPE and receives the equity interest in the SPE in lieu of a cash payment. (*Id.*) In a true contribution, the value of the SPE increases as a result of that contribution and then the healthcare provider, as owner of the SPE, can receive a distribution from the SPE. (*Id.* at 47–49) Soleimani further testified when dealing with providers in the State of Illinois, Daiwa and their lawyers organized the transactions to be true contributions rather than true sales, to comply with Illinois law governing the transfer of healthcare receivables. (*Id.* at 24–25)

**Evidence That MMA Funding, LLC Was a Duly Formed Corporate Entity Under Illinois Law**

MMA Funding, LLC was established on March 25, 1997 as a limited liability company under Illinois law. (New. Jt. Exs. 53, 55) MMA Funding, LLC was managed by

MMA Funding, Inc., which was likewise established as a corporation under Illinois law. (New Jt. Exs. 29, 54) Desnick was the president of MMA Funding, Inc. (New Jt. Ex. 33), and he signed the Contribution Agreement, the MMA Funding, LLC Loan Agreement and the Depository Agreement on March 31, 1997 in his capacity as the President of the manager of MMA Funding, LLC. (New Jt. Exs. 2, 3, 4) MMA Funding, LLC was owned 99% by the Hospital and 1% by Medical Management. A stock certificate was issued in the name of Desnick as owner of MMA Funding, Inc. (New Jt. Ex. 35).

At the Remand Trial, counsel for the Trustee conceded that MMA Funding, LLC complied with the formal requirements under Illinois law for corporate entities. (12 Tr. Vol. VIII: 1105) That concession was consistent with the Trustee's statement in his reply in support of his summary judgment motion (02 A 00363, Dkt. No. 823) that "acknowledg[ed] that MMA Funding, on or about March 31, 1997, took all appropriate steps necessary to be recognized as an entity under Illinois law. It existed." (*Id.* at 9) Indeed, in the Trustee's response to Defendant's Statement of Additional Facts the Trustee stated that he did not contest (1) that the Hospital was a Subchapter S Illinois corporation (02 A 00363, Dkt. No. 821, at 2 ¶ 2), or (2) that MMA Funding, LLC was an Illinois limited liability corporation that filed its Articles of Organization with the Illinois Secretary of State on March 25, 1997. (*Id.* at 3 ¶ 6)

It's only creditor was Daiwa, which ensured that MMA Funding, LLC had no other creditors that could initiate an involuntary bankruptcy. LaSalle also maintains that MMA Funding, LLC was structured in such a way that a voluntary bankruptcy filing required approval by its manager, MMA Funding, Inc. The bylaws of MMA Funding, Inc. further prohibited it from initiating a voluntary bankruptcy case on behalf of MMA Funding, LLC unless such action was authorized in advance by the unanimous written approval of all of its directors, including its duly appointed "independent director," Fred Scher. (New Jt. Ex. 31; New Jt. Ex. 33–34, 36, 43–45, 47) According to LaSalle, this helped to ensure that MMA Funding, LLC would not file a voluntary bankruptcy case solely because Desnick, to the other director of MMA Funding, Inc., wanted it to.

**Evidence Regarding Transfer of Receivables**

The Remand Opinion stated that MMA Funding, LLC "did not purchase the receivables for any price (at least, if it did, the record does not show what that price was)." 619 F.3d at 696. The Trustee further contends that MMA Funding, LLC never purchased or received any accounts receivable from the Hospital, citing the following evidence: (i) the receivables were consistently shown on the Hospital's audited financial statements as assets of the Hospital; (ii) the audited financial statements never showed any contributions of receivables to MMA Funding; (iii) the audited financial statements also showed the Daiwa Loan as a loan to the Hospital; and (iv) Phillip Robinson, the CFO of Medical Management of America, Inc. testified that he never saw any indication that the Hospital contributed its receivables to MMA Funding, LLC or that the entity ever received borrowings from Daiwa. (New Def. Ex. ¶¶ 92, 93; Jt Ex. 202 ¶¶ 63, 64, 66; 06 Tr. Vol. I: 104–05, 107; New Pl. Ex. 41, at 11, 28–32, 31–34, 42–43, 52–53)

Robinson also admitted that the Borrowing Base Certificates could be interpreted as confirming MMA Funding, LLC's receipt of receivables from the Hospital. (New Def. Ex. 141, at 226–27) Indeed, over

500 Borrowing Base Certificates evidence MMA Funding, LLC's receipt and control of receivables from the Hospital. The transfer of receivables was effected through the Contribution Agreement, which provided for ongoing transfers, and MMA Funding, LLC's receipt of receivables is evidenced by the Advance Requests and Borrowing Base Certificates. Furthermore, MMA Funding, LLC gave written notice to over one hundred obligors that the receivables had been transferred (and would continue to be transferred) to MMA Funding, LLC. (New Def. Ex. 82 ¶ 101) In those written notices, the Hospital instructed obligors to wire payments to account No. 67000110129 at Grand National Bank. (New Jt. Ex. 19) At all times between March 31, 1997 and the petition date, cash originating from Medicare and Medicaid receivables was paid into that account. (New Def. Ex. 82 ¶¶ 162, 165, 196) In other words, the flow of payment on the receivables functioned exactly as it was supposed to in light of the transfer of receivables to MMA Funding, LLC.

In addition, a balance sheet prepared in connection with the closing of the Daiwa Loan showed MMA Funding, LLC's assets and liabilities. Those assets included the value of the receivables available. (New Jt. Ex. 20) In addition, a closing statement shows that proceeds of the Daiwa Loan were wired to MMA Funding, LLC's bank account at Grand National Bank. (New Jt. Ex. 22)

Indeed, there is ample evidence in the record that MMA Funding, LLC purchased the receivables from the Hospital.

**Daiwa Would Not Have Made the Loan Without Assurance that MMA Funding, LLC Was a Legitimate Bankruptcy Remote Entity**

The loan was commercially reasonable in that the lender required use of a special purpose entity before making a loan involving the Hospital showing some sign of distress.

Daiwa's employees Soleimani and Hyams testified that Daiwa would not have made a loan directly to the Hospital. (New Def. Ex. 142, at 50–51; New Def. Ex. 141, at 40) Daiwa required that MMA Funding, LLC be a special purpose "bankruptcy remote" entity. (New Def. Ex. 141, at 40–41) In exchange, the Hospital obtained indirect access to a loan from Daiwa at a lower interest rate. (*Id.* at 18) Gregg Szilagyi of Shefsky & Froelich prepared the opinion of counsel letter. Szilagyi's testimony at the Remand Trial demonstrated the process of preparing the Shefsky & Froelich Opinion and the delivery of said opinion to Daiwa as a condition precedent to closing the Daiwa Loan. (12 Tr. Vol. VII: 1030–31) That testimony was allowed on that basis and the Shefsky & Froelich Opinion was admitted as a joint exhibit. (*Id.* at 1031; New Jt. Ex. 12) An BRE's status as an independent economic unit is the entire basis on which the lender chooses to extend credit. There is good reason to avoid judicial disruption of commercial transactions based on a balancing of factors susceptible to subjective interpretation. As noted by one securitization expert, "[d]iscretion would undermine the securitization market. Some degree of certainty is essential for the market's functioning . . . ." *Securitization Post–Enron, supra* at 1545.

 The Initial Opinion and the District Judge's subsequent affirmation of that Opinion each placed heavy emphasis on the parties intent in participating in the Daiwa Loan. As stated in the Initial Opinion, MMA Funding, LLC was created for a specific purpose and had a specific reason to exist separately from the Hospital. Daiwa relied on that separateness. The transaction documents involved were folly

integrated unambiguous documents. Under Illinois law, where contract terms are un-ambiguous they are to be given their clear and natural meaning. *Modern Steel Treating Co. v. Liquid Carbonic Industrial/Medical Corp.*, 298 Ill.App.3d 349, 232 Ill.Dec. 619, 698 N.E.2d 710, 712 (1998).

Finally, the U.C.C. financing statements filed by both the Hospital and MMA Funding, LLC provided notice to all creditors that MMA Funding, LLC was a separate entity and that the Hospital had transferred its receivables to it.

### CONCLUSION ON BANKRUPTCY REMOTE ENTITY ISSUES

The Memorandum Opinion issued in connection with the Trustee's Motion for Summary Judgment left for trial the issue of whether MMA Funding, LLC was "operationally distinct" from the Hospital and the sale in issue was indeed a true sale. The conclusion is made from the weight of evidence showing that MMA Funding, LLC was separate from the Hospital despite not complying with some corporate formalities. Whether an entity is "operationally distinct" must be considered in light of all evidence as to the entity's purpose as well as function. MMA Funding, LLC's sole purpose was to buy and hold the Hospital's receivables. The parties to the transaction bargained for this limited purpose for their own economic reasons. The Trustee has not shown that MMA Funding, LLC did not generally function in the way it was supposed to.

For reasons stated above, it is held that the Trustee has not met his burden to establish that MMA Funding, LLC was not separate from the Hospital or that no "true sale" of the Hospital's Receivables occurred.

### FINAL CONCLUSIONS TO FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to the Findings of Fact and Conclusions of Law, the original judgment in this proceeding will be vacated and a new separate judgment will be entered adjudging the issues as follows:

On Count VIII, brought pursuant to the Illinois Uniform Fraudulent Transfer Act, judgment for Defendant, the request for relief having been "waived" by Plaintiff, that Count will be dismissed with prejudice.

On Count IX, brought pursuant to the Illinois Uniform Fraudulent Transfer Act, judgment will be entered for Defendant, Plaintiff having been unable to establish either (i) that the Hospital was insolvent before September 30, 1999 or (ii) that Lease payments to Defendant were made with the Hospital's property.

On count X, brought pursuant to 11 U.S.C. § 548, judgment for Defendant, Plaintiff having been unable to establish (i) that the Hospital was insolvent before September 30, 1999 and (ii) that Lease payments to Defendant were made with the Hospital's property.

### EXHIBIT A